Naomi A. Igra, SBN 269095
naomi.igra@sidley.com
S. Patrick Kelly, SBN 275031
patrick.kelly@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400
Facsimile: +1 415 772 7400

Douglas A. Axel, SBN 173814
daxel@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Sabrineh Ardalan (*pro hac vice* forthcoming)
sardalan@law.harvard.edu
Sameer Ahmed, SBN 319609
sahmed@law.harvard.edu
Zachary Albun (*pro hac vice* forthcoming)
zalbun@law.harvard.edu
Deborah Anker (*pro hac vice* forthcoming)
danker@law.harvard.edu
Nancy Kelly (*pro hac vice* forthcoming)
nkelly@law.harvard.edu
John Willshire Carrera (*pro hac vice* forthcoming)
jwillshire@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE
CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone: +1 617 384 7504
Facsimile: +1 617 495 8595

*Attorneys for Plaintiff*
*Additional Counsel on next page*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO

| | |
|---|---|
| PANGEA LEGAL SERVICES; DOLORES STREET COMMUNITY SERVICES, INC.; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; and CAPITAL AREA IMMIGRANTS' RIGHTS COALITION,<br><br>           Plaintiffs,<br><br>           v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY;<br>CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*;<br>KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary for the Department of Homeland Security;*<br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES;<br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;<br>TONY H. PHAM, *under the title of Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement;*<br>U.S. CUSTOMS AND BORDER PROTECTION; | Case No. 20-cv- _____<br><br>Hon. _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**ADMINISTRATIVE PROCEDURE ACT CASE** |

1  MARK A. MORGAN, *under the title of Senior
   Official Performing the Duties of the*
2  *Commissioner of U.S. Customs and Border
   Protection*;
3  U.S. DEPARTMENT OF JUSTICE;
   WILLIAM P. BARR, *under the title of U.S.*
4  *Attorney General*;
   EXECUTIVE OFFICE FOR IMMIGRATION
5  REVIEW; and
   JAMES MCHENRY, *under the title of Director
6  of the Executive Office for Immigration Review*,

7              Defendants.

8

9  Ben Schwarz (*pro hac vice* forthcoming)          Jamie Crook, SBN 245757
   bschwarz@sidley.com                               crookjamie@uchastings.edu
10 SIDLEY AUSTIN LLP                                 Annie Daher, SBN 294266
   60 State Street, 36th Floor                       daherannie@uchastings.edu
11 Boston, MA 02109                                  Blaine Bookey, SBN 267596
   Telephone:  +1 617 223 0300                       bookeybl@uchastings.edu
12 Facsimile:  +1 617 223 0301                       Karen Musalo, SBN 106882
                                                     musalok@uchastings.edu
13 Brian C. Earl  (*pro hac vice* forthcoming)       CENTER FOR GENDER & REFUGEE
   bearl@sidley.com                                  STUDIES
14 SIDLEY AUSTIN LLP                                 UC HASTINGS COLLEGE OF THE LAW
   787 Seventh Avenue                                200 McAllister Street
15 New York, NY 10019                                San Francisco, CA 94102
   Telephone:  +1 212 839 5300                       Telephone: +1 415 565 4877
16 Facsimile:  +1 212 839 5599                       Facsimile: +1 415 581 8824

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

**INTRODUCTION**

1.      This action challenges a sweeping final rule that transforms the asylum process and effectively prevents most applicants from establishing claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), *Procedure for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80274 (Dec. 11, 2020) (the "Omnibus Asylum Rule"[1] or "the Rule").[2] If allowed to go into effect on January 11, 2021, the Rule will devastate the asylum system, plaintiff organizations, and the vulnerable populations they serve.

2.      The Department of Homeland Security ("DHS") and the Department of Justice ("DOJ") (together, "Agencies" or "Defendants"), rushed to promulgate the Rule in the waning hours of the Trump Administration. Defendants gave the public only 30 days to comment on a Rule that effects multiple wide-ranging changes to the asylum system and upends asylum law as it has developed over the last forty years. The Rule flies in the face of decisions by immigration adjudicators and Article III courts requiring asylum rules to be consistent with the humanitarian purpose of the Refugee Act of 1980, which incorporated the 1967 Protocol to the Refugee Convention into U.S. law. The Refugee Act established an asylum system consistent with international obligations to prevent *refoulement*—the return of refugees to persecution—and to provide a pathway for refugees to seek permanent residence and family reunification in the United States. At its core, the Rule is contrary to law because it so narrows the availability of asylum and related protections that the United States will cease to provide humanitarian protections required under the Refugee Act and under the CAT.

3.      The Rule effects numerous substantive and procedural changes to the asylum system that violate the Administrative Procedure Act ("APA") because they are contrary to law, in excess of the Agencies' authority, arbitrary and capricious, and violate the United States' treaty obligations and the Constitution.

---

[1] The Rule affects withholding of removal and protection under the CAT as well as asylum, but for ease of reference, Plaintiffs' references to "asylum" may include all three forms of protection.
[2] Plaintiffs also challenge the implementation of the Rule through a related policy memorandum, and revisions to the Form I-589 Application for Asylum and for Withholding of Removal and the instructions for its use. *See* ¶¶ 52–53, *infra*.

4.    *First*, the Rule establishes new *de facto* bars to asylum eligibility by requiring that adjudicators "will not" exercise discretion in favor of an asylum applicant if any of nine factors apply, except in "extraordinary circumstances." 85 Fed. Reg. at 80282. The Rule also adds three "significant adverse discretionary factors," including whether the asylum seeker entered the United States unlawfully. *Id.* These factors severely restrict the adjudicator's ability to consider the totality of circumstances on a case-by-case basis, as decades of asylum law requires.[3] The Rule thus flouts federal court decisions holding that Defendants' similar recent attempts to restrict asylum eligibility are unlawful, including a decision granting a preliminary injunction to these plaintiffs in *Pangea Legal Servs. v. DHS*, 20-CV-07721-SI, 2020 WL 6802474 (N.D. Cal. Nov. 19, 2020) ("*Pangea I*").

5.    The Rule's *de facto* bars depart dramatically from the principle that "[t]he danger of persecution should generally outweigh all but the most egregious of adverse factors." *EBSC II,* 950 F.3d at 1274 (quoting *Matter of Pula*, 19 I. & N. Dec. at 474). Absent extraordinary circumstances, the Rule would deny asylum to an applicant who has already proven that she qualifies for asylum if, for example, she:

- failed to file a tax return, regardless of the reason for the failure;
- failed to report any income that would generate tax liability;
- had any outstanding tax obligation, regardless of the amount in arrears;
- spent more than 14 days in any one country while en route to the United States;
- was unlawfully in the United States for more than a year cumulatively, even if changed circumstances or extraordinary circumstances justify the delay in applying for asylum;
- withdrew or abandoned a previous asylum application; or
- missed her asylum interview, even if it was for good cause, unless she can demonstrate by a preponderance of evidence the existence of exceptional circumstances.[4]

---

[3] *See E. Bay Sanctuary Covenant v. Barr*, 950 F.3d 1242, 1274 (9th Cir. 2020) ("EBSC II") (asylum review requires a "totality of the circumstances" approach) (quoting *Matter of Pula*, 19 I. & N. Dec. 467, 473–74 (BIA 1987), *superseded by statute on other grounds by Godoy v. Holder*, 434 Fed. App'x 634 (9th Cir. 2011)).

[4] 85 Fed. Reg. at 80282.

6.      Courts have already rejected similar bars as contrary to the Refugee Act. For example, the Rule's *de facto* bar based on a refugee's prior fourteen-day sojourn in another country is unlawful under *East Bay Sanctuary Covenant v. Barr*, which struck down a similar bar based on the "countries through which the alien transited en route to the United States." 964 F.3d 832, 847 (9th Cir. 2020) ("*EBSC III*"). And by the same reasoning the Ninth Circuit applied in that case, all of the Rule's *de facto* bars are contrary to law because they effectively preclude asylum for those with *bona fide* claims, and could return refugees to persecution for trivial misconduct, contrary to the text and purpose of the Refugee Act.

7.      *Second*, the Rule unlawfully expands the "firm resettlement" bar, 85 Fed. Reg. at 80282, which precludes asylum for those "firmly resettled in another country prior to arriving in the United States." 8 U.S.C. § 1158(b)(2)(A)(vi). Federal courts of appeals have long understood "firm resettlement" to be akin to an offer of permanent resident status. Yet the Rule would consider an applicant firmly resettled after just one year in another country, even if the applicant had no offer or path to permanent residence there. 85 Fed. Reg. at 80283. These and other changes that expand the firm resettlement bar could preclude asylum for applicants who reside in other countries on an unstable or temporary basis, contrary to the text of the Immigration and Nationality Act ("INA").

8.      *Third*, the Rule unlawfully requires an immigration judge to "pretermit" an asylum application if he determines that the application does not state a *prima facie* claim for relief on the asylum application form. 85 Fed. Reg. at 80280. Pretermission effectively denies applicants their right to a full examination of their claims. The Rule's pretermission provisions are thus directly contrary to provisions of the INA that require an immigration judge to "administer oaths, receive evidence, and interrogate, examine, and cross-examine the [applicant] and any witnesses," 8 U.S.C. § 1229a(b)(1), and provide that applicants "shall have a reasonable opportunity to examine evidence against [her], to present evidence on [her] own behalf, and to cross-examine witnesses presented by the Government." *Id.* § 1129a(b)(4)(B). Pretermission also violates the Due Process Clause by denying asylum applicants their right to fair proceedings and an opportunity to develop their claims. As part of that full and fair hearing, "where applicants appear without counsel," immigration judges

must "fully develop the record." *Jacinto v. INS*, 208 F.3d 725, 734 (9th Cir. 2000). The Rule's pretermission provision effects the opposite result.

9.    *Fourth*, the Rule radically redefines a "frivolous" filing with potentially grave consequences for asylum applicants. *See* 85 Fed. Reg. at 80286–87. 8 U.S.C. § 1158(d)(6) provides that one who "knowingly" makes a frivolous application for asylum is "permanently ineligible for any benefits" under the Act. 8 U.S.C. § 1156(d)(6). Because a finding of frivolousness is a "veritable death sentence of immigration proceedings,"[5] the current system builds in substantive and procedural protections for applicants, consistent with their right to due process.

10.    The Rule would arbitrarily jettison those fundamental protections and deny applicants a full and fair opportunity to prove their claim before an immigration judge could deem their application frivolous, while vastly expanding the circumstances in which an application may be deemed frivolous. 85 Fed. Reg. at 80296–302. For example, the Rule defines a frivolous claim as including one "clearly foreclosed by applicable law," 85 Fed. Reg. at 80279. This new definition threatens to sweep in good faith claims made by *pro se* applicants against a complex and ever-shifting legal backdrop and even by those who are represented where the Agencies change longstanding asylum rules on a near-daily basis. This is particularly true in light of the multiple intersecting new rules Defendants have promulgated in recent days and months.[6] Numerous commenters raised concerns about how the Rule's redefinition of frivolous claims departs from well-established principles and threatens draconian consequences flowing from vague standards. The Agencies' failure to address this serious problem with the Rule renders the redefinition of "frivolous" arbitrary and capricious, and inconsistent with the purpose of the INA's asylum provisions.

11.    *Fifth*, the Rule redefines core statutory terms in ways that drastically restrict who would be a "refugee" under the INA. The Rule's new definitions run contrary to the purpose of the INA and long-standing statutory interpretation by both immigration adjudicators and Article III courts. For example, the INA offers protection for those persecuted based on "political opinion." 85

[5] *Yousif v. Lynch*, 796 F.3d 622, 627 (6th Cir. 2015).
[6] *Casa de Md., Inc. v. Wolf*, No. 8:20-CV-02118-PX, 2020 WL 5500165, at *26 (D. Md. Sept. 11, 2020).

Fed. Reg. at 80280. That phrase has long been broadly construed to effect the humanitarian purpose of asylum.[7] But the Rule explicitly narrows the definition of a "political opinion" to "an ideal or conviction in support of the furtherance of a discrete cause related to political control of a state or a unit thereof." *Id.* This new definition contravenes the INA by arbitrarily precluding asylum for applicants who are persecuted on account of other widely-recognized political opinions.[8]

12.    The redefinition of "political opinion" is just one of the Rule's many new restrictive definitions. The Rule redefines nearly all of the most critical statutory terms, including "particular social group," 85 Fed. Reg. at 80280, and "persecution," *id.* at 80326. The Rule also redefines the "nexus" element of an asylum claim by requiring the *de facto* categorical rejection of certain claims contrary to long-standing precedent requiring case-by-case, individualized determinations.[9] As to these and other redefined terms, the Rule arbitrarily upends decades of precedent, and restricts the meaning of the term "refugee" so dramatically as to defeat the purpose of the INA's asylum provisions.

13.    These and numerous other unlawful provisions are not the only problems with the Rule. The Rule is also procedurally invalid because it was proposed and issued pursuant to the purported authority of Chad Wolf, notwithstanding multiple court rulings that he is wielding power without lawful authority under the Homeland Security Act ("HSA"), the Federal Vacancies Reform Act ("FVRA"), and the Appointments Clause of the United States Constitution.[10] The Agencies

---

[7] *See, e.g.*, *Borja v. INS*, 175 F.3d 732 (9th Cir. 1999) (en banc) (finding refusal to join insurgent political movement constituted political opinion), *superseded by statute on other grounds as stated by Parussimova v. Mukasey*, 555 F.3d 734, 739–40 (9th Cir. 2009); *Grava v. INS*, 205 F.3d 1177, 1181 (9th Cir. 2000) (finding whistleblower exposing government corruption could be eligible for asylum based on political opinion though he did not "concomitantly espouse political theory"); *Perez-Ramirez v. Holder*, 648 F.3d 953, 958 (9th Cir. 2011), (finding persecution on account of political opinion where employee of government agency was kidnapped and beaten after escalating evidence of corruption to supervisor and refusing to participate in corruption), *overruled on other grounds by Maldonado v. Lynch*, 786 F.3d 1155 (9th Cir. 2015); *Yan Xia Zhu v. Mukasey*, 537 F.3d 1034, 1045 (9th Cir. 2008) (finding persecution on account of political opinion where rape victim wrote to town government complaining of government protection of her rapist.)

[8] *See supra* n.7 (citing cases).

[9] *See, e.g.*, *Navas v. INS*, 217 F.3d 646, 657 (9th Cir. 2000) ("In some cases, the factual circumstances alone may provide sufficient reason to conclude acts of persecution were committed on account of . . . one of the . . . protected grounds . . . where there appears to be no other logical reason for the persecution at issue." (internal citations omitted)).

[10] *See, e.g.*, *Immigrant Legal Res. Ctr. v. Wolf*, 20-CV-05883-JSW, 2020 WL 5798269, at *1 (N.D. Cal. Sept. 29, 2020); *Casa de Md., Inc.*, 2020 WL 5500165, at *23; *N.W. Immig. Rights Project v.*

themselves acknowledge that the DHS and DOJ components of this Rule are "inextricably intertwined," 85 Fed. Reg. at 80286, so they cannot escape the consequences of Mr. Wolf's unlawful exercise of authority. The Court should set aside the entire Rule for this reason alone.

14.    The Rule was also effectively fast-tracked despite its enormous scope, fundamental flaws, and intersection with multiple other rules. Commenters were allowed just 30 days to comment on a proposed rule that spanned 43 pages in the federal register and changed more than 30 sections of the Code of Federal Regulations that pertain to asylum, withholding of removal, and CAT protection. 85 Fed. Reg. at 36264–306 (June 15, 2020). The Agencies promulgated the Rule as a component of an unlawfully staggered rulemaking process that involves numerous overlapping and intersecting rules proposed in a short period of time. Within the last six months, DHS has issued multiple new rules that address asylum eligibility and processing. For this Rule alone, the Agencies received almost 89,000 comments. The Agencies recognize that the Rule is "significant regulatory action," 85 Fed. Reg. at 80377, yet it submitted the Rule to the Office of Information and Regulatory Affairs ("OIRA") just three months after the proposal. The final Rule made "few substantive changes," *id.* at 80274, over the proposal despite the serious problems with the Rule commenters identified. Defendants achieved such speed by disregarding substantive comments, including a comment letter submitted by 22 state Attorneys General detailing the Rule's harm to statewide public interests;[11] Defendants did not even mention receiving that letter in the final Rule. The Agencies' process does not come close to satisfying basic requirements of the APA.

15.    For these and other reasons discussed below, the Rule cannot stand. It effectively dismantles the asylum system Congress erected to protect refugees from *refoulement* and establish a pathway to permanent residency and family reunification in the United States. Many provisions of the Rule are clearly targeted at denying protection to Central and South Americans and other traveling over land to the southern border. The Rule as a whole is thus inconsistent with the Refugee

*U.S. Citizenship and Immig. Servs.*, CV 19-3283 (RDM), 2020 WL 5995206, at *24 (D.D.C. Oct. 8, 2020).

[11] Attorneys General of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington, and the District of Columbia, Comments on Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 36264 (July 15, 2020).

Act. The Rule is substantively and procedurally invalid under the APA, unlawful under the HSA, FVRA, and Appointments Clause, and unconstitutional under the Due Process Clause of the U.S. Constitution, and must be set aside.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under the Constitution and federal statutes, including the INA, 8 U.S.C. § 1101 et seq., and the APA, 5 U.S.C. § 551 et seq. This Court also has subject matter jurisdiction under 5 U.S.C. § 702. Additionally, the Court has remedial authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–202.

17.     Defendants' publication of the final Rule in the Federal Register on December 11, 2020 constitutes final agency action and is therefore subject to judicial review. 5 U.S.C. §§ 704, 706.

18.     Plaintiffs have standing to challenge the Rule under 5 U.S.C. § 702 because they have been and will be injured by the Rule's operation. Plaintiffs are also within the zone of interest of the INA, which establishes asylum eligibility requirements. *See, e.g., EBSC II*, 950 F.3d at 1270; *La Clinica de la Raza v. Trump*, No. 19-cv-04980-PJH, 2020 WL 4569462, at *9–11 (N.D. Cal. Aug. 7, 2020), *amended and superseded by* 2020 WL 6940934 (Nov. 25, 2020), *reconsideration granted by* 2020 WL 7053313 (Nov. 25, 2020).

19.     Venue is proper in this District because Defendants are officers or employees of the United States or Agencies thereof acting in their official capacity or under color of legal authority, or are federal Agencies of the United States. 28 U.S.C. § 1391(e)(1). Venue is also proper because Plaintiffs Pangea Legal Services and Dolores Street Community Services have their principal place of business in San Francisco, California. Consequently, both reside in this judicial district under 28 U.S.C. § 1391(c)(2).

## PARTIES

20.     Plaintiff Pangea Legal Services ("Pangea") is a non-profit organization based in California's Bay Area with offices in San Francisco and San Jose. Pangea's mission is to stand with immigrant communities and to provide services through direct legal representation. Pangea serves the immigrant community in the Bay Area by providing direct legal services, including filing both

affirmative and defensive asylum applications, engaging in policy advocacy, and providing educational programs aimed at legal empowerment. It is a "small entity" under the Regulatory Flexibility Act ("RFA") because Pangea is a small nonprofit with gross receipts of less than $1.5 million for 2019. The publication and impending effective date of the Rule has required Pangea to divert resources from its core activities to address the impact of the Rule on the communities it serves.

21.     Plaintiff Dolores Street Community Services, Inc. ("DSCS") is a non-profit organization based in San Francisco, California, that provides a variety of services to low-income and immigrant communities in San Francisco, including through its Deportation Defense & Legal Advocacy Program. DSCS's mission is to cultivate collective power among low-income and migrant communities to create a more just society. DSCS serves San Francisco's immigrant community in part by providing direct legal services—including filing both affirmative and defensive asylum applications—and by partnering with other organizations to carry out local and national advocacy. It is a "small entity" under the RFA because DSCS had less than $10 million in revenue in 2019. The publication and impending effective date of the Rule has required DSCS to divert resources from its core activities to address the impact of the Rule on the communities it serves.

22.     Plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") promotes the dignity and protects the rights of immigrants in partnership with its network organizations. CLINIC implements its mission by providing substantive legal and program management training and support for nonprofit organizations within its network, including organizations engaged in completing affirmative and defensive applications for asylum; providing direct representation and legal orientation to asylum seekers; and engaging in advocacy and providing advocacy support to network organizations at state, local, and national levels. CLINIC is the largest charitable legal immigration network in the United States, with almost 400 nonprofit organizations spanning 48 states, including the state of California. Many of its affiliates appear on the List of Pro Bono Legal Service Providers maintained by the Executive Office for Immigration Review ("EOIR") as required by 8 C.F.R. § 1003.61. CLINIC maintains an office with three staff members in Oakland, California, and has staff in a dozen states around the country. It is a "small entity" under the RFA because

CLINIC's revenues for 2019 were just over $10 million. The publication and impending effective date of the Rule has required CLINIC to divert resources from its core activities to address the impact of the Rule on the communities it serves.

23.     Plaintiff Capital Area Immigrants' Rights Coalition ("CAIR Coalition") is a non-profit organization serving the Washington, D.C. region. It appears on the List of Pro Bono Legal Service Providers maintained by the EOIR as required by 8 C.F.R. § 1003.61. CAIR Coalition's mission is to ensure equal justice for all immigrant adults and children at risk of detention and deportation in the Washington, D.C. region and beyond. CAIR Coalition implements its mission by providing direct legal representation to children and adults in immigration proceedings, including representing unaccompanied immigrant children in interviews before the Asylum Office; conducting educational programming, including know your rights presentations and training of attorneys to defend immigrants; and engaging in impact litigation and advocacy on key policy issues. It is a "small entity" under the RFA because CAIR Coalition had 2019 revenues of less than $6 million. The publication and impending effective date of the Rule has required CAIR Coalition to divert resources from its core activities to address the impact of the Rule on the communities it serves.

24.     Defendant DHS is a cabinet-level department that enforces the immigration laws of the United States.

25.     Defendant Chad F. Wolf is purportedly the Acting Secretary of Homeland Security. He is being sued in his official capacity. In this capacity, he directs each of the component Agencies within DHS, including United States Immigration and Customs Enforcement ("ICE"), United States Citizenship and Immigration Services ("USCIS"), and United States Customs and Border Protection ("CBP"). The Secretary of DHS is responsible for the administration and enforcement of immigration laws under 8 U.S.C. § 1103(a).

26.     Defendant Kenneth T. Cuccinelli is the Senior Official Performing the Duties of the Deputy Secretary for DHS and Acting Director of USCIS. He is being sued in his official capacity. Cuccinelli acceded to the post of Acting Director of USCIS pursuant to his appointment as Principal Deputy Director of USCIS by (ostensible) Acting Secretary of Homeland Security Kevin

1    McAleenan in 2019, and McAleenan's corresponding designation of the position as Acting Director
2    of USCIS.
3        27.    Defendant USCIS is the agency within DHS responsible for adjudicating
4    affirmatively filed asylum applications and conducting credible and reasonable fear interviews.
5        28.    Defendant DOJ is a cabinet-level department of the federal government.
6        29.    Defendant William P. Barr is the U.S. Attorney General. He is being sued in his
7    official capacity. Under 8 U.S.C. § 1103(g), the Attorney General is responsible for the
8    administration of immigration law.
9        30.    Defendant EOIR is a sub-agency of DOJ responsible for adjudicating administrative
10   claims concerning federal immigration laws, including asylum applications filed in immigration
11   court.
12       31.    Defendant James McHenry is the Director of EOIR. He is being sued in his official
13   capacity.

14                        **GENERAL ALLEGATIONS**
15   **I.    BACKGROUND**
16       **A.    The Immigration and Nationality Act**
17       32.    Federal law affords several humanitarian protections for noncitizens who fear
18   persecution and violence in their home countries. Congress incorporated international humanitarian
19   principles into U.S. law through the INA, which ensures that asylum and related protections are
20   accessible to asylum seekers who fear returning to their home countries because of the persecution
21   or torture they would endure.
22       33.    The U.S. asylum system was founded on its international obligations under the 1951
23   Convention Relating to the Status of Refugees ("Refugee Convention") and the 1967 United Nations
24   Protocol Relating to the Status of Refugees ("1967 Protocol"). Opened for signature in 1951, the
25   Refugee Convention was designed to avoid the horrors experienced by refugees during World War
26   II. The 1967 Protocol, which the United States ratified in 1968, expanded the Convention's
27   protections, allowing them to be applied universally.
28

34. Congress incorporated the 1967 Protocol into U.S. law with the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102. The Refugee Act amended the INA to include a formal process for people fearing persecution in their home country to apply for asylum. *Id.* § 101(a) (codified at 8 U.S.C. § 1521 Note).

35. The Refugee Act thus codified the United States' longstanding tradition of "welcoming the oppressed of other nations." H.R. Rep. No. 96-781, at 17–18 (1980) (Conf. Rep.). Congress deliberately sought to bring the United States into compliance with its international obligations under the 1967 Protocol and the Refugee Convention. *See* H.R. Rep. No. 96-608, at 17 (1979) (noting that proposed asylum and withholding provisions were designed to "conform[] United States statutory law to our obligations under Article 33 [of the Refugee Convention]"); S. Rep. No. 96-256, at 4 (1979) (same). "Congress imbued these international commitments with the force of law when it enacted the Refugee Act . . . ." *R-S-C- v. Sessions*, 869 F.3d 1176, 1178 (10th Cir. 2017); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987) (explaining that Congress enacted the Refugee Act of 1980 "to bring United States refugee law into conformance with the [1967 Protocol]").

36. Asylum may be granted to a person who has suffered persecution or who has a "well-founded fear of persecution" on account of one of five enumerated protected grounds: "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1)(B); *id.* § 1101(a)(42)(A). Among other requirements, to be eligible for asylum, a person must not fall within any mandatory bars to asylum. Specifically, they must not (i) have participated in the persecution of others; (ii) have been convicted of a "particularly serious crime" that makes them a danger to the United States; (iii) have committed a "serious nonpolitical crime outside the United States;" (iv) represent a danger to the security of the United States; (v) have engaged in "terrorist activity;" or (vi) have resettled in a third country prior to arriving in the United States. *See id.* §§ 1158(b)(2)(A)(i)–(vi).

37. In addition to asylum, U.S. law provides for "withholding of removal," pursuant to which a refugee may not be removed to the particular country where she faces persecution, 8 U.S.C. § 1231(b)(3)(B), and CAT protection against return to a country where she would be in danger of

1    being subjected to torture. Foreign Affairs Reform and Restructuring Act of 1988, *codified as* a note

2    to 8 U.S.C. § 1231; 8 C.F.R. §§ 208.16–18.

3          38.     There are key differences between asylum protection and the two other forms of relief

4    against removal. In particular, unlike asylum, withholding of removal and CAT protection do not

5    provide a pathway to lawful permanent residence and citizenship nor do they provide derivative

6    benefits to immediate family members. *O.A. v. Trump*, 404 F. Supp. 3d 109, 120 (D.D.C. 2019).

7    Additionally, to qualify for asylum, an applicant need only show a *well-founded fear* of persecution,

8    8 U.S.C. § 1101(a)(42); *Cardoza-Fonseca*, 480 U.S. at 440, whereas U.S. courts have held that to

9    qualify for withholding of removal or CAT protection, the applicant must show that it is *more likely*

10   *than not* she would be persecuted "because of" a protected ground or tortured if she were returned to

11   a particular country. 8 U.S.C. § 1231(b)(3); 8 C.F.R. § 208.16(b)(2), (c)(2); *INS v. Stevic*, 467 U.S.

12   407 (1984). Thus, if an applicant establishes a *well-founded fear* of persecution, but the Attorney

13   General declines to grant asylum on discretionary grounds, the applicant could be deported to her

14   country of origin unless she could prove it is *more likely than not* she would be persecuted or

15   tortured there.[12]

16         **B.**     **Basic Asylum Procedure**

17         39.     There are two basic mechanisms through which a noncitizen may initiate an asylum

18   application. *Affirmative* asylum applications, *i.e.*, applications initiated by applicants who are not

19   facing removal proceedings, are administered in the first instance by an asylum officer who is part of

20   the USCIS, an agency within the Department of Homeland Security. *Defensive* asylum applications,

21   *i.e.,* applications that are initiated by applicants facing removal proceedings, as a defense to

22   removability, are adjudicated in a formal proceeding before an immigration judge ("IJ").

23         40.     IJs sit within the EOIR, a sub-agency of the DOJ. Decisions of the IJ may be appealed

24   to the Board of Immigration Appeals ("BIA"), which is also part of EOIR. When an affirmative

25   application is denied by USCIS for a person with status, the decision is final. Where USCIS does not

---

[12] The Supreme Court has defined "well-founded fear" as a 10% chance of harm whereas more likely than not is over 50%, so an applicant disqualified from asylum could be returned to her country even if it is 49% likely she would be persecuted or tortured.

grant an affirmative application for a person without status, the applicant will be referred to immigration court for removal proceedings. In such instances, the asylum application may be renewed as a defense to removal.

41.     For decades, asylum offices, immigration courts, the BIA, and Article III courts have emphasized that asylum adjudication requires an individualized, case-by-case, "totality of the circumstances" approach, in which the adjudicator evaluates "the totality of the circumstances and actions of [a noncitizen] in his flight from the country where he fears persecution, rather than deny asylum outright because of a single procedural flaw in the migrant's application." *EBSC II*, 950 F.3d at 1274 (quoting *Matter of Pula*, 19 I. & N. Dec. at 473–74) (internal quotation marks omitted).

42.     Moreover, in enacting the Refugee Act, Congress rejected categorical restrictions on asylum in favor of individualized, non-discriminatory treatment of claims. Pub. L. No. 96-212, 91 Stat. 102 (1980); *see also Bringas-Rodriguez v. Sessions*, 850 F.3d 1051, 1059–60 (9th Cir. 2017) (en banc) (examining history of Refugee Act leading to "the nondiscriminatory definition of refugee"). The refugee definition includes clear elements—persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion—that must be applied in a neutral, non-discriminatory manner. 8 U.S.C. § 1101(a)(42)(A); *Selgeka v. Carroll*, 184 F.3d 337, 343 (4th Cir. 1999) (holding that the Act "places upon the Attorney General the obligation to establish [a] *single procedure* for asylum claims that apply to all applicants *without distinction*" (emphasis added)).

43.     Once an applicant has established the statutory eligibility requirements for asylum, "the danger of persecution should generally outweigh all but the most egregious factors" in the remaining, narrow discretionary analysis. *Matter of Pula*, 19 I. & N. Dec. at 474. Especially where an individual may be eligible for asylum and cannot establish the more stringent criteria for withholding-of-removal, the discretionary factors should be "carefully evaluated in light of the usually harsh consequences which may befall [a noncitizen]." *Id.*

**C.     The Rulemaking Process**

44.     On or about June 10, 2020, DHS and DOJ issued a Notice of Proposed Rulemaking ("NPRM"), and slated it for publication in the Federal Register on June 15, 2020. The NPRM took

13
COMPLAINT

up 161 pages in a double-spaced PDF document (43 pages in the close-typed Federal Register). The NPRM covers at least 14 distinct aspects, procedural and substantive, of asylum, withholding of removal, and the CAT. The regulations themselves cover more than 60 pages, and include dense technical language and sweeping new restrictions that will send bona fide refugees back to their countries, where they would face persecution and torture.

45.    The NPRM was exceptionally broad in scope, addressing sweeping procedural and substantive asylum issues, some with little connection to others, in the same proposed rule.

46.    The final Rule is almost identical to the NPRM. While there are potentially other ways to distinguish and categorize the regulatory changes effected by the Rule, the following list roughly illustrates its breadth. The Rule would:

- institute an additional nine discretionary factors so adverse that they would amount to *de facto* bars to asylum

- institute three significantly adverse discretionary factors;

- redefine the firm resettlement bar;

- require an IJ in some instances to pretermit applications without a hearing;

- broaden the definition of "knowingly" filing a "frivolous" application;

- institute a new "asylum and withholding only" adjudicative process within EOIR;

- add several additional considerations to USCIS asylum officers' purview during the credible fear screening;

- in credible fear screenings limit consideration of precedent favorable to the applicant to precedent from the local federal circuit court;

- change the standard of proof in credible fear interviews;

- narrow the definitions of particular social group and political opinion;

- narrow the definition of persecution, eliminating a need for adjudicators to consider cumulative harm;

- narrow the prevailing interpretation of nexus;

- revise the requirements for consideration of internal relocation;

- restrict admissibility of certain evidence;

- change the requirements for a showing of torture for protection under CAT;

- and allow disclosure of asylum application information, which has been protected under confidentiality requirements, to certain government personnel.

47.     Each of these provisions is significant enough that each on its own would have warranted an independent notice and opportunity to comment. For example, the twelve new discretionary factors supersede, by the Agencies' own description, the seminal *Matter of Pula* precedent that has prevailed for over thirty years, and erects significant new barriers to asylum in the most common scenarios. 19 I. & N. Dec. at 474; 85 Fed. Reg. at 36285. Each of these discretionary factors—and even subcategories within them—are substantial and distinct enough to warrant independent notice, public comment, and consideration. Instead, the Agencies grouped these and numerous other significant changes into a single Rule and allowed the public only 30 days to comment, even in the midst of the COVID-19 pandemic.

48.     Numerous commenters complained about the abbreviated time frame. For example, Plaintiff CLINIC wrote: "The Administrative Procedures Act (APA) § 553 requires that the public 'interested persons' have 'an opportunity to participate in the rule making.' In general, the Agencies must afford 'interested persons a reasonable and meaningful opportunity to participate in the rulemaking process.'. . . . Executive Order 12866 specifies that 'in most cases [proposed regulations] should include a comment period of not less than 60 days.'. . . . [T]he NPRM . . . is completely silent on why it is only offering 30 days to comment rather than the 60 days required by Executive Order." CLINIC's comment went on to urge the administration to rescind the proposed rule and provide the public at least 60 days to comment.[13]

49.     Although the comment period was shorter than necessary to allow for meaningful public participation, the potential implications of the rule were understood to be so severe that the public submitted almost 89,000 comments, many extensive and supported by voluminous legal and factual research.

---

[13] CLINIC, Public Comment Opposing Proposed Rules on Asylum at 8 (July 15, 2020) ("CLINIC Comment").

50.     Many of these comments noted the impact on small entities, like the plaintiff organizations. Although the Regulatory Flexibility Act ("RFA") requires federal agencies to analyze the effects of their rules on "small entities." 5 U.S.C. §§ 603–604, the Agencies disposed of this requirement by stating that "[the] rule will not have a significant economic impact on a substantial number of small entities." 85 Fed. Reg. at 80383. The Agencies assert, without evidence, that "any costs imposed on attorneys or representatives for asylum seekers will be minimal and limited to the time it will take to become familiar with the rule." *Id*. at 80378. The Agencies assert, without evidence, that becoming familiar with the rule would require "a certain, albeit small, amount of time" and that any time spent would "likely be offset by the future benefits of the rule." *Id*.

51.     The Rule was submitted to the OIRA for final review on October 29, 2020. In other words, the Agencies purport to have reviewed and considered all relevant information in just over three months.

52.     The NPRM was accompanied by revisions to the Form I-589 Application for Asylum and for Withholding of Removal and the instructions to that form. By contrast to the NPRM, the comment period for the revisions to Form I-589 was 60 days. The final revised Form I-589 and instructions were published with the Rule and will take effect at the same time. The revised Form I-589 inserts new questions and expands existing questions. Most notably, the revised Form I-589 includes this new question: "If you are claiming membership in a particular social group(s), identify or describe the particular social group(s), or provide any information that shows your membership in a particular social group(s)." The previous form only required an applicant to check a box if her application was based on membership in a particular social group.[14] The previous form also asked an applicant who had experienced harm "Why you believe the harm or mistreatment or threats occurred." Among other changes, the revised Form I-589 will now ask instead, "Why you believe the harm, mistreatment, or threats occurred. If you are seeking asylum or statutory withholding of removal based on one or more of the protected grounds listed above (race, religion, nationality,

---

[14] The Rule asserts that "asylum applicants have provided definitions of alleged particular social groups in asylum applications for many years." 85 Fed. Reg. at 80317. In fact, the requirement that applicants articulate their particular social group on Form I-589 is a new requirement of the revised form.

political opinion, or membership in a particular social group), you must explain why you believe the harm, mistreatment, or threats you experienced were on account of one or more of the protected grounds."

53.     On December 11, 2020, EOIR issued a Policy Memorandum concerning the Rule. After describing the changes to the regulations, the Policy Memorandum instructs adjudicators that "although the rulemaking itself is not retroactive, nothing in the rule precludes adjudicators from applying existing authority codified by the rule to pending cases, independent of the prospective application of the rule. Accordingly, the statutory authority and case law incorporated into the rule, as reflected in both the NPRM and the final rule, would continue to apply if the rule itself does not go into effect as scheduled." Policy Memorandum at 13 (footnote citations omitted). After noting that courts have enjoined other immigration-related rulemakings, footnote five notes in relevant part, "[t]he rule discussed in this PM will likely be challenged through litigation." *Id.* at 13 n.5. Despite the fact that federal courts have recognized the viability of particular social groups based on gender, the Policy Memorandum also states that "gender" may be appropriately considered as a basis to reject asylum claims under the analysis of "nexus," as provided expressly in the Rule, or under the definition of "particular social group," because the list of exclusions under each new definition in the Rule are non-exhaustive. *Id.* at 7 n.2.

54.     The Rule was published in the Federal Register on December 11, 2020. The Rule's stated purpose is to assert the government's "right and duty to protect its own resources and citizens, while aiding those in true need of protection from harm." 85 Fed. Reg. at 80274. According to the Agencies, the Rule adopted the NPRM with just five substantive changes. *Id.* Although the Rule has an effective date of January 11, 2021, and the preamble asserts that the Rule will apply prospectively to applications for protection filed after the effective date, the revised regulations expressly make only one component prospective only, providing that the definition of "frivolous" will apply to application filed on or after the Rule's effective date. 8 C.F.R. § 208.20(a)(2). Consistent with the Policy Memorandum, the Rule states that "to the extent that the rule changes any existing law, the Departments are electing to make the rule apply prospectively" to applications for protection "filed on or after its effective date." 85 Fed. Reg. at 80380. The Rule continues: "Nevertheless, to the

extent that the rule merely codifies existing law or authority, nothing in the rule precludes

adjudicators from applying that existing authority to pending cases independently of the prospective

application of the rule." *Id*. at 80380-81. The Rule does not include a list of which changes

Defendants will in practice deem to be codifying existing law.

### D.     Recent Executive-Branch Efforts to Curtail Asylum Protection

55.     This Rule is part of a larger effort by the Trump Administration to end asylum

protection and turn refugees away at the border notwithstanding the Refugee Act and decades of

precedent interpreting its scope and purpose. In 2016, then-candidate Trump campaigned on a

platform that denigrated immigration and asylum, particularly immigration from Mexico and from

Central/South America via Mexico. When he announced his presidential bid, he infamously said:

"When Mexico sends its people, they're not sending their best. . . . They're sending people that have

lots of problems, and they're bringing those problems with [*sic*] us. They're bringing drugs. They're

bringing crime. They're rapists. And some, I assume, are good people." *Donald Trump Announces a

Presidential Bid*, Wash. Post (June 16, 2015), https://tinyurl.com/gl6ofm5. Three days later, he

repeated a variation of the same statement on Twitter, writing, "Druggies, drug dealers, rapists and

killers are coming across the southern border. When will the U.S. get smart and stop this travesty?"

President Donald Trump (@realDonaldTrump), Twitter (June 19, 2015, 10:22 PM),

https://tinyurl.com/y7yxpxym.

56.     President Trump has routinely characterized asylum seekers from Central America in

general as gang members. During remarks in Las Vegas in April 2019, Trump called the asylum

system a "scam" and described asylum seekers as "having face tattoos and looking like UFC

fighters." The President proceeded to state that "we don't love the fact that [asylum seekers] are

carrying the flag of Honduras, Guatemala, or El Salvador." *President Trump Mocks Asylum Seekers,

Calls Program a Scam*, *C-SPAN* (April 9, 2019), https://tinyurl.com/y7fry7gf.

57.     President Trump has continued to make similar remarks throughout his presidency.

For example, in 2018, reports circulated that a group of several thousand asylum seekers were

approaching the U.S.-Mexico border seeking refuge. President Trump tweeted about the event

repeatedly over the next several weeks, writing:

- "I am watching the Democrat Party led assault on our country by Guatemala, Honduras and El Salvador, whose leaders are doing little to stop this large flow of people, INCLUDING MANY CRIMINALS, from entering Mexico to U.S....." President Donald Trump (@real-DonaldTrump), Twitter (Oct. 18, 2018, 7:25 AM), https://tinyurl.com/y7ymkoew.

- "Sadly, it looks like Mexico's Police and Military are unable to stop the Caravan heading to the Southern Border of the United States. Criminals and unknown Middle Easterners are mixed in. I have alerted Border Patrol and Military that this is a National Emergy [*sic*]. Must change laws!" President Donald Trump (@realDonaldTrump), Twitter (Oct. 22, 2018, 8:37 AM), https://tinyurl.com/y7dc4ex6.

- "There are a lot of CRIMINALS in the Caravan. We will stop them. Catch and Detain! Judicial Activism, by people who know nothing about security and the safety of our citizens. Not good!" President Donald Trump (@realDonaldTrump), Twitter (Nov. 21, 2018, 4:42 PM), https://tinyurl.com/yap64bfh.

58. Around the same time, President Trump aired a midterm campaign ad that featured footage of an undocumented Mexican immigrant, Luis Bracamontes, bragging about his murder of two police officers in California. The ad juxtaposed footage of Bracamontes with images of the so-called "migrant caravan" of asylum seekers moving toward the United States border—even though Bracamontes had nothing to do with the caravan—and stated: "Dangerous illegal criminals like cop-killer Luis Bracamontes don't care about our laws." Michael M. Grynbaum & Niraj Chokshi, *Even Fox News Stops Running Trump Caravan Ad Criticized as Racist*, N.Y. Times (Nov. 5, 2018), https://tinyurl.com/y87jwehq.

59. President Trump's attempts to paint asylum seekers (particularly those from Central America) as gang members and dangerous people continued into the weeks surrounding the publication of the proposed Rule in 2020. The day the comment period for this Proposed Rule closed, President Trump retweeted a clip of himself highlighting the arrest of purported "criminal illegal aliens." President Donald Trump (@realDonaldTrump), Twitter (July 15, 2020, 12:34 PM).

60. Similarly, during a presidential debate held on October 22, 2020, President Trump described noncitizen children separated from their parents at the U.S. border as having been brought to the United States "through cartels and through coyotes and through gangs." ABC News, *Biden and Trump Discuss Their Views on Immigration Policy*, YouTube (Oct. 22, 2020),

https://www.youtube.com/watch?v=DZ9vIzVZjS4. In criticizing "catch and release" (the practice of allowing asylum seekers to await their immigration hearings in the community rather than detaining them), President Trump further stated, "Catch and release is a disaster. A murderer would come in, a rapist would come in, a very bad person would come in . . . we [would] have to release them into *our* country." *Id.* (emphasis added).

61.     During his presidency, President Trump has repeatedly disparaged the asylum system Congress enacted consistent with its obligations under international law. On November 18, 2018, he tweeted, "Catch and Release is an obsolete term. It is now Catch and Detain. Illegal Immigrants trying to come into the U.S.A., often proudly flying the flag of their nation as they ask for U.S. Asylum, will be detained or turned away. Dems must approve Border Security & Wall NOW!" President Donald Trump (@realDonaldTrump), Twitter (November 18, 2018, 2:55 PM), https://tinyurl.com/ydz8l2us.

62.     But President Trump apparently realized that U.S. law provides for asylum. On April 1, 2019, he tweeted, "Democrats, working with Republicans in Congress, can fix the Asylum and other loopholes quickly. We have a major National Emergency at our Border. GET IT DONE NOW!" President Donald Trump (@realDonaldTrump), Twitter (April 1, 2019 7:20 PM), https://tinyurl.com/y8c5794b. On July 6, 2019, he tweeted in part, "Democrats must change the Loophole &, Asylum Laws - but they probably won't! They want Open Borders, which means massive crime and drugs!" President Donald Trump (@realDonaldTrump), Twitter (July 6, 2019, 8:17 AM), https://tinyurl.com/ycda66re.

63.     In December 2019, President Trump posted a tweet reading in part, "Without the horror show that is the Radical Left . . . the Border would be closed to the evil of Drugs, Gangs and all other problems!" President Donald Trump (@realDonaldTrump), Twitter (Dec. 6, 2019, 11:00 AM), https://tinyurl.com/ybdblyq5. Later that month, he took to Twitter to share a link to an article about a number of purported gang-related arrests in New York, writing, "We are getting MS-13 gang members, and many other people that shouldn't be here, out of our Country!" President Donald Trump (@realDonaldTrump), Twitter (Dec. 20, 2019, 5:41 PM), https://tinyurl.com/y7vnqdvl.

64. These comments are part of a broader pattern of anti-asylum, racist and xenophobic remarks made by members of the Trump Administration. For example, in 2017, at the height of litigation surrounding the Administration's travel bans, President Trump tweeted, "That's right, we need a TRAVEL BAN for certain DANGEROUS countries, not some politically correct term that won't help us protect our people!" President Donald Trump (@realDonaldTrump), TWITTER (June 5, 2017, 9:20 PM), https://tinyurl.com/ycetbno7. A few months later, he tweeted again, "The travel ban into the United States should be far larger, tougher and more specific–but stupidly, that would not be politically correct!" President Donald Trump (@realDonaldTrump), TWITTER (Sept. 15, 2017, 6:54 AM), https://tinyurl.com/yd6euqn8.

65. Around January 2018, President Trump met with lawmakers to discuss protections for immigrants from Haiti, El Salvador, and African countries. According to those present at the meeting, the President asked, "Why are we having all these people from shithole countries come here?" Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, WASH. Post (Jan. 12, 2018), https://tinyurl.com/ybspu5qa. He also suggested that the United States should allow more people from countries like Norway instead. Alan Fram & Jonathan Lemire, *Trump: Why Allow Immigrants from 'Shithole Countries'?*, AP NEWS (Jan. 11, 2018), https://tinyurl.com/y88fdweu.

66. Similarly, Defendant Kenneth Cuccinelli has made a number of troubling comments about immigrants and their families. During a radio interview in 2012, Cuccinelli criticized Washington, D.C.'s pest control policy, stating that "it is worse than our immigration policy," and noting, "You can't break up rat families. Or raccoons, and all the rest, and you can't even kill 'em." Nick Wing, *Ken Cuccinelli Once Compared Immigration Policy to Pest Control, Exterminating Rats*, HUFFINGTON POST (July 26, 2013), https://tinyurl.com/yaj9rdxa.

67. More recently, in August 2019, Cuccinelli was asked whether he agreed that the words of Emma Lazarus appearing on the Statue of Liberty, "Give me your tired, your poor," are part of the American ethos. Devan Cole & Caroline Kelly, *Cuccinelli Rewrites Statue of Liberty Poem to Make Case for Limiting Immigration*, CNN (Aug. 13, 2019), https://tinyurl.com/y5rvejcd. He responded, "They certainly are: 'Give me your tired and your poor who can stand on their own

two feet and who will not become a public charge.'" *Id*. He later noted that Lazarus's poem "was referring back to people coming from Europe." *Id*.

68.     The Trump Administration has repeatedly used racist rhetoric to cast non-white immigrants as dangerous and to curb their entry into the United States. These statements leave no doubt about the racial, ethnic, and national origin-based animus driving the Rule. The Rule will cause significant harm to non-white immigrants.

69.     The Rule advances the Trump Administration's goal of dismantling the asylum system that Congress established. In remarks made on October 22, 2020, Defendant Wolf made clear that after the Administration "tried to work with Congress" to address what he described as "loopholes that incentivize illegal behavior," the Administration "implement[ed] major asylum reforms." Chad F. Wolf, Remarks as Prepared by Acting Secretary Chad F. Wolf Highlighting Border Security and Immigration Policies of the Trump Administration (Oct. 22, 2020), https://tinyurl.com/ycw4wowg. The efforts "to weed out fraudulent and meritless asylum claims" include "Tightening up standards for asylum applicant employment authorization; Elevating legal standards of proof for asylum and statutory withholding of removal screening; and Instituting new mandatory bars to asylum." *Id*.

70.     Consistent with Mr. Wolf's comments, during his presidency, Mr. Trump and executive Agencies including DHS and DOJ attempted on numerous occasions to override the legislatively-enacted asylum framework, and ordered or enacted measures to curtail the availability of asylum for refugees—in particular, refugees of color and those coming from Mexico and Central/South America—or to increase the cost and difficulty of applying for asylum.

71.     For example, in November 2018, the Trump Administration announced that noncitizens who enter the United States between ports of entry would be ineligible for asylum. Shortly thereafter, this Court enjoined the policy nationwide on grounds that plaintiffs were likely to prevail on their claims that the policy was contrary to law, arbitrary and capricious, and was implemented in violation of the APA. The nationwide injunction was affirmed by the Ninth Circuit in February 2020. *ESBC II*, 950 F.3d at 1259.

72.     In July 2019, Kenneth Cuccinelli, the ostensible acting Director of USCIS, issued a memorandum reducing the time asylum seekers would be granted to prepare for a credible fear interview from "72 or 48 hours" to "one full calendar day from the date of arrival at a detention facility," prohibited asylum officers from granting extensions of time to prepare for credible fear interviews, and, allegedly, canceled a policy that provided orientation to asylum seekers regarding their legal rights and provided the only means of transmitting information to asylum seekers who could not read or who had special needs. *L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 8 (D.D.C. 2020). On March 1, 2020, the United States District Court for the District of Columbia found that the reduction in time and elimination of extensions were invalid, because Cuccinelli had not validly acceded to the office under the FVRA and had no authority to issue the rule changes. *Id.* at 20-29.

73.     In July 2019, DHS and DOJ issued an interim final rule, *Asylum Eligibility and Procedural Modifications*, 84 Fed. Reg. 33829 (July 16, 2019), categorically denying asylum to noncitizens arriving at the Mexican border, unless they had first applied for and been denied asylum in Mexico or another country through which they traveled or had been trafficked. Shortly thereafter, this Court enjoined implementation of the rule. In July 2020, the Ninth Circuit affirmed the injunction with respect to the four states bordering Mexico, on grounds that the rule was contrary to law and arbitrary and capricious. *ESBC III*, 964 F.3d at 838. The interim final rule was also vacated by the U.S. District Court for the District of Columbia. *Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25 (D.D.C. 2020) ("*CAIR II*"). Despite the injunction and vacatur, on December 16, 2020, the Agencies issued a final rule implementing the interim final rule with only minor changes to be effective on January 19, 2021.

74.     In June 2020, DHS issued two final rules—*Removal of 30-Day Processing Provision for Asylum Applicant-Related Form I-765 Employment Authorization Applicants*, 85 Fed. Reg. 37502 (June 22, 2020) and *Asylum Application, Interview, and Employment Authorization for Applicants*, 85 Fed. Reg. 38532 (June 26, 2020)—that significantly increase the amount of time that asylum applicants must wait to obtain employment authorization and in some cases make it impossible to obtain or maintain such authorization. The comment period was 60 days. The rules

1    took effect in August 2020 before being partially enjoined. *Casa de Md., Inc. v. Wolf*, 8:20-CV-

2    02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020).

3        75.    In July 2020, DHS and DOJ issued a proposed rule, *Security Bars and Processing*, 85

4    Fed. Reg. 41201 (July 9, 2020), that would amend regulations to allow adjudicators to deny asylum

5    and withholding applications on "security" grounds if the applicant exhibits a symptom of a

6    contagious disease (such as COVID) or coming from a region where the disease is prevalent. Thirty

7    days were allowed for public comment. *Id.*

8        76.    In August 2020, DHS issued a final rule dramatically increasing fees for applicants

9    for essential immigration benefits, including naturalization and asylum. 85 Fed. Reg. 46788 (Aug. 3,

10   2020). In September 2020, this Court enjoined the fee increases on grounds that plaintiffs were

11   likely to prevail on their claims that the putative Secretaries of Homeland Security (initially Kevin

12   McAleenan and later Chad Wolf) during the relevant period were not validly appointed under the

13   HSA, and on their claims that the rule was arbitrary and capricious. *Immigrant Legal Res. Ctr.*, 2020

14   WL 5798269, at *1. Shortly prior to this Court's decision, the United States District Court for the

15   District of Maryland reached substantially the same conclusion in the litigation challenging the

16   employment authorization rule changes. *Casa de Md.*, 2020 WL 5500165, at *23. About a week

17   later, the United States District Court for the District of Columbia reached the same conclusion on

18   the alternative ground that an *acting* Secretary of Homeland Security does not have authority to

19   revise the order of succession in the event of a vacancy, so the mechanism by which Wolf acceded to

20   the post was invalid. *N.W. Immig. Rights Project*, 2020 WL 5995206, at *24.

21       77.    In October 2020, DHS and DOJ issued a final rule, *Procedures for Asylum and Bars*

22   *to Asylum Eligibility*, imposing a slew of new categorical bars on asylum applicants. 85 Fed. Reg.

23   67202 (Oct. 21, 2020). The proposal for this rule had allowed only 30 days for comment. 84 Fed.

24   Reg. 69640. On November 19, 2020, the day before the rule was scheduled to take effect, this Court

25   issued a temporary restraining order enjoining implementation of the rule nationwide on grounds

26   that it was contrary to law, arbitrary and capricious, and passed in violation of the APA. *Pangea I*,

27   2020 WL 6802474, at *2. On November 24, 2020, the Court converted the TRO to a preliminary

28   injunction. *Pangea Legal Servs. v. DHS,* 20-CV-07721-SI, ECF 74 (N.D. Cal. Nov. 24, 2020).

78.     On September 23, 2020, after the comment period for the Rule being challenged in this action closed, DOJ published another notice of proposed rulemaking that would amend the regulations for adjudication of applications for asylum, withholding of removal, and protection under CAT, *Procedures for Asylum and Withholding of Removal*, 85 Fed. Reg. 59692 (Sept. 23, 2020). Notably, the proposed rule, which was published as a final rule on December 16, 2020, establishes a 15-day filing deadline for asylum applicants in asylum-and-withholding-only proceedings (a new procedure set up by the Rule at issue in this suit). 85 Fed. Reg. 81698 (Dec. 16, 2020). The rule requires immigration judges to reject an asylum application as incomplete if it does not include a response to each of the required questions contained in the asylum application form or is unaccompanied by the required materials. 85 Fed. Reg. at 81699. In late 2019, with no notice to the public, USCIS implemented a similar blank-answer policy applicable to the affirmative asylum applications it considers. That policy is the subject of a class-action complaint before this Court, Class Action Complaint for Injunctive and Declaratory Relief, *Vangala v. USCIS*, 3:20-cv-08143 (N.D. Cal. Nov. 19, 2020). Failure to correct any deficiencies will result in a finding that the applicant has abandoned the application and waived the opportunity to file such an application. 85 Fed. Reg. at 81699. The rule also "expands 8 CFR 1208.12 to allow an immigration judge, on his or her own authority, to submit probative evidence from credible sources into the record." *Id.* Despite concerns raised in comments to the proposed rule, the Department issued the final rule making those proposed changes on December 16, 2020. 85 Fed. Reg. 81698 (Dec. 16, 2020). Thus, the new 15-day filing deadline for asylum applicants in asylum-only proceedings is scheduled to take effect on January 15, 2021. *Id.*

79.     In addition to the agency rulemaking and executive orders, the Trump Administration has sought to invalidate years of well-settled BIA and federal court precedent on asylum eligibility and procedures through unprecedented use of the Attorney General's authority to refer cases from the BIA to the Attorney General, pursuant to 8 C.F.R. § 1003.1(h)(1)(i). Through frequent exercise of this referral power, the Attorney General has issued decisions that express disapproval of entire categories of asylum claims. *See, e.g.*, *Matter of A-B-*, 27 I. & N. Dec. 316 (A.G. 2018) (disapproving of domestic violence-based claims and gang-based claims); *Matter of L-E-A-*, 27 I. &

N. Dec. 581 (A.G. 2019) (disapproving of family-based claims); *Matter of A-C-A-A-*, 28 I. & N. Dec. 84 (A.G. 2000) (expressing in dicta doubt that applicants will establish gender was "at least one central reason for persecution"). Though federal court decisions have considerably limited the force of these Attorney General decisions, *see, e.g.*, *Diaz-Reynoso v. Barr*, 968 F.3d 1070 (9th Cir. 2020); *Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020); *De Pena-Paniagua v. Barr*, 957 F.3d 88 (1st Cir. 2020), the Attorney General decisions have nonetheless been applied by IJs and the BIA to deny claims that would have likely prevailed without these precedential decisions.

80.     Many aspects of these Attorney General decisions, despite failing in the courts, have been codified into the Rule, including the revisions to the particular social group, persecution, nexus, and torture definitions.

## II.    THE RULE RESTRICTS ASYLUM AND CAUSES REFOULEMENT CONTRARY TO THE REFUGEE ACT

81.     The Rule as a whole is contrary to law and in excess of statutory authority because it restricts asylum so dramatically that it defeats the purpose of the Refugee Act and violates the United States' international law obligations. The Rule will have the effect of returning refugees to persecution and blocking the path to permanent residence and family unification that the Refugee Act provides. The Rule dismantles the asylum system Congress established and is therefore fundamentally inconsistent with the Refugee Act.

82.     The Rule's stated purpose is to assert the "government's right and duty to protect its own resources and citizens, while aiding those in true need of protection from harm." 85 Fed. Reg. at 80274. But the Rule does nothing to aid refugees. Instead, the Rule implements a view of who has a "true need of protection" that cannot be squared with the Refugee Act and the treaties it incorporated into U.S. law. The Rule also disregards the severe harm it inflicts on the public interest.

83.     As with so many of the anti-asylum measures this Administration has taken, "Defendants have not shown that the Rule actually addresses" the problems it purports to fix. *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1118 (N.D. Cal. 2018) ("*EBSC I*"), *aff'd*, 950 F.3d 1242 (9th Cir. 2020). And even if it did so in some small measure, that would not justify the

1    usurpation of Congressional authority. As the Ninth Circuit noted: "There surely are enforcement

2    measures that . . . the Attorney General can take to ameliorate the [immigration] crisis, but continued

3    inaction by Congress is not a sufficient basis under our Constitution for the Executive to rewrite our

4    immigration laws." *Id.* (citation omitted).

5    84.    Nevertheless, this sweeping new Rule seeks nothing less than to "rewrite our

6    immigration laws." *Id.* It does so in a wide variety of ways that will prevent the vast majority of

7    asylum seekers from establishing their claims. The Agencies failed to calculate the cumulative

8    impact of the changes in the Rule. Nor did it assess the impact of this Rule in conjunction with

9    numerous regulations that have been hastily promulgated through staggered rulemaking. As a result,

10   the entire Rule is invalid.

11   **A.    The Rule's "discretionary factors" drastically restrict asylum eligibility.**

12   1.    Nine Adverse Factors Requiring a "Discretionary Denial" Absent

13   Extraordinary Circumstances

14   85.    Under the guise of "discretionary factors," the Rule imposes *de facto* eligibility bars

15   that are contrary to law and an unreasoned arbitrary departure from past practice. The Rule mandates

16   that the Attorney General "will not favorably exercise discretion" to grant asylum in nine

17   enumerated scenarios. 8 C.F.R. § 208.13(d)(2)(i)(A)-(I) (proposed); 8 C.F.R. § 1208.13(d)(2)(i)(A)-

18   (*I*) (proposed). If any of the nine factors in subpart (d)(2)(i) is present, the Attorney General "will

19   not" make a discretionary grant of asylum unless there are "extraordinary circumstances," which the

20   Rule suggests could include "those involving national security or foreign policy considerations, or

21   cases in which [a noncitizen], by clear and convincing evidence, demonstrates that" denial could

22   result in "exceptional and extremely unusual hardship" to the applicant. 8 C.F.R. § 208.13(d)(2)(ii)

23   (proposed); 8 C.F.R. § 1208.13(d)(2)(ii) (proposed). Even then, a showing of extraordinary

24   circumstances will not automatically "warrant a favorable exercise of discretion." *Id.*

25   86.    Although the Agencies declined to define "extraordinary circumstances," they specify

26   that this term is intended to mean something *more than* the fact that an applicant has established past

27   persecution or a well-founded fear of future persecution. 85 Fed. Reg. at 80342. In other words,

28   these purported discretionary factors create new bars for otherwise qualified asylum applications,

leaving only a narrow and elusive possibility of an exception to the bars if the applicant can satisfy an undefined requirement of establishing extraordinary circumstances.

87.     Through the nine bars disguised as discretionary factors, the Agencies have unreasonably and without justification superseded well-settled precedent including *Matter of Pula*, which recognizes, consistent with the INA and international law, that a showing of past persecution or a strong likelihood of future persecution should outweigh all but the most egregious factors and lead to a discretionary grant of asylum. *Matter of Pula*, 19 I. & N. Dec. at 474; *see also Matter of Marin*, 16 I. & N. Dec. 581 (BIA 1987). Without rational basis or explanation, the Agencies have upended the presumption in favor of granting asylum in *Matter of Pula* and placed a burden on the applicant, even after she has shown past persecution or a likelihood of future persecution, to establish *in addition* that extraordinary circumstances outweigh the presence of one of the enumerated "discretionary" factors.

88.     Until this Rule, adjudicators have weighed the positive factors against any negative factors. Discretion under the statute requires "some level of individualized determination," *Reno v. Flores*, 507 U.S. 292, 312 (1993), and Congress provided adjudicators the ability by reviewing evidence to make hard individualized decisions in complex cases involving trauma survivors, individuals of different cultural backgrounds, and vulnerable people with language barriers.

89.     By placing all of these restrictions on discretion, the Agencies effectively dismantle the protections that are accorded to refugees under the Refugee Convention. Like the three discretionary factors discussed earlier, each of these factors will likely have a particularly negative impact on Central and South American asylum seekers and asylum seekers who cannot afford to obtain a visa or buy a plane ticket straight to the United States.

90.     Each of the nine discretionary factors is in excess of authority because the Agencies do not have any authority to create new eligibility bars beyond those Congress codified in the INA. *See, e.g.*, *Pangea I*, 2020 WL 6802474, at *1.

91.     Not one of these factors has any basis in the INA and some stand in direct conflict with the text of the INA.

92.     Each of the nine adverse factors individually is arbitrary and capricious for lack of a reasoned explanation and the Agencies' failure to consider important aspects of the problem. The Rule notes only that the Agencies have issued guidance on the exercise of discretion in other circumstances, without ever suggesting why it is reasonable to create these *de facto* bars or whether the Agencies evaluated the potentially harmful consequences of the factors they chose. 85 Fed. Reg. at 80342.

93.     The nine adverse discretionary factors are unlawful under the APA for the following reasons as well:

94.     The first "adverse discretionary factor" applies against an applicant who spent more than 14 days in another country before arriving in the United States unless she applied for and was denied protection in that country, can demonstrate she is a victim of trafficking, or the country was not a party to the Refugee Convention, the 1967 Protocol, or CAT. 8 C.F.R. § 208.13(d)(2)(i)(A) (proposed); 8 C.F.R. § 1208.13(d)(2)(i)(A) (proposed). This factor, which serves as a bar that could only be overcome with a showing of extraordinary circumstances, is not in accordance with the INA, is arbitrary and capricious, and stands in blatant disregard of federal court precedent finding similar bars unlawful, as described above.

95.     The second "adverse discretionary factor" applies against an applicant who traveled through more than one country before arriving in the United States unless one of the exceptions set forth in the preceding paragraph is shown. 8 C.F.R. § 208.13(d)(2)(i)(B) (proposed); 8 C.F.R. § 1208.13(d)(2)(i)(B) (proposed). This factor, which serves as a bar that could only be overcome with a showing of extraordinary circumstances, is not in accordance with the INA, is arbitrary and capricious, and is in blatant disregard of federal court precedent finding similar bars unlawful, as described below.

96.     The third "adverse discretionary factor" applies against an applicant who would be subject to ineligibility on grounds of a specified criminal conviction but for "the reversal, vacatur, expungement, or modification of a conviction or sentence," unless the applicant was found not guilty. 8 C.F.R. § 208.13(d)(2)(i)(C) (proposed); 8 C.F.R. § 1208.13(d)(2)(ii)(C) (proposed).

97.     This factor, which serves as a bar that could only be overcome with a showing of extraordinary circumstances, is not in accordance with the INA, which sets forth narrow ineligibility ground where an applicant, "having been *convicted by a final judgment* of a particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii) (emphasis added). The statutory basis requires conviction by a final judgment. There is no statutory basis for applying a bar based on a criminal conviction that has been reversed, vacated, expunged, or modified. Any reliance on § 1158(b)(2)(C) would also be unavailing to justify this discretionary factor. *See Pangea I*, 2020 WL 6802474, at *19.

98.     The Agencies did no offer an adequate explanation for this factor, confirming its arbitrary and capricious nature. As the Court held in *Pangea I*, rationales based on adjudicative efficiency, the promotion of lawfulness, and community protection are inadequate when they contradict the statutory text and fly in the face of those purported objectives. *Id.* at *16-18.

99.     The Rule fails to consider that the same compelling circumstances that may lead to a state court expunging or modifying a conviction or sentence may provide strong positive equities that an adjudicator should consider in whether or not to exercise discretion on behalf of an asylum seeker. Such decisions should be made on a case-by-case basis and not subject to a rule that would "ordinarily result" in the denial of the application.

100.    The fourth "adverse discretionary factor" applies against an applicant who "accrued more than one year of unlawful presence" in the United States before applying for asylum. 8 C.F.R. § 208.13.(d)(2)(i)(D) (proposed); 8 C.F.R. § 1208.13(d)(2)(ii)(D) (proposed). This factor, serves as a bar that could only be overcome with a showing of extraordinary circumstances, is not in accordance with the INA, which creates exceptions to the one-year statute of limitations for asylum claims. *See* 8 U.S.C. § 1158(a)(2)(B), (D).

101.    Plaintiff CLINIC provided a detailed legislative history of the exception to the one-year filing deadline in § 1158(a)(2)(D) in its comment, which the Agencies did not address in the final Rule. As CLINIC concluded in its comment, "[t]he legislative history demonstrates that Congress had the specific intent for individuals with changed or extraordinary circumstances

(interpreted broadly) to maintain their eligibility for asylum despite filing an application after one year of unlawful presence."

102.    This factor also conflicts with existing agency policy and interpretations that provide a broad definition of the changed circumstances exception. 8 C.F.R. § 208.4(a)(4), (5); 8 C.F.R. § 1208.4(a)(4), (5).

103.    The fourth adverse discretionary factor is also arbitrary and capricious because it does not reflect consideration of the real-world consequences of the bar or the high risk that people who have suffered persecution, PTSD, and other challenging life circumstances upon arrival in the United States will be refouled to countries where they fear future persecution, often because that very experience of past persecution prevented them from promptly applying for asylum within one year.

104.    The fifth "adverse discretionary factor" applies against an applicant who has failed to file any tax return, or to pay any tax due, or has income that would generate tax liability but that has not been reported to the IRS. 8 C.F.R. § 208.13.(d)(2)(i)(E) (proposed); 8 C.F.R. § 1208.13(d)(2)(ii)(E) (proposed). This factor is arbitrary and capricious. It does not take into account the unique circumstances of asylum seekers who often arrive in the United States with no economic resources, and with little to no ability to obtain assistance navigating the tax code, one of the most complex areas of U.S. law.

105.    This factor places an unreasonable burden on asylum seekers to prove they are not required to pay taxes, necessitating familiarity with the tax code that most asylum seekers are unlikely to be able to obtain.

106.    In addition, the Rule fails to address the intersection of this factor with the recent EAD Rules discussed above, which make it much harder for asylum seekers to obtain work authorization. Thus, more will be forced to work in the underground economy to support themselves and their families, paid in cash and without W-2s or other documentation necessary to file accurate tax returns.

107.    This factor ignores the fact that asylum seekers, like anyone in the United States, might be unable to comply with tax reporting requirements for blameless reasons, including language barriers, the lack of translations of tax forms, inability to obtain a social security number or

1    an individual tax identification number, and hardship in making tax payments based on income

2    earned through self-employment.

3        108.    The remaining adverse discretionary factors each relate to an applicant's legitimate

4    use of asylum application procedures and none are adequately justified in the Rule. The sixth

5    "adverse discretionary factor" applies against an applicant who has had two or more prior

6    applications for asylum denied for any reason. 8 C.F.R. § 208.13(d)(2)(i)(F) (proposed); 8 C.F.R. §

7    1208.13(d)(2)(ii)(F) (proposed). The seventh "adverse discretionary factor" applies against an

8    applicant who has previously withdrawn or abandoned an asylum application. 8 C.F.R. §

9    208.13(d)(2)(i)(G) (proposed); 8 C.F.R. § 1208.13(d)(2)(ii)(G) (proposed). The eighth "adverse

10   discretionary factor" applies against an applicant who fails to attend an asylum interview absent

11   exceptional circumstances or deficient notice of the interview. 8 C.F.R. § 208.13.(d)(2)(i)(H)

12   (proposed); 8 C.F.R. § 1208.13(d)(2)(ii)(H) (proposed). The ninth "adverse discretionary factor"

13   applies against an applicant who, after being subjected to a final order of removal, files a motion to

14   reopen to seek asylum based on changed country conditions more than a year after the changed

15   conditions occurred. 8 C.F.R. § 208.13(d)(2)(i)(*I*) (proposed); 8 C.F.R. § 1208.13(d)(2)(ii)(*I*)

16   (proposed).

17       109.    The Agencies make no serious attempt to justify the sixth through ninth factors. Their

18   main defense to comments on these factors is an assertion that the factors do not establish a bar

19   because they can be overcome with extraordinary circumstances. That is fundamentally flawed.

20       110.    Fundamentally, the Agencies' flawed efficiency rationale cannot justify the draconian

21   impacts the factors will have on deserving asylum applicants. In purporting to consider efficiency,

22   the Agencies failed to consider comments explaining how bona fide asylum seekers might submit

23   multiple applications that are denied, withdrawn, or abandoned—for example because they were

24   victims of ineffective assistance of counsel, were *pro se* because they could not afford counsel (made

25   more likely by the increasing difficulty with obtaining work authorization), or suffered from a

26   mental disability that made it difficult to adequately set forth their claim. There are likewise

27   legitimate reasons why an applicant might withdraw a pending asylum application to seek other

28

1    relief such as a family-based immigrant visa petition or petition for Special Immigrant Juvenile

2    Status.

3        111.    The ninth adverse factor based on the filing of a motion to reopen more than a year

4    after the changed country conditions is unjustified and also contradicts the INA, which provides that

5    "there is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for

6    relief under sections . [8 U.S.C.] § 1158 or 1231(b)(3) of this title and is based on changed country

7    conditions . . . ." 8 U.S.C. § 1229a(c)(7)(C)(ii). The outright contradiction between the proposed rule

8    and the statute renders the proposed rule *ultra vires.* If Congress had wanted to impose a one-year

9    filing deadline on motions to reopen based on changed country conditions, it could have done so, but

10   instead it provided for no time limit.[15]

11       112.    Considering the nine adverse factors overall, the clear intent is to make it possible for

12   the Agencies to deny asylum more efficiently and more broadly. *See, e.g.*, 85 Fed. Reg. at 80342

13   ("The Departments believe that the inclusion of the proposed factors in the rule will better ensure

14   that immigration judges and asylum officers properly consider, in all cases, whether applicants for

15   asylum merit the relief as a matter of discretion . . . . [T]he list of factors to consider . . . would take

16   place in one streamlined adjudication."); *id.* at 80351 (citing the number of applications received in

17   FY 2019 and claiming that the 14-day "discretionary" bar would "assist the efficient adjudication of

18   asylum claims." Efficiently denying asylum applications is not a purpose consistent with the INA.

19       113.    The discretionary factors are arbitrary and capricious for the additional reason that the

20   Agencies have not considered any alternatives to the lists of adverse factors—such as considering

21   positive factors or continuing to conduct a totality of the circumstances analysis. They also failed to

22   consider the impact of the lists of "adverse factors" on asylum seekers, not even acknowledging the

23   exceptional reduction in claims that could be granted.

24       114.    The Agencies also have not attempted to consider countervailing equities, identifying

25   no exceptions to the "significantly adverse factors" and only extremely narrow exceptions to the

26   ───────────────

     [15] *Wang v. BIA*, 508 F.3d 710 (2d Cir. 2007), on which the Rule relies to justify the ninth adverse
27   discretionary factor, involved whether equitable tolling was appropriate for a motion to reopen based
     on ineffective assistance of course and is inapposite to whether a time limit is appropriate for a
     motion to reopen based on changed country conditions when Congress expressly provided for no
28   time limit.

"adverse factors." To the extent the Agencies seek to justify the harsh consequences of the significantly adverse and adverse factors by relying on the availability of withholding of removal or CAT protection, that is arbitrary and capricious as well. Asylum, withholding of removal, and CAT protection serve different purposes and offer protection to different groups of applicants. The burden of proof for withholding of removal or CAT protection is higher than that to demonstrate eligibility for asylum, and withholding of removal and CAT protection afford lesser protection and fewer rights than asylum, including no family reunification and no pathway to citizenship.

### 2. Significant Adverse Factors

115. Longstanding precedent requires adjudicators to balance favorable and unfavorable factors and to make an ultimate determination whether to grant the discretionary relief of asylum based on an individualized case-by-case totality of the circumstances analysis. *See EBSC II*, 950 F.3d at 1274 (citing *Matter of Pula*, 19 I. & N. Dec. at 473-74). Consistent with the priority placed on *non-refoulement*, the danger that an applicant will face—persecution if denied asylum in the United States—is usually found to "outweigh all but the most egregious facts." *Id.* The Rule changes all this without serious consideration of the harm it will cause to asylum seekers or the conflict it creates with the Refugee Act and the international obligations it codified.

116. The Rule introduces three "significant adverse discretionary factors" that an adjudicator "shall consider," and which would prevent a favorable exercise of discretion under 8 U.S.C. § 1158(b)(1)(A) in almost every asylum case. 8 C.F.R. § 208.13(d)(1) (proposed). Each factor is contrary to law, in excess of statutory authority, and constitutes arbitrary and capricious agency action.

117. *First*, an immigration judge must consider as a significant adverse discretionary factor whether the applicant unlawfully entered or attempted unlawfully to enter the United States, unless the applicant was fleeing persecution in a contiguous country or the applicant was under the age of 18 at the time. 8 C.F.R. § 208.13(d)(1)(i) (proposed). This provision would result in adjudicators denying asylum to most asylum seekers who enter the United States between ports of entry.

118.    In other words, this significant adverse factor seeks to achieve the same unlawful result the Agencies tried to achieve in 2018. *EBSC II*, 950 F.3d. at 1259; *O.A.*, 404 F. Supp. 3d at 147. These cases addressed the combination of a presidential proclamation and a rule by the agencies that effectively barred individuals who entered the United States between ports of entry—*i.e.*, those who bypassed the requirement to present themselves to CBP officers at the border. In striking down that rule, the Ninth Circuit Court of Appeals described its effect as "staggering" inasmuch as "its most direct consequence falls on the more than approximately 70,000 [noncitizens] a year (as of FY 2018) estimated to enter between the ports of entry [who] then assert a credible fear in expedited-removal proceedings." *EBSC II*, 950 F.3d. at 1260 (internal quotation omitted).

119.    Courts enjoined the ban because it directly contradicted the language of the INA, which states: "Any [noncitizen] who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival* and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such [noncitizen]'s status, *may apply for asylum* in accordance with this section or, where applicable, section 1225(b) of this title." 8 U.S.C. § 1158(a)(1). With this language, Congress deliberately placed those who arrive between ports of entry on equal footing with those who do not, and mandated a uniform procedure for both.

120.    The Rule achieves the opposite unlawful result. Although the Rule labels this a "discretionary" factor, it requires immigration judges to consider whether the applicant arrived without inspection and assigns, and if so, weigh that as a "significant" adverse factor in deciding whether to grant asylum. 85 Fed. Reg. 80387. As the Second Circuit has held, it would be anomalous for an asylum seeker's means of entry, which under the INA cannot render her statutorily ineligible for asylum, to nonetheless render her ineligible for a favorable exercise of discretion. *Huang v. INS*, 436 F.3d 89, 100 (2d Cir. 2006). *Cf. EBSC II*, 950 F.3d. at 1272 ("[e]xplicitly authorizing a refugee to file an asylum application *because* he arrived between ports of entry and then summarily denying the application for the same reason borders on absurdity") (emphasis in original). Despite numerous comments on this point, the Agencies did not seriously consider this problem or reasonably explain the dramatic shift in policy the Rule effects.

121.    *Second*, the Rule adds a significant adverse factor if the applicant did not apply for protection in at least one country outside her country of citizenship, nationality, or last lawful habitual residence through which she transited before entering the United States unless she (i) received a final judgment denying protection in that country, (ii) meets the definition of a "victim of a severe form of trafficking in persons" in 8 C.F.R. § 214.11, or (iii) the country or countries through which the applicant transited are not parties to the 1951 Refugee Convention, the 1967 Protocol, or CAT. 8 C.F.R. § 208.13(d)(1)(ii)(A)–(C); 8 U.S.C. § 1208.13(d)(1)(iii)(A)–(C) (proposed).

122.    This provision of the Rule conflicts with statutory provisions that address when asylum seekers must apply for asylum in another country. 8 U.S.C. §§ 1158(a)(2)(A), (b)(2)(A)(vi). In fact, the Administration's prior attempts to create a third-country transit ban have been enjoined by federal courts as contrary to the plain language of the INA, 8 U.S.C. § 1158(a). *CAIR II*, 471 F. Supp. 3d at 25; *EBSC III*, 964 F.3d at 838. The Rule at issue here goes even farther than the transit ban because the Rule would apply to someone who arrives by plane unless it was a direct flight, whereas the transit ban carved out anyone arriving by plane.

123.    Congress allowed for only two grounds of ineligibility for asylum based on third-country transit: where the United States has a safe third country agreement with another country or where the applicant has been firmly resettled in another country prior to arriving in the United States. 8 U.S.C. §§ 1158(a)(2)(A), (b)(2)(A)(vi). These narrowly drawn provisions require asylum seekers to look to another country for protection only if that country provides a "safe option," and they take into consideration whether the asylum seekers has already received protection in that country or would have access to a full and fair asylum procedure or offer of other permanent status in that country. The significantly adverse third-country factor in the Rule is thus contrary to 8 U.S.C. § 1158 because it is not limited to a narrow class of people and fails to take into account the safety of the third countries or the fairness of their asylum procedures or the offer of a permanent status.

124.    It is also contrary to United Nations High Commissioner for Refugees ("UNHCR") Guidance providing that the "primary responsibility to provide protection rests with the State where asylum is sought" and that a refugee has no obligation to seek asylum at the first effective

opportunity. *Guidance Note on Bilateral and/or Multilateral Transfer Arrangements of Asylum-Seekers* ¶ 1, UNHCR (May 2013), https://tinyurl.com/y79klf6a.

125.     In addition, this significantly adverse factor is arbitrary and capricious. It is blatantly discriminatory as it will primarily bar people arriving by land from countries south of Mexico and people who arrive by airplane unless they had the wealth and geographic position to be able to obtain a direct flight to the United States.

126.     The countries through which Central and South Americans and others traveling by land must cross to reach the U.S.–Mexico border are not safe and have nascent and fundamentally flawed asylum structures. *See EBSC III*, 964 F.3d at 850-51; *id.* at 859-60 (Miller, E. concurring in part). The Rule does not adequately address these issues, which were raised in comments, nor offer a reasonable explanation for its departure from past practice and precedent affording refugees protection irrespective of their manner of entry. *See, e.g.*, *EBSC II*, 950 F.3d at 1274 ("The Attorney General's interpretation of section 1158(a) is also unreasonable . . . in light of the United States's treaty obligations . . . . As . . . . UNHCR explains, the Rule runs afoul of three of these codified rules: the right to seek asylum, the prohibition against penalties for irregular entry, and the principle of non-refoulement . . . .") (internal citations and punctuation omitted).

127.     Instead, the Rule unfairly penalizes primarily poor asylum seekers who travel by land to the southern border. The Agencies failed to address the harm inflicted against applicants who can only reach the United States by overland travel through countries with ineffective asylum protections. And as the Agencies well know, the fact that a country is a party to the Refugee Convention and/or 1967 Protocols and/or CAT does not establish that the country is able and willing to provide adequate protection to asylum seekers.[16]

128.     In all events, the Agencies have failed to consider the risk that people subject to this discretionary bar would face persecution while awaiting asylum adjudications in other countries that are also dangerous. Nor have the Agencies adequately examined the possibility that many countries

---

[16] *ESBC III*, 964 F.3d at 846-47 (noting that many individuals in Mexico have fled Guatemala, Honduras, and El Salvador, all of which are parties to the Refugee Convention and the 1967 Protocols).

through which asylum seekers transit lack asylums systems that are fair and have the capacity to process claims. The Agencies have also failed to consider or explain why the Rule does not provide for any special protection for unaccompanied children, despite special protections established by law.

129.    *Third*, the Rule requires adjudicators to apply a significant adverse factor if the applicant used fraudulent documents to enter the United States unless the applicant traveled to the United States without transiting through any other country. 8 C.F.R. §§ 208.13(d)(1)(iii), 1208.13(d)(1)(iii) (proposed). This is contrary to congressional intent in enacting the INA, including Congress's decision not to include any bar based on use of forged or false entry documents. This factor also arbitrarily disregards authority recognizing that refugees fleeing persecution are unlikely to arrive at the United States with valid entry documents, particularly where they have had to travel through one or more additional countries. *See, e.g.*, *Gulla v. Gonzales*, 498 F.3d 911 (9th Cir. 2007); *Matter of Pula*, 19 I. & N. Dec. at 474. The Rule does not offer a reasoned explanation for disregarding the facts it previously recognized and does not adequately consider this serious problem.

## B.    The Rule vastly expands the firm resettlement bar.

130.    8 U.S.C. § 1158(b)(2)(A)(vi) provides that an individual who was "firmly resettled in another country prior to arriving in the United States" is ineligible for asylum. Under prior policy, an applicant is considered to be "firmly resettled" if, before arriving in the United States, she entered into another country and received an offer of *permanent* resident status, citizenship, or other type of *permanent* resettlement in that country. 8 C.F.R. § 208.15 (current); 8 C.F.R. § 1208.15 (current). [17]

---

[17] *See Camposeco-Montejo v. Ashcroft*, 384 F.3d 814 (9th Cir. 2004) (finding Guatemalan applicant was not firmly resettled during 16 years in Mexico because he did not have an offer of permanent residence and was subject to restrictive conditions there); *Mengstu v. Holder*, 560 F.3d 1055 (9th Cir. 2009) (Ethiopian national who spent two years in a Sudanese refugee camp was not firmly resettled); *Sall v. Gonzales*, 437 F.3d 229, 235 (2d Cir. 2006) (passage of four years alone does not show firm resettlement where the question is whether the applicant "enjoyed the legal rights—such as the right to work and to enter and leave the country at will—that permanently settled persons can expect to have"); *Abdille v. Ashcroft*, 242 F. 3d 477, 487 (3d Cir. 2000) (requiring at least circumstantial evidence of the existence of a government-issued offer of firm resettlement).

131.    The length of time an applicant resided in another country before seeking protection in the United States is not dispositive in the firm resettlement analysis under the current legal framework. *See, e.g.*, *Camposeco-Montejo*, 384 F.3d at 814.

132.    Under the current legal and regulatory framework, even if an applicant is determined to have been firmly resettled in another country before arriving in the United Sates, she may still demonstrate that either of two exceptions codified in agency regulations exists so as to preclude application of the bar. 8 C.F.R. § 208.15(a), (b) (current); 8 C.F.R. § 1208.15(a), (b) (current).[18] The initial burden is on the government to make a *prima facie* showing of an offer of firm resettlement. *See Matter of A-G-G-*, 25 I. & N. Dec. 486 (BIA 2011) (setting forth a burden shifting framework to guide firm resettlement adjudications).

133.    The Rule substantially alters the firm resettlement definition by establishing several new scenarios in which the applicant will be deemed to have been firmly resettled.

134.    *First*, it deems an applicant firmly resettled if she "resided in a country through which the [applicant] transited prior to arriving in or entering the United States" and (i) received or was eligible for any permanent legal immigration status in that country, (ii) resided in such a country with non-permanent but indefinitely renewable status, or (iii) resided in such a country and *could have* applied for and obtained non-permanent, indefinitely renewable legal immigration status, even if she never applied for or was not offered such status. 8 C.F.R. § 208.15(a)(1)(i)-(iii) (proposed); 8 C.F.R. § 1208.15(a)(1)(i)-(iii) (proposed).

135.    *Second*, it deems an applicant firmly resettled if she resided voluntarily without suffering persecution in any one country for one year or more after departing her country of

---

[18] The existing regulatory exceptions in 8 C.F.R. § 208.15; 8 C.F.R. § 1208.15 (current), are applied in cases including *Arrey v. Barr*, 916 F.3d 1149, 1160 (9th Cir. 2019) (remanding to BIA where Board had denied asylum for a Cameroonian woman who had received an offer of refugee status in South Africa but had not adequately considered the restrictive conditions she faced there); *Gwangsu Yun v. Lynch*, 633 F. App'x 29, 30 (2d Cir. 2016) (unpublished) (finding no "significant ties" for North Korean asylum seeker based on length of stay in South Korea alone "unless there is substantial evidence that two years was longer than 'necessary to arrange onward travel'"); *Siong v. INS*, 376 F.3d 1030, 1040 (9th Cir. 2004) ("Because of the evidence that Siong may not have 'found a haven from persecution' in France, . . . Siong also has established at least a plausible claim that he is not firmly resettled in France." (internal citation omitted); *Yang v. INS*, 79 F.3d 932, 939 (9th Cir. 1996).

nationality and before arriving in the United States. 8 C.F.R. § 208.15(a)(2) (proposed); 8 C.F.R. § 1208.15(a)(2).[19]

136.    *Third*, it deems an applicant firmly resettled if (i) she is a citizen of a country other than the one where she claims a fear of persecution and was present in that second country before arriving in the United States, or (ii) she is a dual national and passes through her second country of nationality after fleeing persecution in the first but renounces that citizenship before or after arriving in the United States. 8 C.F.R. §§ 208.15(a)(3)(i)-(ii) (proposed); 1208.15(a)(3)(i)-(ii) (proposed).

137.    *Fourth*, a finding that an adult applicant was firmly resettled will be imputed to any children of the applicant who were not yet 18 when the resettlement occurred if they lived with the applicant, unless the child can show she would not have been eligible for any permanent legal status or non-permanent but indefinitely renewable legal immigration status separate from the parent. 8 C.F.R. § 208.15(b) (proposed); 8 C.F.R. 1208.15(b) (proposed).

138.    *Fifth*, the Rule does not allow for any exceptions to the firm resettlement bar, contrary to existing regulations, 8 C.F.R. § 208.15(a), (b); 8 C.F.R. § 1208.15(a)(b) (current), that were issued subject to notice and comment rulemaking and have long been applied by immigration judges, the BIA, and federal courts of appeal.

139.    *Sixth*, the Rule shifts the burden of proving that the firm resettlement bar does *not* apply to the applicant "when the evidence of record indicates that the firm resettlement bar may apply." 8 C.F.R. § 208.15(b) (proposed); 8 C.F.R. § 1208.15(b) (proposed). This shift increases the evidentiary burden on asylum seekers, many of whom are *pro se*, to research and provide evidence on foreign immigration laws.

140.    The revised standard for applying the firm resettlement bar is not in accordance with law. Fundamentally, the Rule imposes the firm resettlement bar in situations in which resettlement is plainly unstable and temporary, contravening the clear language of the statute.

---

[19] The final rule includes a limited exception to this part of the firm resettlement bar if the applicant was placed in Mexico pursuant to the Migrant Protection Protocols or was subjected to metering and as a result spent more than one year in Mexico. 8 C.F.R. § 208.15(a)(2) (proposed); 8 C.F.R. § 1208.15(a)(2) (proposed).

141.     Congress intended the firm resettlement bar to apply only when a person had obtained safe, *permanent* refuge in another country. 8 U.S.C. § 1158(b)(2)(A)(iv). Case law further requires an offer of *permanent*, not temporary, resettlement. *See, e.g.*, *Bonilla v. Mukasey*, 539 F.3d 72 (1st Cir. 2008); *Mengstu*, 560 F.3d at. In contradiction of this intent and court precedent and without explanation, the Rule redefines "firm resettlement" to allow the bar to apply where one's legal status in another country was indefinite or temporary. 8 C.F.R. § 208.15(a)(1)(ii)–(iii) (proposed); 8 C.F.R. § 1208.15(a)(1)(ii)–(iii) (proposed).

142.     The revised framework for applying the firm resettlement bar is moreover arbitrary and capricious. For example, as grounds for the revised definition of firm resettlement, the Rule cites the purported "increased availability of resettlement opportunities," without providing any evidentiary support or explanation of where these increased opportunities are or how an asylum seeker might access them.

143.     The revised bar is moreover based on unreasoned speculation that a noncitizen "fleeing persecution would ordinarily be expected to seek refuge at the first available opportunity where there is no fear of persecution or torture." 85 Fed. Reg. at 80283. The mere fact that a country is a party to the Refugee Convention and 1967 Protocol does not mean that it provides the same rights to refugees as the United States historically has or that are actually required under those treaties. Plaintiff CLINIC provided several examples in its comment of countries that are parties to these treaties yet significantly restrict freedom of movement of refugees within their borders.

144.     In a lengthy footnote, the Rule intimates that firm resettlement may be available in Mexico. 85 Fed. Reg. 80282–83 n.10. Yet the sources cited in the footnote document increases in the filing of claims for asylum in Mexico, not increases in the rate of asylum grants. In fact, the skyrocketing rates of claims for Mexican asylum (resulting in large part from U.S. policies shutting down access to the asylum system for people arriving by land at the U.S.-Mexico border) have severely strained Mexico's asylum system, which suffers from extremely limited funding and insufficient staffing to keep pace with the increasing number of applications. Recent data show that it may take two years to adjudicate an asylum case in Mexico.

145.    And whereas Mexican law may theoretically provide for broader grounds for obtaining protection insofar as it also recognizes refugee status based on "generalized violence" and "massive violation of human rights," human rights advocates have documented that inadequate staffing and funding have led to inconsistent outcomes and mistaken denials of asylum, and that Mexican asylum adjudicators routinely deny asylum to Central Americans under the false assumption that they can be safely repatriated to their home countries. Moreover numerous reports have documented the threats to the lives of asylum seekers in Mexico awaiting adjudication of their claims.

146.    In addition to failing to justify the basis for changing the definition of the firm resettlement bar itself, the Rule also fails to justify the elimination of the existing regulatory exceptions to the firm resettlement bar (restrictive conditions in the third country or a lack of significant ties there). The Rule simply reverses course, ignoring decades of case law including *Matter of A-G-G-*, 25 I. & N. Dec. 486 (BIA 2011), without explanation.

**C.    The Rule empowers adjudicators to pretermit asylum applications.**

147.    The Rule would require an IJ to pretermit and deny asylum, withholding of removal, and CAT protection at any point, without a hearing, if in the IJ's opinion, the applicant "has not established a prima facie case for relief." 8 C.F.R. § 1208.13(e)(1) (proposed). The IJ would be required to do so *sua sponte* or upon a motion by DHS. *Id.* § 1208.13(e) (proposed). The only thing resembling procedural protection is the requirement of ten days' notice, during which time the applicant would be allowed to submit any written response to the notice. Yet there is no requirement that the notice convey the ground on which the IJ is considering pretermission, leaving applicants with no indication of the issues they should address or the additional evidence they should obtain.

148.    The pretermission provision is contrary to the plain language of 8 U.S.C. § 1229a(b)(1), which provides that "[a]n immigration judge *shall conduct proceedings* for deciding the admissibility or deportability" of a noncitizen. § 1229a(a)(1) (emphasis added). The proceedings may take place in person, in absentia only upon agreement of the parties, through video conference, or through telephone conference by consent. *Id.* § 1229a(b)(2)(A)(i)-(iv). The section further provides that the IJ "shall administer oaths, receive evidence, and interrogate, examine, and cross-

1    examine the [applicant] and any witnesses." *Id.* § 1229a(b)(1). At the proceeding, the noncitizen,

2    among other rights, "shall have a reasonable opportunity to examine the evidence against [her], to

3    present evidence on [her] own behalf, and to cross-examine witnesses . . . ." *Id.* § 1229a(c)(4).[20]

4    149.    Congress intended that IJs have a duty to develop a full record, for reasons including

5    ensuring that applicants have a means "of knowing what information was relevant to their cases" so

6    that they have a full and fair opportunity to "make[] a case against removal." *United States v.*

7    *Copeland*, 376 F.3d 61, 71 (2d Cir. 2004); *see Oshodi v. Holder*, 729 F.3d 883, 889 (9th Cir. 2013)

8    (en banc) ("[E]very individual in removal proceedings is entitled to a full and fair hearing . . . . The

9    statutory and regulatory regime . . . protects an alien's right to present evidence and testimony on

10   one's behalf . . . ." (internal citations omitted)).[21]

11   150.    This unambiguous statutory language requiring a hearing during which an applicant is

12   entitled to testify, present evidence, and conduct cross-examination would be rendered a nullity if an

13   IJ could declare an application meritless before convening the type of proceeding required by 8

14   U.S.C. § 1129a. Accordingly, the pretermission provision is not in accordance with law and must be

15   enjoined under the APA, 5 U.S.C. § 706(2)(A). For the same reason, the pretermission provision is

16   in excess of the Agencies' statutory authority, and should be set aside as unlawful under the APA, 5

17   U.S.C. § 706(2)(C). The Agencies have no statutory authority to allow IJs to make eligibility

18   determinations without first weighing whether an applicant's credible testimony establishes

19   eligibility for relief from removal. *Id.* The Agencies cannot override clear statutory language setting

20   forth the minimum process required before an IJ can deny a claim for protection.

21   151.    The pretermission provision should also be set aside under 5 U.S.C. § 706(2)(A) on

22   the ground that it is arbitrary and capricious. The Rule fails to address an important aspect of the

---

[20] In addition to the statutory mandates, current regulations and BIA precedential decisions require
an evidentiary hearing before adjudication of applications for protection. *See* 8 C.F.R. § 1240.1(c),
1240.11(c)(3)(iii); *Matter of Fefe*, 20 I. & N. Dec. 116 (BIA 1989).

[21] *Matter of S-M-J-*, 21 I. & N. Dec. 722, 725, 727–29 (BIA 1997) (noting that "the duty to ascertain
and evaluate all the relevant facts is shared between the applicant and the examiner," and that
adjudicators cannot impose "[u]nreasonable demands . . . on an asylum applicant to
present evidence to corroborate particular experiences" and should afford applicants the benefit of
the doubt (internal quotations omitted)).

1    problem—the harm to *pro se* applicants with limited resources and/or limited English proficiency.

2    *Cf. EBSC III*, 964 F.3d at 849; *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Aut. Ins.*

3    *Co.*, 463 U.S. 29, 43 (1983). The Rule ignores the fact that U.S. immigration laws are exceedingly

4    complex, whereas many applicants for protection proceed *pro se* and often have limited English

5    proficiency. Whether such a person can present a *prima facie* case for asylum in written English or

6    has ample written documentation supporting her claim has no legitimate relationship to the merit of

7    her underlying claim. The agency's failure to consider the effect of pretermission on *pro se*

8    applicants renders the provision arbitrary and capricious.

9    152.   The Rule fails to engage with the many comments explaining that allowing

10   pretermission before an evidentiary proceeding would penalize the overwhelming majority of

11   applicants who proceed *pro se* and often have limited English proficiency. These applicants will face

12   significant challenges if they are forced to defend their *prima facie* eligibility in written English,

13   with no notice of the deficiencies in their applications and with no opportunity to testify and respond

14   to the IJ's questioning.[22] A ten-day response period is furthermore patently inadequate for an

15   applicant, especially a detained applicant, to gather any necessary evidence and prepare a written

16   brief that would most likely also need to be translated.

17   153.   In response to comments about the vulnerability of *pro se* applicants, the Agencies

18   assert that "a large majority (85 percent at the end of FY2020) of those asylum seekers who are in

19   proceedings before DOJ—and who, in turn could have an immigration judge pretermit their asylum

20   application—are represented in proceedings." 85 Fed. Reg. at 80305. As an initial matter, the

21   materials referenced by the Agencies also state the representation rate in all pending cases, including

22   those in which the noncitizen has not yet had a hearing, is just 60%. Moreover, the Agencies'

23   misleading statistic fails to account for variations in representation rates based on location and stage

24   of the process. Under the existing regime, an asylum applicant might have her case transferred away

---

25   [22] It is well-settled under circuit case law that when an applicant is *pro se*, the IJ has "an affirmative
obligation to help establish and develop the record." *Yang v. McElroy*, 277 F.3d 158, 162 (2d Cir.
26   2002); *see also Jacinto v. INS*, 208 F.3d 725, 732–33 (9th Cir. 2000). UNHCR Handbook on
Procedures and Criteria for Determining Refugee Status ¶ 196 (1979, Rev'd 1992) similarly places a
27   burden to ascertain and evaluate relevant facts in part on the examiner: "[I]n some cases, it may be
for the examiner to use all the means at his disposal to produce the necessary evidence in support of
28   the application." *Id.* ¶ 196.

from the border to an urban center, where she may eventually find representation by the time of her individual merits hearing. Under the Rule and other recent regulatory changes, an asylum applicant might have as little as 15 days to prepare and submit an asylum application, which would then be subject to pretermission. It is far less likely that an applicant will secure counsel within this 15-day period than by the time the case is scheduled for an individual hearing. However, with the need to submit a complete application so quickly, and the possibility that the application will be pretermitted without ever scheduling a hearing, a likely result of the Rule is that more asylum seekers will have their applications denied before they can secure legal representation.

154.    The opportunity to respond to a pretermission motion or show-cause order does not cure these fundamental problems with the Rule's pretermission provision. It is irrational for the Agencies to conclude that a person proceeding *pro se* and with limited ability to understand legal English would be able to address any deficiencies identified by an IJ. The way for an applicant to do so is to be questioned at a hearing, as the INA requires, by an IJ who can elicit and evaluate her testimony with adequate interpretation.

155.    The Agencies unreasonably failed to consider the harm the pretermission provision, which allows only a written response, would impose on unrepresented applicants with limited English ability. The pretermission provision unjustifiably deviates from past BIA precedent that required significantly greater process, including *Matter of Fefe*, 20 I & N Dec. 116 (BIA 1989). The Agencies attempt to justify the departure on the ground that the regulations interpreted in *Matter of Fefe* are no longer in effect. But the Board's holding in *Fefe* did not turn solely on those regulations, rather it "considere[d] the full examination to be an *essential* aspect of the asylum adjudication process for reasons related to fairness to the parties *and to the integrity of the asylum process itself.*" *See id.* at 118 (emphasis added). Here, the Board looked to UNHCR for guidance. *See id.*

156.    In completely denying due process guarantees to applicants, the Rule also contravenes the basic principles of procedural due process as established in the Fifth Amendment to the U.S. Constitution. Courts have found—time and again—that immigration judges violate the Due

1   Process Clause if they do not allow a noncitizen to fully developing her claims in immigration

2   court.[23]

3       157.    The flawed explanations offered in support of the pretermission provision belie the

4   Agencies' claims of reasoned decisionmaking. For example, the Agencies attempt to justify the

5   pretermission provision by likening it to summary judgment in judgment in civil litigation. 85 Fed.

6   Reg. at 80307. Civil litigants are entitled to conduct discovery before a court may enter summary

7   judgment, and Rule 56(d) of the Federal Rules of Civil Procedure enables a litigant to obtain

8   additional time to gather evidence before being required to defend against summary judgment.[24] In

9   contrast, there are no provisions in the Rule that ensure applicants receive a full and fair opportunity

10  to present their case before an IJ orders pretermission, only the patently inadequate 10-day notice

11  requirement.

12      158.    The Agencies' citation to *INS v. Abudu*, 485 U.S. 94 (1988), to claim that applicants

13  will generally be able to establish a *prima facie* case further confirms the arbitrary and capricious

---

[23] *See, e.g.*, *Guan v. Barr*, 925 F.3d 1022, 1032 (9th Cir. 2019) ("The Due Process Clause of the Fifth Amendment guarantees that [noncitizens] in removal proceedings have 'a full and fair opportunity to be represented by counsel, to prepare an application for ... relief, and to present testimony and other evidence in support of [that] application.'" (citation omitted)); *Lacsina Pangilinan v. Holder*, 568 F.3d 708, 709 (9th Cir. 2009)(finding a due process violation when the immigration judge prevented full examination of the applicant; *Cano-Merida v. INS*, 311 F.3d 960, 964-65 (9th Cir. 2002) (finding a due process violation where the IJ pressured a noncitizen to drop an asylum claim before developing facts); *Cruz Rendon v. Holder*, 603 F.3d 1104, 1111 (9th Cir. 2010) (finding a petitioner was denied due process where the petitioner was denied a continuance and limitations were placed on her testimony, thereby preventing petitioner from fully and fairly presenting her case); *Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1058–59 (9th Cir. 2005) (IJ violated due process in refusing to hear relevant expert testimony regarding domestic violence, where the testimony could have affected the IJ's assessment of credibility); *Agyeman v. INS*, 296 F.3d 871, 884–85 (9th Cir. 2002) (*pro se* noncitizen was prejudiced by IJ's failure to explain adequately how to prove existence of marriage, grant time to develop the noncitizen's claim, failure to sufficiently *sua sponte* develop the record); *Salgado-Diaz v. Ashcroft*, 395 F. 3d 1158, 1162 (9th Cir. 2005) ("Immigration proceedings, although not subject to the full range of constitutional protections, must conform to the Fifth Amendment's requirement of due process."); *see also Gonzaga-Ortega v. Holder*, 736 F.3d 795, 804 (9th Cir. 2013); *United States v. Reyes-Bonilla*, 671 F.3d 1036, 1045 (9th Cir. 2012); *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) ("[A noncitizen] who faces deportation is entitled to a full and fair hearing of his claims and a reasonable opportunity to present evidence on his behalf.").
[24] There are similar procedural protections for a summary judgment proceeding before an administrative law judge, including a requirement of a hearing if there is a material issue of fact. 28 C.F.R. § 68.38(e).

nature of the pretermission provision. *See* 85 Fed. Reg. at 80303. Several commenters objected that the NPRM relied selectively and misleadingly on *Abudu* as support for the pretermission provision. The Agencies failed to address the comments or justify reliance on *Abudu*, which discussed only the proper standards of review for circuit courts addressing a BIA denial of a motion to reopen and explicitly *declined* to address "what constitutes a prima facie case for establishing eligibility for asylum." 485 U.S. at 104.

159.    The Agencies' reliance on an unpublished decision to justify the pretermission provision and departure from the existing regulatory and statutory framework is equally flawed. *See* 85 Fed. Reg. at 80302 (citing *Bo Yu Zhu v. Gonzalez*, 218 F. App'x 21 (2d Cir. 2007)). In *Zhu*, the IJ pretermitted the case after giving the applicant 30 days to submit a brief addressing specifically identified deficiencies in his case, which the applicant failed to do or request additional time. *Id.* at 23.[25]

160.    The Agencies suggest that the requirement for greater specificity triggered by the pretermission provision does not conflict with the INA because Congress chose a one-year filing deadline over an earlier proposal of a thirty-day filing deadline and therefore already addressed concerns about the impact on applicants from requiring a certain degree of specificity. 85 Fed. Reg. at 80303. The Rule also relies on the *absence* of any statement in the IIRIRA conference report encouraging "a condensed application for the sake of expediency." *Id.* Reliance on draft legislation that was not enacted and the absence of a statement in a conference report does not show reasoned decision-making.

161.    Moreover, the Agencies' rationale fails to account for another rule that was finalized just days after the Rule. As noted above, *Procedures for Asylum and Withholding of Removal* establishes a 15-day filing deadline for asylum applicants in asylum-and-withholding-only proceedings. Because of the staggered rulemaking, commenters to the Rule could not alert the Agencies to the combined effect of the Rule's pretermission provision and the new 15-day requirement in another rule. As a result of these rules, applicants will be required to gather and

---

[25] Commenters objected to the NPRM's reliance on *Zhu*, yet the Rule continues to cite *Zhu* favorably as support for the pretermission provision and entirely fails to address the comments objecting to that reliance. 85 Fed. Reg. at 80303.

present more detailed information in a dramatically shorter amount of time than the Agencies'

rationale purportedly relies upon, and frequently without the benefit of counsel, in order to avoid

pretermission.

162.    The Rule's assertion that pretermission creates a more efficient process is unfounded.

An applicant will have to make a full submission to avoid pretermission, but that submission could

well be stale by the time of the merits hearing such that supplemental submissions would be

required. As a result, adjudicators could be required to review multiple lengthy submissions.

163.    The Rule also claims that pretermission will improve efficiency because fewer than

20% of asylum applications are granted after a hearing. That statistic is misleading. As

commentators have noted, the Agencies' have adjusted what they include in their calculations to

depress that figure, which should be much higher.[26]

164.    The pretermission provision will interfere with applicants' ability to meet their

burden of proof for asylum under 8 U.S.C. § 1158(b)(1)(B); is not in accordance with the plain text

of the INA; exceeds the Agencies' statutory authority by requiring IJs to deny applicants of their

statutory right to an evidentiary proceeding; and has no justifiable or reasoned basis. It should be set

aside as unlawful under APA, 5 U.S.C. §§ 706(2)(A) and (C).

**D.    The Rule redefines a "frivolous" filing with grave consequences for applicants.**

165.    8 U.S.C. § 1158 (d)(6) permanently bars applicants who "knowingly" make a

frivolous application for asylum from receiving any immigration benefit under the INA, provided the

applicant has received notice of the consequences of filing a frivolous application. 8 U.S.C. §

1158(d)(6). While the INA does not define the terms "knowingly" or "frivolous," because of the

extremely harsh consequences of a frivolous finding, the Agencies have narrowly construed §§

1158(d)(6), requiring deliberate fabrication of material elements. 8 C.F.R. §§ 208.20 (current),

1208.20 (current). Existing law requires that an applicant receive notice and an opportunity to

---

[26] *See, e.g.,* Jeffrey S. Chase, *EOIR's New Math*, JEFFREY S. CHASE BLOG (Dec. 12, 2020), https://tinyurl.com/ycbjxll4.

1  address discrepancies or implausible aspects of her claim before an IJ can make a frivolousness

2  determination and deny asylum.[27]

3       166.    Under the current framework, only an IJ or the BIA can determine an asylum

4  application to be frivolous. The Rule would allow asylum officers adjudicating affirmative

5  applications to make frivolousness findings and refer the applicant to an immigration judge on that

6  basis, although an immigration judge would have to affirm the frivolousness finding in order for the

7  applicant to be rendered permanently ineligible. 8 C.F.R. § 208.20(b).

8       167.    The Final Rule expands the grounds on which an asylum application can be deemed

9  frivolous and provides that the notice requirement is satisfied by the written warning on Form I-589.

10  85 Fed. Reg. at 80300. For applications filed on or after January 11, 2021, an IJ may deem an

11  application frivolous without additional notice if the IJ finds that the application (1) contains a

12  fabricated material element, (2) is premised upon false or fabricated evidence unless the application

13  would have been granted without that evidence, (3) was filed without regard to the merits of the

14  claim, or (4) is clearly foreclosed by applicable law. 8 C.F.R. §§ 208.20(c)(1)–(4) (proposed),

15  1208.20(c)(1)–(4) (proposed). Applications that are withdrawn or untimely filed may also be deemed

16  frivolous.[28] 8 C.F.R. §§ 208.20(e)-(f) (proposed), 1208.20(e)-(f) (proposed). The Final Rule defines

17  "knowingly" as acting with actual knowledge or willful blindness regarding the frivolous nature of

18  an application. 85 Fed. Reg. at 80279.

---

19  [27] *See, e.g., Yan Liu v. Holder*, 640 F.3d 918, 927-30 (9th Cir. 2011) (noting that "the substantive

20  and procedural requirements for a frivolousness finding are . . . stringent" and vacating frivolousness finding were applicant was not afforded and opportunity to responds where grounds for finding frivolousness finding were not disclosed to her pre-hearing or during her merits hearing and basis for

21  finding did not meet the heightened requirements for a frivolousness finding); *Matter of Y-L-*, 24 I. & N. Dec. 151, 155 (BIA 2007) ("Given the serious consequences of a frivolousness finding, the

22  regulation provides a number of procedural safeguards. These include the following requirements: (1) notice to the [noncitizen] of the consequences of filing a frivolous application; (2) a specific

23  finding by the Immigration Judge or the Board that the [noncitizen] knowingly filed a frivolous application; (3) sufficient evidence in the record to support the finding that a material element of the

24  asylum application was deliberately fabricated; and (4) an indication that the [noncitizen] has been afforded sufficient opportunity to account for any discrepancies or implausible aspects of the

25  claim."); 8 C.F.R. § 1208.20 (current).
[28] An applicant can avoid a frivolousness finding upon withdrawal of an application only if she

26  "wholly disclaims the application" and withdraws it with prejudice, is eligible for and accepts voluntary departure in no more than 30 days, withdraws any and all other applications for relief, *and*

27  waives her right to appeal or file a motion to reopen or reconsider. 8 C.F.R. § 208.20(f)(1)–(4); § 1208.20(f)(1)–(4).

28

COMPLAINT

168.    The Rule does not require that an adjudicator provide an applicant with any opportunity to address concerns as to whether aspects of a claim may warrant a frivolousness finding, beyond the general warning concerning the consequences of filing a frivolous application contained in the asylum application form. 8 C.F.R. § 208.20(d) (proposed); 8 C.F.R. § 1208.20(d) (proposed).

169.    The Rule's frivolousness provision should be set aside pursuant to APA, 5 U.S.C. § 706(2)(A) as arbitrary and capricious, an abuse of discretion and not in accordance with law, and under § 706(2)(C) because it exceeds the Agencies' statutory authority.

170.    *First*, insofar as the Rule's frivolousness provision would allow an IJ to make a frivolousness determination and deny asylum without notice or an evidentiary proceeding, it is in excess of statutory authority and not in accordance with law. As set forth above in Part C, IJs are required to conduct proceedings during which applicants are entitled to present evidence, including testimony, and to cross-examine any witnesses. The frivolousness provision would upend these statutory due process rights to a full and fair opportunity to presents one's case

171.    *Second*, the frivolousness provision is vague to the point that it fails to provide constitutionally sufficient notice of the conduct that may trigger a frivolousness determination. The Agencies ignored the due process concerns raised by commenters that the wording of the four-part definition is too vague to provide adequate notice of prohibited conduct.

172.    *Third*, the Agencies have failed to consider the harmful impacts of including applications that are "filed without regard to the merits" or are "foreclosed by applicable law" in the definition of frivolous applications. As commenters observed, the chilling effect of these provisions will deter applicants from bringing potentially meritorious claims, including those based on good-faith arguments that may seek to overturn or limit an unfavorable precedent.

173.    The Rule fails to engage with comments that this aspect of the Rule would be particularly harsh for *pro se* applicants who are poorly positioned to evaluate whether their claim is meritless, even if submitted in good faith, or clearly foreclosed by precedent—other than to suggest, inaccurately, that an overwhelming majority of applicants are represented. 85 Fed. Reg. at 80299.

174.     The Rule furthermore disregards the fact that, especially under the Trump Administration, asylum law has undergone a number of sweeping and sudden procedural and substantive shifts, between the unusually high volume of Attorney General decisions and barrage of new regulations. An asylum claim might easily be consistent with controlling law at the time it was filed only to become "foreclosed by law" with the next executive order or precedential agency decision.

175.     Nor does the Rule address any of the due process concerns raised in comments noting that the new ground for finding an application to be frivolous if it has "no merit" would create a conflict for attorneys. It places in devastating tension their duty to advocate zealously for their clients, including by pressing good-faith arguments, and their duty not to subject their clients to the risk of a finding of frivolousness under the new, unjustified definition.

176.     *Fourth*, the Agencies claim the rule is necessary to more efficiently screen out frivolous applications, but the Agencies have failed to identify reliable evidence to support their assertion of an increase in the volume of frivolous applications. For support, the Agencies cite *Angov v. Lynch*, 788 F.3d 893 (9th Cir. 2015). But *Angov* did not involve a frivolousness determination. It affirmed the agency's adverse credibility finding based on the submission of fraudulent documents. *Id.* at 910. The decision contains one sentence that "[c]ases involving fraudulent asylum claims are distressingly common. . . . And for every case where fraud is discovered or admitted, there are doubtless scores of others . . . ." *Id.* at 902 (citations omitted). This offhand dictum regarding asylum cases that contain purportedly fraudulent documents—not frivolous applications—hardly provides the type of reliable factual information upon which reasoned decision-making could be based.

177.     The only other justification for the Agencies' belief that the volume of frivolous asylum applications is increasing is their conjecture that because the overall number of asylum applications has increased, there has "almost certainly" been an increase in frivolous applications. 85 Fed. Reg. at 80301. This is pure speculation.

178.     The Rule does not consider how the professed goal of deterring frivolous filings could be achieved more efficiently and through less draconian steps than dramatically increasing the volume of frivolousness determinations, which permanently bar impacted applicants from ever

1   obtaining immigration relief in the United States. *Khadka v. Holder*, 618 F.3d 996, 1002 (9th Cir.

2   2010) (noting the harsh consequences of a frivolousness finding).

3       179.    *Fifth*, the Agencies have no reasoned basis for interpreting the statutory requirement

4   of "knowingly" making a frivolous application to include acting with willful blindness, 85 Fed. Reg.

5   at 80299. The Rule asserts that because Congress decided to not define "knowingly" in 8 U.S.C. §

6   1158(d)(6), "willful blindness" is necessarily a reasonable interpretation of the term. 85 Fed. Reg. at

7   80299. The Agencies unreasonably borrow the "willful blindness" standard from criminal and patent

8   infringement law without explaining why it is correct to fill in any gaps left by Congress' use of the

9   term "knowingly" based on these two specific areas of law, with no obvious connection to

10  immigration proceedings. A common construction of "knowing" in civil fraud contexts, for example,

11  requires actual knowledge to impose liability. *Gilman v. FDIC*, 660 F.2d 688 (6th Cir. 1981). The

12  Agencies have failed to justify adopting a heightened standard from dissimilar contexts.

13      180.    *Sixth*, the Agencies have not justified subjecting untimely and withdrawn applications

14  to the frivolousness provisions unless the requirements of 8 C.F.R. §§ 208.20(f) (proposed),

15  1208.20(f) (proposed) are met as a narrow exception in cases of withdrawn applications. The

16  Agencies failed to consider the harm to applicants who may have blameless reasons for filing their

17  applications more than one year after entering the United States. *See* 8 U.S.C. § 1158(a)(2)(D).

18      181.    Further, the exception for an applicant who withdraws her application and agrees to

19  voluntary departure is likely to lead to *refoulement* by coercing applicants to return to the countries

20  from which they fled to escape persecution or torture. 8 C.F.R. §§ 208.20(f)(1)-(4) (proposed),

21  1208.20(f)(1)-(4) (proposed). The threat of a frivolousness finding that would result in permanent

22  ineligibility for immigration benefits will pressure asylum applicants—including those with

23  potentially meritorious claims—into giving up and going "home" to a country where they are in

24  mortal danger. This is an inappropriate use of rulemaking power that exceeds the Agencies' statutory

25  authority.

26      182.    *Seventh*, the four-part frivolousness framework further conflicts with the statute

27  because whether a claim lacks merit or is foreclosed by applicable law is not synonymous with

28  whether it is frivolous.

183.    In this regard, the Rule ignores congressional intent that the term "frivolous" in 8 U.S.C. § 1158(d)(6) should incorporate UNHCR's guidance, which provides that a claim "should not be rejected as 'manifestly unfounded' even if it does not fall under the Refugee Convention definition, if it is also evident that the applicant is in need of protection for other reasons and thus may qualify for the granting of asylum."[29] The UNHCR definition thus clearly encompasses applications that an immigration judge may find "lack merit" but that may be found by a court of appeals to establish a protection claim. The Rule does not address UNHCR's guidance and therefore ignores Congress's commitment to the Protocol, a treaty that represents the United States' tradition of being "a beacon of hope, and of light . . . the country where people could come to when they [are] persecuted." 142 Cong. Rec. S4,466 (daily ed. May 1, 1996) (statement by Senator Richard Michael DeWine). Accordingly, the Rule conflicts with Congress' intent and is inconsistent with the United States' treaty obligations under the Protocol and Convention, as incorporated into U.S. law in the Refugee Act of 1980.

184.    *Eighth*, the Agencies' discussion defending the expansion of the frivolousness bar disregards comments that emphasized the plainly dire consequences and argued that the Rule fails to weigh these consequences against the objectives the Agencies are purporting to achieve by expanding the bar. Combined with the increasing complexity and rapid changes to current U.S. asylum law (including elsewhere in this very Rule), the broad definition of "frivolous" to include claims foreclosed by law and its harsh consequences will deter and prevent applicants from pursuing claims that would be meritorious under existing law.

185.    Neither the NPRM nor the final Rule includes any analysis of the negative impact of the rule change on asylum seekers, attorneys, or adjudicators, nor an explanation for the assumption that all asylum seekers have a nuanced understanding of U.S. asylum law.

**E.    The Rule redefines core statutory terms to restrict asylum.**

1.    Particular Social Group

---

[29] *See Follow-up on Earlier Conclusions of the Sub-Committee on the Determination of Refugee Status with Regard to the Problem of Manifestly Unfounded or Abusive Applications*, UNHCR (Aug. 26, 1983), https://tinyurl.com/y8t799vr.

186.    The Rule re-defines the phrase "particular social group," 8 C.F.R. § 208.1(c) (proposed); 8 C.F.R. § 1208.1(c) (proposed), one of the five statutory grounds on which an asylum or withholding of removal claim can be based, primarily to impose additional requirements and restrictions on the establishment of a cognizable particular social group. 8 U.S.C. § 1101(a)(42)(A). The term "particular social group" refers to a group of people who share a common characteristic that they "either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Matter of Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985). In recent years, the Agencies have added two additional elements to the longstanding *Acosta* test, requiring applicants to also show that their proposed group is defined with particularity and socially distinct in the society in question. *See, e.g.*, *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 237 (BIA 2014). A cognizable social group must also not be "defined exclusively by the fact that its members have been subjected to harm," the so-called circularity rule. *Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. 69, 74 (BIA 2007); *see Diaz-Reynoso v. Barr*, 968 F.3d 1070, 1081 (9th Cir. 2020) (discussing circularity principle).

187.    Throughout the evolution of the particular social group framework, the Agencies have emphasized that social group cognizability must be determined on a case-by-case basis. *Matter of Acosta*, 19 I. & N. Dec. at 233; *M-E-V-G-*, 26 I. & N. Dec. at 242. The importance of case-by-case adjudication is also reflected in federal case law. *See, e.g.*, *Pirir-Boc v. Holder*, 750 F.3d 1077, 1084 (9th Cir. 2014) ("To be consistent with its own precedent, the BIA may not reject a group solely because it had previously found a similar group in a different society to lack social distinction or particularity."). Due to the fact-intensive nature of the cognizability determination, the BIA's general policy is to not consider for the first time on appeal a social group that is substantially different from the group considered by the IJ, though it may do so when warranted by the record. *Matter of W-Y-C- & H-O-B-*, 27 I. & N. Dec. 189, 192 (BIA 2018); *see Cantarero-Lagos v. Barr*, 924 F.3d 145, 151 (5th Cir. 2019).

188.    The Rule makes a number of changes to the standard for establishing social group cognizability that contradict well established BIA and circuit court precedent. It does not offer a

reasoned explanation for this sharp break with precedent nor does it reflect adequate consideration of the serious problems with this change.

189.    *First*, it codifies the Agencies' position previously expressed in BIA case law that a particular social group must be (1) based on an immutable characteristic; (2) particular; and (3) socially distinct. *See* 8 C.F.R. § 208.1(c) (proposed); 8 C.F.R. § 1208.1(c) (proposed).

190.    *Second*, the Rule establishes a two-part anti-circularity test for the first time, requiring applicants to show that their proposed group (1) exists independently of the alleged persecution and (2) is not defined exclusively by the harm feared. *Id.*

191.    *Third*, in a departure from the Agencies' longstanding practice of adjudicating social group cognizability on a case-by-case basis, the Rule establishes a general rule that the following nine scenarios will generally not qualify as particular social groups: (1) past or present criminal activity or associations, (2) past or present terrorist activity or association, (3) past or present persecutory activity or association, (4) presence in a country with generalized violence or a high crime rate, (5) the attempted recruitment of the applicant by criminal, terrorist, or persecutory groups, (6) the targeting of the applicant for criminal activity for financial gain based on perceptions of wealth or affluence, (7) interpersonal disputes of which governmental authorities were unaware or uninvolved, (8) private criminal acts of which governmental authorities were unaware or uninvolved, and (9) status as a noncitizen returning from the United States. *Id.*

192.    *Fourth*, under the Rule an applicant waives "for all purposes" any particular social group formulation that was not explicitly articulated to the IJ. *Id.* The Rule specifically notes that an applicant may not rely on a new social group as the basis for a motion to reopen or reconsider, including where such motions are based on ineffective assistance of prior counsel unless the applicant complies with procedural requirements for a motion to reopen or reconsider and demonstrates that counsel's failure to define or provide a basis for defining a particular social group "constituted egregious conduct." 8 C.F.R. § 208.1(c) (proposed).

193.    The provisions of the Rule that (1) generally foreclose social groups arising out of nine circumstances; (2) revise the circularity standard; and (3) prohibit applicants from relying on

social groups not articulated to the IJ violate the APA, 5 U.S.C. § 706(2), because they are contrary to law, arbitrary and capricious, and an abuse of discretion.

194.    In addition, the Rule's foreclosure of social groups in the nine enumerated scenarios is unlawful agency action under the APA for several reasons.

195.    *First*, foreclosing groups arising out of particular contexts violates the non-discriminatory refugee definition enacted by Congress. *See Bringas-Rodriguez*, 850 F.3d at 1059–60. The 1980 Refugee Act marked a conscious turn away from a prior era of ideological and policy-driven asylum adjudications, in which protection was only available on an "ad hoc" basis to those fleeing specific regimes. Under the Refugee Act, protection is available to any person meeting the statutory definition of a refugee; asylum eligibility does not turn on the form of the underlying persecution. *Negusie v. Holder*, 555 U.S. 511, 520 (2009). This presumption against certain types of claims also deprives applicants of an impartial adjudication of their cases.

196.    *Second*, categorically foreclosing certain groups departs from longstanding precedent requiring adjudication of particular social groups on a case-by-case basis, a change the Agencies do not acknowledge. Instead, the Agencies claim that the Rule is consistent with case-by-case adjudication, on the dubious grounds that while the Rule establishes a "general rule" against these social groups, they may still prevail in rare circumstances. *See, e.g.*, 85 Fed. Reg. at 80321. The Agencies' only response to comments raising this concern is to repeatedly state that the Rule only establishes that the listed groups will not prevail "without more," but the Agencies offer no indication of what "more" they intend to require. *See, e.g.*, 85 Fed. Reg. at 80314.

197.    This provision is also not supported by the justifications offered by the Agencies. The cases cited as the basis for the Agencies' belief that the listed groups are generally not cognizable do not actually support this proposition. While many of the cases reject the specific proposed group as not cognizable, based on the record in the case or other defects, they do not stand for the proposition that these groups will generally not succeed. The Agencies' claim that the real problem with the listed groups is that they do not have the requisite particularity and social distinction falls especially flat, as the Rule itself recognizes that these are record- and society-specific inquiries that are ill-suited for generalizations. *See, e.g.*, 85 Fed. Reg. at 80314.

198.    *Third*, the nine enumerated circumstances import other elements of the asylum definition into the social group cognizability analysis, upsetting the balanced statutory scheme. This provision thus allows adjudicators to reject particular social groups for reasons unrelated to the immutability, social distinction, or particularity of the group, contrary to the Agencies' own framework for assessing social group cognizability. For example, in a forced recruitment case, the actual social group delineated would likely be based on some combination of nationality, age, gender, or family status, not necessarily in reference to the recruitment.

199.    The new two-part circularity standard is unlawful because it is based on a false distinction between alternate articulations of the existing standard. The Agencies have used the "existed independently" and "defined exclusively by the alleged harm" formulations interchangeably to describe the circularity standard, making no distinction between the two. *See M-E-V-G-*, 25 I. & N. Dec. at 236 n.11 (noting that "independent existence" is required by *Matter of A-M-E- & J-G-U-*, 24 I. & N. Dec. at 74, which discusses "defined exclusively"). The Agencies make no response to commenters pointing out their failure to explain how these provisions differ, or requesting clarity as to their scope.

200.    To the extent the new circularity standard is read to mean that a group is invalid if it does not exist *completely* independently of the harm feared, it is an unexplained change and an unreasoned interpretation of "particular social group." The Agencies have long acknowledged that the persecution suffered may permissibly play a role in helping define the particular social group and that the circularity standard only prohibits groups defined entirely by the harm suffered. *See M-E-V-G-*, 25 I. & N. Dec. at 236 n.11; *Diaz-Reynoso*, 968 F.3d at 1082–83. Under the new standard, applicants could be denied protection simply because they included too many modifiers in their social group definition. *See, e.g.*, *Diaz-Reynoso*, 968 F.3d at 1085 (noting that a circularity rule that prohibited any reference to harm would mean that "a Tutsi fleeing Rwanda during the Rwandan Civil War would be denied relief if he or she included in the description of the Tutsi social group that Tutsis had been targeted in a campaign of genocide").

201.    The new circularity standard also fails to consider that truly circular social groups— those that are defined solely by the harm suffered—will be weeded out by the nexus element. A

social group cannot be created solely by the alleged persecution because nexus requires that the persecution must have been inflicted on account of that social group. *Lukwago v. Ashcroft*, 329 F.3d 157, 172 (3d Cir. 2003). Thus, for example, a claim based on the group "victims of domestic violence" would likely fail at nexus: a woman is not subjected to domestic violence *because* she is a victim of domestic violence but rather because of her gender or gender and immutable relationship status, taken together. The Rule's broad new circularity standard duplicates the work of the nexus element.

202.    Finally, the component of the particular social group redefinition providing for waiver of any social group not articulated to the IJ violates applicants' due process rights under the Fifth Amendment as it makes no exception for failure to raise viable groups due to ineffective assistance of counsel or unrepresented asylum seekers who do not understand the nuances of particular social group jurisprudence.[30] Moreover, the Agencies justify this provision as necessary to achieve the illegitimate goal of reducing the time spent analyzing claims and facilitating pretermission, an explanation that fails to consider the impact of this policy on applicants—especially *pro se* applicants—who, in light of the complex particular social group case law, lack the sophistication to make out a viable particular social group in the first instance. 85 Fed. Reg. at 36279.

203.    Considered as a whole, the Rule's changes to the definition of a cognizable social group cannot be reconciled with the INA and the Fifth Amendment and are therefore contrary to law. The Rule conflicts with the non-discriminatory refugee definition established by Congress, upsets the balanced statutory scheme for analyzing asylum claims, and undermines the constitutional due process rights inherent in removal proceedings.

204.    The Rule's changes to the definition of a cognizable social group constitute unlawful agency action for the additional reason that they are arbitrary and capricious and an abuse of discretion. The Rule departs from settled agency standards, including the required case-by-case review of particular social groups and the circularity standard, departures it fails to acknowledge or

---

[30] *See Cantarero-Lagos v. Barr*, 924 F.3d 145, 154 (Dennis., J., concurring in the judgement) ("[I]f [an] 'exact delineation' requirement is further imposed on pro se asylum seekers, they will not stand a chance. Someone who faces persecution on account of a protected ground is no less deserving of asylum's protections because of her inability to exactly delineate a convoluted legal concept.").

adequately justify. The Rule is an unreasoned interpretation of "particular social group" and will result in the denial of meritorious claims.

2.   Political Opinion

205.   The Rule radically narrows the definition of political opinion, upending decades of BIA case law and federal court precedent without adequate explanation. The Rule rewrites the definition of political opinion to constitute a protected ground only when the "ideal or conviction [are] in support of the furtherance of a discrete cause related to political control of a state or a unit thereof." *See* 8 CFR § 208.1(d) (proposed); 8 CRF § 1208.1(d) (proposed). In effect, the Rule introduces an entirely new state action requirement on those seeking asylum protection on political opinion grounds.

206.   An asylum applicant has been persecuted on account of political opinion, and thus may qualify as a refugee, if she "held or . . . [her] persecutors believed that [s]he held a political opinion." *Ahmed v. Keisler*, 504 F.3d 1183, 1192 (9th Cir. 2007); *see also Navas,* 217 F.3d at 656 (9th Cir. 2000). Under the INA, an asylum seeker need not have expressed or acted on their political opinion. The INA and Refugee Convention specifically refer to "'political opinion' rather than 'political activity.'" *See Mamouzian v. Ashcroft*, 390 F.3d 1129, 1132 (9th Cir. 2004).

207.   Courts have long recognized that asylum claims based on political opinion do not require formal political party membership. Rather, courts examine political opinion claims considering the society, culture and context in which they arise. *See, e.g.*, *Zhiqiang Hu v. Holder*, 652 F.3d 1011, 1017 (9th Cir. 2011) ("[A] political opinion encompasses more than just participation in electoral politics or holding a formal political ideology.") (citation omitted).

208.   This interpretation of the political opinion ground in the INA is consistent with the humanitarian protections the United States committed to provide when it incorporated the 1980 Refugee Act into U.S. law. As UNHCR has explained, "the notion of political opinion needs to be understood in a broad sense to encompass 'any opinion on any matter in which the machinery of State, government, society, or policy may be engaged.'" *Guidance Note on Refugee Claims Relating*

*to Victims of Organized Gangs* ¶ 45, UNHCR (March 31, 2010), https://tinyurl.com/ycxh53a9 (emphasis added).[31]

209.    Courts including the Ninth Circuit have understood political opinion to apply broadly and to include, for example, whistleblowing, environmentalism, refusing to accept a bribe, feminism, union activities, opposition to government corruption, refusal to acquiesce to sexual assault, and rejection of recruitment efforts by extremist groups, among others.[32]

210.    Indeed, the Department of Justice itself has recognized that violations of gender-discriminatory norms can be been considered expressions of feminist political opinions. And, in *Fatin v. INS*, then-Circuit Court Judge Samuel Alito found that an expression of women's rights in violation of a law that imposes sanctions on women for not wearing a head covering in public is a cognizable feminist political opinion. *See Fatin v. INS.*, 12 F.3d 1233, 1241–43 (3d Cir. 1993) ("[W]e have little doubt feminism qualifies as political opinion within the meaning of the relevant statutes[.]"). Nevertheless, the Rule did not address comments that raised concerns about the Rule's reversal of this long standing precedent and utterly failed to consider this important aspect of the problem.

---

[31] *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987) (finding that it "clear from the legislative history of . . . the entire 1980 Act . . . that one of Congress' primary purposes was to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees" and looking to the UNHCR analysis to guide its interpretation of the term "refugee"); *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 949 (9th Cir. 2007) (noting that the Ninth Circuit "view[s] the UNHCR Handbook as 'persuasive authority in interpreting the scope of refugee status under domestic asylum law'" (citation omitted)).

[32] *See, e.g.*, *Singh v. Barr*, 935 F.3d 822, 825 (9th Cir. 2019) (whistleblowing "may constitute a political activity sufficient to form the basis of persecution") (citation omitted); *Nyamu v. Holder*, 490 F. App'x 39, 41 (9th Cir. 2012) (unpublished) ("[The applicant's] advocacy regarding the pollution caused by businesses in his region of Kenya clearly constituted a political opinion"); *Sagaydak v. Gonzalez*, 405 F.3d 1035 (9th Cir. 2005) (finding that refusal to accept a bribe from private company was an expression of protected political opinion); *Al-Saher v. INS*, 268 F.3d 1143, 1146 (9th Cir. 2001) ("[the applicant's] statements regarding the unfair distribution of food in Iraq resulted in Iraqi officials imputing an anti-government political opinion [on the applicant]"), *amended*, 335 F.3d 1140 (9th Cir. 2004); *Grava v. INS*, 205 F.3d 1177 (9th Cir. 2000) (opposition to government corruption may constitute political opinion); *see also Hernandez-Chacon v. Barr*, 948 F.3d 94 (2d Cir. 2020) (refusal to acquiesce to sexual assault can be political opinion in light of social context); *Jabr v. Holder*, 711 F.3d 835 (7th Cir. 2013) (holding that rejection of extremist group's recruitment efforts may constitute cognizable political opinion); *Osorio v. INS*, 18 F.3d 1017, 1029-31 (2d Cir. 1994) (union activities can imply a political opinion).

211.    Under long-standing precedent, adjudicators apply a thorough and contextual factual inquiry to determine whether opposition to a non-state actor constitutes a political opinion in each case.[33]

212.    The Rule reverses this precedent because it would deny asylum to applicants fleeing persecution by non-state actors unless their political opinion in opposition to a non-state group was expressed through public acts "related to efforts by the state to control," or if they had expressed their opposition through behavior that is "antithetical to or otherwise opposes the ruling legal entity of the state or a legal sub-unit of the state." 85 Fed. Reg. 80385–86.

213.    The Rule references what it asserts is "the general understanding that a political opinion is intended to advance or further a discrete cause related to political control of a state" in order to significantly limit the definition of the term. 85 Fed. Reg. at 80280. By way of justification, the Agencies offer a false distinction between matters involving state or political entities and matters of "culture." Yet, the new requirement in the Rule violates the long-standing principle embedded in U.S. and international law that harm from non-state actors constitutes persecution, provided the applicant establishes that the government is "unwilling or unable" to control the persecutors. *See, e.g., Bringas-Rodriguez*, 850 F.3d at 1051.

214.    The definition is also so narrow as to exclude what most Americans would recognize as the plain meaning of political opinion. For example, the early 1960's sit-ins which desegregated lunch counters would not be deemed manifestations of political opinion under the Rule because racial segregation of private business was in many cases a cultural institution rather than a legal mandate or government policy. *See Heart of Atlanta Motel v. U.S.*, 379 U.S. 241 (1964); *Katzenbach*

---

[33] *See, e.g., Regalado-Escobar v. Holder*, 717 F.3d 724, 729–30 (9th Cir. 2013) (opposition to the FMLN's violent tactics constitutes a political opinion); *Silaya v. Mukasey*, 524 F.3d 1066, 1072 (9th Cir. 2008) (substantial evidence compelled the conclusion that the applicant was persecuted by a communist rebel group on account of her imputed political opinion); *Ali v. Ashcroft*, 394 F.3d 780, 785, (9th Cir. 2005) (finding petitioner suffered persecution on account of political opinion by militia group which was not the ruling government in Somalia); *see also Martinez-Buendia v. Holder*, 616 F.3d 711 (7th Cir. 2010) (determining that refusal to cooperate with the FARC for ideological reasons is an expression of political opinion); *De Brenner v. Ashcroft*, 388 F.3d 629, 635–36 (8th Cir. 2004) (finding persecution on account of imputed political opinion given beliefs antithetical to the Shining Path's Marxist ideals).

*v. McClung*, 379 U.S. 294 (1964). The activists who confronted this ill were not voicing opposition to a political or state entity but fighting for social and cultural change. But despite representing a classic example of political activism, these protests would be excluded from the Rule's overly narrow definition of "political opinion."

215.    Many other quintessential contemporary forms of political expression in the United States could similarly be labeled cultural, social or otherwise unrelated to matters of state or political control under the Rule. LGBTQIA+ pride parades, abortion clinic protests, and the 1995 "Million Man March" are just a few examples of American political expression that focuses on social and cultural change. Indeed, in their effort to enact a highly restrictive understanding of the political opinion ground, the Agencies in the NPRM go so far as to claim that "voting" would not generally count as an expressive political behavior. 85 Fed. Reg. at 36280 n.30.

216.    The Rule would also significantly impact those seeking asylum because of the persecution they suffered or feared due to their advocacy on behalf of a cause related to LGBTQIA+ identity. If the definition of political opinion is narrowed in this manner, the only individuals who will have viable asylum claims based on their political opinion are publicly known activists who stand up to repressive governments. The Rule would exclude all other individuals advocating for equal rights, social acceptance, or societal change, in direct contravention of U.S. obligations under domestic and international law.

217.    The Rule would also exclude protection based on gender-related political opinions, and would, in turn, have particularly harmful effects on women and girls fleeing persecution based on their beliefs in gender equality. *See* Nancy Kelly, *Gender-Related Persecution: Assessing Asylum Claims of Women*, 26 CORNELL INT'L L.J. 625, 642 (1993), https://tinyurl.com/y72kod4z ("The existing refugee definition contained in the Convention and the Immigration and Nationality Act can accommodate the majority of gender-related cases of women, formulated as persecution based on membership in a particular social group, political opinion or imputed political opinion."). In so doing, the Rule violates the long-standing recognition that protected beliefs include those that are

1    "different from those of the Government or parts of society," which may include opinions as to

2    gender roles.[34]

3              3.    Persecution

4        218.    The Rule redefines "persecution," requiring applicants to establish a more severe

5    level of harm and listing six forms of abuse that will no longer constitute persecution. 8 C.F.R. §

6    208.1(e) (proposed); 8 C.F.R. § 1208.1(e)(proposed).

7        219.    In determining whether conduct against the applicant constitutes persecution, the

8    adjudicator considers the severity of harm the applicant suffered or fears. Under current legal

9    standards, persecution is understood to mean "threat[s] to the life or freedom of, or the infliction of

10   suffering or harm upon, those who differ in a way regarded as offensive." *Matter of Acosta*, 19 I. &

11   N. Dec. at 222. Persecution is not limited to physical violence and encompasses, for example, severe

12   economic restrictions, mental anguish, and the receipt of death threats. *Id.*; *see Navas,* 217 F.3d at

13   658; *Matter of O-Z- & I-Z*, 22 I. & N. Dec. 23, 25–26 (BIA 1998). There is no bright-line test;

14   instead, determination of whether an applicant has suffered persecution requires an individualized

15   assessment of the applicant's experiences, taking into account their cumulative or aggregate effect.

16   *See, e.g.*, *Herrera-Reyes v. Attorney Gen. of United States*, 952 F.3d 101, 109–10 (3d Cir. 2020);

17   *Santos-Guaman v. Sessions*, 891 F.3d 12, 17 (1st Cir. 2018).

18       220.    The Rule heightens the severity of harm required to show persecution, redefining the

19   term as "an extreme concept involving a severe level of harm that includes actions so severe that

20   they constitute an exigent threat." 8 C.F.R. § 208.1(e) (proposed); 8 C.F.R. § 1208.1(e) (proposed).

21       221.    The Rule also establishes a non-exhaustive list that enumerates six forms of harm that

22   do not constitute persecution: (1) harm arising out of civil, criminal, or military strife; (2) "all

23   treatment that the United States regards as unfair, offensive, unjust, or even unlawful or

24

25   _____

     [34] *Guidelines on International Protection No. 1: Gender-Related Persecution Within the Context of
     Article 1A(2) of the 1951 Convention and/or its 1967 Protocol Relating to the Status of Refugees*
26   ¶ 32, UNHCR (May 7, 2002), https://tinyurl.com/yb28dryq (emphasis added); *Handbook on
     Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection*
27   *Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* ¶ 80, UNHCR
     (April 2019), https://tinyurl.com/y9h3gmmv (recognizing as political opinions, beliefs that are not
28   tolerated by the authorities).

1   unconstitutional;" (3) intermittent harassment, including brief detentions; (4) threats made with no

2   "actual effort to carry out the threats, except that particularized threats of severe harm of an

3   immediate and menacing nature made by an identified entity may constitute persecution;" (5) non-

4   severe economic harm or property damage; and (6) laws or policies that are unenforced or

5   infrequently enforced, unless there is evidence they have been or would be applied to the applicant

6   personally. *Id.*

7        222.   The Rule does not require adjudicators to consider the cumulative effect of harm

8   experienced by an applicant. For example, an adjudicator would be required to find an absence of

9   persecution of the applicant was detained repeatedly over the course of months or years, if each

10   detention was considered "brief."

11        223.   The Rule's heightened definition of "persecution" and exclusion of six forms of harm

12   from the definition of "persecution" are contrary to the INA. As the Rule recognizes, by using the

13   term "persecution" in the Refugee Act, Congress ratified the existing judicial and administrative

14   constructions of the term resulting from its usage in previous INA provisions, adopting *inter alia* the

15   requirement that persecution be assessed on an individual basis. 85 Fed. Reg. at 80327; *see Matter of*

16   *Acosta*, 19 I. & N. Dec. at 222–23. The Rule's list of six forms of harm that do not constitute

17   persecution is contrary to Congress' clear intention that the severity of the harm be assessed on a

18   case-by-case basis.

19        224.   The Agencies have also failed to justify the creation of a list of excluded harms, a

20   change in the Agencies' longstanding practice. The case law cited as the basis for the list endorses a

21   fact-intensive persecution analysis that does not support the establishment of categorical exclusions.

22   *See, e.g.*, *de Zea v. Holder*, 761 F.3d 75, 69–80 (1st Cir. 2014). And the Agencies ignore significant

23   case law concluding that, depending on the facts of the case, the harms listed in the Rule may rise to

24   the level of persecution. *See, e.g.*, *Javhlan v. Holder*, 626 F.3d 1119 (9th Cir. 2010).

25        225.   Relatedly, the changes to the persecution standard fail to consider that many asylum

26   seekers experience multiple forms of harm that may constitute persecution when considered

27

28

cumulatively. While prior agency guidance required a cumulative analysis, the Rule does not, an

unexplained and unjustified change. *See Matter of O-Z-*, 22 I. & N. Dec. 23.[35]

226.    The Rule is also unlawful because it does not require a child-sensitive analysis. This

omission conflicts with 8 U.S.C. § 1232(d)(8), which requires regulations to consider the specialized

needs of unaccompanied children. The Rule ignores the particular vulnerabilities of children and

departs, without explanation, from the Agencies' prior standards and circuit precedent requiring a

child-sensitive analysis. *See, e.g.*, *Guidelines for Children's Asylum Claims, Asylum Office Basic

Training Course* 36-37, USCIS (March 21, 2009), http://www.refworld.org/pdfid/4f3e30152.pdf;

USCIS, RAIO Combined Training Program: Children's Claims 44-45 (Dec. 20, 2019); *Hernandez-

Ortiz v. Gonzales*, 496 F.3d 1042, 1046 (9th Cir. 2007). The Agencies' response to the significant

number of commenters who raised this issue is lacking, and is limited to a statement that the Rule

does not prevent adjudicators from conducting a child-sensitive analysis. 85 Fed. Reg. at 80328.

227.    Defects in the Agencies' selection and explanation of the specific forms of harm

excluded from the definition of persecution provide a further basis for finding the Rule unlawful

under APA, 5 U.S.C. § 706(2)(A).

228.    For example, the exclusion of "generalized harm that arises out of civil, criminal, or

military strife" speaks not to the severity of the harm suffered but to nexus, an inappropriate

duplication of the statutory structure that is unrelated to the severity of the harm. 8 C.F.R. § 208.1(e)

(proposed); 8 C.F.R. § 1208.1(e) (proposed).

229.    Additionally, the exclusion of certain threats ignores the reality that merely receiving

repeated threats may result in significant psychological harm, as has been widely recognized as

persecution by the Agencies and courts. *See, e.g.*, *Mashiri v. Ashcroft*, 383 F.3d 1112, 1119 (9th Cir.

2004). Even USCIS has recognized that threats may rise to the level of persecution. The Agencies

---

[35] *See also* USCIS, RAIO Combined Training Program: Definition of Persecution and Eligibility Based on Past Persecution Training Module 11-27 (June 12, 2015). This agency document references "cumulative" or "cumulatively" 18 times, notes that "[t]he federal courts, as well as the BIA, have held that cumulative instances of harm, considered in totality, may constitute persecution on account of a protected characteristic," and instructs adjudicators to "evaluate the entire scope of harm experienced and feared by the applicant to determine if he or she was persecuted and fears persecution."

have departed from agency policy and practice without sufficient explanation or engagement with comments on this point. While the Agencies amended the final Rule to allow consideration of particularized threats of severe harm that are immediate and menacing and made by an identified entity, this is an exceedingly high bar that does not rehabilitate the unreasoned nature of this provision.

230.    Finally, the exclusion of laws and policies that are infrequently enforced absent evidence that the law would be applied to the individual applicant from consideration of persecution ignores the myriad ways the existence of these laws may harm applicants and conflicts with the well-founded fear standard by requiring a higher degree of certainty that harm will take place. *Cardoza-Fonseca*, 480 U.S. at 440; *see, e.g.*, *Krotova v. Gonzales*, 416 F.3d 1080, 1087 (9th Cir. 2005). The Agencies do not acknowledge or explain this departure from the statutory text and settled law, instead responding to the numerous commenters who addressed this point by insisting that its interpretation is consistent with prior law.

### 4.    "On Account Of"

231.    Under the INA, the persecution an asylum seeker suffers or fears must be "on account of" one of the enumerated protected grounds in order to qualify for protection. 8 U.S.C. § 1101(a)(42). This provision is also known as the "nexus" requirement.

232.    U.S. law recognizes that persecutors may have multiple reasons or motives for their actions, and a protected ground need not be the only reason for the persecution. 8 U.S.C. § 1158(b)(1)(B)(i) (a protected ground must be "at least one central reason" for the persecution); *see also* 8 U.S.C. § 1231(b)(3)(C); *Parussimova*, 555 F.3d at 740 ("The Act requires that a protected ground serve as '*one* central reason' for the persecution, naturally suggesting that a persecutory act may have multiple causes.") (emphasis in original); *Alvarez Lagos v. Barr*, 927 F.3d 236, 250 (4th Cir. 2019) ("The protected ground need not be the only reason—or even the dominant or primary reason—for the persecution. . . it is enough that the protected ground be '*at least one* central reason' for the persecution.") (internal citations omitted, emphasis in original).

233.    The nexus determination is necessarily a case-specific inquiry that may be supported by direct or circumstantial evidence, given the difficulty of providing direct evidence of a persecutor's motivation for harm. *See, e.g.*, *Garcia-Martinez v. Ashcroft*, 371 F.3d 1066, 1075 (9th Cir. 2004) ("the [immigration judge] appeared to require that [petitioner] provide direct evidence of the soldiers' motive, when we have consistently allowed circumstantial evidence to suffice") (emphasis in original omitted); *see also Matter of J-B-N- & S-M-*, 24 I. & N. Dec. 208, 211 (BIA 2007) ("[A]n applicant must produce evidence, either direct or circumstantial, from which it is reasonable to believe that the harm was or would be motivated in part by an actual or imputed protected ground."); *Matter of S-P-*, 21 I. & N. Dec. 486, 489 (BIA 1996) ("Proving the actual, exact reason for persecution or feared persecution may be impossible in many cases. An asylum applicant is not obliged to show conclusively why persecution has occurred or may occur.").

234.    In contrast to the flexible inquiry required by the statutory language itself and decades of case law, the Rule provides a list of eight "non-exhaustive situations" in which asylum seekers will generally not be granted protection based on lack of nexus, creating a presumption of denial. 8 C.F.R. §§ 208.1(f) (proposed), 1208.1(f) (proposed). These include:

- "interpersonal animus or retribution" and "interpersonal animus in which the alleged persecutor has not targeted, or manifested an animus against other members of an alleged particular social group in addition to the member who has raised the claim;"

- "generalized disapproval of, disagreement with, or opposition to criminal, terrorist, gang, guerilla, or other non-state organizations absent expressive behavior in furtherance of a discrete cause against such organizations related to control of a state or expressive behavior that is antithetical to the state or a legal unit of the state" and "resistance to recruitment or coercion by guerilla, criminal, gang, terrorist, or other non-state organizations;"

- "the targeting of the applicant for criminal activity for financial gain based on wealth or affluence, or perceptions of wealth or affluence;"

- "criminal activity;"

- "perceived, past or present, gang affiliation;" and

1          • "gender."

2          235.    Yet this list has little to do with nexus, and is instead geared toward excluding from

3   protection whole groups of people while sidestepping any meaningful analysis or direction. *See*

4   *Grace*, 965 F.3d at 906 ("[Asylum] officers must 'analyze each case on its own merits in the context

5   of the society where the claim arises'") (citation omitted); *see also De Pena-Paniagua*, 957 F.3d at

6   94 (reversing the BIA where it "through arbitrary and unexamined fiat" found certain types of

7   asylum claims categorically deficient).

8          236.    The Rule provides absolutely no guidance as to why the circumstances listed cannot

9   be "at least one central reason" for the harm which the applicant has experienced or that she fears.

10  The Rule thus fails to acknowledge the well-settled principles that there are complex reasons for

11  persecution and persecutors often have more than one reason for targeting a victim, and a protected

12  ground need only be one of those reasons as long as it is at least one central reason.

13         237.    In terms of interpersonal animus, the Rule oversimplifies a very complex issue and

14  will lead to the wrongful denial of protection to individuals based solely on the fact that they have a

15  "personal" or preexisting relationship with their persecutors. It is common that persecution by a

16  nongovernmental actor is directed at someone the persecutor knows or with whom he has a personal

17  relationship. This does not diminish the fact that he may be targeting the person at least in part

18  because of a protected characteristic, by personal animus rooted in a protected characteristic, or a

19  combination of personal animus and a protected ground. It would be contrary to the statutory

20  definition to limit the ability to find nexus where there is private actor harm. As shown above, the

21  statutory definition recognizes that private actor harm can constitute persecution if the government is

22  "unable or unwilling to control" the private actor. *See* 8 U.S.C. § 1101(a)(42); *Matter of Acosta*, 21 I

23  & N. Dec. at 222 (to constitute persecution "harm or suffering ha[s] to be inflicted either by the

24  government . . . or by persons or an organization that the government [i]s unable or unwilling to

25  control."); *Bringas-Rodriguez*, 850 F.3d at 1064.

26         238.    Indeed, it has been well accepted in U.S. law, as well as internationally, for more than

27  twenty years, that individuals can be eligible for protection based upon harmful practices such as

28  female genital mutilation (FGM) or forced marriage. *See generally Matter of Kasinga*, 21 I. & N.

1    Dec. 357 (BIA 1996); *Mohammed v. Gonzales*, 400 F.3d 785 (9th Cir. 2005); *Benyamin v. Holder*,

2    579 F.3d 970 (9th Cir. 2009). In such cases, the harm is often inflicted by family members. *See, e.g.*,

3    *Matter of S-A-*, 22 I. & N. Dec. 1328 (BIA 2000) (granting asylum protection based on persecution

4    by the applicant's father for her failure to abide by his conservative interpretation of his religious

5    beliefs); *Benyamin*, 579 F.3d at 973 (finding the applicant's daughter was subject to past persecution

6    due to FGM ordered by a family member). Yet these preexisting relationships do not somehow

7    eliminate the impact of persecution based on a protected ground. *See, e.g.*, *Bi Xia Qu v. Holder*, 618

8    F.3d 602, 608 (6th Cir. 2010) ("[I]f there is a nexus between the persecution and the membership in

9    a particular social group, the simultaneous existence of a personal dispute does not eliminate that

10   nexus."); *Nabulwala v. Gonzales*, 481 F.3d 1115, 1118 (8th Cir. 2007) (finding that "family-

11   arranged rape" of lesbian daughter could constitute persecution); *Faruk v. Ashcroft*, 378 F.3d 940,

12   943 (9th Cir. 2004) ("There is no exception to the asylum statute for violence from family members;

13   if the government is unable or unwilling to control persecution, it matters not who inflicts it.").

14       239.    Additionally, there has never been a requirement that an applicant for asylum show

15   that her persecutor targeted other members of the particular social group at issue, and the Agencies

16   do not offer any reasoned explanation as to why it is a relevant inquiry.

17       240.    Furthermore, the provisions related to opposition to gangs and resistance to

18   recruitment by gangs as circumstances under which the Agencies will not provide protection is

19   contrary to law. Nexus analysis necessarily requires evaluating with a case-by-case analysis. *See*

20   *Singh v. INS*, 94 F.3d 1353, 1359 (9th Cir. 1996) ("[W]hether discrimination, harassment, or

21   violence directed at a particular group on account of a protected ground is sufficiently offensive to

22   constitute persecution under the Act must be decided on a case-by-case basis."). Any categorical

23   declaration, like this one, regarding nexus is thus contrary to law.

24       241.    Moreover, this section of the Rule is arbitrary and capricious for the additional reason

25   that it purports to address nexus but does not, in fact, do so. Nearly identical language appears in the

26   political opinion section of the Rule. The protected ground is entirely separate from the nexus

27   inquiry, which requires the adjudicator to ask whether the respondent has established that she has

28   been, or will be persecuted on account of this opinion. Inserting duplicative and unrelated criteria

1  into the nexus element of the asylum law will not advance either of the Agencies' stated goals of

2  preserving resources and protecting those who are truly in danger.

3      242.    The Rule lists "the targeting of the applicant for criminal activity for financial gain

4  based on wealth or affluence, or perceptions of wealth or affluence" as a circumstance under which

5  the Agencies will not provide protection. 8 C.F.R. § 208.1(f)(5) (proposed); 8 C.F.R. § 1208.1(f)(5)

6  (proposed). This blanket exclusion once again is contrary to law and flies in the face of the required

7  case-by-case analysis, as perceptions of wealth can correlate to protected grounds including race,

8  religion, or a particular social group such as family. It also ignores the mixed motives test and seems

9  to be related far more to particular social group definitions than to nexus, making it duplicative.

10  Furthermore, several courts *have*, on a case-by-case basis, found valid social groups based in large

11  part on wealth. *See, e.g.*, *Tapiero de Orejuela v. Gonzales*, 423 F.3d 666, 672–73 (7th Cir. 2005)

12  (holding that the plaintiffs were targeted by FARC guerillas because of their status as educated,

13  landowning cattle farmers).

14      243.    The listing of "criminal activity" as a circumstance under which the Agencies will not

15  provide protection, 8 C.F.R. § 208.1(f)(6) (proposed); 8 C.F.R. § 1208.1(f)(6) (proposed), is also

16  overbroad and would bar most asylum claims, as most forms of persecution—rape, kidnapping,

17  assault, etc.—are criminal acts in virtually all countries around the world. Applicants already bear

18  the burden of proving that they have suffered, not random criminal acts, but instead targeted criminal

19  activity that has a nexus to a protected characteristic and that rises to the level of persecution. *See,*

20  *e.g.*, *Gormley v. Ashcroft*, 364 F.3d 1172, 1176–77 (9th Cir. 2004). Formalizing an exclusion of

21  applicants based on criminal activity appears simply to be a "backdoor" method of barring asylum

22  claims based on harm from non-state actors in contravention of U.S. law, which incorporated the

23  1967 Protocol. The Rule does not provide a sufficiently reasoned basis for making this change.

24      244.    The Rule's listing of "perceived, past or present, gang affiliation" as a circumstance

25  under which the Agencies will not provide protection, 8 C.F.R. § 208.1(f)(7) (proposed); 8 C.F.R.

26  § 1208.1(f)(7) (proposed), contradicts the refugee definition, which separates the analysis of whether

27  an applicant has a protected characteristic from the analysis of whether persecution was or would be

28  "on account of" that characteristic. *See Oliva v. Lynch*, 807 F.3d 53, 59 (4th Cir. 2015)

1  (distinguishing nexus and particular social group requirements, and recognizing persecution "on

2  account of" former membership in the MS-13 gang); s*ee also Benitez Ramos v. Holder*, 589 F.3d

3  426, 428–29 (7th Cir. 2009) (recognizing persecution on account of former gang membership as a

4  basis for asylum); *Ordonez Azmen v. Barr*, 965 F.3d 128 (2d Cir. 2020) (remanding to consider

5  whether "former members of the Mara 18 gang in Guatemala who defected" is a cognizable social

6  group "in the society in question").

7         245.    The Rule lists "gender" as a circumstance under which the Agencies will not provide

8  protection. 8 C.F.R. § 208.1(f)(8) (proposed); 8 C.F.R. § 1208.1(f)(8) (proposed). The placement of

9  gender on this list holds no basis in law or in logic. To establish nexus to a protected ground, the

10  applicant need only show that the ground is at least one central reason for the infliction of harm. 8

11  U.S.C. § 1158(b)(1)(B)(i). The Rule provides no explanation why gender is listed in nexus; when

12  applicants do claim asylum on the basis of a gender-related social group, they legally still have to

13  prove nexus between the particular social group and persecution suffered, like an applicant claiming

14  any other particular social group. *See Niang v. Gonzales*, 422 F.3d 1187, 1199-200 (10th Cir. 2005)

15  ("[T]he focus with respect to [gender based asylum] claims should be not on whether either gender

16  constitutes a social group (which both certainly do) but on *whether the members of that group are*

17  *sufficiently likely to be persecuted . . . 'on account of' their membership*.") (emphasis added).

18         246.    If the goal of the Rule is to prevent an asylum seeker from ever demonstrating that

19  her gender was at least one central reason for their harm, the Rule is contradicted by long-standing

20  recognition that harms are inflicted on women based, at least in part, on their "gender," which relates

21  to their inferior social status as women and that these harms, including female genital mutilation,

22  forced marriage, forced prostitution, trafficking, honor killings, and domestic violence, constitute a

23  basis for asylum protection. *See, e.g.*, *Hassan v. Gonzalez*, 484 F.3d 513, 518 (8th Cir. 2007)

24  (recognizing a particular social group of "Somali females," and that a factfinder could reasonably

25  conclude that all Somali females have a well-founded fear of persecution based solely on gender

26  given the prevalence of female genital mutilation); *Juan Antonio v. Barr*, 959 F.3d 778, 790 n.3 (6th

27  Cir. 2020) (emphasizing there can be "no general rule against claims involving domestic violence as

28  a basis for membership in a particular social group"); *Matter of Kasinga*, 21 I. & N. Dec. at 357

("The practice of female genital mutilation, which results in permanent disfiguration and poses a risk of serious, potentially life-threatening complications, can be the basis for a claim of persecution.").

247.    If the Rule is intended to say that harm based on gender can never be tied to one of the protected grounds, that is also contradicted by a long line of cases and guidance that recognize that gender can define, in whole or in part, a particular social group under the refugee definition. *See, e.g.*, *Perdomo v. Holder*, 611 F.3d 662, 667 (9th Cir. 2010) ("[W]omen in a particular country, regardless of ethnicity or clan membership, could form a particular social group" (citing *Mohammed*, 400 F.3d at 798)); *De Pena-Paniagua*, 957 F.3d at 88 (recognizing the cognizability of "women" or "women in country X" as a particular social group); *Diaz-Reynoso*, 968 F.3d at 1079-80 (remanding for further consideration of whether "Guatemalan indigenous women who are unable to leave their relationship" is cognizable).

248.    The Rule thus will short-circuit the requirement that adjudicators engage in the "mixed motive" analysis required when determining nexus. *See, e.g.*, *Singh v. Holder*, 764 F.3d 1153, 1162 (9th Cir. 2014). As written, an adjudicator could conclude that one aspect of the harm the applicant feared is precluded by the regulations, such as "criminal activity," and deny the claim without engaging in the required analysis of the reasons for the criminal activity and whether one central reason for the harm or threatened harm was a protected characteristic.

249.    The Agencies failed to consider an important aspect of the problem or to give a reasoned explanation for the departure from existing precedent. For example, hundreds of commenters expressed concerns about the impact of the Rule on asylum seekers who feared female genital mutilation but the Rule makes only passing reference to two comments concerning on the issue. 85 Fed. Reg. 80312; 85 Fed. Reg. 80322. And the Rule nowhere addresses the conflict between the Rule and USCIS's own statements on female genital mutilation.[36] The Rule has only one citation to the key case on the issue, *Matter of Kasinga*, 21 I. & N. Dec. at 375. That citation is

---

[36] *See, e.g.*, Harvard Immigration & Refugee Clinical Program, Comment on Notice of Proposed Rulemaking, "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review," 85 Fed. Reg. 36264 (July 15, 2020), http://harvardimmigrationclinic.org/files/2020/08/HIRC-Asylum-Rule-Comment-FINAL.pdf (Indeed, USCIS has identified [female genital mutilation/cutting] as both a "serious human rights abuse" and "gender-based violence." (citing *Female Genital Mutilation or Cutting (FGM/C)*, USCIS, https://www.uscis.gov/fgmc (last modified June 15, 2018)).

in a string cite at footnote 55 of the Rule, collecting the cases cited by a commenter to show gender-based violence has supported a valid asylum claim in multiple precedents. The Rule includes no discussion of this important decision, even though it was cited in more than 150 comments.

5.    Redefinition of Internal Relocation Standard

250.    The Rule changes the analysis of what a "well-founded fear" means for the refugee definition by redefining the internal relocation standard. 8 C.F.R. § 208.13(b)(3) (proposed); 8 C.F.R. § 1208.13(b)(3). Present regulations specify that adjudicators evaluating the "reasonableness under all the circumstances" of an asylum applicant's ability to internally relocate to avoid persecution "should consider, but are not limited to considering, whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." 8 C.F.R. § 208.13(b)(3) (current). Under these regulations, if an asylum applicant "could avoid future persecution by relocating to another part of the applicant's country. . . , [and] under all the circumstances, it would be reasonable to expect the applicant to do so," an adjudicator may conclude she lacks "a well-founded fear of future persecution." *See id.* § (b)(2)(ii). This approach mirrors UNHCR recommendations on internal relocation. *See* UNHCR, Handbook on Procedures and Criteria for Determining Refugee Status and Guidelines on International Protection Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees, April 2019, HCR/1P/4/ENG/REV. 4, available at https://www.refworld.org/docid/5cb474b27.html [accessed 30 November 2020], ¶ 91; *see also Cardoza-Fonseca*, 480 U.S. at 438 ("In interpreting the Protocol's definition of 'refugee' we are further guided by the analysis" of UNHCR); *Diaz-Reynoso*, 968 F.3d at 1070 (relying on UNHCR guidance to inform the Court's interpretation of the refugee definition).

251.    In interpreting the "reasonableness" of internal relocation, courts have consistently emphasized the need to inquire into the specific facts and circumstances of individual applicants and their countries of origin. *See, e.g., Singh v. Whitaker*, 914 F.3d 654, 661 (9th Cir. 2019) ("[T]he BIA must conduct a reasoned analysis with respect to a petitioner's individualized situation to determine

whether . . . it is reasonable to relocate"); *Boer-Sedano v. Gonzales*, 418 F.3d 1082, 1090–91 (9th Cir. 2005); *Khattak v. Holder*, 704 F.3d 197, 207 (1st Cir. 2013) ("And while the IJ and BIA do not necessarily have to address each of the reasonableness factors explicitly, . . . the agency must explain why the factors that cut against the asylum applicant outweigh the factors in his favor.") (internal citations omitted); *NLA v. Holder*, 744 F.3d 425, 442 (7th Cir. 2014).

252.    Under present regulations, where "the persecutor is a government or is government-sponsored, or the applicant has established persecution in the past," whether by a state or non-state actor, "it [is] *presumed* that internal relocation would ***not be reasonable***." 8 C.F.R. § 208.13(b)(3)(i)-(ii) (emphasis added). Courts have reversed the BIA when it has misplaced the burden of proof per the above framework. *See, e.g.*, *Afriyie v. Holder*, 613 F.3d 924, 935-36 (9th Cir. 2010), *overruled on other grounds in Bringas-Rodriguez*, 850 F.3d at 1070; *Khattak*, 704 F.3d at 207; *Ndonyi v. Mukasey*, 541 F.3d 702, 712 (7th Cir. 2008).

253.    The Rule presumes, without explanation, that internal relocation is reasonable when an asylum seeker faces persecution by a non-state actor. Yet, the Agencies offer no evidence or analysis to support this unfounded contention. In a drastic departure from well-established practice, policy, and procedure and in an improper attempt to rewrite refugee law, the new regulations place the burden on the asylum seeker, regardless of whether she has established past persecution, to demonstrate by a "preponderance of the evidence" that internal relocation is not reasonable. In doing so, the Rule erects a standard of proof for asylum eligibility that goes well beyond the "well-founded fear" standard established by the Refugee Convention and adopted by the Supreme Court. *See Cardoza-Fonseca*, 480 U.S. at 439-40 (finding that an asylum seeker may establish eligibility for protection if she shows a one in ten chance of persecution if returned to her home country). By requiring an asylum applicant to prove more than a well-founded fear, the regulations contradict both the INA and the Refugee Convention.

254.    Importantly, this heightened standard applies even to asylum seekers who have demonstrated past persecution on account of a protected ground by a non-state actor, *i.e.*, who under present regulations benefit from a presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1)(a) ("An applicant who has been found to have established such past

1    persecution shall also be presumed to have a well-founded fear of persecution on the basis of the

2    original claim."). The Rule does not offer any justification for imposing this additional burden on

3    asylum seekers who have already established past persecution and in so doing, attempts to rewrite

4    the statutory definition of refugee and burden-shifting regulations that implement the well-founded

5    fear standard. *See* 8 U.S.C. § 1101(a)(42) (defining a refugee as someone who establishes either past

6    persecution or a well-founded of persecution on account of a protected ground).

7        255.    Additionally, the Rule departs, without sufficient explanation or analysis, from the

8    established factors adjudicators presently consider when making an individualized assessment of an

9    asylum applicant's possibility of internal relocation. While the NPRM described the present list of

10   factors as providing "little practical guidance," to adjudicators, *see* 85 Fed. Reg. at 36282, the factors

11   have been endorsed and relied upon by the BIA and federal courts alike in interpreting the

12   "reasonableness" standard. *See, e.g.*, *Matter of M-Z-M-R-*, 26 I. & N. Dec. 28 (BIA 2012); *Knezevic*

13   *v. Ashcroft*, 367 F.3d 1206, 1214-15 (9th Cir. 2004); *Hagi-Salad v. Ashcroft*, 359 F.3d 1044, 1049

14   (8th Cir. 2004) ("We likewise defer to the agency's reasonable interpretation of governing

15   Department of Justice regulations.").

16       256.    In place of the current list of factors, the Rule instead substitutes unexplained and

17   irrelevant criteria including: "the applicant's demonstrated ability to relocate to the United States in

18   order to apply for asylum" as well as "the size of the country of nationality…the geographic locus of

19   the alleged persecution, the size, reach, or numerosity of the alleged persecutor." 8 C.F.R. §

20   208.13(b)(3) (proposed); 8 C.F.R. § 1208.13(b)(3) (proposed).

21       257.    The inclusion of "the applicant's demonstrated ability to relocate to the United States

22   in order to apply for asylum" is nonsensical. By definition, any and every asylum applicant will have

23   "relocate[d] to the United States in order to apply for asylum." *See* 8 U.S.C. § 1158(a)(1) ("Any

24   [noncitizen] who is physically present in the United States or who arrives in the United States . . .

25   may apply for asylum"). An applicant's ability to flee to the United States is not material to whether

26   she could live freely and safely in her country of origin—it is very likely evidence that she cannot—

27   and the Rule provides no basis for reaching that conclusion.

28

COMPLAINT

258.    The Rule also unreasonably discounts individualized factors that may be relevant to an applicant's risk of persecution and/or ability to reasonably relocate. The Rule would force adjudicators to make decisions in a vacuum, ignoring the overall context of an asylum applicant's plight and dangerous conditions throughout the country. This is contrary to the well-settled principle that it is not "reasonable" to expect refugees to internally relocate when doing so would require them to "live in hiding" or to move to places where they would not realistically be able to support themselves due to material, economic, cultural, or linguistic barriers. *See Matter of M-Z-M-R-*, 26 I. & N. Dec. at 32–36 ; *Boer-Sedano*, 418 F.3d at 1090-91 (finding relocation within Mexico unreasonable because of social and cultural constraints that petitioner would face as a gay man with AIDS); *Knezevic*, 367 F.3d at 1214 (finding internal relocation unreasonable "because [the petitioners] had no home, no business, no possessions, no place to go, and the quality of life in Bosnia-Herzegovina was abysmal"); *Doe v. Att'y Gen.*, 956 F.3d 135, 154 (3d Cir. 2020) ("Relocation is not reasonable if it requires a person to 'liv[e] in hiding.'") (citation omitted); *Singh v. Sessions*, 898 F.3d 518, 522 (5th Cir. 2018) ("The case law is clear that an [asylum seeker] cannot be forced to live in hiding in order to avoid persecution."); *NLA*, 744 F.3d at 442 ("It is an error of law to assume that an applicant cannot be entitled to asylum if she has demonstrated the ability to escape persecution only by chance or by trying to remain undetected.").

## F.    The Rule introduces new standards and procedures to restrict the forms of relief available to asylum seekers

### 1.    Asylum-and-Withholding-Only Proceedings

259.    The Rule creates a new restrictive asylum-and-withholding-only proceedings for applicants seeking these forms of protection that truncate the process available to asylum seekers.[37]

260.    Under the existing regulatory and statutory framework, once an asylum seeker demonstrates a credible fear of persecution or torture, she is placed into removal proceedings

---

[37] Another rule, which was published as a final rule on December 16, 2020, establishes a 15-day filing deadline for asylum applicants in asylum-and-withholding-only proceedings. *See supra* ¶ 78.

pursuant to 8 U.S.C. § 1229a, which allow adjudicators to consider any defenses against removal and provide procedural safeguards and opportunities for administrative and judicial review.

261. The Rule would amend existing regulations so that asylum and withholding of removal applicants are placed in special proceedings in which the only relief available is asylum, withholding of removal, and CAT protection. 8 C.F.R. § 208.2(c)(1) (proposed); 8 C.F.R. § 1208.2(c)(1) (proposed).

262. The Rule would prevent IJs presiding over the new asylum-and-WOR-only proceedings from considering adjustment of status or other alternative forms of relief. This change would disadvantage, among other groups, children who may be eligible for Special Immigrant Juvenile Status (SIJS) or women eligible for U or T visas or protection under the Violence Against Women Act, forms of relief currently subject to initial adjudication by USCIS, with the IJ then adjudicating the adjustment of status for those applicants that are in removal proceedings. Yet under the new asylum-or-withholding-only procedures, the IJ would be foreclosed from doing so.

263. USCIS will not adjudicate applications for adjustment of status within its jurisdiction if an immigration judge currently has jurisdiction over removal proceedings against an individual applicant. Thus, for an accompanied child who may be eligible for SIJS and is in asylum or withholding only proceedings before an IJ, DHS would have to agree to terminate the IJ proceedings, which is unlikely.

### 2.   Restrictions on Admissibility of Critical Evidence.

264. The Rule prohibits applicants from offering evidence of so called "cultural stereotypes" that could be seen as promoting stereotypes of a country or individual. 8 C.F.R. § 208.1(g) (proposed); 8 C.F.R. § 1208.1(g) (proposed). Because the provision is impermissibly vague, it could have the effect of excluding consideration of country conditions evidence that has long been considered probative of the elements an applicant must establish to obtain asylum, WOR, or CAT protection.

265. Current agency guidance also recognizes the relevance of such evidence. For example, "press accounts of discriminatory laws and policies, historical animosities, and the like"

1    may demonstrate the social distinction of a proposed particular social group. *M-E-V-G-*, 26 I. & N.

2    Dec. at 244.

3        266.    Such evidence may also be accepted as probative of the nexus element. *See, e.g.*,

4    *Matter of N-M-*, 25 I. & N. Dec. 526, 529 (BIA 2011).

5        267.    Because an applicant may establish that she has a well-founded fear of persecution

6    based on evidence establishing that there is a "pattern or practice" of persecution against people

7    similarly situated to herself on account of a protected ground in her country of origin, 8 C.F.R. §

8    208.13(b)(2)(iii)(A), such background country conditions evidence is also relevant to showing future

9    persecution.

10       268.    The Rule renders inadmissible any evidence in support of an asylum or withholding

11   of removal application that "promotes cultural stereotypes about a country, its inhabitants, or an

12   alleged persecutor, including stereotypes based on race, religion, nationality, or gender." 8 C.F.R. §

13   208.1(g) (proposed); 8 C.F.R. § 1208.1(g) (proposed). This restriction applies only to evidence

14   offered in support of an application, and not to the government in opposing an application. Evidence

15   showing that an alleged persecutor "holds stereotypical views of the applicant" remains admissible.

16   *Id.* The Rule does not offer a further definition of the term "cultural stereotypes."

17       269.    The Rule's prohibition against evidence that could be read as promoting stereotypes

18   of a country or individual is unlawful agency action under the APA. 5 U.S.C. § 706(2).

19       270.    The Rule conflicts with the statutory guarantee that applicants be given a reasonable

20   opportunity to present evidence, as well as the Agencies' adoption of flexible evidentiary standards.

21   8 U.S.C. § 1229a(b)(4)(B); 8 C.F.R. §§ 1240.1(c), 1240.7.

22       271.    It constitutes an impermissible change from prior agency precedent that explicitly

23   endorsed such evidence.

24       272.    The Agencies do not offer a well-reasoned justification for imposing this new

25   restriction, which is impermissibly vague.

26           3.    <u>Heightening the Burden to Establish Torture</u>

27

28

273.    The Rule would impose a nearly impossible evidentiary burden to show torture for those seeking protection under the Convention Against Torture.[38]

274.    Existing regulations define torture as:

any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

*See* 8 C.F.R. § 208.18(a)(1); 8 C.F.R. § 1208.18(a)(1).

275.    The Rule would define "acting in an official capacity" to mean "acting under color of law." 8 C.F.R. § 208.18(a)(1) (proposed); 8 C.F.R. § 1208.18(a)(1) (proposed). It would further define "acquiescence of a public official" to mean that the public official, prior to the activity constituting torture, had awareness of the activity and breached a legal responsibility to intervene and prevent such activity. 8 C.F.R. § 208.18(a)(7) (proposed); 8 C.F.R. § 1208.18(a)(7) (proposed).

276.    To establish a public official's awareness, an applicant for CAT protection would have to show the public official had actual knowledge or willful blindness. *Id.* Willful blindness is defined as having awareness "of a high probability of activity constituting torture and deliberately avoided learning the truth." *Id.* Reckless disregard for the truth and/or negligent failure to inquire will not suffice. *Id.*

277.    Finally, the Rule specifies that there is no breach of a legal responsibility to intervene if the public official is unable to intervene or intervenes without successfully preventing the tortuous activity. *Id.* Considered separately and together, the Rule unreasonably heightens the standard to establish eligibility for protection from torture under CAT, in conflict with U.S. treaty obligations, congressional intent, and well-settled case law.

278.    In particular, the Rule would substantially hinder an applicant's ability to establish eligibility for CAT protection in cases involving torture perpetrated by private actors, such as

---

[38] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), art. 3(1), Dec. 10, 1983, 1465 U.N.T.S. 85 (entered into force June 26, 1987).

domestic violence, child abuse, gang violence, among other examples, even when public officials would reasonably be expected to know about the conduct. Commenters objected to the Rule on the ground that it was intended to and/or would have the effect of impeding claims brought most often by Central Americans.[39] The Agencies acknowledged but completely failed to respond to these comments in the Rule. *See* 85 Fed. Reg. at 80368.

279.    The inclusion of a new requirement to show that the public official was acting "under color of law" is unclear and will unjustifiably result in the denial of CAT claims that clearly meet the definition or torture under existing law.[40] For example, if an official who participates or acquiesces in torture claims to be acting in an official capacity, is wearing an official uniform, or otherwise makes it known to the applicant that he is a government official, a CAT applicant would have no reason to know whether the official is acting "under color of law" or not. Yet even if he was not, he was using the power of his position while participating in torture, and there would be no basis in the law for denying CAT protection in such a case.

280.    The arbitrary and capricious nature of the Rule is further demonstrated by the new requirement that an applicant demonstrate the public official's actual knowledge or willful blindness (newly defined as having awareness of a high probability of activity constituting torture and deliberately avoiding learning the truth) with regard to the conduct constituting torture.

281.    Federal courts and the UN Committee Against Torture include willful blindness in the definition of acquiescence.[41]

---

[39] Among others, Plaintiff CLINIC objected in the Comment it submitted that the Final Rule's changes would particularly burden CAT applicants seeking protection from gang- and cartel-based torture in Central America and Mexico.

[40] In response to comments objecting to language in the NPRM that would have precluded claims arising out of conduct by "rogue officials," the Agencies removed the term from the Final Rule. 85 Fed. Reg. at 80366–368. But by retaining the "under color of law" component, they failed to adequately respond to the comments showing that the "under color of law" proviso has an equivalent and equally damaging impact on the ability of many torture survivors to establish eligibility.

[41] *See, e.g.*, *Zheng v. Ashcroft*, 332 F.3d 1186, 1196 (9th Cir. 2003); *Khouzam v. Ashcroft*, 361 F.3d 161, 170–71 (2d Cir. 2004); *Mouawad v. Gonzales*, 485 F.3d 405, 413 (8th Cir. 2007); *Amir v. Gonzales*, 467 F.3d 921 (6th Cir. 2006); *Convention Against Torture & Other Cruel, Inhumane or Degrading Treatment or Punishment, General Comment No. 2* ¶ 18, U.N. Committee Against Torture (Jan. 24, 2008), https://www.refworld.org/pdfid/47ac78ce2.pdf ("Comment No. 2").

282.    The Agencies' justification for imposing a heightened *mens rea* requirement is deeply flawed. The Agencies seek to justify this increased burden out of concern for giving "fair notice" of what conduct will constitute torture to public officials, 85 Fed. Reg. at 80396, but there is no basis for considering the due process rights of public officials who are not being charged with a crime and are not present in the United States. The purpose of the framework for adjudicating CAT applications is to ensure that the United States does not *refoule* someone to a country where they face a likelihood of future torture. It is arbitrary and capricious to consider the "due process notice" rights of the perpetrators of torture who will never appear before the Agencies for any adjudication.

283.    The Agencies moreover did not adequately address comments noting that the burden to establish the subjective frame of mind of the public official will be virtually impossible for any CAT applicant.

284.    The Agencies' imposition of a requirement to show, in a case involving acquiescence, that the public official had a legal duty to act and breached that duty, is likewise unjustifiable and based on faulty reasoning. The Rule brushes off comments objecting that this burden of proof would be insurmountable for CAT applicants who might lack substantial legal knowledge to be able to even begin to meet this evidentiary burden, to say nothing of the fact that another country, like many jurisdictions in the United States, may not impose a legal duty to intervene in situations where an individual is suffering torture, despite knowledge of the conduct. The Rule does not acknowledge that its duty to intervene component will eviscerate CAT protection.

285.    The Rule's revisions to the standard to show torture take the United States even further out of compliance with binding international law, which interprets "acquiescence" even more broadly to include circumstances when public officials "know or *have reasonable grounds to believe* that acts of torture or ill-treatment are being committed by non-State officials or private actors and they fail to exercise due diligence to prevent, investigate, prosecute, and punish such non-State officials or private actors consistently with the Convention." Comment No. 2, *supra* note 41, ¶ 18 (emphasis added). The UNHCR also interprets CAT to impose an obligation on states to prevent torture with respect to "all persons who act, de jure or de facto, in the name of . . . the State party," and not only those acting "under color of law." *Id.* ¶ 7.

286.     Even before the Rule, the United States' interpretation of what conduct constitutes torture has been out of alignment with international law on providing protection against torture since its initial implementation of CAT. The Rule sets an untenably high standard for establishing acquiescence on the part of the state and pushes the United States further out of compliance with its international obligations, which are codified into domestic law pursuant to the Foreign Affairs Reform and Restructuring Act of 1988.

### 4.     Reduction of Privacy Protection

287.     The Rule significantly expands the Agencies' abilities to disclose confidential information provided by applicants in connection with their applications for asylum, withholding of removal, or CAT protection.

288.     The current regulatory framework establishes broad confidentiality provisions to ensure applicants' safety and protect the sensitive and personal information provided in the course of requesting protection. *See, e.g.*, *Lin v. Dep't of Justice*, 459 F.3d 255, 267-68 (2d Cir. 2005). Any information that is provided in or related to an application for protection may not be disclosed without the written consent of the applicant. 8 C.F.R. §§ 208.6(a)–(b), 1208.6(a)–(b). Records related to credible or reasonable fear interviews as well as any other records kept by DHS or DOJ that might indicate a person is going through the asylum process are similarly protected from disclosure. *Id.*

289.     The current regulations only allow disclosure of these records in a few limited circumstances. Specifically, records may be disclosed to (1) U.S. government officials or contractors who need the information to adjudicate asylum applications and credible/reasonable fear interviews or to defend other legal actions related to such adjudication or applications; (2) federal, state, or local courts hearing cases related to these applications or adjudications; or (3) U.S. government investigations of any criminal or civil matter. 8 C.F.R. § 208.6(c) (current); 8 C.F.R. § 1208.6(c) (current).

290.     The Rule overrides the existing confidentiality provisions by establishing a blanket authorization to share information in eight circumstances: (1) as part of investigation or adjudication

on the merits of the application for protection or for any other immigration application; (2) as part of a state or federal criminal investigation or proceeding; (3) where required by a state or federal mandatory reporting requirement; (4) to deter or ameliorate the effects of child abuse; (5) as part of any proceeding arising under immigration laws; and (6) as part of the government's defense of a legal action related to the applicant's immigration or custody status. 8 C.F.R. § 208.6(d)(1)–(2) (proposed); 8 C.F.R. § 1208.6(d)(1)–(2) (proposed).

291.    The Rule further authorizes disclosure to (7) employees or officers of the Departments of Justice, Homeland Security, State, Health and Human Services, and Labor, as well as any U.S. national security agency, when needed for "an official purpose" and (8) to any U.S. government employee or contractor who has a good faith belief that the information is needed to prevent the commission or furtherance of a crime, or to ameliorate the effects of a crime. 8 C.F.R. § 208.6(e) (proposed); 8 C.F.R. § 1208.6(e) (proposed).

292.    When sharing information in one of these eight circumstances, the Rule permits broad disclosure of any information contained in an application for asylum and related relief; any information submitted to support that application; any information regarding the asylum applicant herself; and any information regarding an applicant who has completed a credible/reasonable fear interview. 8 C.F.R. § 208.6(d)-(e) (proposed); 8 C.F.R.§ 1208.6(d)-(e) (proposed).

293.    Allowing such information sharing and broad disclosure would have a significant deterrent effect on asylum seekers, who often fear retaliation against themselves and their family members for coming forward. Asylum applications regularly include sensitive details of past trauma and physical, sexual, and psychological abuse that individuals only open up about based on assurances of confidentiality and prohibitions against information sharing. Such broad disclosure provisions will necessarily undermine asylum seekers' willingness to share their stories and ability to present their claims fully and effectively.

294.    The Rule's blanket authorizations allowing information sharing constitute a dramatic departure from prior regulation and past practice without adequate explanation. The circumstances under which the Rule allows such information sharing are also impermissibly vague and broad in scope.

III.     **The Rule Will Lead to Significant Danger of *Refoulement***

295.    Considered as a whole, the Proposed Rule will result in denial of protection to a majority of applicants with meritorious claims, leading to significant danger of *refoulement*, which "occurs when a government returns [noncitizens] to a country where their lives or liberty will be threatened on account of race, religion, nationality, membership of a particular social group, or political opinion." *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1087–88 (9th Cir. 2020).

296.    Refoulement is prohibited under international law norms and treaty obligations that are binding on the United States. *Id.* at 1088 ("The United States is obliged by treaty and implementing statute . . . to protect against refoulement of [applicants for protection].").

297.    The 1967 Protocol "bound parties to comply with the substantive provisions of Articles 2 through 34 of the [1951] United Nations Convention Relating to the Status of Refugees." *Stevic*, 467 U.S. at 416. The United States is bound by the substantive terms of international refugee law as a party to the 1967 Protocol, which it signed with only two limited reservations not relevant here. U.S. Declarations and Reservations to the Protocol Relating to the Status of Refugees, Nov. 1, 1968, 19 U.S.T. 6223, 6257. As noted above, the United States' obligations under the 1967 Protocol are incorporated into the Refugee Act.

298.    The United States' international law obligations with respect to refugees is further established in additional treaties including the International Covenant on Civil and Political Rights and the Convention Against Torture. ICCPR arts. 2, 6, 7, Dec. 16, 1966, T.I.A.S. No. 92-908, 999 U.N.T.S. 171; CAT art. 3, Dec. 10, 1984, T.I.A.S. 94-1120.1, 1465 U.N.T.S. 85.

299.    The United States is bound to enforce customary international law and to construe federal law consistently with the United States' obligations under customary international law and treaties ratified by the United States. U.S. Const. Art. VI.

300.    Sufficiently defined customary international law obligations bind executive and agency action. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 737-38 (2004); *The Paquete Habana*, 175 U.S. 677, 700 (1900).

301.    The United States is therefore bound by the international law prohibition against *refoulement*, which is the cornerstone of the refugee protection scheme. *See INS v. Stevic*, 467 U.S.

1   at 428 n.22 ("Foremost among the rights which the Protocol would guarantee to refugees is the

2   prohibition (under Article 33 of the 1951 Convention) against" *refoulement*.).

3       302.   Domestic law implements the norm of *non-refoulement* as well. *See* 8 U.S.C. §

4   1231(b)(3); *see also Innovation Law Lab*, 951 F.3d at 1093 ("Congress intended [§ 1231(b)(3)] to

5   'parallel' the anti-refoulement provision of Article 33 of the 1951 Convention.").

6       303.   The Rule is intended to and will have the effect of denying protection to the

7   overwhelming majority of applicants, leading to *refoulement*, in violation of the United States'

8   obligations under international and domestic law. By impeding access to asylum through the

9   introduction of changes to procedural due process, narrowing the substantive definition of those

10  entitled to protection as an asylee (or qualifying for admissions as a refugee), and vastly expanding

11  the criteria for denying individuals protection, the Rule establishes a regulatory framework that will

12  deny almost every claim and which cannot be reconciled with international and U.S. law standards.

13  If enacted, this framework will lead to the refoulement of individuals with international protection

14  needs, leading to a serious deterioration of the protection the United States is required to offer under

15  domestic and international law.

16  **IV.   Other Defects Render the Rule Invalid Under the APA**

17       **A.   Chad Wolf Is Serving As Acting DHS Secretary Without Valid Authority**

18       304.   As numerous courts have concluded, Chad Wolf does not have lawful authority to

19  serve as Acting DHS Secretary.[42]

20       305.   The Rule was jointly issued by DHS and DOJ and sets forth corresponding provisions

21  to amend 8 C.F.R. § 208, which operationalizes immigration laws administered by DHS (including

---

[42] *See, e.g. Immigrant Leg. Resource Ctr. v. Wolf,* 20-CV-05883-JSW, 2020 WL 5798269, at *8 (N.D. Cal. Sept. 29, 2020) (enjoining fee increase rule where "Plaintiffs are likely to show that the appointments are not lawful, and, thus, that the [fee increase rule] is likely invalid under the APA"); *Casa de Maryland, Inc. v. Wolf*, 8:20-CV-02118-PX, 2020 WL 5500165, at *23 (D. Md. Sept. 11, 2020) (enjoining Employment Authorization rule on grounds that Wolf was installed without authority); *Batalla Vidal v. Wolf*, 16CV4756NGGVMS, 2020 WL 6695076, at *9 (E.D.N.Y. Nov. 14, 2020) (granting summary judgment halting suspension of DACA on grounds McAleenan and Wolf not authorized as Secretary of DHS); *see also La Clinica de la Raza v. Trump*, 19-CV-04980-PJH, 2020 WL 6940934, at *14 (N.D. Cal. Nov. 25, 2020) (finding McAleenan not validly designated under Neilsen's April 10, 2019 designation).

COMPLAINT

1   those that govern affirmative asylum applications), and 8 C.F.R. § 1208, which operationalizes

2   immigration laws administered by EOIR, a sub-agency of DOJ.

3       306.    As the Agencies noted in the Rule's preamble, "the DHS and DOJ regulations are

4   inextricably intertwined, and the Departments' roles are often complementary…. Because officials

5   in both DHS and DOJ make determinations involving the same provisions of the INA, including

6   those related to asylum, it is appropriate for the Departments to coordinate on regulations like the

7   proposed rule that affect both Agencies' equities in order to ensure consistent application of the

8   immigration laws." 85 Fed. Reg. at 80286.

9       307.    The Appointments Clause of the U.S. Constitution requires that officers of the United

10   States, including the Secretary of DHS, be appointed by the president and approved by the Senate.

11   This division of authority between the executive and the Senate serves as a check on both branches,

12   and serves as "a means of promoting judicious choices of persons for filling the offices of the

13   union." *L.M.-M.*, 442 F. Supp. 3d at 7. Congress recognized that circumstances sometimes

14   necessitate an interim officer, and passed the FVRA as a means to authorize the president to direct

15   certain officials to temporarily carry out the duties of a vacant position that requires a nomination

16   and Senate consent in the ordinary course. *See id.*

17       308.    On August 14, 2020, the U.S. Government Accountability Office ("GAO") issued a

18   decision stating that the "incorrect official assumed the title of Acting Secretary" when former DHS

19   Secretary Kirstjen Nielsen resigned in April 2019 and that "subsequent amendments to the order of

20   succession made by [Kevin McAleenan] were invalid and officials who assumed their positions

21   under such amendments, including Chad Wolf and Kenneth Cuccinelli, were named by reference to

22   an invalid order of succession." *Decision in the Matter of Department of Homeland Security—*

23   *Legality of Service of Acting Secretary of Homeland Security and Service of Senior Official*

24   *Performing the Duties of Deputy Secretary of Homeland Security* at 1, U.S. Gov't Accountability

25   Office (GAO) (Aug. 14, 2020), https://www.gao.gov/assets/710/708830.pdf ("GAO Decision").

26       309.    While the GAO Decision focused primarily on the invalidity of Wolf's appointment

27   pursuant to the HSA, Wolf's claim to the role of Acting Secretary fares no better under the FVRA.

28   The FVRA incorporates time limits for officials temporarily filling a vacated post. Generally, the

time limit is 210 days from the time the post became vacant, although the deadline can be extended when the president submits a nomination to the Senate. 5 U.S.C. § 3346(a)(1). The FVRA also contains a provision invalidating the actions taken by officers acting invalidly, ostensibly pursuant to the FVRA.

310.    The relevant vacancy for Secretary occurred, at the latest, by April 10, 2019, the purported effective date of former DHS Secretary Kirstjen Nielsen's resignation, and by the next day Kevin McAleenan purported to assume the office of Acting DHS Secretary.

311.    Kevin McAleenan resigned, and Wolf purported to assume the role of Acting Secretary of DHS, on November 13, 2019—217 days after April 10, 2019, and thus beyond the 210-day period set forth in the FVRA. Accordingly, Wolf's assumption of the role of Acting Secretary was not lawful pursuant to the FVRA.

312.    On June 15, 2020, DOJ and DHS jointly published the proposed Rule. *See* 85 Fed. Reg. 36264. Wolf delegated the authority to Chad Mizelle to sign the proposal, notwithstanding that—as the GAO Decision explained—Wolf lacked the authority to do so under the HSA, and also under the FVRA because at that time no Senate-confirmed person had held the role of Secretary for more than 210 days.

313.    On December 11, 2020, the Agencies jointly published the final Rule. The Rule is signed by Chad Mizelle as the Senior Official Performing the Duties of the General Counsel for DHS, pursuant to authority delegated by Wolf. 85 Fed. Reg. 80401. Wolf's delegation of responsibility for signing the Rule to Mizelle did not cure the legal infirmity that plainly would attach if Wolf signed the Rule himself.

314.    First, because Wolf is serving in violation of the HSA, FVRA, and the Appointments Clause of the United States Constitution, he has no lawful rulemaking authority that he could delegate to an acting general counsel, even if Mizelle were not himself serving in violation of the FVRA.

315.    Second, Mizelle is serving in violation of the FVRA and HSA himself, and thus cannot perform the duties of the general counsel. He purported to assume the role of acting general counsel on February 12, 2020, and assumed the title of "Senior Official Performing the Duties of the

General Counsel for DHS" without being nominated for Senate confirmation. Mizelle signed the Rule more than 210 days after the former Senate-confirmed general counsel was terminated so Mizelle is performing the duties of general counsel in violation of the FVRA.

316.     Moreover, under the FVRA, Wolf's invalid actions cannot be cured by ratification, including his attempted ratification on November 16, 2020, of all actions he took between November 13, 2019, and November 16, 2020.

317.     The succession-order ratification efforts by FEMA Administrator, Peter Gaynor, were also ineffectual. Gaynor became Acting DHS Secretary by operation of law on September 10, 2020, pursuant to the Nielsen's April 2019 delegation and E.O. 13753, at which time he attempted to ratify or otherwise adopt the November 2019 delegation that McAleenan had issued. *See Batalla Vidal v. Wolf*, No. 16-cv-4756 (NGG) (VMS), Dkt. 341 (E.D.N.Y. Nov. 13, 2020) (addressing sequence of events). Gaynor attempted the ratification again on November 14, 2020.

318.     Gaynor's two ratification attempts were legally insufficient to make Wolf Acting DHS Secretary effective immediately (to trigger a new 210-day clock). Among other things:

(1) Gaynor had no authority to ratify McAleenan's November 2019 delegation to Wolf because McAleenan was not lawfully performing the functions and duties of Acting DHS Secretary at that time. Thus the November 2019 delegation was invalid and could not lawfully be ratified by Gaynor. 5 U.S.C. § 3348(d)(2).

(2) Gaynor had no authority to issue the ratifications more than 210 days after Secretary Nielsen's resignation. *See* 5 U.S.C. § 3348(d)(1).

(3) DHS never submitted any notice to Congress that Administrator Gaynor was serving as Acting Secretary, as is required by the FVRA, 5 U.S.C. § 3349(a)(2); *see Batalla Vidal*, 2020 WL 6695076, at *9.

(4) Gaynor neither resigned from the office that he purported to accede to Wolf in either ratification attempt, nor otherwise created a new vacancy in the role of Acting Secretary. The purpose of the FVRA and HSA to ensure someone is accountable for DHS's mission would be undermined if two people could simultaneously exercise the Secretary's power.

319.    The Rule acknowledges but rejects two federal court decisions that determined Gaynor had no authority to ratify or issue his own succession order, *see* 85 Fed. Reg. at 80382 (citing and "disagree[ing]" with *Batalla Vidal* and *N.W. Immig.*, 2020 WL 5995206, at *24) and inexplicably concludes that despite these federal court rulings, the Gaynor ratification "provides an alternative basis for concluding that Mr. Wolf Currently serves as the Acting Secretary," 85 Fed. Reg. at 80382.[43]

320.    In sum, DHS relies on the authority delegated to the Secretary of Homeland Security in promulgating regulations (*see* 8 U.S.C. § 1103(a)(3)). DHS has no authority to promulgate the Rule without a validly serving Secretary or even Acting Secretary.[44] Because at the time he signed the NPRM and at the time when the delegated singing to Mizelle, Wolf occupied the role of Acting Secretary of Homeland Security in violation of the HSA and the FVRA, these actions are invalid and irremediable.

321.    Because DHS action is "inextricably intertwined" with DOJ action here, 85 Fed. Reg. at 80286, the entire Rule must be set aside because no one at DHS had lawful authority to propose or issue the Rule and it would be impossible for DOJ to implement the rule if the DHS rule is found to be invalid.

**B.    The rushed process and staggered rulemaking flouted the requirements of the APA.**

322.    The Rule was also effectively fast-tracked despite its enormous scope, fundamental flaws, and intersection with multiple other rules. Commenters were allowed just 30 days to comment on a proposed rule that spanned 43 pages in the federal register and changed more than 30 sections of the Code of Federal Regulations that pertain to asylum, withholding of removal, and CAT

---

[43] As of the filing of this Complaint, the Government has not appealed the rulings in *Batalla Vidal* or *Northwest Immigrants Rights Project*. The time to appeal in *Northwest Immigrants Rights Project* has expired.

[44] In addition to the fact that Wolf and Mizelle are not lawfully serving in their positions, Cuccinelli is not validly serving at his post either, for multiple reasons. For one thing, Cuccinelli purports to be Acting Director of USCIS pursuant to the FVRA, but the mechanism by which he was designated to that post was invalid, *L.M.-M.*, 442 F. Supp. 3d at 26, and, separately, it was carried out by Kevin McAleenan, who multiple courts have found could not designate an Acting Director in any case, since he himself had not been validly designated to the post of Secretary of Homeland Security. Similarly, Defendants Pham and Morgan purport to serve in their positions pursuant to the FVRA, but both positions have been vacant well beyond the time limitations of the FVRA.

protection. 85 Fed. Reg. at 36264–36306. Nevertheless, the Agencies received over 80,000 comments.

323.    According to the Rule, "Many if not most comments opposing the NPRM either misstate its contents, provide no evidence (other than isolated or distinguishable anecdotes) to support broad speculative effects, are contrary to facts or law, or lack an understanding of relevant immigration law and procedures." 85 Fed. Reg. at 80284. Not only is this a gross misstatement of the contents of several comments, but the Agencies also gave no consideration to the effect on the quality of comments caused by the short comment period on such a lengthy and sweeping Rule.

324.    In considering the adequacy of a 30-day comment period, the Agencies failed to account for numerous intersecting rules being promulgated around the same time, or how the staggered rulemaking impaired the public's ability to meaningfully comment on the rule.[45]

325.    The staggered rulemaking was a source of confusion for commenters. In responding to comments about the decisions in *CAIR II*, *ESBC III*, *ESBC I*, and *O.A.*, the Agencies concluded, "In general, commenters appear to have confused multiple rulemakings, as well as the existing legal differences between and among asylum, statutory withholding of removal, and protection under the CAT regulations. The Agencies decline to adopt the commenters' positions to the extent they are based on inaccurate or confused understandings of the proposed rule and of the legal distinctions between and among asylum, statutory withholding of removal, and protection under the CAT regulations." 85 Fed. Reg. at 80292.

326.    The complexity of the Rule and speed of the process denied the public a meaningful opportunity to comment on the Rule and provide the Agencies with the full scope of analysis and data required for a Rule of this magnitude.

327.    The Agencies underestimated the economic impact of the Rule by failing to consider any costs other than the burden associated with completing the Form I-589.

---

[45] *See* CLINIC Comment, *supra* n.13 at 7 (Due to the Agencies' issuance of a "a second, complex [proposed] rule . . . less than a week before the 30-day comment period ends for the current proposed rule, it is impossible to consider the potential interplay between these two rules."); N.Y.C. Bar Ass'n – Immigration & Nationality Law Comm., Public Comment Opposing Proposed Rules on Asylum, and Collection of Information (July 14, 2020), at 5 ("[T]here is simply not time for the Committee to do an adequate job responding to the provisions and statements in the NPRM that we have identified as problematic and potentially unlawful within the 30-day framework.).

328.    A "major rule," which must be published at least 60 days before its effective date, includes any rule that is likely to result in an annual effect on the economy of $100,000,000 or more.

329.    According to the "Form I-589 Public Comments and Response Matrix" published with the Rule, the estimated annual total cost burden of the revised Form I-589 is $70,406,400. This figure only includes the estimated time and cost burden of completing the form.

330.    The Attorneys General of California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, and Washington and the District of Columbia submitted a comment in opposition to the proposed rule ("States' Comment Letter"). The Agencies makes no reference to the States' Comment Letter in the Rule.

331.    The States' Comment Letter identified harm to the States' economies caused by the Rule. States' Comment Letter at 18. It also referenced a draft 2017 report by the U.S. Department of Health and Human Services that found that over the past decade, refugees, including asylees, have contributed $63 billion more in tax revenues than they cost in public benefits. *Id*. at 18–19. The Agencies made no reference to this HHS Report in the Rule.

332.    Because the Agencies underestimated the Rule's economic impact, the Rule has a 30-day effective date rather than the 60-day effective that would be required under a proper analysis of the Rule's economic impact.

**C.    The rulemaking failed to comply with the Regulatory Flexibility Act.**

333.    The Rule violates the Regulatory Flexibility Act ("RFA"), which requires federal agencies to analyze the effects of their rules on "small entities." 5 U.S.C. §§ 603–604. Here, the Agencies failed to do so, stating that the Rule "will not have a significant economic impact on a substantial number of small entities" because "the rule applies to asylum applicants, who are individuals, not entities." 85 Fed. Reg. at 80378. The Rule also states that it "affects only the operations of the Federal government," *id.*, and asserts that it need not consider "indirect effects on entities not regulated by a proposed rule." *Id.*

334. The Agencies thus failed to analyze the effects on non-profit entities, as required under the RFA, and also failed to consider the serious problem of how the Rule will impact immigration legal services providers like plaintiffs.

## V. The Rule Irreparably Harms Plaintiffs and the Public

335. Plaintiffs are non-profit organizations that provide direct representation to, and advocate on behalf of, immigrant communities, and provide training and educational programming to immigration practitioners and/or immigrant communities. They each have significant reliance interests at stake because they have structured their missions, operations, budgets, and plans based on existing law, and with the expectation that Agencies will not severely restrict the availability of asylum in violation of the Refugee Act. The significant changes the Rule will impose—including by creating a series of *de facto* bars to asylum eligibility, expanding applicability of prior bars, re-defining terms to exclude common scenarios, and raising the bar refugees must clear to qualify for asylum—will harm Plaintiffs in a number of ways.

### 1. The Rule Frustrates Plaintiffs' Missions

336. Each of the Plaintiffs shares a mission to support and provide legal services to as many low income and vulnerable noncitizens as possible, including to asylum seekers. For example, CLINIC operates the nation's largest network of nonprofit legal immigration services programs as part of its mission to embrace the Gospel value of welcoming the stranger by promoting the dignity and protecting the rights of immigrants. The Rule frustrates Plaintiffs' missions by establishing a number of new barriers to asylum eligibility that will make it far more difficult for Plaintiffs to serve their clients—many of whom the Rule will render ineligible for asylum.

337. For CLINIC (and the nearly 400 affiliated immigration programs in its network), the Rule will impede its core aims of "welcoming the stranger" and protecting the rights of immigrants by categorically excluding many from asylum eligibility, leaving CLINIC and its affiliates without a means of securing a pathway to permanent residence for many of the people it serves.

338. Moreover, the Rule requires immigration adjudicators to deny asylum, absent extraordinary circumstances, if any of nine "discretionary factors" apply, including, among others,

whether the applicant failed to file taxes, whether the applicant remained in different country briefly, whether the applicant transited through more than one country en route to the United States, and whether and for how long the applicant was in the United States unlawfully.

339.    The Rule also significantly narrows the availability of asylum relief through a series of new provisions and definitions. The unreasonably narrow definitions of persecution, nexus, political opinion, and particular social group, to exclude common and recurring scenarios for people with bona fide claims for protection, making it much more likely that their claims will be unjustifiably denied. The changes to the burden of proof on internal relocation, elimination of an applicant's ability to present potentially critical evidence, expansion of the firm resettlement bar, and the heightened burden to establish torture will disqualify many previously eligible applicants and increase the burden of representing even those applicants whose applications are ultimately successful.

340.    The Rule will also eliminate noncitizens' right to be heard on their applications, by threatening them with draconian consequences for filing legally deficient applications, and by requiring IJs to pretermit applications that the IJ finds does not make out a *prima facie* claimed based solely on the application form submitted. The Rule makes pretermission more likely through revisions to the Form I-589 that, for example, require applicants to articulate their particular social groups on the form itself.

341.    Each of these changes will both decrease the number of individuals Plaintiffs are able to assist, and increase the resources necessary to assist the constituents who retain a hope of relief.

342.    For example, the number of intake interviews CAIR Coalition has traditionally been able to provide is driven in part by its ability to rely on appropriately supervised legal assistants and law student volunteers to conduct such interviews. Given the increased complexity resulting from the new Rule (including the need to assess the applicability of a number of new *de facto* bars to asylum eligibility and the impact of other new factors now included in the adjudicators' analysis), CAIR Coalition anticipates that it will no longer be able to staff client intake interviews with legal assistant or law student volunteers. The new need to staff such interviews with CAIR Coalition staff members and volunteer lawyers will (i) significantly reduce the overall number of intake interviews

CAIR Coalition is able to conduct and (ii) reduce CAIR Coalition's capacity to assist as many clients as possible in other aspects of the asylum process, including in trial-stage proceedings.

343.    The Rule will significantly reduce the number of cases in which Plaintiffs can support and represent asylum seekers going forward, as their attorneys will need to expend an increased amount of time and resources on each client's case to establish eligibility under the Rule. This includes, among other things, the time and resources required to identify whether the applicant can establish persecution on account of a protected ground under the new standards, ensuring that the application could not be pretermitted, identify evidence that could not be characterized as stereotype evidence and explain why evidence provided is not stereotype evidence, compile evidence to affirmatively prove internal relocation was not safe and reasonable, and so on. The Plaintiffs will also need to expend an increased amount of time and resources on the cases of applicants who are barred from asylum by the Rule and bear the burden to meet a higher standard under withholding of removal than asylum.

344.    The ability of the Plaintiffs to take on new clients will also be harmed by the Rule's impact on family members of the asylum seekers the Plaintiffs serve, many of whom are parents who fled their home countries with their young children. If a parent who flees to the United States is subject to, for example, one of the Rule's new *de facto* eligibility bars, and thereby forced to seek withholding of removal, they will no longer be able to ensure that their child or spouse can also obtain protection in the United States because withholding of removal does not confer benefits on derivative family members. This will likely result in increased family separation, as family members who no longer qualify for asylum as derivatives are more likely to be removed, but will also have a significant impact on the Plaintiffs, who will be faced with an increased number of cases where they must assist each family member in seeking asylum as a principal, rather than being able to rely on derivative status, at the same time as they face a decrease in the number of resources they have available.

345.    The resulting reduction in the number of people Plaintiffs are able to support will frustrate their missions, including by directly conflicting with CAIR Coalition's mission to expand access to counsel within the population it serves.

2.    The Rule Diverts Resources from Plaintiffs' Core Programs

346.    The Rule is also causing and will continue to cause Plaintiffs to divert resources from their core programs. Before the effective date of the Rule, each Plaintiff will need to expend significant resources—including by diverting resources from its core programs—to analyze and interpret the Rule, create new informational materials and resources to address the Rule, and provide training to its staff and, in the case of CLINIC, its large network of affiliates, almost half of whom provide asylum representation. For example, CAIR Coalition will need to update its client database and intake process to add questions and responses relevant to the Rule's new definitions of particular social group, political opinion, nexus, and persecution, as well as the twelve new discretionary factors, a process that will take days of staff member time and require deferring previously planned updates due to cost and timing reasons.

347.    Additionally, several of the Plaintiffs provide training and support to other practitioners and/or directly to immigrant communities, which will require them to expend substantial resources in the near term on tasks such as drafting client alerts, designing and hosting webinars, and updating any website content concerning asylum eligibility. For example, Pangea provides Know Your Rights presentations to hundreds of immigrants each year, and Dolores Street Community Services conducts advocacy work for ICE detainees. In 2020, Pangea piloted a program that provides in-depth assistance to *pro se* asylum applicants that has already served ten clients, while CAIR Coalition hosted 182 workshops for *pro se* asylum seekers and provided *pro se* assistance to 241 individuals in 2019 alone. To continue offering these programs, Pangea, CAIR Coalition, and DSCS will need to analyze the new Rule, revise their training materials, and create new curricula promptly. They will also need to spend more staff time on each workshop to explain the complexities of the rule to *pro se* asylum seekers.

348.    Likewise, all Plaintiffs anticipate needing to rework their existing training materials to ensure their staff understand the entire gamut of the Rule's new substantive and procedural requirements, which will take a tremendous amount of time and workforce effort that the Plaintiffs cannot afford to spare.

349.    Moreover, because CLINIC is the hub of the largest network of immigration legal services providers in the nation, its affiliate programs will look to it to provide real-time guidance regarding the new Rule, including through in-depth articles and news alerts and multi-platform social media announcements. Among other tools, CLINIC provides its affiliates with access to the "Ask-the-Experts" portal on its website, which allows attorneys and accredited representatives at its affiliates to submit inquiries regarding individual immigration matters. In order to ensure that it is adequately prepared to field questions from affiliate legal staff about the impact of the Rule on asylum-seeking clients, CLINIC will need to devote substantial resources to training its legal staff. If a submitted question is broadly applicable, CLINIC staff may also spend additional weeks developing trainings or written resources designed to answer it. In the past, CLINIC has had to hire a consulting attorney at an hourly rate to assist in responding to such inquiries, which proliferate in the wake of a new rule. That cost negatively impacts CLINIC's budget.

350.    Each of the tasks and expenses necessary to respond to the new Rule—including those described above—requires Plaintiffs to divert their finite resources from other aspects of the programs they provide. As a result of the Rule, Plaintiffs anticipate the need to make changes including reallocating staffing, devoting less time to advocacy projects and community initiatives, and taking on fewer cases.

### 3.    The Rule Jeopardizes Plaintiffs' Funding

351.    The Rule will also jeopardize Plaintiffs' funding. Plaintiffs rely in part on grants from sources such as states, counties, and foundations. Such grants are often conditioned on Plaintiffs' ability to achieve certain targets, such as a total number of clients served or asylum applications filed each year. In 2020, grants of this nature constituted approximately 65% of Pangea's budget and approximately 95% of the budget for DSCS's Deportation Defense & Legal Advocacy Project. CAIR Coalition, too, receives funding from grants and foundations tied to the number of adults CAIR Coalition is able to represent each year. Because the Rule will necessarily reduce the number of Plaintiffs' clients eligible for asylum, and will require Plaintiffs to spend significantly more time on each client's case, Plaintiffs are unlikely to be able to comply with existing funding

requirements—and thus expect to lose a substantial amount of their funding once this Rule goes into effect.

352.   Similarly, CAIR Coalition has established pro bono partnerships with a number of law firms with which it places asylum cases. In addition to providing pro bono legal services, many of these law firms donate money to CAIR Coalition, often in exchange for opportunities to provide direct assistance with and staffing of asylum matters. Currently, law firm donations of this kind account for close to 5% of CAIR Coalition's annual budget. Under the Rule, fewer of CAIR Coalition's clients will be eligible for asylum, and even some eligible clients may decline to apply for asylum due to the expanded application of the frivolous application consequences, as a result of which it will necessarily have fewer asylum cases to place with partner law firms. CAIR Coalition expects that this shift could result in a decrease in the amount of law firm donations it receives.

353.   Even under the best of circumstances, the loss of a significant source of funding could have devastating impacts for the Plaintiffs. With respect to the new Rule, the harm caused by the loss of funding will be further exacerbated by the concomitant increase in demands on Plaintiffs' resources.

### 4.   The Rule Harms the Populations Plaintiffs Serve

354.   In addition to the harmful outcomes described above, if permitted to take effect, the Rule will cause serious harm to the populations Plaintiffs serve.

355.   Many noncitizens who could be eligible for asylum will never submit an application due to a fear of the expanded application of the frivolousness consequences or increased costs of representation given increased complexity. Among those who apply for asylum, many who could be eligible will never have the opportunity to testify in support of their application because an immigration judge will find the application legally insufficient and pretermit the case.

356.   The Rule callously excludes many vulnerable noncitizens from asylum eligibility, in violation of the INA, international law, and decades of asylum jurisprudence. Applicants will be subjected to the firm resettlement bar despite not having been firmly resettled. Victims of government repression, military violence, gang violence, domestic violence, and sexual violence will

be denied asylum based on the unreasonably narrow definitions of persecution, nexus, political opinion, and particular social group. Applicants who spent more than fourteen days in another country before coming to the United States will be summarily denied asylum as a matter of "discretion." refugees subject to the Rule's unlawful significantly adverse factors or adverse factors that would generally result in denial of asylum would *de facto* bar applicants from asylum entirely without regard for the severity of the adverse factor or the circumstances under which it arose, and almost entirely without regard for the danger that a denial of asylum represents.

357.    As a direct result of the Rule, thousands of people fleeing persecution, violence, and even death in their countries of origin will be ineligible for the life-saving relief asylum and related protections are meant to provide, in direct contravention of the INA, the Refugee Convention and the Convention Against Torture. The Rule will also impact their family members, who will be rendered ineligible for derivative asylum and family reunification. Moreover, the Rule will leave thousands ineligible for adjustment of status based on asylum, as a result of which—even if they are permitted to remain in the United States under an alternate form of protection—they will no longer have a pathway to citizenship.

358.    Each of the Rule's provisions addressed above will dramatically alter the asylum system and would place many refugees in harm's way. Taken together, the effect of the Rule is far more egregious than the sum of its parts. It would penalize asylum seekers for virtually every action they take to escape harm. Those who remain outside the United States as required by CBP through its practice of "metering" asylum seekers, would be denied asylum for remaining in another country. Those who enter the United States between ports of entry would be denied for entering illegally. The Rule is cloaked in "clarifications," "definitions," and "efficiency," but its effect—and purposefully so—is to unlawfully deny asylum to bona fide refugees in search of a safe haven.

359.    Worse than its illegality is the Rule's callousness. Without input from Congress and in the face of repeated court decisions barring substantially similar enactments, the Agencies continue to target bona fide refugees by attacking the asylum protections guaranteed by international legal obligations directly incorporated into U.S. law. In violation of the United States Constitution, the APA, the INA, and international law the United States has codified, the Agencies would narrow

requirements for eligibility, broaden asylum bars, shift burdens to the applicant, and eliminate opportunities for the applicant to make her case. The Agencies' efforts cannot stand.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### RULE PROPOSED AND ISSUED BY DHS WITHOUT LAWFUL AUTHORITY, VIOLATION OF THE FEDERAL VACANCIES REFORM ACT, HOMELAND SECURITY ACT, APPOINTMENTS CLAUSE

360.    Plaintiffs repeat and incorporate each of the allegations above.

361.    The Secretary of Homeland Security is a principal officer of the United States whose appointment requires Presidential nomination and Senate confirmation. *See* 6 U.S.C. § 112(a)(1); *see also* U.S. Const. art. II, § 2, cl. 2.

362.    Defendant Chad Wolf, purporting to be the Acting Secretary of Homeland Security, reviewed and approved the proposed rule and purported to delegate signature authority to Chad Mizelle. 85 Fed. Reg. 80381.

363.    Chad Wolf has not been confirmed by the Senate to hold the office of Secretary of Homeland Security.

364.    Chad Wolf has no lawful authority to serve as Acting Secretary under the HSA because he purports to have assumed authority pursuant to an order of succession established by Kevin McAleenan, who did have lawful authority to succeed Secretary Nielsen under the HSA.

365.    Chad Wolf also lacks authority under the FVRA, which provides that "an action taken by a person who is not acting" under its requirements "in the performance of any function or duty of a vacant office . . . shall have no force or effect." 5 U.S.C. § 3348(d)(1).

366.    Chad Wolf has taken action after the FVRA's statutory 210-day limit on actions by acting official.

367.    Chad Wolf therefore had no valid authority to propose, review or approve the Rule, or to delegate signature to Chad Mizelle.

368.    Chad Mizelle also did not independently review or approve the proposed rule nor did he have independent lawful authority to act in Mr. Wolf's place.

369.    Chad Mizelle is also not lawfully holding the position of Senior Official Performing the Duties of the General Counsel.

370.    Because the rule was proposed, reviewed and approved by Chad Wolf in violation of the Appointments Clause, the HSA, or the FVRA, the Rule is also "not in accordance with law" and " must be set aside under 5 U.S.C. § 706(2)(A), (D).

371.    The Rule violates the Due Process Clause of the United States Constitution.

372.    The Rule violates the RFA.

373.    Defendants' violation is causing ongoing harm to Plaintiffs.

### SECOND CLAIM
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2), EXCESS OF AUTHORITY OR NOT IN ACCORDANCE WITH LAW

374.    Plaintiffs repeat and incorporate each of the allegations above.

375.    The Administrative Procedure Act prohibits agency action that is "in excess of statutory jurisdiction, authority or limitations, or short of statutory right," or "not in accordance with law. 5 U.S.C. § 706(2)(C),

376.    Defendants may only exercise the authority conferred by statute. *City of Arlington v. F.C.C.*, 569 U.S. 290, 297 (2013) ("[Agencies'] power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires.").

377.    DHS asserts that the source of its authority to promulgate the rule lies in 8 U.S.C. § 1103(a)(1) and (3). 85 Fed. Reg. 80274. That authority is expressly limited to "administration and enforcement of this chapter" and the necessity of "carrying out [the Secretary's] authority under the provisions of this chapter." Exceeding the scope of delegated authority also violates the separation of powers.

378.    The Rule as a whole exceeds Defendants' statutory authority and is not in accordance with law because it restricts the availability of asylum in excess of Defendants' authority and in contravention of the Refugee Act, and the *non-refoulment* obligations it codifies.

379.    The Rule exceeds Defendants' statutory authority and is not in accordance with law

because its provisions pertaining to "discretionary factors" create *de facto* bars to asylum eligibility that contravene the text and purpose of the INA, and unreasonable conflict with the requirement that asylum applications be considered on an individualized case-by-case basis that takes into account the totality of the circumstances.

380.    The Rule exceeds Defendants' statutory authority and is not in accordance with law because its expansion of the firm resettlement bar is not authorized under the INA, and contravenes its text and purpose.

381.    The Rule exceeds Defendants' statutory authority and is not in accordance with law because it empowers adjudicators to pretermit asylum applications in a manner that is contrary to the INA and violates asylum seekers' due process rights.

382.    The Rule exceeds Defendants' statutory authority and is not in accordance with law because its redefines a "frivolous" filing in a manner that is inconsistent with the INA and the *non-refoulement* obligations it codifies, and violate applicants' rights to due process.

383.    The Rule's definitions of "particular social group," "political opinion," "persecution," "on account of," and internal relocation are in excess of Defendants' statutory authority and not in accordance with law because they restrict the availability of asylum in a manner inconsistent with the text and purpose of the INA.

384.    The Rules exceeds Defendants' statutory authority and is not in accordance with law because its introduces new standards and procedures that restrict the availability of asylum in a manner inconsistent with the text and purpose of the INA, including the expansion of asylum-and-withholding-only proceedings, restrictions on admissibility of critical evidence, the heightened burden to establish torture, and the reduction of privacy protection.

385.    Defendants' violation is causing ongoing harm to Plaintiffs.

### THIRD CLAIM
### VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2), ARBITRARY AND CAPRICIOUS OR WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW

386.    Plaintiffs repeat and incorporate each of the allegations above.

387.    Under the APA, an agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(C),

388.    The Rule is arbitrary and capricious because it seeks to upend the existing asylum system and dramatically restricts the availability of asylum without a reasoned explanation or consideration of important aspects of the problem.

389.    The Rule is arbitrary and capricious because it makes an unreasoned and unexplained break from longstanding precedent requiring an individualized case-by-case totality of the circumstances analysis of asylum claims. *In Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987), without reasoned explanation, consideration of alternatives, or consideration of serious aspects of the problem.

390.    The Rule is arbitrary and capricious because it fails to offer any substantial evidence or reasoned explanation for how its provisions will serve its stated purposes.

391.    The Rule is arbitrary and capricious because it disregards reasonable reliance interests.

392.    The Rule is arbitrary and capricious because it is pretext for the dismantling of the asylum system, generally, and barring Central Americans, people of color, and women fleeing gender-based violence in particular.

393.    The Rule is arbitrary and capricious because it fails to take into account the Rule's intersection with other rules, including those issued through staggered rulemaking.

394.    The Rule is arbitrary and capricious because it implements actions courts have held to be unlawful.

395.    The Rule is arbitrary and capricious because it does not adequately weigh the serious risk of *refoulement*.

396.    The Rule is arbitrary and capricious because it does not offer reasoned explanation or adequately consider serious aspects of the problems created by its *de facto* bars to asylum eligibility; the firm resettlement bar; pretermission; its redefinition of "frivolous" filings; its redefinition of "particular social group," "political opinion," "persecution," "on account of," and internal relocation; or its new standards and procedures that restrict the availability of asylum, restrictions on

1    admissibility of critical evidence, the heightened burden to establish torture, the reduction of privacy

2    protection.

3        397.    Defendants' violation is causing ongoing harm to Plaintiffs.

4    **FOURTH CLAIM**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706(2),**
5    **WITHOUT OBSERVANCE OF PROCEDURE REQUIRED BY LAW**

6        398.    Plaintiffs repeat and incorporate each of the allegations above.

7        399.    The APA requires a court to hold unlawful and set aside agency action that is

8    arbitrary, capricious, or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A),

9    (D).

10        400.    The agency failed to comply with the requirements of the Regulatory Flexibility Act

11    ("RFA").

12        401.    The Rule is a "rule" within the meaning of the RFA. *Id.* § 601(2).

13        402.    The RFA requires federal administrative Agencies to analyze the effects on "small

14    entities" of rules they promulgate, and to publish initial and final versions of those analyses. *See* 5

15    U.S.C. §§ 603–604.

16        403.    The RFA defines "small entities" to include small businesses, small nonprofit

17    organizations, and small governmental jurisdictions. *Id.* § 601(6). Each of the Plaintiffs is a "small

18    entity" within the meaning of the RFA and is directly affected by the Rule, which, among other

19    things, will require them to devote substantial resources to addressing the new restrictions on asylum

20    eligibility imposed by the Rule and will jeopardize their funding.

21        404.    DOJ and DHS's regulatory flexibility analysis does not comply with the RFA because

22    DOJ and DHS concluded that the Rule will not have a significant impact on small entities. In lieu of

23    an adequate explanation, the Rule simply asserts that "[t]his regulation affects only individual

24    [immigrants]," a statement that wholly ignores the impact of the Rule on Plaintiffs and other

25    organizations that serve asylum seekers. 85 Fed. Reg. at 80383.

26        405.    The RFA requires DOJ and DHS to describe and estimate the number of small

27    entities that would be affected by the Rule. 5 U.S.C. § 604(a)(4). DOJ and DHS did not do so and

28

1   refused to include small nonprofit organizations affected by the Rule. 85 Fed. Reg. at 80377–78,

2   80383.

3       406.   The RFA requires DOJ and DHS to describe "the steps the agency has taken to

4   minimize the significant economic impact on small entities consistent with the stated objectives of

5   applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the

6   alternative adopted in the [Rule] and why each one of the other significant alternatives to the [Rule]

7   considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. §

8   604(a)(6). Again, DOJ and DHS failed to describe any such steps and failed to consider the "stated

9   objectives of applicable statutes," *id.*, including the INA, the Refugee Act, and the HSA. 85 Fed.

10   Reg. at 80377–78, 80383.

11       407.   As a result of the foregoing, the Rule's regulatory flexibility analysis does not comply

12   with the RFA.

13       408.   The APA also requires an agency proposing a new rule to provide public notice and

14   to "give interested persons an opportunity to participate in the rule making through submission of

15   written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. §

16   553(c).

17       409.   The 30-day notice-and-comment period provided was inadequate in light of the

18   proposed rule's evident complexity and potential for far-reaching impact. The Rule was also part of

19   an improperly staggered rulemaking process, which prevented the public from understanding and

20   commenting on the final regulatory regime. Further, the Agency did not respond adequately to

21   public comments. The Rule is therefore invalid.

**FIFTH CLAIM**
**VIOLATION OF THE DUE PROCESS CLAUSE**

24       410.   Plaintiffs repeat and incorporate each of the allegations above.

25       411.   The Due Process Clause of the Fifth Amendment prohibits laws and regulations that

26   fail to "give ordinary people fair warning about what the law demands of them." *United States v.*

27   *Davis*, 139 S. Ct. 2319, 2323 (2019). The requirement of fair notice applies in civil contexts just as

28

in *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212–13 (2018) (plurality opinion). Given the "grave nature of deportation," the "most exacting vagueness standard" applies in the immigration context." Id. at 1213.

412.    The Rule violates due process because it establishes procedures and standards that deny asylum applicants a full hearing.

413.    The Rule is unconstitutionally vague. It fails to provide fair notice of the conduct that may result in a bar to asylum eligibility and invites arbitrary enforcement by immigration adjudicators.

414.    The Rule violates due process because it erects arbitrary barriers to asylum seekers' access to statutory rights.

415.    Defendants' violation is causing ongoing harm to Plaintiffs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court:

A.    Hold unlawful, vacate, and set aside the Rule under 5 U.S.C. § 706(2);

B.    Declare the Rule arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure as required by law, in violation of the APA, INA, and RFA;

C.    Declare the Rule invalid for being co-issued by Defendant Chad Wolf, who lacked the authority to do so pursuant to the Appointments Clause of the United States Constitution, the HSA, and the FVRA;

D.    Declare the Rule unconstitutional for violating the Due Process of the Fifth Amendment of the United States Constitution;

E.    Enter a preliminary and permanent nationwide injunction, without bond, enjoining Defendants, their officials, agents, employees, and assigns from implementing or enforcing the Rule;

F.    Stay the implementation or enforcement of the Rule;

G.    Award Plaintiffs reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412 and any other applicable provision of law including but not limited to 42 U.S.C. § 1988; and

H.    Grant any other and further relief this Court may deem just and proper.

Respectfully submitted,

DATE: December 21, 2020

By:_/s/ Naomi A. Igra_

Sabrineh Ardalan (*pro hac vice* forthcoming)
sardalan@law.harvard.edu
Sameer Ahmed, SBN 319609
sahmed@law.harvard.edu
Zachary Albun (*pro hac vice* forthcoming)
zalbun@law.harvard.edu
Deborah Anker (*pro hac vice* forthcoming)
danker@law.harvard.edu
Nancy Kelly (*pro hac vice* forthcoming)
nkelly@law.harvard.edu
John Willshire Carrera (*pro hac vice*
forthcoming)
jwillshire@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE
CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone: +1 617 384 7504
Facsimile: +1 617 495 8595

Jamie Crook, SBN 245757
crookjamie@uchastings.edu
Annie Daher, SBN 294266
daherannie@uchastings.edu
Blaine Bookey, SBN 267596
bookeybl@uchastings.edu
Karen Musalo, SBN 106882
musalok@uchastings.edu
CENTER FOR GENDER & REFUGEE
STUDIES
UC HASTINGS COLLEGE OF THE LAW
200 McAllister Street
San Francisco, CA 94102
Telephone: +1 415 565 4877
Facsimile: +1 415 581 8824

Naomi A. Igra, SBN 269095
naomi.igra@sidley.com
S. Patrick Kelly, SBN 275031
patrick.kelly@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Douglas A. Axel, SBN 173814
daxel@sidley.com
SIDLEY AUSTIN LLP
555 West Fifth Street
Los Angeles, CA 90013
Telephone: +1 213 896 6000
Facsimile: +1 213 896 6600

Ben Schwarz (*pro hac vice* forthcoming)
bschwarz@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
Telephone: +1 617 223 0300
Facsimile: +1 617 223 0301

Brian C. Earl (*pro hac vice* forthcoming)
bearl@sidley.com
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone: +1 212 839 5300
Facsimile: +1 212 839 5599

*Attorneys for Plaintiffs*