1  Naomi A. Igra, SBN 269095
   naomi.igra@sidley.com
2  S. Patrick Kelly, SBN 275031
   patrick.kelly@sidley.com
3  SIDLEY AUSTIN LLP
   555 California Street, Suite 2000
4  San Francisco, CA 94104
   Telephone: +1 415 772 1200
5  Facsimile: +1 415 772 7400
   Facsimile: +1 415 772 7400
6
   Douglas A. Axel, SBN 173814
7  daxel@sidley.com
   SIDLEY AUSTIN LLP
8  555 West Fifth Street
   Los Angeles, CA 90013
9  Telephone: +1 213 896 6000
   Facsimile: +1 213 896 6600
10

Sabrineh Ardalan (*pro hac vice* pending)
sardalan@law.harvard.edu
Sameer Ahmed, SBN 319609
sahmed@law.harvard.edu
Zachary Albun (*pro hac vice* pending)
zalbun@law.harvard.edu
Deborah Anker (*pro hac vice* forthcoming)
danker@law.harvard.edu
Nancy Kelly (*pro hac vice* forthcoming)
nkelly@law.harvard.edu
John Willshire Carrera (*pro hac vice* forthcoming)
jwillshire@law.harvard.edu
HARVARD LAW SCHOOL
HARVARD IMMIGRATION AND REFUGEE
CLINICAL PROGRAM
6 Everett Street, WCC 3103
Cambridge, MA 02138
Telephone: +1 617 384 7504
Facsimile: +1 617 495 8595

11  *Attorneys for Plaintiff*
    *Additional Counsel on next page*

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                          SAN FRANCISCO

15  PANGEA LEGAL SERVICES, *et al.*,          Case No. 3:20-cv-09253-JD

16                 Plaintiffs,                **PLAINTIFFS' NOTICE OF MOTION AND**
                                              **MOTION FOR A PRELIMINARY**
17         v.                                 **INJUNCTION, TEMPORARY**
                                              **RESTRAINING ORDER AND ORDER TO**
18  U.S. DEPARTMENT OF HOMELAND               **SHOW CAUSE; MEMORANDUM OF**
    SECURITY *et al.*,                        **POINTS AND AUTHORITIES IN**
19                                            **SUPPORT**
                 Defendants.
20                                            Assigned to Hon. Judge James Donato

21

22                                            **RELIEF REQUESTED BY 5:00 P.M.,**
                                              **JANUARY 10, 2021**

23

24

25

26

27

28

Ben Schwarz (*pro hac vice* pending)
bschwarz@sidley.com
SIDLEY AUSTIN LLP
60 State Street, 36th Floor
Boston, MA 02109
Telephone:  +1 617 223 0300
Facsimile:  +1 617 223 0301

Brian C. Earl  (*pro hac vice* pending)
bearl@sidley.com
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
Telephone:  +1 212 839 5300
Facsimile:  +1 212 839 5599

Jamie Crook, SBN 245757
crookjamie@uchastings.edu
Annie Daher, SBN 294266
daherannie@uchastings.edu
Blaine Bookey, SBN 267596
bookeybl@uchastings.edu
Karen Musalo, SBN 106882
musalok@uchastings.edu
CENTER FOR GENDER & REFUGEE STUD-
IES
UC HASTINGS COLLEGE OF THE LAW
200 McAllister Street
San Francisco, CA 94102
Telephone: +1 415 565 4877
Facsimile: +1 415 581 8824

PLEASE TAKE NOTICE that Plaintiffs Pangea Legal Services ("Pangea"), Dolores Street Community Services, Inc. ("DSCS"), Catholic Legal Immigration Network, Inc. ("CLINIC"), and Capital Area Immigrants' Rights Coalition ("CAIR Coalition") (collectively "Plaintiffs") will, and do, move the Court under Federal Rule of Civil Procedure 65 for a temporary restraining order ("TRO") and order to show cause why a preliminary injunction should not issue against Defendants U.S. Department of Homeland Security ("DHS"); Chad F. Wolf, in his purported official capacity as Acting Secretary of the DHS; U.S. Citizenship and Immigration Services ("USCIS"); Kenneth T. Cuccinelli, in his official capacity as the Senior Official Performing the Duties of the Director, USCIS; U.S. Immigration and Customs Enforcement ("ICE"); Tony H. Pham, in his official capacity as the Senior Official Performing the Duties of the Director of ICE; U.S. Customs and Border Protection ("CBP"); Mark A. Morgan, in his official capacity as Acting Commissioner of CBP; U.S. Department of Justice ("DOJ"); William P. Barr, in his official capacity as U.S. Attorney General; Executive Office for Immigration Review ("EOIR"); and James R. McHenry III, in his official capacity as Director of the EOIR (collectively "Defendants").

Plaintiffs respectfully move the Court to enter a nationwide TRO and preliminary injunction maintaining the *status quo* and enjoining Defendants from implementing or enforcing the rule titled *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80274 (Dec. 11, 2020) ("the Rule") and any related policies or procedures, including the Policy Memorandum entitled *Guidance Regarding New Regulations Governing Procedures For Asylum and Withholding of Removal and Credible Fear Reviews* issued by Defendants EOIR and McHenry on December 11, 2020, pending final judicial resolution of this action. This motion is based on this Motion, the accompanying Complaint for Declaratory and Injunctive Relief, the accompanying Memorandum of Points and Authorities, the accompanying proposed Order to Show Cause and Temporary Restraining Order, the accompanying supporting declarations of Naomi A. Igra ("Igra Dec."), Adina Appelbaum ("CAIR Dec."), Victoria Neilson ("CLINIC Dec."), Katherine Mahoney ("DSCS Dec."), Etan Newman ("Pangea Dec."), as well as the papers, evidence, and records on file in this action, and any other written or oral evidence or argument presented at or before the time this motion is heard by the Court.

As set forth in the accompanying Memorandum of Points and Authorities, a temporary re-straining order is necessary by **5:00 p.m. PT on January 10, 2021** to prevent immediate and irrepa-rable harm to the Plaintiffs and the populations they serve. The Final Rule is scheduled to take effect on **January 11, 2021**. Because Defendants set the final rule to take effect 30 days after publica-tion—an unusually short period—Plaintiffs are unable to seek a preliminary injunction on this judi-cial district's ordinary schedule.

Accordingly, Plaintiffs seek an expedited briefing and hearing schedule that will permit a TRO and preliminary injunction to preserve the *status quo* and prevent Defendants from implement-ing or enforcing the Rule.

Plaintiffs' counsel have consulted with Defendants' counsel about this briefing schedule and come to agreement, as described in Plaintiffs' Unopposed Motion for an Order Entering Briefing Schedule and Setting Hearing Date, filed along with this motion. The parties propose that Defend-ants' opposition and any amicus briefs be due by December 31, 2020 and that Plaintiffs' reply and Defendants' sur-reply, if any, to the amicus briefs be due by January 5, 2021. The parties jointly re-quest that this Court schedule a hearing on January 7, 2021.

# TABLE OF CONTENTS

**PAGE(S)**

I.      INTRODUCTION ................................................................................................................1

II.     BACKGROUND ................................................................................................................1

      A.      The Refugee Act ....................................................................................................1

      B.      The Rule ..................................................................................................................1

      C.      The Purported Acting Secretary of DHS ................................................................3

III.    LEGAL STANDARD.........................................................................................................4

IV.     ARGUMENT......................................................................................................................5

      A.      Plaintiffs are likely to succeed on the merits. ..............................................................5

            1.      The Rule should be set aside because Chad Wolf lacks valid authority............5

            2.      The Rule's evisceration of the asylum system is unlawful...............................6

            3.      Core components of the Rule illustrate that it is unlawful................................9

            4.      Defendants did not satisfy basic procedural requirements of the APA. ..........15

      B.      The Rule will irreparably harm Plaintiffs and the people they serve. .........................18

      C.      The equities and the public interest favor injunctive relief.........................................20

V.      CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
   295 U.S. 495 (1935)..................................................................................................7

*All. for the Wild Rockies v. Cottrell*,
   623 F.3d 1127 (9th Cir. 2011) ...................................................................................4

*Arizona v. United States*,
   567 U.S. 387 (2012)....................................................................................................7

*Barapind v. Reno*,
   225 F.3d 1100 (9th Cir. 2000) ...................................................................................1

*Batalla Vidal v. Wolf*,
   16-CV-4756 (NGG) (VMS), 2020 WL 6695076 (E.D.N.Y. Nov. 14, 2020)..............4, 5

*Bullock v. U.S. Bureau of Land Mgmt.*,
   No. 4:20-CV-00062-BMM, 2020 WL 5746836 (D. Mont. Sept. 25, 2020)...................5

*California by & through Becerra v. U.S. Dep't of the Interior*,
   381 F. Supp. 3d 1153 (N.D. Cal. 2019) ......................................................................9

*Camposeco–Montejo v. Ashcroft*,
   384 F.3d 814 (9th Cir. 2004) ......................................................................................9

*Casa de Md., Inc., v. Wolf*,
   Civil Action No. 8:20-cv-02118-PX, 2020 WL 5500165 (D. Md. Sept. 11, 2020) .........4, 5, 12, 14

*DHS v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020)................................................................................................9

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018) ("*EBSC I*") ..................................................................6, 7

*E. Bay Sanctuary Covenant v. Trump*,
   950 F.3d 1242 (9th Cir. 2020) ("*EBSC II*")......................................................4, 7, 8, 12

*E. Bay Sanctuary Covenant v. Barr*,
   964 F.3d 832 (9th Cir. 2020) ("*EBSC III*")....................................................7, 8, 11, 13

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)....................................................................................................8

*Matter of Fefe*,
   20 I. & N. Dec. 116 (BIA 1989) ...............................................................................12

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ............................................................................................ 8

*Guedes v. ATF*,
    920 F.3d 1 (D.C. Cir. 2019),
    *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019),
    *and cert. denied*, 140 S. Ct. 789 (2020) .......................................................... 6

*Immigrant Legal Res. Ctr. v. Wolf*,
    Case No. 20-CV-05883-JSW, 2020 WL 5798269 (N.D. Cal. Sept. 29, 2020) ................ 3, 4, 5, 15

*Innovation Law Lab v. Wolf*,
    951 F.3d 1073 (9th Cir. 2020) .......................................................................... 8

*INS v. Abudu*,
    485 U.S. 94 (1988) ........................................................................................... 14

*INS v. Cardoza-Fonseca*,
    480 U.S. 421 (1987) ......................................................................................... 7

*Jacinto v. INS*,
    208 F.3d 725 (9th Cir. 2000) ........................................................................... 13

*La Clinica de la Raza v. Trump*,
    Case No. 19-CV-04980-PJH, 2020 WL 6940934 (N.D. Cal. Nov. 25, 2020) ................ 5

*Mengstu v. Holder*,
    560 F.3d 1055 (9th Cir. 2009) .......................................................................... 9

*Michigan v. E.P.A*,
    576 U.S. 743 (2015) ..................................................................................... 8, 15

*NLRB v. SW General, Inc.*,
    137 S. Ct. 929 (2017) ...................................................................................... 6

*Nw. Immigrant Rights Project v. U.S. Citizenship & Immigr. Servs.*,
    No. CV 19-3283 (RDM), 2020 WL 5995206 (D.D.C. Oct. 8, 2020) ...................... 5, 6

*Pangea Legal Servs. v. U.S. Dept. of Homeland Sec.*,
    Case No. 20-CV-07721-SI, 2020 WL 6802474 (N.D. Cal. Nov. 19, 2020) ............... 11

*Pub. Citizen v. Fed. Motor Carrier Safety Admin*,
    374 F.3d 1209 (D.C. Cir. 2004) ........................................................................ 8

*Matter of Pula*,
    19 I. & N. Dec. 467 (BIA 1987) ........................................................................ 11

*Sall v. Gonzales*,
    437 F.3d 229 (2d Cir. 2006) .............................................................................. 9

*Util. Air. Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ............................................................................................................ 8

*Matter of Y-L-*,
    24 I. & N. Dec. 151 (BIA 2007) ...................................................................................... 15

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ............................................................................................................ 7

*Zhu v. Gonzalez*,
    218 F. App'x 21 (2d Cir. 2007) ...................................................................................... 14

**Rules & Statutes**

Fed. R. Civ. P. 56(d) ........................................................................................................... 13

5 U.S.C. § 706(2) ........................................................................................................... 5, 6

5 U.S.C. § 3345 ................................................................................................................... 6

5 U.S.C. § 3345(a)(2) ........................................................................................................ 6

5 U.S.C. § 3345(b) ............................................................................................................. 6

5 U.S.C. § 3345(b)(1)(B) ................................................................................................... 6

5 U.S.C. § 3345(b)(2) ........................................................................................................ 6

5 U.S.C. § 3346 ............................................................................................................... 3, 6

5 U.S.C. § 3348(a)(1) ........................................................................................................ 6

5 U.S.C. § 3348(d)(1) ........................................................................................................ 6

5 U.S.C. § 3348(d)(2) ........................................................................................................ 6

6 U.S.C. § 113(a)(1)(J) ...................................................................................................... 3

6 U.S.C § 113(g) ............................................................................................................ 5, 6

8 U.S.C. § 1158(a)(2)(B) ................................................................................................. 11

8 U.S.C. § 1158(a)(2) (D) ............................................................................................... 11

8 U.S.C. § 1158(b)(2)(A)(ii) ........................................................................................... 11

8 U.S.C. § 1158(b)(2)(A)(vi) ............................................................................................ 9

8 U.S.C. § 1158(d)(6) ...................................................................................................... 14

8 U.S.C. § 1229a .............................................................................................................. 13

8 U.S.C. § 1229a(a)(1) ................................................................................................ 12

8 U.S.C. § 1229a(b)(1) ........................................................................................... 12, 13

8 U.S.C. § 229a(b)(2)(A)(i)–(iv) ................................................................................ 12

8 U.S.C. § 1229a(c)(4) ................................................................................................ 12

8 U.S.C. § 1229a(c)(7)(C)(ii) ..................................................................................... 11

8 C.F.R. § 208.15(a) ................................................................................................... 10

8 C.F.R. § 208.15(b) ................................................................................................... 10

8 C.F.R. § 208.20 ........................................................................................................ 14

8 C.F.R. § 208.20(c)(1)–(4) ....................................................................................... 15

8 C.F.R. § 1208.20 ................................................................................................ 14, 15

8 C.F.R. § 1208.15(a) ................................................................................................. 10

8 C.F.R. § 1208.15(b) ................................................................................................. 10

8 C.F.R. § 1240.1(c) ................................................................................................... 12

8 C.F.R. § 1240.11(c)(3)(iii) ...................................................................................... 12

28 C.F.R. § 68.38(e) ................................................................................................... 14

**Other Authorities**

85 Fed. Reg. 36264 (June 15, 2020) .................................................................... 1, 2, 3

85 Fed. Reg. 75223 (Nov. 25, 2020) ........................................................................... 4

85 Fed. Reg. 80274 (Dec. 11, 2020) ................................................................... *passim*

Administrative Procedure Act ("APA") ............................................................. *passim*

Federal Vacancies Reform Act ("FVRA") ....................................................... 3, 4, 5, 6

Homeland Security Act ("HSA") ................................................................................. 3

Immigration and Nationality Act ("INA") ......................................................... *passim*

    § 240(c)(7)(C)(ii) ................................................................................................ 11

Regulatory Flexibility Act ("RFA") ............................................................................ 3

Pub. L. No. 96-212, 94 Stat. 102 ("Refugee Act") ............................................ *passim*

H.R. Rep. No. 96-608 (1979)..................................................................................................................... 1

PLS.' MOTION FOR PI, TRO & OSC, CASE NO. 3:20-cv-09253-JD

## I.      INTRODUCTION

This action challenges a sweeping final rule issued by DHS and DOJ (collectively the "Agencies") that would prevent the vast majority of applicants from establishing their claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"), *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, [1] 85 Fed. Reg. 80274 (Dec. 11, 2020) ("the Rule").[2] The Rule so narrows the availability of asylum that the United States will effectively cease to provide humanitarian protections required under the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ("Refugee Act"). The Court should immediately enjoin the Rule because it is unlawful under the Administrative Procedure Act ("APA"), it irreparably harms Plaintiffs, and the balance of harms and public interest tip sharply in favor of an injunction.

## II.      BACKGROUND

### A.      The Refugee Act

The Refugee Act amended the Immigration and Nationality Act ("INA"), "to respond to the urgent needs of persons subject to persecution in their homelands." Pub. L. No. 96-212, 94 Stat. 102 § 101(a). When it enacted the Refugee Act, "Congress sought to bring United States refugee law into conformity with the 1967 . . . Protocol," which in turn "incorporates the substantive provisions" of the Refugee Convention. *Barapind v. Reno*, 225 F.3d 1100, 1106 (9th Cir. 2000). Congress codified the Refugee Act "so that U.S. statutory law clearly reflects our legal obligations under international agreements." H.R. Rep. No. 96-608, at 18 (1979).

### B.      The Rule

Defendants published the Notice of Proposed Rulemaking ("NPRM") for the Rule in June 2020, with a 30 day comment period. 85 Fed. Reg. 36264 (June 15, 2020). The NPRM included

---

[1] The Rule affects withholding of removal and protection under the CAT as well as asylum, but for ease of reference, Plaintiffs' references "asylum" may include all three forms of protection.

[2] In addition to the Rule, Declaration of Naomi A. Igra ("Igra Dec."), Ex. 1, Plaintiffs seek to enjoin all agency action to implement the Rule, including through a related policy memorandum, Igra Dec., Ex. 3, and revisions to the Form I-589 Application for Asylum and for Withholding of Removal, Igra Dec., Ex. 12, and the instructions for its use. *See* Complaint for Declaratory and Injunctive Relief ("Comp.") ¶¶ 1 n.2, 52-53.

1

1  sweeping changes to almost every aspect of the asylum process.[3] According to Defendants, the

2  NPRM aimed to "'protect its own resources and citizens, while aiding those in true need of protec-

3  tion from harm.'" 85 Fed. Reg. 80274 (quoting 85 Fed. Reg. 36265).

4      Contrary to Defendants' stated dual purpose, no proposal in the NPRM protected refugees.

5  Rather, the NPRM substantially narrowed asylum eligibility, erected procedural barriers to seeking

6  asylum, increased the evidentiary burden on asylum seekers, and removed procedural protections for

7  them. For example, provisions of the NPRM:

8      • Redirect many refugees into proceedings that lack basic procedural protections[4]

9      • Allow immigration judges to pretermit proceedings without holding an evidentiary

10      hearing, even for unrepresented asylum seekers[5]

11      • Restrict the favorable evidence and authorities an immigration judge can consider[6]

12      • Redefine statutory terms in ways that substantially narrow who may be a "refugee"[7]

13      • Mandate denial of asylum in nearly all cases where the applicant spent more than 14

14      days in any country of transit, and in many other common circumstances[8]

15  Many of the changes seek to reverse longstanding precedents established to carry out the purpose of

16  the Refugee Act. *See, e.g.* Comp. ¶¶ 41-43, 85-89, 141-42, 186-193. Many changes also take the United

17  States out of compliance with U.S. and international law. *See, e.g.*, Comp. ¶¶81-82, 124, 183, 208.

18      Despite the scope of the NPRM, the Agencies provided for just a 30-day comment period in

19  the midst of the COVID pandemic when many stakeholders faced unprecedented upheaval.[9] Defend-

20  ants ignored numerous requests to extend the comment period, *see, e.g.*, Igra Dec., Ex. 4 at 7–9; Ex.

21

22  ---

23  [3] *See generally* Igra Dec., Ex. 2; Pangea Dec. ¶¶ 11, 52; DSCS Dec. ¶¶ 9, 76; CAIR Dec. ¶¶ 12, 45;
   CLINIC Dec. ¶¶ 22, 68.

24  [4] *See, e.g.* 85 Fed. at 36265-66 (placing applicants in asylum-and-withholding-only proceedings).
   [5] *Id*. at 36277.

25  [6] *See, e.g. id*. at 36282 (barring evidence "promoting cultural stereotypes").

26  [7] *See, e.g. id*. at 36281 (listing "nonexhaustive situations," including gender, where nexus will not
   generally be found); *id*. at 36280–81 (defining "persecution" and enumerating six forms of harm that
   will not constitute persecution); *id*. at 36282 (broadening definition of internal relocation); *id*. at 36285

27  (broadening applicability of firm resettlement bar).
   [8] *See, e.g. id*. at 36282–86 (describing "adverse factors").

28  [9] Pangea Dec. ¶10; DSCS Dec. ¶ 83; CAIR Dec. ¶12; CLINIC Dec. ¶ 22.

5 at 2; Ex. 21 at 5–6. Notwithstanding these obstacles, the Agencies received nearly 88,000 comments; many stated that the brief comment period hindered their ability to meaningfully comment. 85 Fed. Reg. 80373; *see, e.g.*, Igra Dec., Ex. 4 at 8–9; Ex. 5 at 2; Ex. 11 at 11; Ex. 21 at 5–6.

The Agencies sent the final rule for review just three months after the NPRM was published. Comp. ¶ 14. The Rule, essentially unchanged from the NPRM, failed to offer meaningful responses to comments identifying serious problems. 85 Fed. Reg. 80274-76. For example, the Rule failed to mention the letter filed by 22 state Attorneys General describing the impact of the Rule on states. Igra Dec., Ex. 9. It did not include a complete economic impact analysis reflecting the data the Attorneys General provided, *see* 85 Fed. Reg. 80377-78, or meaningfully assess the impact of the Rule on small entities including legal service providers pursuant to the Regulatory Flexibility Act ("RFA"). 85 Fed. Reg. 80378.

## C. The Purported Acting Secretary of DHS

The Rule aims to transform the asylum system at a time when Defendant Wolf leads DHS without lawful authority. Wolf purportedly "reviewed and approved" the NPRM and the Rule as the "Acting Secretary of DHS." 85 Fed. Reg. 80381, 80385. He "delegated the authority to electronically sign" them to Chad Mizelle, the "Senior Official Performing the Duties of the General Counsel for DHS."[10] 85 Fed. Reg. 36290.

Numerous commenters objected that Wolf had no authority to take these actions under the Homeland Security Act ("HSA") or the Federal Vacancies Reform Act ("FVRA").[11] DHS responded that Secretary Kirstjen Nielsen designated Kevin McAleenan as her successor before she resigned on April 10, 2019, and McAleenan designated Wolf as his successor before he resigned on November 13, 2019. 85 Fed. Reg. 80381. That contradicts a conclusion of the Government Accountability Office ("GAO"), Igra Dec., Ex. 19, and every court to have considered the question. *See Immigrant Legal Res. Ctr. v. Wolf*, Case No. 20-CV-05883-JSW, 2020 WL 5798269, at *8 (N.D. Cal. Sept. 29,

---

[10] Mizelle is not lawfully serving as General Counsel of DHS. The position, which has been vacant since September 2019, requires appointment by the President and Senate confirmation. 6 U.S.C. § 113(a)(1)(J). Mizelle was never nominated or confirmed. The FVRA does not allow officers in an acting capacity where a position has been vacant for more than 210 days. 5 U.S.C. § 3346.

[11] *See, e.g.,* Igra Dec., Ex. 25 at 53-55; Ex. 29 at 13.

2020) ("*ILRC*"); *Casa de Md., Inc., v. Wolf*, Civil Action No. 8:20-cv-02118-PX, — F. Supp. 3d ——, 2020 WL 5500165, at \*20–\*23 (D. Md. Sept. 11, 2020); *Batalla Vidal v. Wolf,* 16-CV-4756 (NGG) (VMS), 2020 WL 6695076, at \*9 (E.D.N.Y. Nov. 14, 2020).

     DHS maintains "in the alternative" that Peter Gaynor would be the Acting Secretary if McAleenan's accession was unlawful. [12] 85 Fed. Reg. 80382; Igra Dec., Ex. 15. On September 10, 2020—519 days after Secretary Nielsen resigned—the President nominated Wolf to be Secretary of DHS. In DHS's view, this nomination restarted the 210-day clock under the FVRA and made it possible for Gaynor to accede to the position of Acting DHS Secretary. Igra Dec., Ex. 14 ("Gaynor Order"). That same day, Gaynor purported to simultaneously exercise authority as DHS Secretary to revise the order of succession *and* also terminate his own authority so that Wolf was again in line to assume the Acting Secretary role. *Id.* On September 17, 2020, Wolf purported to ratify his prior actions as Acting Secretary. Igra Dec., Ex. 15.

     DHS later disclosed that the Gaynor Order may have been executed before the President nominated Wolf. *See* Igra Dec., Ex. 16. Although DHS maintains that Gaynor's delegation was valid, *id.*, on November 14, 2020, Gaynor repeated the exercise of terminating his authority and designating a new order of succession, with Wolf first in line. *See* 85 Fed. Reg. 75223, at 75225 (Nov. 25, 2020); Igra Dec., Ex. 17. Wolf issued a re-ratification which DHS published November 16, 2020. *Id.* Ex. 18.

## III.   LEGAL STANDARD

     A plaintiff seeking a preliminary injunction must establish that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1271 (9th Cir. 2020) ("*EBSC II*"). These factors operate on sliding scale so an injunction may issue if "the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [the requesting party's] favor.'" *All. for the Wild Rockies v. Cottrell*, 623 F.3d 1127, 1132 (9th Cir. 2011).

---

[12] DHS argues this even though Gaynor was not the Federal Emergency Management Agency Administrator at the time of Secretary Nielsen's resignation. Chris Krebs, who recently resigned as Director of Cybersecurity and Infrastructure, would have been next in the line of succession at that time. Igra Dec., Ex. 19 at 8 n.11.

1   **IV.      ARGUMENT**

2          **A.      Plaintiffs are likely to succeed on the merits.**

3          The APA requires a reviewing court to "hold unlawful and set aside agency action" that is

4   "arbitrary, capricious," "not in accordance with law," "contrary to constitutional right," "in excess of

5   statutory jurisdiction, authority, or limitations, or short of statutory right," or "without observance of

6   procedure required by law." 5 U.S.C. § 706(2). The Rule is invalid on all of these grounds.

7                 **1.      The Rule should be set aside because Chad Wolf lacks valid authority.**

8          The Rule asserts that Wolf is "validly acting as Secretary of Homeland Security" because he

9   succeeded McAleenan. 85 Fed. Reg. 80381. This assertion flies in the face of multiple federal court

10  decisions holding that McAleenan was never validly designated as Acting Secretary, and so could

11  not have validly designated Wolf as his successor.[13]

12         The Gaynor Order is ineffective for several reasons. DHS has not pointed to any authority

13  that would allow it "to take administrative action in the alternative" or "allow[] two different peo-

14  ple—Mr. Wolf and Administrator Gaynor—to simultaneously exercise the Secretary's power." *Ba-*

15  *talla Vidal*, 2020 WL 6695076, at *9. Also, DHS still has not noticed a vacancy as required under

16  the FVRA. *Id.*; Igra Dec. Ex. 22. If DHS had noticed the vacancy when Secretary Nielsen resigned,

17  Chris Krebs would have acceded to the position of DHS Secretary. Igra Dec., Ex. 19 at 8 n.11. And

18  "[e]ven if Administrator Gaynor should be Acting Secretary, DHS cannot recognize his authority

19  only for the sham purpose of abdicating his authority to DHS's preferred choice, and only in the al-

20  ternative." *Batalla Vidal*, 2020 WL 6695076, at *9. Moreover, Gaynor had no authority to designate

21  Wolf his successor because 6 U.S.C. § 113(g) only authorizes a Secretary of DHS to change the or-

22  der of succession.[14] *Nw. Immigrant Rights Project v. U.S. Citizenship & Immigr. Servs.*, No. CV 19-

23

24  _____

    [13] *See, e.g. ILRC*, 2020 WL 5798269, at *8; *Casa de Md.*, 2020 WL 5500165, at *23; *Batalla Vidal*,
25  2020 WL 6695076, at *9; *see also La Clinica de la Raza v. Trump*, Case No. 19-CV-04980-PJH, 2020
    WL 6940934, at *14 (N.D. Cal. Nov. 25, 2020) (finding McAleenan not validly designated under
26  Neilsen's April 10, 2019 designation); *Bullock v. U.S. Bureau of Land Mgmt.*, No. 4:20-CV-00062-
    BMM, 2020 WL 5746836 (D. Mont. Sept. 25, 2020) ("The President cannot shelter unconstitutional
27  'temporary' appointments for the duration of his presidency through a matryoshka doll of delegated
    authorities.").
28  [14] 6 U.S.C § 113(g) is simply an alternative "means" for designating someone to serve in an acting
    capacity; that person still "serve[s] as an acting officer," 5 U.S.C. § 3345(b), and is therefore subject

3283 (RDM), 2020 WL 5995206, at *24 (D.D.C. Oct. 8, 2020) ("Because the Court holds that an

Acting Secretary may not amend the Department's order of succession under § 113(g)(2), neither

appointment of Wolf was effective."). Gaynor was also not eligible to act as DHS Secretary because

the office had been vacant for more than 210 days, which is the limit under the FVRA. 5 U.S.C. §

3345(a)(2). The Rule asserts that "Mr. Wolf's nomination to the Senate would have restarted the

FVRA's time limits," 85 Fed. Reg. 80382, but the FVRA only allows a nomination to extend service

beyond 210 days for the person "serving . . . as described under section 3345" of the FVRA. 5

U.S.C. §3346. Mr. Gaynor was not actually serving in that role at the time of Wolf's nomination.[15]

In all events, Mr. Wolf cannot serve as an acting official while his nomination is pending.

5 U.S.C. § 3345(b)(1)(B). Defendants have argued in other cases that 5 U.S.C. § 3345 does not apply

because Mr. Wolf assumed his position under 6 U.S.C. § 113(g). *See, e.g. Nw. Immigrant Rights

Project*, 2020 WL 5995206, at *24. But only the Senate-confirmed Secretary can designate a succes-

sor pursuant to that provision. Because Wolf has never properly been designated under 6 U.S.C. §

113(g), he is subject to the FVRA's nomination bar. *Id.*

Defendants' promulgation of the Rule absent lawful authority was "in excess of . . . author-

ity" and "not in accordance with law" under the APA. 5 U.S.C. § 706(2).[16] As the Rule explains,

"the DHS and DOJ regulations are inextricably intertwined," 85 Fed. Reg. 80286; the entire Rule

must therefore be set aside.

## 2. The Rule's evisceration of the asylum system is unlawful.

No provision of the INA gives the executive branch the authority to "rewrite the immigration

---

to the nomination bar. *NLRB v. SW General, Inc.*, 137 S. Ct. 929, 941 (2017) ("Subsection (b)(1) ad-
dresses nominations *generally*, prohibiting any person who has been nominated to fill any vacant of-
fice from performing that office's duties in an acting capacity.") (emphasis in original). Moreover, 5
U.S.C. § 3345(b)(2) specifically identifies exceptions to the nomination bar; none apply here.

[15] The clock is "toll[ed]" for a person already serving during a nomination but only "reject[ion],
withdraw[al], or return[]" "starts a new . . . clock." *NLRB*, 137 S. Ct. at 936.

[16] Moreover, "action[s] taken by a person who [was] not acting under section 3345, 3346 or 3347," of
the FVRA have "no force or effect" and "may not be ratified." 5 U.S.C. §§ 3348(d)(1), (2). An "action"
includes an "agency action." 5 U.S.C. § 3348(a)(1). And even if ratification were permitted, Mr. Wolf
cannot ratify his own actions because he is not a Senate-confirmed officer. *Cf. Guedes v. ATF*, 920
F.3d 1, 16 (D.C. Cir. 2019), *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019), *and cert. denied*, 140
S. Ct. 789 (2020) (permitting ratification "only because it was undertaken" by a Senate-confirmed
officer whose "authority to act" the plaintiff did not challenge).

6

laws." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 774 (9th Cir. 2018) ("*EBSC I*"). Funda-

mentally, the Rule cannot stand because it is "contrary to the asylum statute and contravene[s] clear

congressional intent to give effect to our international treaty obligations." *E. Bay Sanctuary Cove-*

*nant v. Barr*, 964 F.3d 832, 855 (9th Cir. 2020) ("*EBSC III*"). "[I]f one thing is clear from the . . . en-

tire 1980 [Refugee] Act, it is that one of Congress' primary purposes was to bring United States ref-

ugee law into conformance with the 1967 United Nation Protocol Relating to the Status of Refugees,

to which the United States acceded in 1968." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987)

(citations omitted). Yet the Rule improperly attempts to rewrite the asylum statute in direct contra-

vention of the international obligations incorporated into U.S. law.[17] As just one example, the Rule

changes the firm resettlement bar to asylum eligibility such that a person with no chance of obtaining

permanent legal status in a third country would nonetheless be deemed "firmly resettled" in that

country and therefore ineligible for asylum. 85 Fed. Reg. 80364. The Agencies recognize that this

interpretation cannot be reconciled with the Refugee Convention or 1967 Protocol, 85 Fed. Reg.

80364, which bind the United States, yet chose to adopt the change anyway. Because Congress en-

acted the Refugee Act to align the United States with international standards, Defendants' unrea-

soned decision to reject those standards usurps legislative power and exceeds the permissible scope

of delegated authority.[18]

    The sheer breadth of the Rule exposes it as an unlawful attempt at wholesale revision of the

asylum laws. Notably, the Ninth Circuit considered the effect of the Administration's last transit

ban[19] "staggering" for its impact on more than 70,000 people a year. *EBSC II*, 950 F.3d at 1260. For

most applicants, the Rule effectively reinstitutes the transit ban, 85 Fed. Reg. 80387; Igra Dec., Ex.

---

[17] *See, e.g.* Comp. ¶¶81–82, 124, 183, 208; *see also* Igra Dec., Ex. 4 at 67–68; Ex. 5 at 16–17; Ex. 7 at 5–7; Ex. 23 at 6-9, 17–19.

[18] *See Arizona v. United States*, 567 U.S. 387, 409 (2012) ("Policies pertaining to the entry of [noncit-izens] . . . [is left] exclusively to Congress.") (citation omitted). *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935) ("Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."); *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) (courts "read significant limitations into . . . immigration statutes in order to avoid their consti-tutional invalidation.").

[19] "Transit ban" refers to the rules at issue in *EBSC*, *III*, which barred asylum applicants based on "countries through which the noncitizen transited en route to the United States." 964 F.3d at 847.

---

7

1    24 at 14, and it also effects dozens of other fundamental changes to asylum law, including the re-

2    definition of nearly every term that establishes who is a "refugee." 85 Fed. Reg. 80394-95; Igra

3    Dec., Exs. 4-11, 20-21, 23-27, 29. Defendants are not free to force such tectonic shifts in asylum law

4    without clear direction from Congress.[20]

5           The Rule as a whole is also arbitrary and capricious. Reasonable agency action "ordinarily

6    requires paying attention to the advantages and disadvantages of agency decisions." *Michigan v.*

7    *E.P.A*, 576 U.S. 743, 753 (2015). The Rule does not meet this standard. Defendants contend that the

8    Rule will help "maintain a streamlined and efficient adjudication process," 85 Fed. Reg. 80371, yet

9    they made no attempt to show how this "efficient" process will still protect asylum seekers con-

10   sistent with the Refugee Act. *See EBSC III,* 964 F.3d at 850 (finding agency regulations must be

11   "consistent with the core regulatory purpose" of asylum, to "protect refugees with nowhere to turn").

12   It clearly will not. Nor did they quantify the harm that would result from the cumulative effect of all

13   the Rule's restrictions on the availability of asylum.[21] Instead, Defendants waved off commenters

14   who emphasized the risks to *refoulement*[22] by suggesting that the United States satisfies its interna-

15   tional obligations with "withholding of removal and CAT protection." 85 Fed. Reg. 80287. But these

16   are not adequate alternatives to asylum. The burden of proof for withholding of removal or CAT

17   protection is higher than for asylum, *EBSC II,* 950 F.3d at 1277, and asylum affords greater benefits,

18   including a pathway to citizenship and family reunification. *Id*.

19          Finally, when a rule departs from the agency's previous position, the agency must offer "a

20   reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered

21   by the prior policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009); *see also*

---

22   [20] *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000) ("[T]he
23   court must be guided to a degree by common sense as to the manner in which Congress is likely to
     delegate a policy decision of such economic and political magnitude to an administrative agency.");
24   *Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (Congress speaks clearly when it intends to
     delegate power to make "decisions of vast economic and political significance") (citation and internal
25   quotation marks omitted).

26   [21] *Pub. Citizen v. Fed. Motor Carrier Safety Admin*, 374 F.3d 1209, 1219 (D.C. Cir. 2004) ("[T]he
     mere fact that the magnitude of [an effect] is *uncertain* is no justification for *disregarding* the effect
27   entirely.").

28   [22] *Refoulement* "occurs when a government returns [noncitizens] to a country where their lives or
     liberty will be threatened on account of race, religion, nationality, membership of a particular social
     group, or political opinion." *Innovation Law Lab v. Wolf*, 951 F.3d 1073, 1087–88 (9th Cir. 2020).

1 *California by & through Becerra v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1166-68 (N.D.

2 Cal. 2019) (agency must "explain the inconsistencies between its prior findings . . . and its deci-

3 sion"). The agency must "be cognizant that longstanding policies may have engendered serious reli-

4 ance interests that must be taken in to account." *DHS v. Regents of the Univ. of Ca.*, 140 S. Ct. 1891,

5 1913 (2020) (citations omitted). The Rule utterly fails this test. Before overhauling the asylum sys-

6 tem, overruling precedential decisions, and rescinding regulations, Defendants were required to give

7 a reasoned explanation, and consider reliance interests and the detrimental impact on small entities

8 like Plaintiffs. They did not. 85 Fed. Reg. 80377-78, 80384. This too renders the Rule invalid under

9 the APA.

### 3.    Core components of the Rule illustrate that it is unlawful.

11       While Plaintiffs cannot in a single 20-page motion fully explain all of the ways in which the

12 Rule's many changes violate the APA, a few examples demonstrate that the core provisions of the

13 Rule are contrary to law and arbitrary and capricious. Taken together, the Rule's provisions would

14 effectively eliminate the possibility of asylum for the vast majority of applicants.

### a.    Unlawful expansion of the firm resettlement bar

16       The Rule dramatically expands the firm resettlement bar far beyond the statutory language

17 without a reasoned explanation. Comp. ¶¶ 130-146. Under 8 U.S.C. § 1158(b)(2)(A)(vi), an individual

18 who was "firmly resettled" elsewhere is ineligible for asylum in this country. Permanency is key to

19 the analysis. *Camposeco–Montejo v. Ashcroft*, 384 F.3d 814, 820–21 (9th Cir. 2004) (petitioner had

20 not firmly resettled despite living in Mexico for sixteen years because he was never offered perma-

21 nent status and his movements were restricted).[23]

22       Contrary to the statutory language and established precedent, the Rule redefines "firm reset-

23 tlement" to include an individual who "could have applied for and obtained any *non-permanent* but

24 indefinitely renewable legal immigration status in that county." 85 Fed. Reg. 80388. That change

25 means the bar could apply to a person who passes through a third county even if she has no pathway

---

[23] *See also Mengstu v. Holder,* 560 F.3d 1055, 1059 (9th Cir. 2009) (similar, where plaintiff was never
offered citizenship or permanent residence in Sudan despite residing there two years); *Sall v. Gonzales,*
437 F.3d 229, 235 (2d Cir. 2006) (question is whether person enjoyed the same legal rights "that
permanently settled persons can expect to have").

1  to permanent status there. Applying the bar to those whose presence in another country is not perma-

2  nent conflicts with the plain language of the statute, which applies only to "firm" resettlement.

3   The Rule justifies expansion of the firm resettlement bar by asserting that there has been an

4  "increased availability of resettlement opportunities," but does not provide evidentiary support. 85

5  Fed. Reg. 80282–83. In a lengthy footnote, the Rule intimates that firm resettlement may be availa-

6  ble in Mexico. 85 Fed. Reg. 80282–83 n.10. Yet the sources cited in the footnote document increases

7  in the *filing of claims* for asylum in Mexico, not increases in the *rate or number of asylum grants*.

8  *See id.* Also, numerous reports have documented the threats to the lives of asylum seekers in Mexico

9  awaiting adjudication of their claims. Igra Dec., Ex. 4 at 55–58; Ex. 5 at 10–11; Ex. 6 at 13–14; Ex.

10  29 at 49–50. The Rule fails to consider these serious problems.

11   Finally, the Rule cites a need for clarity in the firm resettlement analysis, 85 Fed. Reg.

12  80363, but does not explain why the solution to that purported problem is a wholesale departure

13  from the existing definition and exceptions. Nor do the Agencies explain how the dramatic step of

14  eliminating the exceptions in current 8 C.F.R. § 208.15(a) and (b) and 8 C.F.R. § 1208.15(a) and (b)

15  including where an individual is unable to live safely or freely in the third country even if they had

16  "firm" status—is the appropriate solution for the "confusion," as opposed to a more clear explana-

17  tion of what the statute actually requires.

18  <center>**b. Purported "discretionary factors"**</center>

19   The Rule establishes nine "adverse factors" whereby the Attorney General "*will not* favora-

20  bly exercise discretion" to grant asylum in nine enumerated scenarios, absent "extraordinary circum-

21  stances" or in "cases in which [a noncitizen], by clear and convincing evidence, demonstrates that"

22  denial would result in "exceptional and extremely unusual hardship" to the applicant. 85 Fed. Reg.

23  80387-88; Comp. ¶¶ 85-129. The Rule suggests extraordinary circumstances could be "those involv-

24  ing national security or foreign policy considerations." 85 Fed. Reg. 80388. By definition, the "ex-

25  traordinary circumstances" requirement means that the vast majority of applicants will be barred by

26  these so-called discretionary factors. Even a showing of extraordinary circumstances will not auto-

27  matically "warrant a favorable exercise of discretion." *Id.*

28

<center>10</center>

This provision is a dramatic and arbitrary reversal of precedent, inconsistent with the Refu-gee Act, and ignores the substantial reliance interests at stake. Forty years ago, *Matter of Pula* held, consistent with the INA and international law, that a showing of past persecution or a strong likeli-hood of future persecution should outweigh all but the most egregious factors and lead to a discre-tionary grant of asylum. *Matter of Pula*, 19 I. & N. Dec. 467, 474 (BIA 1987). The Rule provides no adequate basis for upending the presumption.

Moreover, many of the "adverse discretionary factors" are inconsistent with the text of the INA. For example:

- The Rule mandates two "adverse discretionary factors" against an applicant who trav-eled through more than one country or spent more than 14 days in another country before arriving in the United States, unless narrow exceptions apply. 85 Fed Reg. 80387–88. This provision disregards precedent finding similar third-country transit bars unlawful and concluding that "the failure to apply for asylum in a country through which [a noncitizen] has traveled has no bearing on the validity of [a nonciti-zen's] claim for asylum in the United States." *EBSC III*, 964 F.3d at 852.

- The Rule mandates an "adverse discretionary factor" against an applicant who was convicted of a crime even where the criminal conviction was subsequently reversed, vacated, expunged, or modified. 85 Fed Reg 80388. That is contrary to law because the INA includes only narrow ineligibility grounds where an applicant, "having been *convicted by a final judgment* of a particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii) (emphasis added). There is no basis for a *de facto* bar based on a criminal conviction that has been re-versed or modified. *See Pangea Legal Servs. v. U.S. Dept. of Homeland Sec.,* Case No. 20-CV-07721-SI, 2020 WL 6802474, at *14–*15 (N.D. Cal. Nov. 19, 2020) (finding similar rule provision contrary to statute and arbitrary and capricious).

- The Rule mandates an "adverse discretionary factor" based on the filing of a motion to reopen more than a year after changed country conditions occur. This provision conflicts with the INA, which provides that "there is no time limit on the filing of a motion to reopen if the basis of the motion is to apply for relief under sections 208 or 241(b)(3) of this title and is based on changed country conditions . . . ." INA § 240(c)(7)(C)(ii); .8 U.S.C. § 1229a(c)(7)(C)(ii).

- The Rule mandates an "adverse discretionary factor" against an applicant who "ac-crued more than one year of unlawful presence" in the United States before applying for asylum. 85 Fed. Reg. 80397. This bar is not in accordance with the INA, which recognizes exceptions to the one-year statute of limitations for asylum claims. *See* 8 U.S.C. §§ 1158(a)(2)(B), (D).

The Agencies' narrow view of what constitutes "extraordinary circumstances" render these and other purported "discretionary factors" insurmountable barriers for the vast majority of asylum applicants. Pangea Dec. ¶¶ 28-31; DSCS Dec. ¶¶ 55-62; CAIR Dec. ¶¶ 30-35; CLINIC Dec. ¶ 42. The Agencies assert these changes will increase efficiency.[24] But efficiently denying asylum applications to vast swaths of people who have qualified under the statutory scheme and forcibly returning them to persecution or torture is not a valid purpose consistent with the INA. Moreover, the Agencies have not considered any alternatives or consider whether the Rule "visit[s] substantial hardship on those the agency claims to protect." *Casa de Md.*, 2020 WL 5500165, at *29. They simply assert that withholding of removal and CAT might still apply, without acknowledging the changes the Rule makes affecting eligibility for those protections. Moreover, asylum, withholding of removal, and CAT protection are not equivalent. *See supra* at 8–9. *EBSC II,* 950 F.3d at 1277. It is arbitrary and capricious to treat withholding and CAT as equivalent despite the critical differences for applicants.

### c.    *Pretermission*

The Rule's pretermission provision is also contrary to law and arbitrary and capricious. It requires immigration judges to pretermit and deny asylum, withholding of removal, and protection under CAT at any point, without a hearing, if the applicant "has not established a prima facie claim for relief." 85 Fed. Reg. 80397. Pretermission conflicts with the plain language of 8 U.S.C. § 1229a(b)(1), which provides that "[a]n immigration judge *shall conduct proceedings* for deciding the admissibility or deportability" of a non-citizen. § 1229a(a)(1) (emphasis added). The statute provides that proceedings may take place in person, through video conference, or through telephone conference by consent. *Id.* §§ 1229a(b)(2)(A)(i)–(iv). Immigration judges "shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the [applicant] and any witnesses." *Id.* § 1229a(b)(1). At the proceeding, the non-citizen, among other rights, "shall have a reasonable opportunity to examine the evidence against [her], to present evidence on [her] own behalf, and to cross-examine witnesses . . . ." *Id.* § 1229a(c)(4).[25]

---

[24] *See, e.g.*, 85 Fed. Reg. 80342, 80351.
[25] Current regulations and BIA precedent also require an evidentiary hearing before adjudication of applications for protection. *See* 8 C.F.R. § 1240.1(c), 1240.11(c)(3)(iii); *Matter of Fefe*, 20 I. & N. Dec. 116 (BIA 1989).

1    This unambiguous statutory language requiring a hearing during which an applicant is enti-

2    tled to testify, present evidence, and conduct cross-examination would be rendered a nullity if an im-

3    migration judge could declare an application meritless before conducting the type of proceeding re-

4    quired by 8 U.S.C. § 1229a. The Agencies cannot introduce procedures that override clear statutory

5    language setting forth the minimum process required before an immigration judge can deny a claim.

6    The Rule also fails to address an important aspect of the problem—the harm to *pro se* appli-

7    cants with limited resources or limited English proficiency. *Cf. EBSC III*, 964 F.3d at 849 (finding

8    agencies acted arbitrarily and capriciously in failing to consider effect of rule on minors); *State*

9    *Farm*, 463 U.S. at 43.[26] These applicants will face significant challenges if they are forced to defend

10   their prima facie eligibility in written English, with no description of the deficiencies in their appli-

11   cations and with no opportunity to testify and respond to the immigration judge's questioning.[27] And

12   a ten-day response period is inadequate for an applicant, especially a detained applicant, to gather

13   any necessary evidence and prepare a written brief that may also need to be translated.

14   The Rule's purported justifications for the pretermission provision only expose the serious

15   problems that the Agencies failed to consider. For example, the Agencies liken the pretermission

16   provision to summary judgment in civil litigation. 85 Fed. Reg. 80307. But civil litigants are entitled

17   to conduct discovery before a court may enter summary judgment, and Fed. R. Civ. P. 56(d) enables

18   a litigant to obtain additional time to gather evidence before being required to defend against sum-

19   mary judgment.[28] In contrast, there are no provisions in the Rule that ensure applicants receive a full

20   and fair opportunity to present their case before an immigration judge orders pretermission, only the

21   patently inadequate ten-day notice requirement.

---

[26] *See e.g.*, Igra Dec., Ex. 4 at 15-18; Ex. 5 at 4-6; Ex. 6 at 4-7; Ex. 7 at 37.

[27] *Jacinto v. INS*, 208 F.3d 725, 732–33 (9th Cir. 2000) ("immigration judges are obligated to fully develop the record in those circumstances where applicants appear without counsel"). The UNHCR Handbook on Procedures and Criteria for Determining Refugee Status (1979, Rev'd 1992) similarly places a burden to ascertain and evaluate relevant facts in part on the examiner: "[I]n some cases, it may be for the examiner to use all the means at his disposal to produce the necessary evidence in support of the application." *Id.* ¶ 196, https://tinyurl.com/yazjzmdk (as accessed Dec. 23, 2020).

[28] Similar procedural protections exist for a summary judgment proceeding before an administrative law judge, including a requirement of a hearing if there is a material issue of fact. 28 C.F.R. § 68.38(e).

The pretermission provision is another dramatic change in agency policy without an adequate explanation. At best, Defendants rely on cases that do not support their rulemaking.[29] Moreover, the Agencies made no attempt to quantify how pretermission would impact asylum seekers, or address how pretermission intersects with other rules to cut off relief before applicants have an opportunity to be heard. Igra Dec., Ex. 4 at 7; *Casa de Md.*, 2020 WL 5500165, at *26 (finding agency action arbitrary and capricious where agency failed to address interaction of separately proposed rules).[30] Each of these defects violations the APA.

### d.      Redefinition of "Frivolousness"

The Rule arbitrarily expands the grounds on which an asylum application can be deemed frivolous despite the grave consequences for asylum seekers. Comp. ¶¶ 165-185. An applicant who "knowingly" makes a frivolous application for asylum is forever barred from receiving any immigration benefit under the INA, provided the applicant has received notice of the consequences of filing a frivolous application. 8 U.S.C. § 1158(d)(6). While the INA does not define the terms "knowingly" or "frivolous," the Agencies previously gave a narrow construction to § 208(d)(6), requiring deliberate fabrication of material elements. 8 C.F.R. §§ 208.20, 1208.20. That narrow construction recognized the severe consequences of a frivolousness finding. Likewise, existing law requires that an applicant receive notice and an opportunity to address discrepancies or implausible aspects of her claim before an immigration judge can make a frivolousness determination and deny asylum. *See, e.g., Matter of Y-L-,* 24 I. & N. Dec. 151, 158 (BIA 2007); 8 C.F.R. § 1208.20 (current).

The Rule expands the grounds on which an asylum application can be deemed frivolous[31] and provides that the notice requirement is satisfied by the English written warning on Form I-589.

---

[29] The Rule cites an unpublished decision, *Zhu v. Gonzalez*, 218 F. App'x 21 (2d Cir. 2007), but there the immigration judge pretermitted the case after giving the applicant 30 days to submit a brief addressing specifically identified deficiencies in his case, which the applicant failed to do. *Id.* at 23. *INS v. Abudu*, 485 U.S. 94 (1988), explicitly *declined* to address "what constitutes a prima facie case for establishing eligibility for asylum" and discussed only the proper standards of review for circuit courts addressing a BIA denial of a motion to reopen. 485 U.S. at 104. Several commenters objected that the NPRM relied selectively and misleadingly on these authorities, Igra Dec., Ex. 25 at 19, 22–23; Ex. 26 at 8–9; Ex. 27 at 17, but Defendants continued to rely on them.

[30] *See also* fn. 35, *infra*.

[31] For applications filed on or after January 11, 2021, an immigration judge may deem an application frivolous without additional notice if she finds that the application (1) contains a fabricated material element, (2) is premised upon false or fabricated evidence unless the application would have been

---

85 Fed. Reg. 80300. The Rule would allow an immigration judge to make a frivolousness determina-

tion and deny asylum without notice or an evidentiary proceeding. For these reasons, it exceeds stat-

utory authority and is contrary to law under the same provisions of the INA that make pretermission

unlawful.

Defendants attempt to justify the change on the ground that the current framework has not

"been successful in preventing the filing of frivolous applications." 85 Fed. Reg. 80301. But they

provide no reasoned basis for that assertion. They also failed to adequately weigh the harmful impact

of including applications that are "foreclosed by applicable law" within the definition of "frivolous"

applications. As commenters observed, the chilling effect of these provisions will deter applicants

from bringing meritorious claims, including those based on good-faith arguments that may seek to

clarify, overturn, or limit an unfavorable precedent.[32] It will also be particularly harsh for *pro se* ap-

plicants who are poorly positioned to evaluate whether their claim is foreclosed by precedent.[33] De-

fendants suggest that this is not a serious problem because an overwhelming majority of applicants

are represented. 85 Fed. Reg. 80299. But their calculation is wrong.[34] And even if a majority of ap-

plicants are represented, the Agencies must still weigh the risk that *pro se* applicants will be returned

to persecution under the new definition. *See Michigan v. E.P.A*, 576 U.S. at 753 (agencies must

"pay[] attention to the advantages and disadvantages" of their decisions).

The Agencies assert that because the overall number of asylum applications has increased,

there has "almost certainly" been an increase in frivolous applications. 85 Fed. Reg. 80301. This is

pure speculation. *See ILRC*, 2020 WL 5798269, at *13 (finding rule arbitrary and capricious where

agency speculated based on minimal data and failed to consider important aspects of the problem).

Defendants have failed to balance this speculative harm against the grave consequence of a frivo-

lousness finding, which results in permanent ineligibility and risks *refoulement*.

**4.      Defendants did not satisfy basic procedural requirements of the APA.**

---

granted without that evidence, (3) was filed without regard to the merits of the claim, or (4) is clearly foreclosed by applicable law. 8 C.F.R. §§ 208.20(c)(1)–(4) (proposed), 1208.20(c)(1)–(4) (proposed).

[32] *See, e.g.*, Igra Dec., Ex. 4 at 87–88; Ex. 11 at 4; Ex. 23 at 17.

[33] *See, e.g.*, Igra Dec., Ex. 4 at 86–88; Ex. 6 at 3; Ex. 11 at 4; Ex. 13 at 32–33; Ex. 23 at 16.

[34] *See, e.g.*, Igra Dec., Ex. 4 at 16.

The Rule was also issued "without observance of procedure required by law" in violation of the APA. 5 U.S.C. § 706(2). Defendants rushed through the rulemaking process without regard for the basic principles of administrative procedure. In light of the number of "serious violations" of the APA, vacatur of the Rule is warranted. *Becerra*, 381 F. Supp. 3d at 1178–79.

 As an initial matter, the Agencies pushed through the NPRM and the Rule under Defendant Wolf even though courts have concluded that he lacks authority to promulgate regulations. Defendants stated that they "disagree" with that conclusion, *id*. at 80382, n.90, but that disagreement does not justify promulgating the Rule without lawful authority. And Defendants apparently failed to consider a reasonable alternative: that they wait until the Senate acts upon Wolf's nomination.

The notice period was also deficient. "The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process." *Idaho Farm Bureau Federal v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). To that end, most rules "should include a comment period of not less than 60 days." Exec. Order 12866, 58 Fed. Reg. 51735 (Oct. 4, 1993). *See also* Exec. Order 13563, 76 Fed. Reg. 3821 (Jan. 21, 2011) (same). The NPRM made sweeping changes to well-established asylum law, and was over 160 pages long with more than 60 pages of proposed regulations with dense, technical language. The Agencies offered no explanation for why they only allowed 30 days for comment. 85 Fed. Reg.at 80373. Nor did they acknowledge the problems they created for commenters by engaging in staggered rulemaking.[35] A 30-day comment period would have been insufficient in any case, but it was wholly insufficient for a comment period conducted over a federal holiday and during a pandemic.[36] *See Becerra*, 381 F. Supp. 3d at 1176–77 (observing that at least one

---

[35] CLINIC Dec. ¶ 22; Igra Dec., Ex. 4 at 7; *Casa de Md.*, 2020 WL 5500165, at *26 (agency failed to address interplay of rules and adverse impact of rules in combination). Another rule proposed after the comment period for the Rule closed and published as a final rule on December 16, 2020, establishes a 15-day filing deadline for asylum applicant in asylum-and-withholding only-proceedings (a new procedure set up by the Rule in this case). Comp. ¶ 78. Staggered rulemaking prevented a consideration of the combined effect of these rules. *Id.* ¶¶ 153, 161.

[36] Many commenters noted the challenges posed by the ongoing COVID-19 pandemic in timely submitting comments. Igra Dec., Ex. 4 at 8-9; Ex. 5 at 2. The Agencies refusal to extend the comment period in light of these extraordinary circumstances was contrary to the prevailing approach. Even the U.S. Supreme Court extended filing deadlines in light of COVID. https://www.supremecourt.gov/orders/courtorders/031920zr_d1o3.pdf (extending the deadline to file any petition for writ of certiorari to 150 days in light of COVID).

1  circuit has recognized that 90 days is "usual" time allotted for comment period and that 30-day com-

2  ment period at issue failed to provide meaningful opportunity to comment).

3       The Agencies took just three months to consider over 88,000 comments before forwarding the

4  Rule to the Office of Information and Regulatory Affairs for review. Such a speedy process could not

5  have allowed time for serious consideration of commenters' concerns. As one indication of the hasty

6  process, the Rule does not mention the letter submitted by the Attorneys General of 22 States, nor does

7  it address the economic impact of the Rule that the letter describes. Igra Dec., Ex. 9. Specifically, the

8  State Attorneys General identified harm to state economies and referenced a draft 2017 report by the

9  U.S. Department of Health and Human Services that concluded that refugees, including asylees, con-

10  tributed $63 billion more in tax revenues than they cost in public benefits over the past decade. *Id.*

11       Defendants' failure to consider this "important aspect of the problem." *State Farm,* 463 U.S.

12  at 43, resulted in the Agencies failing to meet other procedural requirements too. "Major rules" must

13  be published at least 60 days before their effective date. 5 U.S.C. § 801(a)(3). Defendants claimed this

14  was not a "major rule," because they did not think it had an annual effect on the economy of $100

15  million or more. 85 Fed. Reg. 80383. But the Agencies estimated an annual economic impact of more

16  than $70 million just for the time and cost of completing the expanded I-589 Form. Igra Dec., Ex. 28

17  at 1-2. If the changes to the form result in an annual cost of more than $70 million, the additional

18  impact commenters identified surely should have resulted in a finding that this was as "major rule,"

19  requiring at least a 60-day effective date.

20       The Agencies likewise failed to analyze the effect of the Rule on "small entities," as required

21  by the RFA. 5 U.S.C. §§ 603-604. The Agencies asserted that the Rule would not have a significant

22  impact on small entities because the Rule applies to individual asylum applicants. 85 Fed. Reg. 80378.

23  But courts have held that rules such as this one irreparably harm legal service providers.[37] Moreover,

24  8 C.F.R. § 1003.61 requires EOIR to maintain a list of Pro Bono Legal Service Providers that is pro-

25  vided to asylum applicants.[38] And the Agencies acknowledge that the new form "increases the time

26

27  [37] *EBSC III*, 964 F.3d at 854; *EBSC II*, 950 F.3d at 1280.

28  [38] The EOIR List of Pro Bono Legal Service Providers includes CAIR Coalition and CLINIC affiliate
Catholic Charities of the East Bay in Oakland, California.  CAIR Dec.¶ 3; CLINIC Dec. ¶ 6.

1    and cost burdens for . . . legal services providers." Igra Dec., Ex. 28 at 6-8. By taking an unreasonably

2    narrow view of who is affected by the Rule, the Agencies failed to undertake the required regulatory

3    flexibility analysis. For this reason too, the Rule should be set aside. 5 U.S.C. § 706(2)(D).

4           **B.      The Rule will irreparably harm Plaintiffs and the people they serve.**

5           The Rule is scheduled to take effect on January 11, 2021. Plaintiffs are already suffering irrep-

6    arable harm because they have been forced to "divert resources away from [their] core programs to

7    address the new policy." *EBSC II*, 950 F.3d at 1280. Unless the Rule is enjoined, Plaintiffs will be

8    compelled to devote even greater resources to analyzing and interpreting the Rule,[39] completely re-

9    writing existing trainings materials and forms,[40] creating new materials and resources,[41] and retraining

10   thousands of practitioners, who not only represent clients but also advise other attorneys in affiliate

11   groups.[42] The Rule will also require Plaintiffs to expend significantly more resources on each individ-

12   ual case[43] and force Plaintiffs to move each case far more rapidly in order to avoid pretermission, at

13   great expense to both staff and clients many of whom are traumatized and unable to recount all of the

14   details of their harm so quickly.[44] The Rule will compel Plaintiffs to completely change their intake

15   procedures and spend significant time and resources updating intake forms and databases.[45] The Rule

16   will also require Plaintiffs to submit multiple applications for families rather than one application with

17   children and family members receiving asylum protection derivatively[46] and will force Plaintiffs to

18   hire staff or retain experts in almost every case in areas of law, like tax laws implicated by the Rule,

19   unfamiliar to Plaintiffs.[47]

20

21

22

23   [39] Pangea Dec. ¶ 53; DSCS Dec. ¶ 84; CAIR Dec. ¶ 12; CLINIC Dec. ¶¶ 22, 23, 73.

24   [40] Pangea Dec. ¶¶ 11, 52; DSCS Dec. ¶ 84; CAIR Dec. ¶ 51; CLINIC Dec. ¶¶ 12, 24, 28, 30, 31, 73.
     [41] CLINIC Dec. at ¶¶ 23, 27, 31; Pangea Dec. ¶ 54.

25   [42] Pangea Dec. ¶ 53; DSCS Dec. ¶ 84; CAIR Dec. at ¶¶ 45, 48; CLINIC Dec. ¶ 27, 67.

26   [43] Pangea Dec. ¶¶ 47, 49-50; DSCS Dec. ¶¶ 17, 77-78; CAIR Dec. ¶¶ 37-44; CLINIC Dec. ¶¶ 67-68.
     [44] CAIR Dec. ¶ 15; Pangea Dec. ¶ 47; DSCS Dec. ¶ 78.

27   [45] Pangea Dec. ¶¶ 46-47; DSCS Dec. at ¶¶ 17, 83; CAIR Dec. at ¶¶ 46-49;

     [46] Pangea Dec. ¶ 51; DSCS Dec ¶ 82; CLINIC Dec. ¶ 71.

28   [47] Pangea Dec. ¶50; DSCS Dec. ¶ 61; CAIR Dec. ¶ 35; CLINIC Dec. ¶ 62.

1
2
3
4
5
6

   All Plaintiffs expended significant time to comment on the rule in the incredibly short 30-day window.[48] Some are redirecting their resources and rushing to get asylum applications submitted in advance of the Rule's effective date.[49] And given the complete sea-change in the law, Plaintiffs are already having to alter their processes and expend resources in advance of the deadline.[50] Some of Plaintiff CLINIC's affiliates will no longer be able to take asylum cases due to the increased costs imposed by the Rule.[51]

7
8
9
10
11
12
13
14
15
16

   The Rule will also cause "ongoing harms to [Plaintiffs'] organizational missions," *EBSC III*, 964 F.3d at 854, to support and provide legal services to as many low income and vulnerable nonciti-zens as possible. By requiring significantly more resources per case and completely altering the time-lines of asylum cases, requiring Plaintiffs to gather significantly more information from their clients earlier, the cumulative effect is that Plaintiffs would "provid[e] fewer services to fewer individuals," frustrating their missions. *EBSC III*, 964 F.3d at 854.[52] And the Rule will force advocates to pit their ethical obligation of zealous representation of their clients, including obligations to make creative arguments to expand the law, against the client's interest in avoiding the radically expanded frivolous-ness bar, which can permanently bar a client from any immigration benefit, if an immigration judge decides that an argument is foreclosed by law.[53]

17
18
19
20
21

   The Rule will also harm Plaintiffs' funding. Plaintiffs rely in part on grants and donations related to their ability to achieve certain numerical targets, such as total clients served or applications filed.[54] By shrinking the pool of eligible applicants, requiring significantly more work per case, and reducing Plaintiffs' capacity, the Rule "directly threatens their standard caseload, and consequently, their caseload[] dependent funding." *EBSC III*, 964 F.3d at 854. Worsening this budget impact, by

22
23
24
25
26
27
28

---

[48] CLINIC Dec. ¶ 22; CAIR Dec. ¶ 12; DSCS Dec. ¶ 83; Pangea Dec. ¶ 10. CLINIC submitted over 20 comments in a 16 month period. The number and timing of the rules prevented CLINIC from fully analyzing the interactions of the rules and their combined effects. CLINIC Dec. ¶22.
[49] CLINIC Dec. ¶ 72; CAIR Dec. ¶ 12. To the extent the Rule may be retroactively applied, this will impose additional costs on Plaintiffs. CLINIC Dec. ¶ 26; Pangea Dec. ¶ 44; DSCS Dec. ¶ 83.
[50] CAIR Dec. ¶ 51; DSCS Dec. ¶ 84; Pangea Dec. ¶¶ 45, 53.
[51] CLINIC Dec. ¶ 70.
[52] Pangea Dec. ¶¶ 49, 51, 54, 56; DSCS Dec. ¶¶ 10, 86; CAIR Dec. ¶¶ 37-42, 56; CLINIC Dec. ¶¶ 71, 75, 77.
[53] CLINIC Dec. ¶ 66; CAIR Dec. ¶ 29; DSCS Dec. ¶ 13; Pangea Dec. ¶ 42.
[54] Pangea Dec. ¶¶ 56-58; DSCS Dec. ¶¶ 10, 86; CAIR Dec. ¶¶ 53-54; CLINIC Dec. ¶¶ 73-75, 77;

19

1    making everything more complex and increasing the downside for errors made due to inexperience,

2    Plaintiffs will be able to refer far fewer cases to volunteers and pro bono counsel, forcing them to

3    either decline the client or take them on themselves.[55]

4         **C.    The equities and the public interest favor injunctive relief.**

5         Finally, the equities and the public interest favor universal injunctive relief.[56] *See EBSC I*, 932

6    F.3d at 779 ("In immigration matters," the Ninth Circuit has "consistently recognized the authority of

7    district courts to enjoin unlawful policies on a universal basis."). "Relevant equitable factors include

8    the value of complying with the APA, the public interest in preventing the deaths and wrongful re-

9    moval of asylum-seekers, preserving congressional intent, and promoting the efficient administration

10   of our immigration laws . . . ." *EBSC II*, 950 F.3d at 1280. These interests all weigh in Plaintiffs' favor.

11   Most obviously, "the public has an interest in 'ensuring that we do not deliver [refugees] into the hands

12   of their persecutors,' and 'preventing [refugees] from being wrongfully removed, particularly to coun-

13   tries where they are likely to face substantial harm.'" *Id*. at 1281 (citation omitted); *see EBSC III*, 964

14   F.3d at 854 (district court properly "found that there was a public interest in not returning refugees to

15   their persecutors or to a country where they would be endangered"). Further, "maintaining the *status

16   quo*" serves the important interest in "a stable immigration system." *Doe #1 v. Trump*, 957 F.3d 1050,

17   1068 (9th Cir. 2020). Allowing the Rule to take effect will also harm immigrant communities, cities,[57]

18   and states.[58] And "[t]here is generally no public interest in the perpetuation of unlawful agency action.

19   To the contrary, there is a substantial public interest in having governmental agencies abide by the

20   federal laws that govern their existence and operations." *League of Women Voters v. Newby*, 838 F.3d

21   1, 12 (D.C. Cir. 2016).

22   **V.    CONCLUSION**

23        The Court should enjoin or stay the Rule's national implementation before January 11, 2021.

24

25   [55] DSCS Dec. ¶ 79; CAIR Dec. ¶¶ 43-44, 52; CLINIC Dec. ¶¶ 19, 70, 73; Igra Dec., Ex. 8 at 2–4
26   (describing that Rule "would have serious, adverse effects" on ability of pro bono counsel from private
     sector to assist asylum seekers).
     [56] Here, Plaintiffs work with asylum applicants across the country. CLINIC Dec. ¶ 6; CAIR Dec. ¶ 3.
27   [57] Igra Dec., Ex. 11 at 3, 6, 15; Ex. 20 at 1, 2.
28   [58] Igra Dec., Ex. 9 at 2, 18-26, 28-29; Ex. 10 at 2.

1

Respectfully submitted,

2

DATE: December 23, 2020                    By: */s/ Naomi A. Igra*

3

Sabrineh Ardalan (*pro hac vice* pending)          Naomi A. Igra, SBN 269095
sardalan@law.harvard.edu                           naomi.igra@sidley.com

4

Sameer Ahmed, SBN 319609                          S. Patrick Kelly, SBN 275031
sahmed@law.harvard.edu                            patrick.kelly@sidley.com

5

Zachary Albun (*pro hac vice* pending)             SIDLEY AUSTIN LLP
zalbun@law.harvard.edu                            555 California Street, Suite 2000

6

Deborah Anker (*pro hac vice* forthcoming)         San Francisco, CA 94104
danker@law.harvard.edu                            Telephone:  +1 415 772 1200

7

Nancy Kelly (*pro hac vice* forthcoming)           Facsimile:  +1 415 772 7400
nkelly@law.harvard.edu

8

John Willshire Carrera (*pro hac vice* forthcom-   Douglas A. Axel, SBN 173814
ing)                                               daxel@sidley.com

9

jwillshire@law.harvard.edu                         SIDLEY AUSTIN LLP

10

HARVARD LAW SCHOOL                                 555 West Fifth Street
HARVARD IMMIGRATION AND REFUGEE                    Los Angeles, CA 90013

11

CLINICAL PROGRAM                                   Telephone:  +1 213 896 6000
6 Everett Street, WCC 3103                         Facsimile:  +1 213 896 6600

12

Cambridge, MA 02138
Telephone:  +1 617 384 7504                        Ben Schwarz (*pro hac vice* pending)

13

Facsimile:  +1 617 495 8595                        bschwarz@sidley.com
                                                   SIDLEY AUSTIN LLP

14

Jamie Crook, SBN 245757                            60 State Street, 36th Floor
crookjamie@uchastings.edu                          Boston, MA 02109

15

Annie Daher, SBN 294266                            Telephone:  +1 617 223 0300
daherannie@uchastings.edu                          Facsimile:  +1 617 223 0301

16

Blaine Bookey, SBN 267596
bookeybl@uchastings.edu                            Brian C. Earl (*pro hac vice* pending)

17

Karen Musalo, SBN 106882                           bearl@sidley.com
musalok@uchastings.edu                             SIDLEY AUSTIN LLP

18

CENTER FOR GENDER & REFUGEE STUD-                  787 Seventh Avenue
IES                                                New York, NY 10019

19

UC HASTINGS COLLEGE OF THE LAW                     Telephone:  +1 212 839 5300
200 McAllister Street                              Facsimile:  +1 212 839 5599

20

San Francisco, CA 94102
Telephone: +1 415 565 4877                         *Attorneys for Plaintiffs*

21

Facsimile: +1 415 581 8824

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 23, 2020, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of for the Northern District of California by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Naomi A. Igra*

Naomi A. Igra