LOEB & LOEB LLP
Camron A. Dowlatshahi (SBN 308618)
cdowlatshahi@loeb.com
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067-4120
Telephone: (310) 282-2000
Facsimile: (310) 282-2200

LOEB & LOEB LLP
Laura McNally (*Pro Hac Vice* application forthcoming)
lmcnally@loeb.com
Neil Nandi (*Pro Hac Vice* application forthcoming)
nnandi@loeb.com
321 N. Clark St., Suite 2300
Chicago, IL 60654
Telephone: (312) 464-3100
Facsimile: (312) 464-3111

Attorneys for *Amicus Curiae*
Immigration Law Professors

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT

IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PANGEA LEGAL SERVICES; DOLORES STREET COMMUNITY SERVICES, INC.; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; and CAPITAL AREA IMMIGRANTS' RIGHTS COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*; KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary for the Department of Homeland Security*; U.S. CITIZENSHIP AND IMMIGRATION SERVICES; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; TONY H. PHAM, *under the title of Senior Official Performing the* | Case No.: 3:20-cv-09253-JD<br><br>***AMICUS CURIAE* BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br>Date: January 7, 2021<br>Time: 10:00 a.m.<br>Judge: Hon. James Donato<br>Ctrm.: 11 |

| | |
|---|---|
| *Duties of the Director of U.S. Immigration and Customs Enforcement*; U.S. CUSTOMS AND BORDER PROTECTION MARK A. MORGAN, *under the title of Senior Official Performing the Duties of the Commissioner of U.S. Customs and Border Protection*; U.S. DEPARTMENT OF JUSTICE; WILLIAM P. BARR, *under the title of U.S. Attorney General*; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW; and JAMES MCHENRY, *under the title of Director of the Executive Office for Immigration Review*,<br><br>            Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ ii

SUMMARY OF ARGUMENTS .................................................................................................. 1

AMICUS BRIEF IN SUPPORT OF PLAINTIFFS ..................................................................... 1

I. The Departments' Adverse Factors Create De Facto Bars that Conflict with Congress' Statutory Text ................................................................................................ 1

    A. The Asylum Rule's De Facto Bars and Amorphous Exceptions Impermissibly Narrow the Discretion the INA Requires ................................. 1

    B. The Asylum Rule's De Facto Bars Conflict with Congress' Statutory Scheme of Narrowly-Tailored Bars ............................................................... 3

II. Two Adverse Factors—Unlawful Manner of Entry and Use of Fraudulent Entry Documents—Conflict with Congress' Statutory Scheme ................................. 4

    A. Under the Refugee Act and the Illegal Immigration Reform Act, Unlawful Manner of Entry is Not a Bar to Asylum ............................................ 4

    B. Under the INA, Use of Fraudulent Entry Documents Is Not a Bar to Asylum ............................................................................................................ 5

III. Even If the Asylum Rule Were Considered a Permissible Construction of the INA, the Departments Have Not Provided a Sufficient Explanation for the Change in Statutory Interpretation Underlying the Asylum Rule ........................... 5

    A. The Departments Fail to Support Their Claims Regarding Asylum in Mexico ............................................................................................................ 6

    B. The Departments Fail to Support Their Claim that the Asylum Rule Targets Meritless Claims ................................................................................ 7

    C. The Departments Fail to Support Their Dilution of the Firm Resettlement Standard ................................................................................... 9

CONCLUSION ........................................................................................................................... 12

AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER (NO. 3:20-cv-09253-JD)

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Boika v. Holder*,
 727 F.3d 735 (7th Cir. 2013) ............................................................................................... 12

*East Bay Sanctuary Covenant v. Barr*,
 964 F.3d 832 (9th Cir. 2020) ............................................................................................. 6, 8

*East Bay Sanctuary Covenant v. Barr*,
 Case No. 19-cv-04073-JST, 2020 U.S. Dist. LEXIS 211795 (N.D. Ca. Nov. 10, 2020) ......... 6

*East Bay Sanctuary Covenant v. Trump*,
 950 F.3d 1242 (9th Cir. 2020) ..................................................................................... 1, 4, 5

*Encino Motorcars, LLC v. Navarro*,
 136 S. Ct. 2117 (2016) ........................................................................................................ 6

*Etienne Tchitchui v. Holder*,
 657 F.3d 132 (2d Cir. 2011) ............................................................................................... 11

*INS v. Cardoza-Fonseca*,
 480 U.S. 421 (1987) ............................................................................................................ 4

*Maharaj v. Gonzales*,
 450 F.3d 961 (9th Cir. 2006) ......................................................................................... 3, 10

*Matter of A-G-G-*,
 25 I&N Dec. 486 (BIA 2011) ............................................................................................. 10

*Matter of Pula*,
 19 I&N Dec. 467 (BIA 1987) ...................................................................................... 1, 5, 6

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
 545 U.S. 967 (2005) ............................................................................................................ 6

*Ouda v. INS*,
 324 F.3d 445 (6th Cir. 2003) ............................................................................................. 12

*Preçetaj v. Sessions*,
 907 F.3d 453 (6th Cir. 2018) ............................................................................................. 12

*Rosenberg v. Yee Chien Woo*,
 402 U.S. 49 (1971) ........................................................................................................ 3, 10

*Sung Kil Jang v. Lynch*,
 812 F.3d 1187 (9th Cir. 2015) ........................................................................................... 11

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

**Statutes**

8 U.S.C. § 1158 ..................................................................................................................... 8

8 U.S.C. § 1158(a)(1) ............................................................................................................ 4

8 U.S.C. § 1158(a)(2)(A) ....................................................................................................... 3

8 U.S.C. § 1158(b)(1)(A) ....................................................................................................... 1

8 U.S.C. § 1158(b)(2)(A)(vi) ............................................................................................. 3, 9

8 U.S.C. § 1158 (b)(2)(C) ...................................................................................................... 1

8 U.S.C. § 1159(c) ................................................................................................................. 5

8 U.S.C. § 1225(b)(1)(A)(i) ................................................................................................... 5

8 U.S.C. § 1225(b)(1)(A)(ii) .................................................................................................. 5

Act to Amend the Displaced Persons Act of 1948, Pub. L. No. 81-555, 64 Stat. 219 (1950) ........ 9

Displaced Persons Act of 1948, Pub. L. No. 80-774, 62 Stat. 1009 ..................................... 9

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
 Pub. L. No. 104-208, 110 Stat. 3009-546 ..................................................................... 4

Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. ........................................... *passim*

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 .................................................... 2, 4

Refugee Relief Act of 1953, Pub. L. No. 203, 67 Stat. 400 .................................................. 9

**Rules and Regulations**

8 C.F.R. § 208.15 ................................................................................................................ 10

*Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*
 85 Fed. Reg. 80,274 (Dec. 11, 2020) ................................................................... *passim*

**Legislative Materials**

*Displaced Persons in Europe*, S. Rep. No. 80-950 (1948) ................................................... 9

**Other Authorities**

Asylum Access, *Mexican Asylum System for U.S. Immigration Lawyers FAQ* (Nov. 2019),
 https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-
 Immigration-Lawyers.pdf ............................................................................................. 7

- iii -
AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER (NO. 3:20-cv-09253-JD)

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

Clare Ribando Seelke, Cong. Rsch. Serv., IF10215, *Mexico's Immigration Control Efforts* 2
 (2020), https://fas.org/sgp/crs/row/IF10215.pdf ..................................................................... 7

Convention Relating to the Status of Refugees, July 28, 1951
 189 U.N.T.S. 150 ............................................................................................................... 9, 10

David A. Martin, *Taming Immigration: The 64th Henry J. Miller Distinguished Lecture Series
 Remarks*, 36 Ga. St. U.L. Rev. 971, 1002 (2020) ...................................................................... 8

Edward M. Kennedy, *Refugee Act of 1980*, 15 Int'l Migration Rev. 141 (1981) ............................ 2

UNHCR, *Mexico: Fact Sheet* (Apr. 2019),
 https://reporting.unhcr.org/sites/default/files/UNHCR%20Factsheet%20Mexico%20-
 %20April%202019.pdf ............................................................................................................ 6, 7

UNHCR, *States Parties to the 1951 Convention relating to the Status of Refugees and the 1967
 Protocol* (2020), https://www.unhcr.org/en-us/protection/basic/3b73b0d63/states-parties-1951-
 convention-its-1967-protocol.html............................................................................................. 11

# SUMMARY OF ARGUMENTS

The Departments of Justice and Homeland Security's ("Departments") final asylum rule ("Asylum Rule") conflicts with the Congressional purpose and legislative directives underlying the asylum system. Specifically, Congress has developed a comprehensive statutory scheme that includes certain bars on eligibility, but otherwise establishes discretion as a core element of asylum adjudications. The Asylum Rule overturns this scheme by enacting a series of de facto bars based on enumerated "adverse factors," some of which Congress has clearly stated cannot be bars to eligibility. Additionally, these new de facto bars—as well as substantial changes to the scope of firm resettlement bar—mark a substantial departure from the discretion-based asylum regime. The Departments, however, fail to provide sufficient support to justify this dramatic shift.

The Asylum Rule's unsupported deviations from long-standing practice, domestic statutes, and the international law principles underlying the statutes warrant granting Plaintiffs' motion.

# AMICUS BRIEF IN SUPPORT OF PLAINTIFFS

## I. The Departments' Adverse Factors Create De Facto Bars that Conflict with Congress' Statutory Text

The Immigration and Nationality Act ("INA") bakes discretion into its very foundation by stating that the Departments "*may* grant asylum" to an applicant. 8 U.S.C. § 1158(b)(1)(A) (emphasis added). Therefore, when a rule governing the Departments' discretion bars whole categories of applicants at the threshold of *eligibility* for asylum protection, that rule must be "consistent with" Congress's entire framework of asylum protection. *Id.* § 1158(b)(2)(C); *see also East Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1261 (9th Cir. 2020) (holding that the executive branch exceeded power delegated to it by Congress by categorically barring applicants who entered the United States at a point not designated by officials); *Matter of Pula*, 19 I&N Dec. 467, 472-73 (BIA 1987) (discretion cannot be arbitrary or have the effect of categorically barring asylum in "virtually all cases"). The Asylum Rule challenged in the present case creates de facto categorical bars and is not "consistent with" the INA.

### A. The Asylum Rule's De Facto Bars and Amorphous Exceptions Impermissibly Narrow the Discretion the INA Requires

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

- 1 -
AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER (NO. 3:20-cv-09253-JD)

The Asylum Rule distorts the application of discretion by establishing "adverse facts" that will function as de facto, categorical bars on asylum. The Rule specifies unlawful entry, failure to file for legal protection in a third country, and use of fraudulent documents as factors that are "significantly adverse for purposes of the discretionary determination." *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80,274, 80,282 (Dec. 11, 2020). The Rule also identifies nine other "adverse factors"—such as whether the person seeking asylum had spent 14 days in any country that permitted application for refuge or whether the applicant transited through more than one country prior to arrival in the United State—that "would ordinarily result in the denial of asylum as a matter of discretion." *Id.* Only exceedingly rare contingencies, such as the presence of "extraordinary circumstances and exceptional or extremely unusual hardship," can justify a grant of asylum when these new "adverse factors" apply. *Id.* at 80,348. The Departments cite only undefined national security or foreign policy considerations as examples of "extraordinary circumstances." *Id.* at 80,282.

Cases satisfying the "exceptional and extremely unusual hardship" prong will also be rare, since the applicant will have to prove by "clear and convincing evidence" that she fits within this category. *Id.* That daunting standard will screen out all but a handful of asylum seekers. By establishing barriers that are effectively impossible to clear, the Asylum Rule replaces discretion with de facto bars.

Further, in *amici*'s experience, application of amorphous national security or foreign policy rationales to asylum at the discretion stage will have one of two deleterious consequences. First, asylum grants may only benefit the handful of immigrants with insider information about hostile foreign powers. In the alternative, asylum grants may become ideological, turning on whether a grant of asylum would bolster a foreign ally or embarrass a foreign foe. Each of these outcomes would be inimical to Congress's plan for refugee protection. *Cf.* Edward M. Kennedy, *Refugee Act of 1980*, 15 Int'l Migration Rev. 141, 145 (1981) (quoting testimony from a senior executive branch official heard by Congress prior to the enactment of the Refugee Act of 1980 that U.S. refugee policy had devolved into a "patchwork of different programs" influenced by the agenda of the "early cold war years").

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

- 2 -
AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER (NO. 3:20-cv-09253-JD)

## B. The Asylum Rule's De Facto Bars Conflict with Congress' Statutory Scheme of Narrowly-Tailored Bars

In the INA, Congress imposed specific, categorical bars on asylum including firm resettlement in a third country, 8 U.S.C. § 1158(b)(2)(A)(vi), and applicability of an agreement between the United States and a third country for safe removal to that country, 8 U.S.C. § 1158(a)(2)(A). Each of these categorical bars constitutes a deliberate legislative trade-off between U.S. asylum protection and other values, including sharing the refugee burden with other states. Congress's insertion of these categorical bars demonstrates that Congress knew how to include such sweeping restrictions when it believed they were appropriate. In contrast, the Asylum Rule's unilateral addition of a host of de facto categorical bars disrupts the balance that Congress sought to strike between asylum protection and sharing responsibility for refugees with other states.

That risk of undermining the asylum provision's protective framework is particularly acute when, as here, a new rule imposes an express or de facto bar that covers the same field as a statutory bar. For example, the Ninth Circuit has held that the "firm resettlement" bar at 8 U.S.C. § 1158(b)(2)(A)(vi) requires either a formal offer to the foreign national of permanent residence in a third country or evidence that the third country "officially sanctions" the foreign national's "indefinite presence." *See Maharaj v. Gonzales*, 450 F.3d 961, 976 (9th Cir. 2006) (en banc). Even the Departments recognize that firm resettlement requires that the foreign national "be able to reside permanently or indefinitely in the third country." 85 Fed. Reg. at 80,364.

In contrast, the Asylum Rule effectively broadens the criteria for denying asylum based on one's status in a third country by imposing de facto bars on asylum for applicants who have traveled—however briefly—through a third country without seeking legal protection or remained in a third country for longer than 14 days. Contrary to the long-established definition of firm resettlement, the Departments' de facto bars would deny asylum even when the asylum seeker's stay was merely one brief "stop[] along the way" in an escape from persecution. *See Rosenberg v. Yee Chien Woo,* 402 U.S. 49, 56 n.5 (1971); *id*. at 57 n.6 (recognizing the need to preserve legal protections despite such interim "stages" in the refugee's journey).

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

- 3 -
AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER (NO. 3:20-cv-09253-JD)

## II. Two Adverse Factors—Unlawful Manner of Entry and Use of Fraudulent Entry Documents—Conflict with Congress' Statutory Scheme

Certain adverse factors in the Asylum Rule conflict with additional legal authority. Specifically, the Asylum Rule establishes unlawful manner of entry and use of fraudulent entry documents as "significantly adverse" factors, despite legislative directives that these are not eligibility bars.

### A. Under the Refugee Act and the Illegal Immigration Reform Act, Unlawful Manner of Entry is Not a Bar to Asylum

Congress relied on the 1951 Convention Relating to the Status of Refugees (the "Refugee Convention") and the 1967 U.N. Protocol Relating to the Status of Refugees (the "Refugee Protocol") when enacting the landmark Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980). *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–37 (1987). Congress drafted the Refugee Act to "provide a permanent and systematic procedure for the admission … of refugees." Refugee Act § 101(b). In creating this comprehensive framework, Congress did not predicate threshold eligibility for asylum on an applicant's manner of entry into the United States. Instead, Congress understood that an asylum seeker was fleeing her home country to avoid "being shot, tortured, or otherwise persecuted." *Cardoza-Fonseca*, 480 U.S. at 440. Congress thus established broad eligibility for any foreign national "physically present in the United States *or* at a land border or port of entry." Refugee Act § 208(a) (emphasis added).

Sixteen years later, Congress reaffirmed that manner or port of entry is independent of threshold eligibility. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546. Specifically, IIRIRA provided that "[a]ny alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival*) . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1) (emphasis added); *see also East Bay v. Trump*, 950 F.3d at 1261.

Despite this statutory authority, the Asylum Rule establishes unlawful entry as a "significantly adverse factor." Because a large proportion of asylum seekers arrive at undesignated points, the Asylum Rule's denial of these applications would eviscerate the threshold eligibility

**Loeb & Loeb**
A Limited Liability Partnership
Including Professional
Corporations

necessary for the INA's comprehensive framework. The Ninth Circuit has held that a rule that categorically barred asylum for those who entered at an undesignated point at the border exceeded the executive branch's authority. *See East Bay v. Trump*, 950 F.3d at 1261. Repurposing that rule into the de facto categorical bar in the Asylum Rule should engender the same result.

### B. Under the INA, Use of Fraudulent Entry Documents Is Not a Bar to Asylum

Congress—in providing for summary, expedited removal of certain foreign nationals who arrived at the border without documents or with fraudulent document—required that an asylum officer interview individuals who expressed an intent to "apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i) & (ii). This guarantee of an asylum interview would be superfluous if Congress believed that the Departments could routinely deny asylum claims based on an asylum seeker's misrepresentation. Similarly, Congress provided that an asylee seeking lawful permanent resident status would be eligible for a waiver of most grounds for inadmissibility, including the subsection on misrepresentation. *See* 8 U.S.C. § 1159(c). Despite acknowledging this subsection in the Asylum Rule, the Departments offer no plausible reason that Congress would have expressly authorized the waiver if Congress also expected that misrepresentation would usually trigger a discretionary denial of asylum in the first instance. *See* 85 Fed. Reg. at 80,349-50.

The Board of Immigration Appeals has confirmed that use of fraudulent documents is just one factor in the asylum analysis. *See Matter of Pula*, 19 I&N Dec. at 474. Specifically, the Board admonished that concern with the "circumvention of orderly refugee procedures" should not yield the "practical effect" of denying relief in "virtually all cases." *Id*. at 473. Driving home this point, *Matter of Pula* stated that the "danger of persecution should generally outweigh all but the most egregious of adverse factors." *Id*. at 474. This standard has guided discretion in asylum cases for more than thirty years. The Asylum Rule's codification of the use of fraudulent documents as an effectively insurmountable barrier to asylum cannot be squared with the Board's long-standing practice or Congress's express mandates.

### III. Even If the Asylum Rule Were Considered a Permissible Construction of the INA, the Departments Have Not Provided a Sufficient Explanation for the Change in Statutory Interpretation Underlying the Asylum Rule

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

- 5 -
AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER (NO. 3:20-cv-09253-JD)

The "adverse factors" mark a substantial departure from the current case-by-case balancing approach governing the exercise of discretion. *Matter of Pula*, 19 I&N Dec. at 472-73, *superseded in part by statute on other grounds as recognized in Andriasian v. INS*, 180 F.3d 1033, 1043-44 & n.17 (9th Cir. 1999). An agency may change its interpretation of an ambiguous statute, provided that the agency provides a "reasoned explanation." *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981-82 (2005); *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016); *East Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 846-49 (9th Cir. 2020) (*East Bay v. Barr*); *cf. East Bay Sanctuary Covenant v. Barr*, Case No. 19-cv-04073-JST, 2020 U.S. Dist. LEXIS 211795, at *9-10 (N.D. Ca. Nov. 10, 2020) (discussing Supreme Court's 2019 stay of preliminary injunction against the third-country rule). As discussed above, the interpretations here are inconsistent with the statute. Regardless, the Departments have failed to provide a "reasoned explanation" for their abrupt pivot from prior practice.

### A. The Departments Fail to Support Their Claims Regarding Asylum in Mexico

Even if the Asylum Rule were consistent with the INA, the Departments have not provided a "reasoned explanation" for their departure from past statutory interpretation. For example, the Departments provide insufficient support for their claim that seeking asylum in Mexico is a practicable alternative. The Ninth Circuit, by contrast, recently cast doubt on the viability of Mexico as an asylum alternative. *Cf. East Bay v. Barr*, 964 F.3d at 850 (finding that government's claims about efficacy of Mexico's asylum process in context of third-country transit rule were "ungrounded in reality"); *see also id.* at 851 (asylum seekers in "Mexico are (1) subject to violence and abuse from third parties and government officials, (2) denied their rights under Mexican and international law, and (3) wrongly returned to countries from which they fled persecution").

The Departments' assertion relies in part on quotes from three sources that—read fairly and in context—reflect severe skepticism about Mexico's asylum procedures. First, the Departments quote from a United Nations High Commissioner for Refugees ("UNHCR") spokesperson mentioning Mexico's decision to continue accepting asylum claims during the pandemic. 85 Fed. Reg. at 80,282-83. However, UNHCR has also stated that "strong obstacles" hinder access to asylum in Mexico. UNHCR, *Mexico: Fact Sheet*, p. 2 (Apr. 2019),

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

https://reporting.unhcr.org/sites/default/files/UNHCR%20Factsheet%20Mexico%20-%20April%202019.pdf. Analyzing these obstacles, UNHCR noted "the absence of proper protection screening protocols for families and adults" and the "lack of a systematic implementation" of protections for children. *Id.* In addition, UNHCR cited "insufficient resources and limited field presence" of asylum processing offices, which limit practical access to asylum. *Id.*

Second, the Departments cite an asylum group's statement that Mexico has "adopted a broader refugee definition than the U.S. and grants a higher percentage of asylum applications." 85 Fed. Reg. at 80,347, *quoting* Asylum Access, *Mexican Asylum System for U.S. Immigration Lawyers FAQ 1*, 7 (Nov. 2019), https://asylumaccess.org/wp-content/uploads/2019/11/Mexican-Asylum-FAQ-for-US-Immigration-Lawyers.pdf ("Asylum Access FAQ"). However, the Departments' citation ignores the group's more critical assessment that Mexico has "long wait times, poor-quality decisions, and high levels of detention and deportation without access to the asylum system." Asylum Access FAQ, 1.

Third, the Departments cite a Congressional Research Service report, Clare Ribando Seelke, Cong. Rsch. Serv., IF10215 *Mexico's Immigration Control Efforts* 2 (2020), https://fas.org/sgp/crs/row/IF10215.pdf, ("CRS Report") that also mentions increased rates of asylum applications in Mexico. *See* 85 Fed. Reg. at 80,283. But the Asylum Rule's explanation fails to cite to the Congressional Research Service's assessment—based on a 2019 U.S. State Department report—that "migrants in Mexico are vulnerable to human rights abuses and human trafficking." CRS Report at 1. The Congressional Research Service piece also flags warnings by human rights groups that the Mexican government has not been "adequately addressing corruption among police and migration officials." *Id.* In addition, the Congressional Research piece cited asylum experts who have found that Mexico lacks "sufficient budget or staff" to adjudicate asylum applications. *Id.* at 2.

B.  **The Departments Fail to Support Their Claim that the Asylum Rule Targets Meritless Claims**

The Departments assert that the Asylum Rule allows "adjudicators to focus resources more effectively on potentially meritorious claims rather than on meritless ones." 85 Fed. Reg. at 80,284.

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

The Departments invoked this rationale when defending an earlier rule that categorically denied asylum to those who failed to apply for protection in a third country before seeking asylum in the United States. *See East Bay v. Barr*, 964 F.3d at 852. The Ninth Circuit affirmed the district court's enjoinment of that rule, because it exceeded executive authority and was inconsistent with § 1158. *Id.* at 857-58. The express categorical bar that the Ninth Circuit found wanting there and the de facto bar in the Asylum Rule here share a serious infirmity: each indiscriminately cuts off meritorious applications along with meritless claims.

Consider the ruinous effect of the adverse third country transit factor, which establishes transit through more than one country en route to the United States as an adverse factor. Many asylum seekers will fear to apply for asylum in a country such as Mexico in which substantial obstacles hinder participation in the asylum process. *See id.* at 853. Indeed, amici have represented asylum seekers who were mistreated or endangered in these very countries, and other reputable immigration scholars—including those who urge robust immigration enforcement—have focused on desperate conditions in Mexico. *See* David A. Martin, *Taming Immigration: The 64th Henry J. Miller Distinguished Lecture Series Remarks*, 36 Ga. St. U.L. Rev. 971, 1002 (2020) (noting in essay by University of Virginia emeritus professor who served as INS General Counsel and Principal Duty General Counsel of the Department of Homeland Security that Mexican border regions "where asylum seekers wait are prime operating ground for violent Mexican cartels" and enforced stay in Mexico "serves mainly to multiply hardships in order to discourage asylum seekers").

The 14-day stay de facto bar reinforces this point. Under that measure, adjudicators would deny a claim if the asylum seeker spent more than 14 days in a third country before seeking to enter the United States. But the mere length of the journey through a third country says little or nothing about the merits of the asylum-seeker's claim. Many asylum seekers require a long journey to reach a possible haven, and these journeys often involve time-consuming stops along the way. Indeed, an asylum seeker with a stronger claim may well take longer, because of the importance of care in selecting a route. In addition, inclement weather, the need for personal safety, and the asylum seeker's lack of resources may cause delays. None of these factors has any relationship to the

- 8 -
AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER (NO. 3:20-cv-09253-JD)

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

underlying merits of the applicant's asylum claim. Yet the new rule imposes a de facto bar on *all* such claims.

### C. The Departments Fail to Support Their Dilution of the Firm Resettlement Standard

The Departments have also changed the longstanding approach to the INA's categorical bar on asylum for applicants who have firmly resettled in a third country by replacing the longtime "permanent" standard for firm resettlement with one hinging on a more provisional "non-permanent" or even undocumented status. *See* 8 U.S.C. § 1158(b)(2)(A)(vi) (statutory bar); 85 Fed. Reg. at 80,283 (new standard under the Asylum Rule); 85 Fed. Reg. at 80,364 ("[T]he Departments do not believe that legal presence should be a requirement of firm resettlement"). This expansion conflicts with the settled meaning that Congress and the courts have ascribed to the firm resettlement bar for decades.

The concept behind the firm resettlement bar emerged in the wake of World War II, when global states sought to address the unprecedented need for refugee relief. The United States and many members of the United Nations General Assembly pooled their efforts in a multi-national entity called the International Refugee Organization ("IRO"), with a mission that included "the resettlement and re-establishment, in countries able and willing to receive them, of persons who are the concern of the Organization." *See* U.S. Senate Committee on the Judiciary, *Displaced Persons in Europe*, S. Rep. No. 80-950, at 2 (1948). The IRO developed the concept of firm resettlement to maximize the positive impact of member nations' assistance in this mission, and allied powers, including the United States, soon implemented the concept in domestic legislation. *See id.* at 9; *see also* Displaced Persons Act of 1948, Pub. L. No. 80-774, 62 Stat. 1009; Act to Amend the Displaced Persons Act of 1948, § 2(c), 64 Stat. 219, Pub. L. 81-555, H.R. 4567 (1950); Refugee Relief Act of August 7, 1953, Pub. L. No. 203, 67 Stat. 400.

Subsequent developments in international law regarding postwar relief efforts—with which the United States was integrally involved—inform interpretations of those Congressional enactments. Specifically, the Refugee Convention excluded from coverage any person with the "*rights and obligations* which are attached to the possession of the nationality of that country."

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

Convention Relating to the Status of Refugees, art 1(E), July 28, 1951, 189 U.N.T.S. 150 (emphasis added). The Convention also excluded any person who "has acquired a new nationality, and enjoys the protection of the country of his new nationality." *Id.*, art. 1(C)(3). Echoing this emphasis on stable and long-term legal status, U.S. courts have held for nearly fifty years that firm resettlement requires a showing of permanent resettlement and required the government to present prima facie evidence meeting this standard. *See Rosenberg v. Woo,* 402 U.S. at 56 n.5 (foreign national had "valid Hong Kong identity papers enabling him to return and live there"). In 1996, Congress inserted firm resettlement into the asylum provision of the INA as a categorical bar, codifying the doctrine's longtime values of permanence and safety. *See Matter of A-G-G-*, 25 I&N Dec. 486, 494 (BIA 2011). Implementing this codification in 2000, the Immigration and Naturalization Service (the Justice Department predecessor to today's Immigration and Customs Enforcement unit in the Department of Homeland Security) issued a rule defining firm resettlement as "an offer of permanent resident status, citizenship, or some other type of permanent resettlement." 8 C.F.R. § 208.15.

The Departments upend this long-established approach by expanding firm resettlement to include a "non-permanent" status as long as that status is in theory renewable, and even undocumented status when an applicant has "physically resided voluntarily" and without persecution in a third country for "one year or more" prior to entry into the United States. *See* 85 Fed. Reg. at 80,283. These criteria do not entail the proof of permanence and stability that the firm resettlement bar requires. In *amici*'s experience, any status that must be renewed can also be arbitrarily revoked, yet the Departments provide no concrete definition of grounds for revocation that will stave off the risk of arbitrariness. Undocumented status entails even fewer assurances of permanence or stability, as a third country could remove a person with such a status at any time.

While the Departments assert that their overhaul of firm resettlement to include temporary status reconciles "diverging [judicial] interpretations," 85 Fed. Reg. at 80,363, this assertion ignores the judicial consensus on permanence and stability. The Departments correctly state that courts have used two different verbal formulations to describe firm resettlement. *Compare Maharaj v. Gonzales*, 450 F.3d 961, 977 (requiring a clear showing that the applicant was "entitled" to

permanent residence in a third country) *and Etienne Tchitchui v. Holder*, 657 F.3d 132, 137 (2d Cir. 2011) (considering whether the "totality of the circumstances" demonstrate permanence and stability). However, a closer examination shows that the two strands have converged on a pragmatic inquiry about the permanence of the applicant's situation in a third country. For example, the Second Circuit in *Tchitchui* relied on facts suggesting that the applicant from Cameroon had a permanent status in Guatemala: he had obtained permanent residence in Guatemala, engaged in "ongoing business activities" there, and "could work and travel at will." 657 F.3d at 137. Likewise, the Ninth Circuit has recognized that firm resettlement includes an applicant's "acquisition of nationality" in a third country, together with the grant of a "wide range of rights" such as the right to travel and access to education and employment. *See Sung Kil Jang v. Lynch*, 812 F.3d 1187, 1191, 1193 (9th Cir. 2015).

The Departments' other putative rationales for these precipitous changes only underscore their lack of support. For example, the Departments assert that the permanency test is outmoded since firm resettlement is more widely available now than the earlier regulation or agency decisions have found. 85 Fed. Reg. at 80,282 n.10. To support its claim that firm resettlement has now become widely available, the government heralds the 43 new signatories to the Refugee Convention since 1990. *Id*. However, *amici*'s own experience indicates that this data point cannot bear the weight of the government's optimism.

*Amici*'s research, teaching, and practice go beyond extolling the formal approval of refugee protections on which the Departments rely. In *amici*'s experience, conditions on the ground in many of the 43 countries reflect persistent persecution of the signatories' *own nationals*, let alone entrants from elsewhere. This should not be surprising, since many of the 43 countries that have approved the Refugee Convention since 1990 were formerly part of the Communist bloc or the former Yugoslavia, where despotic government, pervasive corruption, and even mass atrocities were the order of the day. *See* UNHCR, *States Parties to the 1951 Convention relating to the Status of Refugees and the 1967 Protocol* (2020), https://www.unhcr.org/en-us/protection/basic/3b73b0d63/states-parties-1951-convention-its-1967-protocol.html (listing, *inter alia*, Afghanistan, Albania, Azerbaijan, Belarus, Bosnia and Herzegovina, Bulgaria,

Cambodia, Croatia, Georgia, Honduras, Kyrgyztan, Latvia, Lithuania, Mexico, Montenegro, Romania, the Russian Federation, Serbia, and Tajikistan).

While some of these countries have made halting progress in the development of rule-of-law institutions, none is the poster child for a newly expansive firm resettlement doctrine that the Departments proclaim. For many of the signatory states, the years from 1990 to the present have included one step forward and two steps back. *See Ouda v. INS*, 324 F.3d 445, 449 (6th Cir. 2003) (applicants who fled to Bulgaria unable to apply for citizenship there since they were Muslims and then forced to leave); *Boika v. Holder*, 727 F.3d 735, 739-40 (7th Cir. 2013) (persecution in Belarus based on opposition to government); *Preçetaj v. Sessions*, 907 F.3d 453, 458-60 (6th Cir. 2018) (reversing denial of asylum and remanding for further consideration of changed circumstances based on violence in Albania). The list of new signatories that the Departments cite is not evidence of firm resettlement's growth, but rather "Exhibit A" in its evanescence.

## **CONCLUSION**

For these reasons, this Court should grant Plaintiffs' motion.

Dated: December 29, 2020

Respectfully submitted,

By: /s/ Camron A. Dowlatshahi
Camron A. Dowlatshahi (SBN 308618)
LOEB & LOEB LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
cdowlatshahi@loeb.com
Telephone: (310) 282-2000
Facsimile: (310) 282-2200

Laura McNally (*Pro Hac Vice* application forthcoming)
lmcnally@loeb.com
Neil Nandi (*Pro Hac Vice* application forthcoming)
nnandi@loeb.com
LOEB & LOEB LLP
321 N. Clark St., Suite 2300
Chicago, IL 60654
Telephone: (312) 464-3100
Facsimile: (312) 464-3111

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations

Peter S. Margulies (*Pro Hac Vice* application forthcoming)
ROGER WILLIAMS UNIVERSITY SCHOOL OF LAW[*]
10 Metacom Avenue
Bristol, RI 02809
(401) 254-4564

Shoba Sivaprasad Wadhia (*Pro Hac Vice* application forthcoming)
PENN STATE LAW[*]
252E Lewis Katz Building
University Park, PA 16802
(814) 865-3823

*Attorneys for Amicus Curiae Immigration Law Professors*

---

[*] University affiliations are listed solely for informational purposes.

- 13 -
AMICUS CURIAE BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
FOR TEMPORARY RESTRAINING ORDER (NO. 3:20-cv-09253-JD)

Loeb & Loeb
A Limited Liability Partnership
Including Professional
Corporations