1  **AKIN GUMP STRAUSS HAUER & FELD LLP**
   MICHAEL J. STORTZ (SBN 139386)
2  580 California Street, Suite 1500
   San Francisco, CA 94104-1036
3  Email:        mstortz@akingump.com
   Telephone:    415.765.9500
4  Facsimile:    415.765.9501

5  **AKIN GUMP STRAUSS HAUER & FELD LLP**
   STEVEN H. SCHULMAN (*pro hac vice* forthcoming)
6  2001 K Street N.W.
   Washington, DC 20006
7  Email:        sschulman@akingump.com
   Telephone:    202.887.4000
8  Facsimile:    202.887.4288

9  Attorneys for *Amici Curiae*
   Former Immigration Judges and
10 Members of the Board of Immigration Appeals
   (As listed on Appendix A of Proposed Brief)

11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                     SAN FRANCISCO DIVISION

15 PANGEA LEGAL SERVICES; DOLORES          Case No. 3:20-cv-09253-JD
   STREET COMMUNITY SERVICES, INC.;
16 CATHOLIC LEGAL IMMIGRATION              **ADMINISTRATIVE MOTION FOR
   NETWORK, INC.; and CAPITAL AREA         LEAVE TO FILE AN *AMICUS* BRIEF**
17 IMMIGRANTS' RIGHTS COALITION,
                                           (Civil L. R. 7-12]
18                    Plaintiffs,

19          v.

20 U.S. DEPARTMENT OF HOMELAND
   SECURITY;
21 CHAD F. WOLF, *under the title of Acting
   Secretary of Homeland Security*;
22 KENNETH T. CUCCINELLI, *under the title of
   Senior Official Performing the Duties of the
23 Deputy Secretary for the Department of Homeland
   Security*;
24 U.S. CITIZENSHIP AND IMMIGRATION
   SERVICES;
25 U.S. IMMIGRATION AND CUSTOMS
   ENFORCEMENT;
26 TONY H. PHAM, *under the title of Senior Official
   Performing the Duties of the Director of U.S.
27 Immigration and Customs Enforcement*;
   U.S. CUSTOMS AND BORDER PROTECTION;
28 MARK A. MORGAN, *under the title of Senior*

                                1

1 | *Official Performing the Duties of the Commissioner of the U.S. Customs and Border Protection*;
2 | U.S. DEPARTMENT OF JUSTICE;
3 | WILLIAM P. BARR, *under the title of U.S. Attorney General*;
4 | EXECUTIVE OFFICER FOR IMMIGRATION REVIEW; and
5 | JAMES MCHENRY, *under the title of Director of the Executive Office for Immigration Review*,

Defendants.

    *Amici curiae* are more than thirty (30) former Immigration Law Judges and former members of the Board of Immigration Appeals who remain keenly interested in the decision-making coming from the Agency.  As set forth more fully in the brief submitted with this administrative motion, *amici curiae* have intimate knowledge of the operation of the immigration courts, and seek an opportunity to develop the factual record and legal arguments presented in this action.  *Amici curiae* therefore respectfully submit this administrative motion for leave to file the attached brief addressing proposed changes to pretermission and frivolousness standards set forth in the Omnibus Asylum Rules. Counsel for the parties have consented to the relief requested by this administrative motion.

    District courts have broad discretion to allow the participation of *amicus curiae,* and "there are no strict prerequisites that must be established prior to qualifying for amicus status." *Woodfin Suite Hotels, LLC v. City of Emeryville,* No. C 06-1254-SBA, 2007 WL 81911, at *3 (N.D. Cal. Jan. 9, 2007) (internal citations omitted). This Court has held that "an individual seeking to appear as amicus must merely make a showing that his participation is useful to or otherwise desirable to the court." *Id.* Furthermore, "[d]istrict courts frequently welcome amicus briefs from non-parties concerning legal issues that have potential ramifications beyond the parties directly involved." *Sonoma Falls Developers, LLC v. Nevada Gold & Casinos, Inc.,* 272 F. Supp. 2d 919, 925 (N.D. Cal. 2003).  Amici curiae here respectfully submit that the attached brief provides useful and valuable insights as to the issues presented in this action, and that consideration of the brief will aid the Court.

    For these reasons, *amici curiae* request that the Court grant their unopposed administrative motion and accept for filing the attached brief.

2

1

Dated:  December 29, 2020                    Respectfully submitted,

2

3                                            AKIN GUMP STRAUSS HAUER & FELD LLP

4

5                                            By:   /s/ *Michael J. Stortz*
                                                   Michael J. Stortz

6                                                  Steven H. Schulman (*pro hac vice* forthcoming)

7                                            Attorneys for *Amici Curiae*
                                             Former Immigration Judges and

8                                            Members of the Board of Immigration Appeals

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**AKIN GUMP STRAUSS HAUER & FELD LLP**
MICHAEL J. STORTZ (SBN 139386)
580 California Street, Suite 1500
San Francisco, CA 94104-1036
Email:        mstortz@akingump.com
Telephone:    415.765.9500
Facsimile:    415.765.9501

**AKIN GUMP STRAUSS HAUER & FELD LLP**
STEVEN H. SCHULMAN (*pro hac vice* forthcoming)
2001 K Street N.W.
Washington, DC 20006
Email:        sschulman@akingump.com
Telephone:    202.887.4000
Facsimile:    202.887.4288

Attorneys for *Amici Curiae*
Former Immigration Judges and
Members of the Board of Immigration Appeals
(As listed on Appendix A)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| PANGEA LEGAL SERVICES; DOLORES STREET COMMUNITY SERVICES, INC.; CATHOLIC LEGAL IMMIGRATION NETWORK, INC.; and CAPITAL AREA IMMIGRANTS' RIGHTS COALITION,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY;<br>CHAD F. WOLF, *under the title of Acting Secretary of Homeland Security*;<br>KENNETH T. CUCCINELLI, *under the title of Senior Official Performing the Duties of the Deputy Secretary for the Department of Homeland Security*;<br>U.S. CITIZENSHIP AND IMMIGRATION SERVICES;<br>U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT;<br>TONY H. PHAM, *under the title of Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement*;<br>U.S. CUSTOMS AND BORDER PROTECTION; | Case No. 3:20-cv-09253-JD<br><br>**BRIEF OF AMICI CURIAE REGARDING CHANGES TO PRETERMISSION AND FRIVOLOUSNESS STANDARDS SET FORTH IN OMNIBUS ASYLUM RULES** |

1

1   MARK A. MORGAN, *under the title of Senior*
    *Official Performing the Duties of the*
2   *Commissioner of the U.S. Customs and Border*
    *Protection*;
3   U.S. DEPARTMENT OF JUSTICE;
    WILLIAM P. BARR, *under the title of U.S.*
4   *Attorney General*;
    EXECUTIVE OFFICER FOR IMMIGRATION
5   REVIEW; and
    JAMES MCHENRY, *under the title of Director of*
6   *the Executive Office for Immigration Review*,

7                     Defendants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

BACKGROUND ........................................................................................................1

ARGUMENT .............................................................................................................2

    A.    Allowing Pretermission Without a Hearing Undermines the Purpose of Asylum and Denies Due Process to Legitimate Asylum Seekers .......................................................2

    B.    Redefining the Meaning of "Frivolous" Exceeds Congressional Intent and Unfairly Disadvantages Asylum Seekers ..........................................................7

    C.    These Proposed Regulations Ignore the Reality of How Seminal Immigration Cases Became Law............................................................................9

        1.    Matter of Toboso-Alfonso .....................................................................10

        2.    Matter of Kasinga ...................................................................................11

CONCLUSION.......................................................................................................12

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Aguilera-Cota v. U.S. INS,*
    914 F.2d 1375 (9th Cir. 1990) ................................................................................................. 4

4

5

*Agyeman v. INS,*
    296 F.3d 871 (9th Cir. 2002) ................................................................................................... 6

6

*Alvarez Lagos v. Barr,*
    927 F.3d 236 (4th Cir. 2019) ................................................................................................... 4

7

8

*Bowers v. Hardwick,*
    478 U.S. 186 (1986) .............................................................................................................. 10

9

*Castro-O'Ryan v. INS,*
    847 F.2d 1307 (9th Cir. 1988) ................................................................................................. 8

10

*De Pena-Paniagua v. Barr,*
    957 F.3d 88 (1st Cir. 2020) ................................................................................................... 10

11

12

*Fatin v. INS,*
    12 F.3d 1233 (3d Cir. 1993) ................................................................................................. 10

13

*Jacinto v. INS,*
    208 F.3d 725 (9th Cir. 2000) ............................................................................................. 5, 6

14

15

*In re Kasinga,*
    21 I&N Dec. 357 (BIA 1996) ........................................................................................... 11, 12

16

*Key v. Heckler,*
    754 F.2d 1545 (9th Cir. 1985) ................................................................................................. 5

17

*Obergefell v. Hodges,*
    576 U.S. 644 (2015) .............................................................................................................. 10

18

19

*Pirir-Boc v. Holder,*
    750 F.3d 1077 (9th Cir. 2014) ................................................................................................. 4

20

*Matter of Toboso-Alfonso,*
    20 I&N Dec. 819 (BIA 1990) ........................................................................................... 10, 11

21

22

**Statutes**

23

8 U.S.C. § 1158(d)(6) ................................................................................................................... 7

24

8 U.S.C. § 1229a(b)(4) ................................................................................................................. 5

25

**Other Authorities**

26

8 C.F.R. § 1208.13 ................................................................................................................... 2, 3

27

8 C.F.R. § 1208.20 ...................................................................................................................... 7

28

85 Fed. Reg. 36264 (June 15, 2020) ........................................................................................... 9

85 Fed. Reg. 80274 (Dec. 11, 2020) ........................................................................ 1, 2, 7

Jeffrey S. Chase, *The Proper Role of IJs as Asylum Adjudicators*, OPINIONS/ANALYSIS
ON IMMIGRATION LAW (Feb. 4, 2018),
https://www.jeffreychase.com/blog/2018/2/4/the-proper-role-of-immigration-
judges-as-asylum-adjudicators ............................................................................. 6

Connor Cory, *The LGBTQ Asylum Seeker: Particular Social Groups and Authentic
Queer Identities,* 20 Geo. J. Gender & L. 577, 578 (2019) ............................... 10

Exec. Office for Immigration Review, *Tracking and Expedition of "Family Unit" Cases*
(November 16, 2018), https://www.justice.gov/eoir/page/file/1112036/download ......................... 6

Immigration Court Practice Manual,
https://www.justice.gov/eoir/page/file/1343626/download ............................... 4

Fatma Marouf, *Becoming Unconventional: Constricting the 'Particular Social Group'
Ground for Asylum*, 44 N.C. J. Int'l L. 487, 488 & 517 (2019) ....................... 10

Karen Musalo & Stephen Knight, *Steps Forward and Steps Back: Uneven Progress in
the Law of Social Group and Gender-Based Claims in the United States*, 13 INT. J.
REFUGEE L. 51 (2001) ......................................................................................... 12

Performance Plan: Adjudicative Employees,
https://www.abajournal.com/images/main_images/03-30-2018_EOIR_-
_PWP_Element_3_new.pdf .................................................................................. 6

Aaron Ponce, *Shoring up Judicial Awareness: LGBT Refugees and the Recognition of
Social Categories*, 18 NEW ENG. J. INT'L & COMP. L. 185 (2012) ................... 11

U.S. Dep't of Justice, *Case Priorities and Immigration Court Performance Measures*
(Jan. 17, 2018), https://www.justice.gov/eoir/page/file/1026721/download ....................... 6

**IDENTITY AND INTEREST OF AMICI CURIAE**[1]

*Amici* curiae are more than 30 former Immigration Judges ("IJs") and former members of the Board of Immigration Appeals ("BIA" or "Board"), who remain keenly interested in the quality of decision-making coming from the agency.[2] *Amici* were appointed to serve at immigration courts around the United States, with the Board, and at senior positions with the Executive Office of Immigration Review ("EOIR"). From their many combined years of service, *amici* have intimate knowledge of the operation of the immigration courts, including the importance of allowing those who appear before us the opportunity to develop the factual record and legal arguments that may support their claims for protection under our immigration laws.

**BACKGROUND**

We are gravely concerned that the efforts by the Department of Homeland Security and the Department of Justice (collectively, the "Agencies" or "Defendants") to remake asylum law and procedure will undermine the ability of the immigration courts to provide a full and fair hearing to those who seek protection in the United States. On December 11, 2020, in the final days of an administration that has already abandoned critical asylum rules and restricted protection to vulnerable refugees, the Agencies issued this new rule that will effectively prevent most applicants from establishing claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80,274 (Dec. 11, 2020) (the "Omnibus Asylum Rule" or "the Rule").

This brief focuses on two inter-related changes contained in the Rule, granting immigration judges the ability to pretermit asylum applications without a hearing and lowering the standard for ruling an asylum application frivolous. We discuss each independently and then explain, in the context of an asylum case based the grounds of particular social group, how the Rule is likely to limit development of the law and deny due process to those seeking protection in our country.

---

[1] No parties' counsel authored this brief in whole or in part. No party, or party's counsel, made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amici curiae* or their counsel made such a monetary contribution. All parties have either consented to this filing of this brief, or have taken no position on the filing of this brief.

[2] *See* Appendix for *amici's* biographies.

Particularly when combined with other changes – including metrics that are forcing immigration judges to process cases at remarkable speed and setting a new 15-day period for filing asylum applications after an initial hearing – these new procedures are likely to result in *bona fide* asylum seekers being returned to harm in their home countries.

## ARGUMENT

This Rule is based on the presumption, unsupported by evidence in the administrative record, that "[c]ases involving asylum fraud are distressingly common."[3] The Agencies have therefore set forth a number of hurdles before asylum seekers by allowing judges to clear their dockets by short-circuiting asylum claims and to penalize those who seek protection from harm in their home countries. In particular, by giving immigration judges new power to pretermit asylum applications without notice or a hearing and encouraging them to find more applications to be frivolous, the Rule thus prioritizes "improv[ing] efficiency for immigration courts"[4] over providing due process.

The idea that the Agencies need to make these trade-offs misunderstands the role of immigration judges and ignores the tools that immigration judges currently possess to identify and punish frivolous applications. In our experience, we needed hearings to evaluate the merits of a claim; the summary I-589 asylum application is not enough to reach such a conclusion. But when we heard false testimony, we had the power to warn the applicant and pretermit a hearing if the elements of an asylum claim could not be established. Likewise, our warnings against filing a fraudulent claim, backed up with the penalty of a lifetime ban on immigration benefits, served as a sufficient deterrent.

### A.   Allowing Pretermission Without a Hearing Undermines the Purpose of Asylum and Denies Due Process to Legitimate Asylum Seekers

The Rule, for the first time, allows Immigration Judges to pretermit and deny applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), based solely on the initial filing and without holding a hearing.[5] Any immigration judge is now able to decide to pretermit solely based on the Form I-589 and any supporting evidence filed at the same time as the

---

[3] 85 Fed. Reg. 80274, 80298 (internal citation omitted).

[4] *Id.* at 80309.

[5] 85 Fed. Reg. 80274; new 8 C.F.R. § 1208.13(e) (eff. Jan. 11, 2021).

application upon a finding that the applicant did not establish a *prima facie* claim to relief.[6] DHS argues that this will streamline the asylum process and allow the Immigration Courts rapidly to reduce the backlog, but fails to acknowledge that the cost of this assembly-line approach will be to deny asylum to individuals eligible for protection under our laws.  Allowing pretermission of asylum cases is especially problematic for *pro se* and non-English speaking asylum seekers.

It is important here to explain the process and content of Form I-589, the Application for Asylum and for Withholding of Removal.  In its current version, issued August 25, 2020,[7] the form is 10 pages long, not including supplemental pages.  The Rules amend the I-589 application, adding 7 more pages, for a total of 17 pages.  While the form adds several questions intended to gather more specificity about the applicant's claim (Part B, explained below), the bulk of the new material focuses on potential bars to asylum (Part C).

The form, in both its current and amended version, is divided into several parts, with Parts A-C requiring personal and substantive information about the asylum applicant and her claim for relief (the remaining parts in both versions are various signatures and verifications).   Part B begins with check boxes for the grounds for asylum and/or relief under the Convention Against Torture, allowing the applicant to select as many grounds she believes are relevant.  The following two pages of questions in Part B, followed by small boxes for text, ask the applicant to explain the basis of her claim (including her particular social group), her family's past mistreatment, fear of future mistreatment, organizational affiliations (such as political parties, labor unions or guerilla groups).  Supplemental pages are provided for text beyond these small boxes, but in our experience, most applicants provide summary answers limited to the space provided on the pages of Form I-589.  Part C (greatly expanded in the new version, far beyond the expansion of Part B) asks questions relating to bars to asylum and other relief, including prior asylum applications in any country, transit through other countries, failure to file within one year of entry, and prior arrests and convictions.

---

[6] *Id.*

[7] *Available at* https://www.uscis.gov/sites/default/files/document/forms/i-589.pdf.

1   In other words, in either version, the asylum application is a brief document that sets forth the

2   very basic facts that has led the applicant to fear return to her home country.  There is no legal argument

3   contained in Form I-589.  The new Form I-589 demands additional information, such as asking the

4   applicant to connect her harm to her grounds for asylum (also known as "nexus") and to define her

5   particular social group, but the idea that an applicant (particularly one unrepresented) can satisfactorily

6   answer these questions on a form is laughable.  The contours of nexus and particular social group are

7   both frequently the subject of appellate court litigation.  *See, e.g., Alvarez Lagos v. Barr,* 927 F.3d 236

8   (4th Cir. 2019); *Pirir-Boc v. Holder*, 750 F.3d 1077 (9th Cir. 2014).  More to the point, as federal courts

9   have recognized, *pro se* respondents can struggle to present even the most basic facts in immigration

10  forms.  *See, e.g., Aguilera-Cota v. U.S. INS*, 914 F.2d 1375, 1382 (9th Cir. 1990) ("Forms are frequently

11  filled out by poor, illiterate people who do not speak English and are unable to retain counsel.").

12  While the I-589 asks the applicant to file supporting documents, as former immigration judges

13  we know that for many asylum seekers it can take months to obtain evidence to support a claim.  Many

14  documents may come from the asylum seeker's home country, and others may need to be translated into

15  English.  We never expected substantial documentary evidence to be submitted with the I-589; rather,

16  the rules set a deadline to submit evidence before the trial (known as the "individual" or "merits"

17  hearing).  *See* Immigration Court Practice Manual, revised Dec. 7, 2020, at 79 ("The following

18  documents should be filed in preparation for the individual calendar hearing, as necessary," including

19  exhibits and a witness list).[8]  Likewise, factual details may be contained in those documents or in the

20  memories of witnesses, which may not be available when the I-589 is completed, particularly for

21  detained applicants locked away by the Department of Homeland Security with limited or no means to

22  communicate with the outside world.

23  Accordingly, as immigration judges, we never looked at Form I-589 in isolation; we would not

24  review the asylum application until shortly before the merits hearing, and then likely in conjunction with

25  additional evidence and, in the case of a represented applicant, legal briefing.  In other words, the I-589

26  serves as the *starting point* for understanding and investigating the asylum applicant's entitlement to

27

28
_____

[8] Immigration Court Practice Manual, https://www.justice.gov/eoir/page/file/1343626/download.

relief under U.S. law, which we would explore at the merits hearing.  Even the expanded I-589 Form recognizes its utility as a summary document that anticipates further explanation and testimony, telling the applicant at Page 9, for example, that "[y]ou must be prepared to explain at your … hearing why you did not file your application within the first year you arrived."

Neither the I-589 Form (in either version) nor immigration court procedures are set up for the immigration judge to pretermit an asylum application without a hearing.  By analogy, pretermission of asylum applications in immigration court is like giving U.S. District Judges the sole authority for dismissing complaints under Rule 12 of the Federal Rules of Civil Procedure – without the benefit of an answer or a motion from the defendant – and no notice or opportunity for briefing or further testimony by the plaintiff.  Given the lack of discovery in immigration court, and that oral testimony is often the only probative evidence of persecution, the entire system is set up to allow the asylum seeker her day in court.  Neither immigration judges nor their brethren on the federal bench should be given such unilateral power to throw out cases presented to them without further word from the applicant.  The simplest notions of due process demand more.

The harsh effects of pretermission will fall hardest on the unrepresented.  The reality of the Immigration Court and asylum systems is that asylum applicants have only the "privilege of being represented, at no expense to the Government..."[9]  In practice, this means that many indigent asylum seekers, including those who are detained and speak no English, must navigate the immigration court and asylum system with no assistance. Such individuals, many of whom are legitimate refugees, will never have their day in court under the new Rule.

Pretermission also conflicts with the duty of immigration judges to explore the basis for a respondent's claim for protection. *See Jacinto v. INS*, 208 F.3d 725, 733 (9th Cir. 2000) (immigration judges "must be especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited" in the cases of *pro se* litigants) (quoting *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985)).  As explained by former immigration judge Jeffrey S. Chase, one of the *amici*, "asylum adjudicators are required to share the burden of documenting the asylum claim . . . [and] once the facts

---

[9] 8 U.S.C. § 1229a(b)(4) (INA § 240(b)(4)).

are ascertained, it is the adjudicator who should identify the reasons for the feared persecution and determine if such reasons bear a nexus to a protected ground."[10]

The federal courts have consistently recognized how difficult it is for asylum applicants, particularly those without a lawyer, to explain how they qualify for asylum.  As a result, *pro se* litigants in immigration court face unique difficulties, and may benefit from searching examination by an immigration judge:

> [b]ecause [noncitizens] appearing *pro se* often lack the legal knowledge to navigate their way successfully through the morass of immigration law, and because their failure to do so successfully might result in their expulsion from this country, it is critical that the I[mmigration] J[udge] "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."

*Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002) (quoting *Jacinto*, 208 F.3d at 733).

As former Immigration Judges and Board of Immigration Appeals Members, we understand the reality of the asylum process in Immigration Court. Countless times, we heard meritorious cases that, on their face originally, appeared to be lacking. In many cases, it was not until testimony was taken in open court and further inquiries made into the facts of the case that it became clear that the applicant qualified for asylum. This was particularly true in cases where the applicant was unrepresented by counsel or, if represented by counsel at the hearing, had filed a *pro se* asylum application.  By allowing and even encouraging Immigration Judges to pretermit asylum applications, legitimate refugees will be returned to harm without any due process.

And make no mistake:  EOIR's policies and practices now provide every incentive for judges to dismiss applications and skip asylum hearings altogether.  The recently-instituted Immigration Court Performance Metrics force immigration judges to look for every avenue to meet case completion requirements and process cases more quickly, without regard for the purpose of asylum, which is to protect the most vulnerable people in the world.[11]

---

[10] Jeffrey S. Chase, *The Proper Role of IJs as Asylum Adjudicators*, OPINIONS/ANALYSIS ON IMMIGRATION LAW (Feb. 4, 2018), https://www.jeffreyschase.com/blog/2018/2/4/the-proper-role-of-immigration-judges-as-asylum-adjudicators.

[11] U.S. Dep't of Justice, *Case Priorities and Immigration Court Performance Measures* (Jan. 17, 2018), https://www.justice.gov/eoir/page/file/1026721/download; Exec. Office for Immigration Review, *Tracking and Expedition of "Family Unit" Cases* (November 16, 2018), https://www.justice.gov/eoir/page/file/1112036/download; EOIR Performance Plan: Adjudicative

**B.    Redefining the Meaning of "Frivolous" Exceeds Congressional Intent and Unfairly Disadvantages Asylum Seekers**

Not only does the Rule give immigration judges the power to pretermit asylum applications without a hearing, it also expands their power and encourages them to find applications "frivolous" and thereby impose severe penalties on asylum seekers.  In tandem, these new powers put those seeking protection in our country at tremendous peril under our laws – *i.e.*, *permanent* ineligibility for any immigration benefits – not to mention from return to dangerous conditions in their home countries.

The Rule redefines the meaning of a "frivolous" asylum application.[12]  The statute, 8 U.S.C. § 1158(d)(6), sets forth the consequences for "knowingly" filing a frivolous application for asylum, and requires that an asylum applicant receive notice of such consequences before a frivolous finding can be made. These safeguards are in place in the statute because a finding that an applicant filed a frivolous application leads to permanent ineligibility for immigration benefits.[13] The Agencies justified this change by asserting that "frivolous" has been defined too narrowly and does not "capture the full spectrum of claims that would ordinarily be deemed 'frivolous'..."[14] Therefore, the Agencies broadened the definition to purportedly "bring it more in line with prior understandings of frivolous applications, including applications that are clearly unfounded, abusive, or involve fraud, and better effectuate the intent of section 208(d)(6) of the INA, 8 U.S.C. 1158(d)(6), to discourage applications that make patently meritless or false claims."[15] The Rule goes well beyond Congressional intent and includes applications where the adjudicator[16] determines that the application lacks "merit" or is "foreclosed by existing law."[17] The Rule also defines as frivolous the filing of an asylum application solely for the purpose of being

---

Employees,                              https://www.abajournal.com/images/main_images/03-30-2018_EOIR_-_PWP_Element_3_new.pdf.

[12] 8 C.F.R. § 1208.20 (eff. Jan. 11, 2021).

[13] 8 U.S.C. § 1158(d)(6).

[14] 85 Fed. Reg. at 80301.

[15] *Id.*

[16] Immigration Judge, BIA, or asylum officer per 85 Fed. Reg. at 80279.

[17] *Id.*

placed in removal proceedings.  These provisions are exceptionally unfair, particularly to *pro se* applicants and those who are the victims of unscrupulous practitioners.

*First*, dismissing an application as frivolous because it is "foreclosed by existing law" sets up a hazard for both represented and *pro se* applicants.  What is "foreclosed by existing law" is a matter of intense legal debate; asylum law is in a state of constant flux.  As the federal courts have recognized, immigration law is extremely complicated and often unintelligible to those without legal training. *Castro-O'Ryan v. INS*, 847 F.2d 1307, 1312 (9th Cir. 1988) ("With only a small degree of hyperbole, the immigration laws have been termed second only to the Internal Revenue Code in complexity.  A lawyer is often the only person who could thread the labyrinth.") (citation omitted).  Successfully pursuing a contested asylum case in immigration court requires an understanding of statutes, regulations, and years of sometimes conflicting federal court and administrative decisions interpreting those laws.  Accordingly, requiring asylum seekers, many of whom are unrepresented and most of whom are non-English speakers, to understand the intricacies of the ever-evolving law, is contrary to the purpose of asylum and unfair to the most vulnerable.

*Second*, notary fraud and other fraudulent schemes are rampant in the immigration law field.  Often, noncitizens are the victims of unscrupulous notaries, immigration consultants, and attorneys who they trust to file asylum applications.  Moreover, in cases where an individual may qualify for the benefit of cancellation of removal, which is available only after removal proceedings have been initiated by the government, some attorneys have resorted to filing non-meritorious asylum cases simply to get a client into immigration court after the Asylum Office denies asylum.  Indeed, ICE has on occasion recommended this practice.  While we, as former Immigration Judges and Board of Immigration Appeals Members, recognize the inherent problems in filing asylum applications in order to apply for cancellation of removal, it is wholly unfair to penalize the asylum applicants who rely on this advice in an otherwise legitimate attempt to legalize their status.

The Rule also denies asylum applicants the opportunity to address discrepancies in the claim.[18] In practice, this means that immigration judges can now pretermit an application and find it frivolous without ever hearing testimony from the asylum seeker.

In addition to being unfair to asylum applicants, the Rule will increase the workload of already burdened Immigration Judges. In addition to evaluating the merits of a claim, including the credibility of the applicant, Immigration Judges are now tasked with determining whether legal arguments were presented in a way that is seeking to "extend, modify, or reverse the law" or whether the arguments were simply foreclosed by existing law.[19] This is an impossible task under the best of circumstances, and particularly burdensome now that Immigration Judges are expected to hear upwards of four asylum cases in a day. It is unrealistic to expect them to be able to make determinations in every case where asylum applicants are pro se and/or presenting creative legal arguments.

Expanding the definition of what constitutes a frivolous asylum application, in combination with the encouragement to pretermit cases without a hearing, puts asylum seekers in grave jeopardy of losing not just an asylum claim but any claim to lawful immigration status in this country.  Before this Rule, an asylum seeker who falsified facts was already in such jeopardy; now she must ensure that her claim is not foreclosed by ever-changing asylum law.  By failing to distinguish between mendacity and mistake, the new Rule sets another unnecessary barrier to asylum that is contrary to the asylum statute and our international refugee protection obligations.

### C.    These Proposed Regulations Ignore the Reality of How Seminal Immigration Cases Became Law

One way to examine the impact of the new Rule is to look back and see what might have been lost – aside from the lives of wrongfully-deported asylum seekers – if immigration judges had been encouraged to pretermit cases and find frivolous those claims that were not then supported by existing case law.  In particular, cases advancing asylum based on membership in a particular social group

---

[18] *Id.*

[19] 85 Fed. Reg. 36264, 36276 (June 15, 2020).

("PSG") will be vulnerable to pretermission and may even result in sanctions for a frivolous filing.  *See, e.g., De Pena-Paniagua v. Barr,* 957 F.3d 88, 94 (1st Cir. 2020) (overturning the BIA for holding that an asylum seeker's claim "necessarily fails because the groups to which she claims to belong are necessarily deficient" when the BIA failed to at least consider "whether the proffered groups exist and in fact satisfy the requirements for constituting a [PSG]"); *Fatin v. INS,* 12 F.3d 1233, 1238 (3d Cir. 1993) ("Both courts and commentators have struggled to define 'particular social group.' Read in its broadest literal sense, the phrase is almost completely open-ended."); Fatma Marouf, *Becoming Unconventional: Constricting the 'Particular Social Group' Ground for Asylum*, 44 N.C. J. INT'L L. 487, 488 & 517 (2019) (explaining that PSG doctrine "has become increasingly complicated" and that recent PSG jurisprudence has injected "ever greater inconsistencies and uncertainty into our asylum system.").

If this new Rule had been in effect over the past few decades, several foundational asylum cases may never have made it to a hearing, much less to the point where they established new precedent.  We discuss two of those cases below.

### 1.   *Matter of Toboso-Alfonso*

In 1990, the United States was still more than a decade away from having even a single state recognize same-sex marriage and more than a quarter century from the Supreme Court's decision in *Obergefell v. Hodges*, 576 U.S. 644 (2015).  Indeed, just four years prior, the Supreme Court had upheld as constitutional Georgia's laws criminalizing homosexual sodomy.  *Bowers v. Hardwick*, 478 U.S. 186 (1986).  U.S. immigration law, likewise, did not recognize the claims of persecuted members of the LGBTQ community to asylum protection.  That year, the Board of Immigration Appeals decided *Matter of Toboso-Alfonso*, 20 I&N Dec. 819 (BIA 1990), which was a "watershed case for LGBTQ asylum claims" because it established "the legal authority protecting LGBTQ asylum seekers."[20] Over strong objection from INS, which argued that Toboso-Alfonso was being awarded protection for "socially

---

[20] Connor Cory, *The LGBTQ Asylum Seeker: Particular Social Groups and Authentic Queer Identities,* 20 GEO. J. GENDER & L. 577, 578 (2019).

deviated behavior," *id.* at 822, this "was the first instance in which [the BIA] recognized gay individuals as members of a particular social group."[21]

Now imagine if the immigration judge in *Toboso-Alfonso* had the power (and strong institutional incentive) to pretermit asylum cases and determine, based on Form I-589, whether the claim for asylum was "foreclosed by existing law."   Mr. Toboso-Alfonso, a man whose sexual preferences were considered criminal in several U.S. states, was asking for protection as a gay man from Cuba.  Of course, we do not have his I-589, but we can surmise from experience that it did not contain significant detail. Indeed, the Board relied heavily on the record Mr. Toboso-Alfonso presented at his hearing, including testimony, "several articles describing … a film which centers on the testimony of 28 Cuban refugees and recounts the human right violations, including incarceration in forced labor camps."  *Id.* at 821.  It is easy to see how, without the benefit of this record, the immigration court could have pretermitted his claim.  It is likewise easy to see how an immigration judge, instructed to sanction those whose claims are "foreclosed by existing law," would have found his application to be frivolous and barred him from any immigration benefit.

### 2.     *Matter of Kasinga*

In December 1994, a 17-year-old named Fauziya Kassindja landed at Newark Airport in New Jersey.  She had fled her native Togo after being forced into a polygamous marriage and was facing female genital cutting (also known as female genital mutilation, or FGM).  *See In re Kasinga*, 21 I&N Dec. 357, 358-59 (BIA 1996).  She immediately asked for asylum at the airport, but it was far from obvious that her claim had merit.  *Id.*  The INS opposed her application and detained her for nearly 18 months, more than 6 months after her immigration court hearing.  *Id.*  From detention, Ms. Kassindja filed an asylum application that attached only two letters and her marriage certificate.  *Id.* at 360.  At her 1995 immigration court merits hearing, at which she was represented by counsel, she submitted into evidence an expert declaration from a professor of cultural anthropology and "a lengthy pre-hearing brief accompanied by extensive documentation, [including] information on the practice of FGM, its harmful effects on women, its lack of legitimate justification, and its condemnation by the international

---

[21]  Aaron Ponce, *Shoring up Judicial Awareness: LGBT Refugees and the Recognition of Social Categories*, 18 New Eng. J. Int'l & Comp. L. 185, 196 (2012).

community." *Id.* at 361.  Nonetheless, after the hearing, the immigration judge denied her claims for asylum and withholding of removal and ordered her deported to Togo.  *Id.* at 357.

The Board of Immigration Appeals, *en banc,* relied heavily on the record created at the hearing to reverse the immigration court.  It determined, for the first time, that "FGM can be a basis for asylum." *Id.* at 358.[22]  Thus, the BIA found that Ms. Kassindja fit into the particular social group "young women of the Tchamba-Kunsuntu Tribe who have not had FGM, as practiced by that tribe, and who oppose the practice."  *Id.* at 365.  Accordingly, *Matter of Kasinga* became a landmark case that acknowledged "that FGM constitutes persecution, and that it was imposed on account of [Ms. Kassindja's] membership in a particular social group, which was defined, in part, by gender."  Karen Musalo & Stephen Knight, *Steps Forward and Steps Back: Uneven Progress in the Law of Social Group and Gender-Based Claims in the United States*, 13 Int. J. Refugee L. 51, 53 (2001).  As a result, *Matter of Kasinga* "proved to be a watershed" by "paving the way for women's asylum claims." *Id.* At 54.

If Ms. Kassindja's immigration judge had been given the power to pretermit her asylum application – with merely two letters from home as evidence – it is easy to see how Ms. Kassindja could have been turned back to Togo to undergo FGM and live out her days as one of her husband's several wives.  Indeed, under the new Rule, the immigration judge could have decided that her claim was foreclosed by existing law and sanctioned her for filing a frivolous application.  Instead, the immigration judge was required to hold a hearing, at which Ms. Kassindja and her counsel were permitted to create the factual and legal record upon which the Board relied to issue this critical precedent.

## CONCLUSION

The new Rule purports to address problems that either do not exist or can be resolved under existing regulations.  Under the cover of uprooting fraud, the Rule elevates efficiency over due process, a trade-off not supported by the asylum laws passed by Congress or any sense of fairness to vulnerable asylum seekers.

For these reasons, *amici* urge this Court to enjoin the new Rules.

---

[22] On appeal, the INS did not disagree that FGM could be the basis for asylum, but disagreed about the parameters of FGM as a basis for asylum. *Matter of Kasinga*, 21 I&N Dec. at 358.

Dated:  December 29, 2020                    Respectfully submitted,

                                            AKIN GUMP STRAUSS HAUER & FELD LLP


                                            By:  /s/ *Michael J. Stortz*
                                                 Michael J. Stortz
                                                 Steven H. Schulman (*pro hac vice* forthcoming)

                                            Attorneys for *Amici Curiae*
                                            Former Immigration Judges and
                                            Members of the Board of Immigration Appeals

# APPENDIX A

## APPENDIX A

## BIOGRAPHIES OF AMICI CURIAE

The **Honorable Steven Abrams** served as an Immigration Judge from 1997 to 2013 at the New York, Varick Street, and Queens Wackenhut Immigration Courts in New York City. Prior to his appointment to the bench, he worked as a Special U.S. Attorney in the Eastern District of New York, and before that as District Counsel, Special Counsel for criminal litigation, and general attorney for the former INS. Judge Abrams also previously worked as assistant counsel for the State of New York Commission of Investigation, as assistant counsel for the New York State Department of Social Services Medicaid Fraud and Abuse Unit, and for the Queens County District Attorney's Office, serving first as an assistant district attorney, then as senior assistant in the Homicide Bureau.

The **Honorable Terry A. Bain** served as an Immigration Judge in the New York Immigration Court from 1994 until 2019.

The **Honorable Esmeralda Cabrera** served as an Immigration Judge from 1994 until 2005 in the New York and Newark and Elizabeth, NJ Immigration Courts.

The **Honorable Sarah M. Burr** served as a U.S. Immigration Judge in New York from 1994 and was appointed as Assistant Chief Immigration Judge ("ACIJ") in charge of the New York, Fishkill, Ulster, Bedford Hills and Varick Street immigration courts in 2006. She served as an ACIJ until January 2011, when she returned to the bench full-time until she retired in 2012. Prior to her appointment, she worked as a staff attorney for the Criminal Defense Division of the Legal Aid Society in its trial and appeals bureaus and also as the supervising attorney in its immigration unit. She currently serves on the Board of Directors of the Immigrant Justice Corps.

The **Honorable Teofilo Chapa** served as an Immigration Judge in Miami, Florida from

1995 until 2018.

The **Honorable Jeffrey S. Chase** served as an Immigration Judge in New York City from 1995 to 2007 and was an attorney advisor and senior legal advisor at the Board from 2007 to 2017. He is presently in private practice as an independent consultant on immigration law, and is of counsel to the law firm of DiRaimondo & Masi in New York City. Prior to his appointment, he was a sole practitioner and volunteer staff attorney at Human Rights First. He also was the recipient of the American Immigration Lawyers Association's annual pro bono award in 1994 and chaired AILA's Asylum Reform Task Force.

The **Honorable George T. Chew** served as an IJ in New York from 1995 to 2017. Previously, he served as a trial attorney at the INS.

The **Honorable Joan V. Churchill** served as an Immigration Judge from 1980-2005 in Washington D.C./Arlington VA, including 5 terms as a Temporary Member of the Board of Immigration Appeals.

The **Honorable Matthew D'Angelo** served as an Immigration Judge in Boston from 2003-2018.

The **Honorable Bruce J. Einhorn** served as an Immigration Judge in Los Angeles from 1990 to 2007. He now serves as an Adjunct Professor of Law at Pepperdine University School of Law in Malibu, California, and a Visiting Professor of International, Immigration, and Refugee Law at the University of Oxford, England. He is also a contributing op-ed columnist at D.C.-based newspaper, *The Hill*. He is a member of the Bars of Washington D.C., New York, Pennsylvania, and the Supreme Court of the United States.

The **Honorable Cecelia M. Espenoza** served as a Member of the Board of Immigration Appeals from 2000-2003 and in the Office of the General Counsel from 2003-2017 where she

App. 2

served as Senior Associate General Counsel, Privacy Officer, Records Officer and Senior FOIA Counsel. She is presently in private practice as an independent consultant on immigration law, and a member of the World Bank's Access to Information Appeals Board.  Prior to her EOIR appointments, she was a law professor at St. Mary's University (1997-2000) and the University of Denver College of Law (1990-1997) where she taught Immigration Law and Crimes and supervised students in the Immigration and Criminal Law Clinics. She has published several articles on Immigration Law. She is a graduate of the University of Utah and the University of Utah S.J. Quinney College of Law. She was recognized as the University of Utah Law School's Alumna of the Year in 2014 and received the Outstanding Service Award from the Colorado Chapter of the American Immigration Lawyers Association in 1997 and the Distinguished Lawyer in Public Service Award from the Utah State Bar in 1989-1990.

The **Honorable Noel Ferris** served as an Immigration Judge in New York from 1994 to 2013 and an attorney advisor to the Board from 2013 to 2016, until her retirement. Previously, she served as a Special Assistant U.S. Attorney in the Southern District of New York from 1985 to 1990 and as Chief of the Immigration Unit from 1987 to 1990.

The **Honorable James R. Fujimoto** served as an Immigration Judge in Chicago from 1990 until 2019.

The **Honorable Gilbert Gembacz** served as an Immigration Judge in Los Angeles from 1996 to 2008.  He also served a detail to Guam in 1998.  Judge Gembacz taught incoming immigration judges as part of their training at the National Judicial College for two years.  He also served for six years on the Executive Committee of the National Association for Immigration Judges, helping to negotiate the union's first contract.

The **Honorable Jennie L. Giambastiani** served as an Immigration Judge in Chicago from

App. 3

2002 until 2019.

The **Honorable John F. Gossart, Jr.** served as a U.S. Immigration Judge from 1982 until his retirement in 2013 and is the former president of the National Association of Immigration Judges. At the time of his retirement, he was the third most senior immigration judge in the United States. Judge Gossart was awarded the Attorney General Medal by then Attorney General Eric Holder. From 1975 to 1982, he served in various positions with the former Immigration Naturalization Service, including as general attorney, naturalization attorney, trial attorney, and deputy assistant commissioner for naturalization. He is also the co-author of the National Immigration Court Practice Manual, which is used by all practitioners throughout the United States in immigration court proceedings. From 1997 to 2016, Judge Gossart was an adjunct professor of law at the University of Baltimore School of Law teaching immigration law, and more recently was an adjunct professor of law at the University of Maryland School of Law also teaching immigration law. He has been a faculty member of the National Judicial College, and has guest lectured at numerous law schools, the Judicial Institute of Maryland and the former Maryland Institute for the Continuing Education of Lawyers. He is also a past board member of the Immigration Law Section of the Federal Bar Association. Judge Gossart served in the United States Army from 1967 to 1969 and is a veteran of the Vietnam War.

The **Honorable Paul Grussendorf** served as an Immigration Judge in Philadelphia and San Francisco from 1997 to 2004.

The **Honorable Miriam Hayward** is a retired Immigration Judge.  She served on the San Francisco Immigration Court from 1997 until 2018.

The **Honorable Charles M. Honeyman** served as an Immigration Judge in the Philadelphia and New York Immigration Courts from 1995 until 2020.

The **Honorable Rebecca Jamil** was appointed as an Immigration Judge by Attorney General Loretta Lynch in February 2016 and heard cases at the San Francisco Immigration Court until July 2018. From 2011 to February 2016, Judge Jamil served as assistant chief counsel for U.S. Immigration and Customs Enforcement in San Francisco. From 2006 to 2011, she served as staff attorney in the Research Unit, Ninth Circuit Court of Appeals, in San Francisco, focusing exclusively on immigration cases. Judge Jamil earned a Bachelor of Arts degree in 1998 from Stanford University and a Juris Doctor in 2006 from the University of Washington Law School. Judge Jamil is a member of the Washington State Bar, and is currently in private practice in San Francisco.

**The Honorable William P. Joyce** served as an Immigration Judge in Boston, Massachusetts. Subsequent to retiring from the bench, he has been the Managing Partner of Joyce and Associates with 1,500 active immigration cases. Prior to his appointment to the bench, he served as legal counsel to the Chief Immigration Judge. Judge Joyce also served as an Assistant U.S. Attorney for the Eastern District of Virginia, and Associate General Counsel for enforcement for INS. He is a graduate of Georgetown School of Foreign Service and Georgetown Law School.

The **Honorable Carol King** served as an Immigration Judge from 1995 to 2017 in San Francisco and was a temporary Board member for six months between 2010 and 2011. She previously practiced immigration law for ten years, both with the Law Offices of Marc Van Der Hout and in her own private practice. She also taught immigration law for five years at Golden Gate University School of Law and is currently on the faculty of the Stanford University Law School Trial Advocacy Program. Judge King now works as a Removal Defense Strategist, advising attorneys and assisting with research and writing related to complex removal defense issues.

The **Honorable Elizabeth A. Lamb** was appointed as an Immigration Judge in September

1995. She received a Bachelor of Arts degree from the College of Mt. St. Vincent in 1968, and a Juris Doctorate in 1975 from St. John's University. From 1983 to 1995, she was in private practice in New York. Judge Lamb also served as an adjunct professor at Manhattan Community College from 1990 to 1992. From 1987 to 1995, Judge Lamb served as an attorney for the Archdiocese of New York as an immigration consultant. From 1980 to 1983, she worked as senior equal employment attorney for the St. Regis Paper Company in West Mark, New York. From 1978 to 1980, Judge Lamb served as a lawyer for the New York State Division of Criminal Justice Services in New York. She is a member of the New York Bar.

The **Honorable Margaret McManus** was appointed as an Immigration Judge in 1991 and retired from the bench after twenty-seven years in January 2018. She received a Bachelor of Arts degree from the Catholic University of America in 1973, and a Juris Doctorate from Brooklyn Law School in 1983. Judge McManus was an attorney for Marion Ginsberg, Esquire from 1989 to 1990 in New York. She was in private practice in 1987 and 1990, also in New York. Judge McManus worked as a consultant to various nonprofit organizations on immigration matters including Catholic Charities and Volunteers of Legal Services from 1987 to 1988 in New York. She was an adjunct clinical law professor for City University of New York Law School from 1988 to 1989. Judge McManus served as a staff attorney for the Legal Aid Society, Immigration Unit, in New York, from 1983 to 1987. She is a member of the New York Bar.

The **Honorable Charles Pazar** was born in the Bronx, New York, and grew up in suburban New Jersey.  He earned a B.A., *magna cum laude* from Boston University and a J.D. from Rutgers University School of Law in Newark, New Jersey.  Judge Pazar served in the Drug Enforcement Administration Office of Chief Counsel and the Immigration and Naturalization Service Office of General Counsel.  He was a Senior Litigation Counsel in the Office of Immigration Litigation

App. 6

(OIL) immediately preceding his appointment as an Immigration Judge in 1998.  He served as an Immigration Judge in Memphis, Tennessee, from 1998 until his retirement in 2017.  During his tenure as an Immigration Judge, he was a panelist in conferences sponsored by the Memphis Bar Association, the Tennessee Bar Association, the Federal Bar Association Immigration Law Section, the University of Mississippi, and the Arkansas Association of Criminal Defense Attorneys.  The FBA has recognized him for his efforts to encourage pro bono representation.  The graduating students at the University of Memphis Cecil C. Humphreys School of Law voted him as graduation speaker in the May, 2017, commencement.  Judge Pazar serves as an adjunct professor of law at the University of Memphis.  He has also served as an adjunct at the University of Mississippi School of Law.  Since retirement, he has continued to teach at the University of Memphis.  He has spoken at houses of worship in Memphis and at the Bench Bar Conference of the Memphis Bar Association, and the Immigration Law Section of the Federal Bar Association. In addition to speaking, he has written articles for the *Memphis Bar Journal*, *Tennessee Bar Journal*, and *The Green Card* (FBA Immigration Law Section journal), advocating for increased pro bono participation by attorneys in the Immigration Courts.

The **Honorable Laura Ramirez** has been a member of the California Bar since 1985. She was appointed an Immigration Judge in San Francisco in 1997, where she served until her retirement from the bench on December 31, 2018.

The **Honorable John W. Richardson** served as an Immigration Judge in Phoenix, Arizona from 1990 until 2018. From 1968 to 1990, he served in the United States Army, Judge Advocate General's Corps, as a trial attorney, trial judge, regional defense counsel, legislative counsel to the Secretary of the Army, and director, Senate Affairs for the Secretary of Defense.

The **Honorable Lory D. Rosenberg** served on the Board from 1995 to 2002. She then

App. 7

served as Director of the Defending Immigrants Partnership of the National Legal Aid & Defender Association from 2002 until 2004. Prior to her appointment, she worked with the American Immigration Law Foundation from 1991 to 1995. She was also an adjunct Immigration Professor at American University Washington College of Law from 1997 to 2004. She is the founder of IDEAS Consulting and Coaching, LLC., a consulting service for immigration lawyers, and is the author of Immigration Law and Crimes. She currently works as Senior Advisor for the Immigrant Defenders Law Group.

The **Honorable Susan Roy** started her legal career as a Staff Attorney at the Board of Immigration Appeals, a position she received through the Attorney General Honors Program. She served as Assistant Chief Counsel, National Security Attorney, and Senior Attorney for the DHS Office of Chief Counsel in Newark, NJ, and then became an Immigration Judge, also in Newark. Judge Roy has been in private practice for nearly five years; two years ago, she opened her own immigration law firm. Judge Roy is the NJ AILA Chapter Liaison to EOIR, is the Vice Chair of the Immigration Law Section of the NJ State Bar Association, and in 2016 was awarded the Outstanding Pro Bono Attorney of the Year by the NJ Chapter of the Federal Bar Association.

The **Honorable Paul W. Schmidt** served as an Immigration Judge from 2003 to 2016 in Arlington, Virginia.  He previously served as Chairman of the Board of Immigration Appeals from 1995 to 2001, and as a Board Member from 2001 to 2003. He authored the landmark decision *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1995) extending asylum protection to victims of female genital mutilation. He served as Deputy General Counsel of the former INS from 1978 to 1987, serving as Acting General Counsel from 1986-87 and 1979-81. He was the managing partner of the Washington, D.C. office of Fragomen, Del Rey & Bernsen from 1993 to 1995, and practiced business immigration law with the Washington, D.C. office of Jones, Day, Reavis and Pogue from

1987 to 1992, where he was a partner from 1990 to 1992.  He served as an adjunct professor of law at George Mason University School of Law in 1989, and at Georgetown University Law Center from 2012 to 2014 and 2017 to present. He was a founding member of the International Association of Refugee Law Judges (IARLJ), which he presently serves as Americas Vice President.  He also serves on the Advisory Board of AYUDA, and assists the National Immigrant Justice Center/Heartland Alliance on various projects; and writes and lectures at various forums throughout the country on immigration law topics. He also created the immigration law blog immigrationcourtside.com.

The **Honorable Patricia M.B. Sheppard** served as an Immigration Judge from 1993 until 2006 in the Boston Immigration Court.

The **Honorable Ilyce S. Shugall** served as an Immigration Judge from 2017 until 2019 in the San Francisco Immigration Court.

The **Honorable Helen Sichel** served as an Immigration Judge from 1997 until 2020 in the New York Immigration Court.

The **Honorable Denise Slavin** served as an Immigration Judge from 1995 until 2019 in the Miami, Krome Processing Center, and Baltimore Immigration Courts.

The **Honorable Andrea Hawkins Sloan** was appointed an Immigration Judge in 2010 following a career in administrative law.  She served on the bench of the Portland Immigration Court until 2017.

The **Honorable William Van Wyke** served as an Immigration Judge from 1995 until 2015 in New York City and York, PA.

The **Honorable Gustavo D. Villageliu** served as a Board of Immigration Appeals Member from July 1995 to April 2003. He then served as Senior Associate General Counsel for EOIR until

App. 9

he retired in 2011, helping manage FOIA, privacy and security as EOIR Records Manager. Before becoming a Board Member, Judge Villageliu was an Immigration Judge in Miami, with both detained and non-detained dockets, as well as the Florida Northern Region Institutional Criminal Alien Hearing Docket 1990-95. Judge Villageliu was a member of the Iowa, Florida and District of Columbia Bars. He graduated from the University of Iowa College of Law in 1977. After working as a Johnson County Attorney prosecutor intern in Iowa City, Iowa he joined the Board as a staff attorney in January 1978, specializing in war criminal, investor, and criminal alien cases.

The **Honorable Polly A. Webber** served as an Immigration Judge from 1995 to 2016 in San Francisco, with details in facilities in Tacoma, Port Isabel, Boise, Houston, Atlanta, Philadelphia, and Orlando. Previously, she practiced immigration law from 1980 to 1995 in her own private practice in San Jose. She was a national officer in AILA from 1985 to 1991 and served as National President of AILA from 1989 to 1990. She has also taught immigration and nationality law at both Santa Clara University School of Law and Lincoln Law School.

The **Honorable Robert D. Weisel** served as an Immigration Judge in the New York Immigration Court from 1989 until his retirement at the end of 2016. Judge Weisel was an Assistant Chief Immigration Judge, supervising court operations both in New York City and New Jersey. He was also in charge of the nationwide Immigration Court mentoring program for both Immigration Judges and Judicial Law Clerks. During his tenure as Assistant Chief Immigration Judge, the New York court initiated the first assigned counsel system within the Immigration Court's nationwide Institutional Hearing Program.