# ATTACHMENT 1

MICHAEL FEUER (S.B. #111529)
 *Los Angeles City Attorney*
MICHAEL DUNDAS (S.B. #226930)
DANIELLE GOLDSTEIN (S.B. # 257486)
200 N. Main Street, 8th Floor
Los Angeles, California 90012
Telephone: (213) 978-8130
mike.dundas@lacity.org
*Attorneys for Amicus Curiae*
*City of Los Angeles*

*(additional counsel for*
*amici curiae listed at end)*

JAMES E. JOHNSON
*Corporation Counsel*
*of the City of New York*
RICHARD DEARING*
DEVIN SLACK*
PHILIP W. YOUNG*
New York City Law Department
100 Church Street
New York, New York 10007
Telephone: (212) 356-2500
phyoung@law.nyc.gov
*Attorneys for Amicus Curiae*
*City of New York*

*\* Not admitted to practice*
 *in this jurisdiction*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

PANGEA LEGAL SERVICES;
DOLORES STREET COMMUNITY SERVICES,
INC.; CATHOLIC LEGAL IMMIGRATION
NETWORK, INC.; AND CAPITAL AREA
IMMIGRANTS' RIGHTS COALITION,

    Plaintiffs,

    v.

U.S. DEPARTMENT OF HOMELAND
SECURITY; CHAD F. WOLF, *under the title of*
*Acting Secretary of Homeland Security*;
KENNETH T. CUCCINELLI, *under the title of*
*Senior Official Performing the Duties of the*
*Deputy Secretary for the Department of*
*Homeland Security*; U.S. CITIZENSHIP &
IMMIGRATION SERVICES; U.S. IMMIGRATION
AND CUSTOMS ENFORCEMENT; TONY H.
PHAM, *under the title of Senior Official*
*Performing the Duties of the Director of*
*U.S. Immigration and Customs*
*Enforcement*; U.S. CUSTOMS AND BORDER
PROTECTION; MARK A. MORGAN, *under the*
*title of Senior Official Performing the Duties*
*of the Commissioner of U.S. Customs and*
*Border Protection*; U.S. DEPARTMENT OF
JUSTICE; WILLIAM P. BARR, *under the title*
*of U.S. Attorney General*; EXECUTIVE
OFFICE FOR IMMIGRATION REVIEW; and
JAMES MCHENRY, *under the title of Director*

Case No. 3:20-cv-09253-JD

**[PROPOSED] BRIEF FOR SEVENTEEN
LOCAL GOVERNMENTS AS AMICI
CURIAE IN SUPPORT OF PLAINTIFFS'
PRELIMINARY INJUNCTION MOTION**

Assigned to Hon. James Donato

Date:   January 7, 2021
Time:   10:00 a.m.

[PROPOSED] LOCAL GOVERNMENT AMICI BRIEF
IN SUPP. OF PRELIM. INJ.

No. 3:20-cv-09253-JD

*of the Executive Office for Immigration* )
*Review,*                                  )
                                           )
                                 Defendants. )

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................... **Error! Bookmark not defined.**

STATEMENT OF INTEREST  AND SUMMARY OF ARGUMENT ...................................... 1

ARGUMENT ............................................................................................................... 3

    I.    The Trump Administration's punitive new asylum rule threatens to deny access to stable immigration status—and a path towards citizenship—for tens of thousands of immigrants living in American cities and counties.................................................... 3

    II.   Lack of stable immigration status will lead to negative economic and social outcomes for thousands of immigrants living in the amici cities and counties........................................ 5

    III.  Worse socioeconomic outcomes for immigrants will cause long-term harm to the amici cities and counties. ......................................................................................................... 10

CONCLUSION ............................................................................................................ 14

i

## TABLE OF AUTHORITIES

**Page(s)**

**Rules and Regulations**

8 C.F.R. § 208.7(a)(1)(i) ................................................................................................ 5

8 C.F.R. § 1003.102(j)(1)............................................................................................... 4

85 Fed. Reg. 80,274 (Dec. 11, 2020) ........................................................................... 1

**Other Authorities**

Abby Budiman, *Key Findings About U.S. Immigrants*, PEW RESEARCH CENTER
    (Aug. 20, 2020), https://perma.cc/AS9B-AVLB ..................................................... 3

Brian J. McCabe, *Are Homeowners Better Citizens? Homeownership and
    Community Participation in the United States*, 91 SOCIAL FORCES 929
    (2013), https://perma.cc/X22S-BUFD. ................................................................. 10

Cities Index, New American Economy (2020), https://perma.cc/H4VV-ZM9J. ......................... 6

City of New York, Comment Letter on Proposed Rule entitled "Procedures for
    Asylum and Withholding of Removal; Credible Fear and Reasonable Fear
    Review," 4 (July 15, 2020), *available at* https://perma.cc/U9GU-QRZV...................... 4, 13

Claudia Boyd-Barrett, *Fear Pushes More Immigrants to Avoid Seeking Medical
    Care*, CALIFORNIA HEALTH REPORT (Feb. 5, 2018), https://perma.cc/ZXG5-
    KN52.................................................................................................................. 6

Dan Kosten, *Immigrants as Economic Contributors: Immigrant Tax
    Contributions and Spending Power*, NATIONAL IMMIGRATION FORUM (Sept.
    6, 2018), https://perma.cc/LJ43-TX7N. ............................................................... 10

David Zahniser, *L.A.'s Budge Crisis Worsens as Deficit Projections Climb to
    $600 Million*, L.A. Times (Oct. 23, 2020),
    https://www.latimes.com/california/story/2020-10-23/la-budget-crisis-600-
    million-deficit .................................................................................................. 12

Department of Homeland Security, *Annual Flow Report* (Sept. 2020),
    https://perma.cc/9FJP-MCJB ............................................................................. 3

Eileen D. McConnell, *Who Has Housing Affordability Problems? Disparities in
    Housing Cost burden by Race, Nativity and Legal Status in Los Angeles*,
    5(3) RACE SOC PROBL. 173 (Sept. 2013), https://perma.cc/89FC-DLAH ............................ 7

Grace Del Vecchio et al., *Chicago's Budge Crisis, Explained*, CITY BUREAU
    (Oct. 16, 2020), https://perma.cc/DR65-6J57 ..................................................... 12

ii

HUMAN RIGHTS FIRST, *Grant Rates Plummet as Trump Administration Dismantles U.S. Asylum System, Blocks and Deports Refugees*, 1 (June 2020), https://perma.cc/V2UG-4KVE ................................................................. 10

James R. McHenry III, EOIR Director, *Guidance Regarding New Regulations Governing Procedures for Asylum and Withholding of Removal and Credible Fear and Reasonable Fear Reviews* (Dec. 11, 2020), https://perma.cc/25KX-SWNT ................................................................. 4

Kaiser Family Foundation, *Health Coverage of Immigrants* (Mar. 18, 2020), https://perma.cc/S2FE-ZY56 ................................................................. 6

Laurie C. Heffron, *Central American Women Fleeing Violence Experience More Trauma After Seeking Asylum*, THE CONVERSATION (Apr. 25, 2019) https://perma.cc/7VLE-68XH ................................................................. 9

Madeline Buiano & Susan Ferriss, *Data Defies Trump's Claims that Refugees and Asylees Burden Taxpayers*, THE CENTER FOR PUBLIC INTEGRITY (May 8, 2019), https://perma.cc/96GR-H8JG ................................................................. 11

Madeleine Sumption & Sarah Flamm, *The Economic Value of Citizenship for Immigrants in the United States*, MIGRATION POLICY INSTITUTE (Sept. 2012), https://perma.cc/29BF-LUST ................................................................. 5, 8

Manuel Pastor & Justin Scoggins, *Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy*, CENTER FOR THE STUDY OF IMMIGRANT INTEGRATION, UNIVERSITY OF SOUTHERN CALIFORNIA (Dec. 2012), https://perma.cc/PB5N-EEZ9 ................................................................. 5, 8, 11

Maria E. Enchautegui & Linda Giannarelli, *The Economic Impact of Naturalization on Immigrants and Cities*, THE URBAN INSTITUTE (Dec. 2015), https://perma.cc/UCH2-H8HZ ................................................................. 7

Mary Williams Walsh, *With Washington Deadlocked on Aid, States Face Dire Fiscal Crises*, N.Y. TIMES (Sept. 7, 2020), https://perma.cc/83JF-SZQQ ................................................................. 12

NEW AMERICAN ECONOMY RESEARCH FUND, *New Data Shows Immigrant-Owned Businesses Employed 8 Million Americans; Immigrants Wield $1.1 Trillion in Spending Power*, (Mar. 12, 2019), https://perma.cc/9GPK-GXPJ ................................................................. 10

New York City Mayor's Office of Immigrant Affairs, *State of Our Immigrant City*, 31 (2019) https://perma.cc/5BVX-T7X6 ................................................................. 6, 7, 8

New York City Office of Civil Justice, *2019 Annual Report* https://perma.cc/2ZTS-7YVC ................................................................. 13

New York State Department of Labor, *NYS Economy Added 36,300 Private Sector Jobs in November 2020, Marking 7th Straight Month of Gains* (Dec. 17, 2020), https://perma.cc/KHJ4-J9SA ................................................................. 9

iii

[PROPOSED] LOCAL GOVERNMENT AMICI BRIEF IN SUPP. OF PRELIM. INJ.

No. 3:20-cv-09253-JD

NYC Health & Hospitals Corporation, *Commission on Health Care for Our Neighborhoods Issue Brief: Sustaining the Safety Net* (Mar. 2017), https://perma.cc/J7E5-NNKX ................................................................................. 11

Office of the New York City Comptroller, *Comments on New York City's Fiscal Year 2021 Adopted Budget*, 23 (Aug. 3, 2020), https://perma.cc/ZH6L-NQZL ................................................................................................................. 12

Oren M. Levin-Waldman, *Income Inequality and Disparities in Civic Participation in the New York City Metro Area*, 15 REG'L LABOR REV. 2 (2012), https://perma.cc/9LVP-ZTP2 .................................................................... 10

Peter Vandor & Nikolaus Franke, *Why are Immigrants More Entrepreneurial?*, HARVARD BUSINESS REVIEW (Oct. 27, 2016), https://perma.cc/N6LF-7JR8 ...................... 10

Robert Lynch & Patrick Oakford, *The Economic Effects of Granting Legal Status and Citizenship to Undocumented Immigrants*, CENTER FOR AMERICAN PROGRESS (Mar. 20, 2013), https://perma.cc/PAT2-H44G ...................... 7, 8, 11

Seattle Office of Immigrant and Refugee Affairs, Comment Letter on Proposed Rule entitled "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review" (July 15, 2020), *available at* https://perma.cc/SPA4-FSVW ................................................................................. 12

*Stress & Trauma Toolkit for Treating Undocumented Immigrants in a Changing Political and Social Environment*, AMERICAN PSYCHIATRIC ASSOCIATION, https://perma.cc/E29Y-YEVS ................................................................................... 9

Tom K. Wong et al., *The Impact of Interior Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants*, U.S. IMMIGRATION POLICY CENTER, UC SAN DIEGO (Apr. 3, 2019), https://perma.cc/HD4Z-QZHF ........................................................................................................................... 6

The Transactional Records Access Clearinghouse ("TRAC") Immigration Project, *Asylum Decisions by Custody, Representation, Nationality, Location, Month and Year, Outcome and more* (2020), https://perma.cc/S372-Q3GF .................................................................................. 3

U.S. Citizenship and Immigration Services, *Public Charge*, (Sept. 2020), https://perma.cc/UGF2-Y96J ................................................................................... 6

U.S. Citizenship and Immigration Services, *USCIS Welcomes Refugees and Asylees*, 4-5 (Nov. 2019), https://perma.cc/KL7J-U4AJ ...................................... 5

iv

## STATEMENT OF INTEREST
## AND SUMMARY OF ARGUMENT

In the waning days of the Trump Administration, the Department of Justice and the Department of Homeland Security have fast-tracked a complete re-write of the regulations governing applications for asylum in the United States through a new rule scheduled to take effect on January 11, 2021: Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80,274 (Dec. 11, 2020). If allowed to go into effect, the challenged rule would fundamentally reshape the asylum process by redefining key aspects of the substantive requirements for asylum, restricting applicants' procedural rights, and penalizing applicants for good faith mistakes. The end result would be to drastically reduce the number of people who are entitled to shelter in this country from persecution and violence. It is yet another example of this Administration's sustained effort to make the United States a hostile place for immigrants to the detriment of everyone in our communities.

Amici curiae are seventeen cities and counties, many with large immigrant populations. Amici agree with the arguments made in plaintiffs' complaint and motion for a preliminary injunction, temporary restraining order, and order to show cause, that the challenged rule is contrary to law because it so narrows the availability of asylum and related forms of relief that the United States will cease to provide humanitarian protections required under the Refugee Act of 1980 and the United Nations Convention Against Torture. Rendering the right to asylum illusory, it establishes new de facto bars to asylum eligibility and redefines many aspects of asylum law in a way that violates the United States Constitution, the Immigration and Nationality Act, federal case law, and international treaty obligations. The rule is also procedurally invalid because the government offered only a truncated and perfunctory notice and comment period, and because the rule relies on the purported authority of an official whose appointment violated the Federal Vacancies Reform Act and the Appointments Clause.

However, this amicus brief focuses not on the clear unlawfulness of the rule, but rather its practical effects. All of the undersigned cities and counties have a powerful interest in ensuring that immigrants who arrive in their locality after fleeing violence and persecution

1

abroad have a fair chance to obtain the substantial protections that asylum status offers. At its core, asylum reflects a common international obligation to protect the global community's most vulnerable populations from government-countenanced persecution and violence. Amici are committed to upholding that moral obligation. But asylum does more than that: it also provides economic and social stability and a path towards full citizenship. A wealth of research—governmental and academic—has consistently shown that ensuring stable immigration status leads to better long-term socioeconomic outcomes. Immigrants who are able to naturalize have higher earnings, higher employment rates, and higher homeownership rates. They also develop higher levels of civic engagement, stronger ties with their community, and a deeper sense of belonging.

It goes without saying that the amici cities and counties directly benefit from those gains through increased tax revenue, decreased public benefits expenditures, and more stable and engaged communities. But the challenged rule abruptly shuts the door to asylum protections for thousands of vulnerable immigrants, making it much more difficult for those immigrants to obtain stable immigration status. The amici cities and counties will be harmed by that outcome—from both an economic and social perspective. Immigrants who lack legal status will find it harder to pursue the kinds of education and well-paying jobs that generate increased tax revenue. It will be more difficult for them to integrate into their local communities and participate in civic life. And they will have to rely more heavily on public benefits and services provided by cities and counties—stretching local governments thin in the midst of unprecedented budgetary crises.

If this rule takes effect, thousands of immigrants will lose access not just to protection from persecution and violence, but also an essential path to economic security and mobility. Because the challenged rule is unlawful and fails to account for the ways in which it will harm America's cities and counties, this Court should grant plaintiffs' motion for a preliminary injunction, temporary restraining order, and order to show cause.

2

[PROPOSED] LOCAL GOVERNMENT AMICI BRIEF
IN SUPP. OF PRELIM. INJ.

No. 3:20-cv-09253-JD

**ARGUMENT**

I.   **The Trump Administration's punitive new asylum rule threatens to deny access to stable immigration status—and a path towards citizenship—for tens of thousands of immigrants living in American cities and counties.**

Every year tens of thousands of immigrants flee persecution and violence in their home countries and apply for asylum in the United States. In fiscal year 2019, close to 50,000 people were granted asylum protection, either affirmatively by U.S. Citizenship and Immigration Services ("USCIS") asylum officers or defensively in deportation proceedings in immigration court.[1] Like all immigrants, people who may be eligible for asylum are heavily concentrated in America's largest metropolitan areas.[2] For example, the immigration courts in New York City, Los Angeles, San Francisco, and Miami alone account for almost 40% of the asylum decisions rendered by immigration courts in fiscal year 2019.[3] New York City's immigration court was the busiest by far, with nearly 10,000 asylum cases and over 5,000 asylum grants.[4] And those statistics don't include the thousands of additional affirmative asylum applications that are resolved by USCIS asylum officers.

The challenged rule is the culmination of this Administration's repeated attacks on the asylum system over the past three years. It is designed to achieve one goal—the near-total elimination of asylum protections for thousands of eligible immigrants. The rule touches on almost all aspects of asylum law, both substantive and procedural. It seeks to redefine key elements of asylum eligibility, including the concept of persecution itself and the protected grounds for demonstrating persecution, resulting in the near total denial of asylum to LGBTQ+

---

[1] Department of Homeland Security, *Annual Flow Report*, 1 (Sept. 2020), https://perma.cc/9FJP-MCJB.

[2] *See* Abby Budiman, *Key Findings About U.S. Immigrants*, PEW RESEARCH CENTER (Aug. 20, 2020), https://perma.cc/AS9B-AVLB (noting that 64% of the nation's foreign born population live in just 20 major metropolitan areas, including most of the nation's undocumented immigrant population).

[3] The Transactional Records Access Clearinghouse ("TRAC") Immigration Project, *Asylum Decisions by Custody, Representation, Nationality, Location, Month and Year, Outcome and more* (2020), https://perma.cc/S372-Q3GF.

[4] *Id.*

3

individuals and survivors of gender-based violence. Further, it robs asylum seekers of due process by giving executive officers unilateral power to deny hearings, creating a slew of discretionary factors designed to deny the vast majority of applications, and making it much more difficult to apply for other forms of relief.

To take just one example, the rule makes it much easier for adjudicators to deem applications "frivolous," a finding which carries the enormous penalty of barring any other future immigration relief. The rule revises the definition of a "frivolous" asylum application to include any application that "is filed without regard to the merits of the claim" or "foreclosed by applicable law."[5] But given the complex and ever-evolving nature of asylum law—and the fact that many asylum seekers file their initial application *pro se*—it is unreasonable to expect uncounseled and non-English-speaking applicants to perfectly demonstrate the merits of their legal claim on the first try.[6] The new definition of "frivolous" applications also cannot easily be squared with existing regulations that explicitly condone the filing of applications, motions, and other documents that make "a good faith argument for the extension, modification, or reversal of existing law or the establishment of new law."[7] The chilling effect of these provisions will deter applicants from bringing good faith and potentially meritorious claims that seek to overturn or limit unfavorable precedent.

In short, the challenged rule will severely hamstring asylum applicants' ability to effectively present their cases in fair proceedings. And the end result is clear: thousands of our most vulnerable residents will be denied access to the relief that they are entitled to. Without the ability to obtain asylum relief—and be placed on a path towards naturalization—these

---

[5] James R. McHenry III, EOIR Director, *Guidance Regarding New Regulations Governing Procedures for Asylum and Withholding of Removal and Credible Fear and Reasonable Fear Reviews*, 3 (Dec. 11, 2020), https://perma.cc/25KX-SWNT.

[6] City of New York, Comment Letter on Proposed Rule entitled "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review," 4 (July 15, 2020), *available at* https://perma.cc/U9GU-QRZV (hereinafter "NYC Comment").

[7] 8 C.F.R. § 1003.102(j)(1).

4

immigrants will face the risk of deportation and the threat of resumed persecution, violence, and even death in their home countries. They will also suffer economically and socially, and the amici cities and counties will suffer with them.

## II. Lack of stable immigration status will lead to negative economic and social outcomes for thousands of immigrants living in the amici cities and counties.

One of asylum's many benefits is that it provides a pathway to legal status and citizenship. Asylum applicants can obtain work authorization status while their applications are pending.[8] And a year after asylum is granted, asylees and their qualifying family members can apply for lawful permanent resident status.[9] Four years after that, asylees can apply for naturalization.[10] Thus, a successful asylum application can be truly life-changing. In addition to providing immediate security from the risk of deportation and persecution, it can also provide asylees with the long-term benefits of successful integration into American society.

Obtaining stable immigration status and a path towards citizenship provide myriad benefits for immigrants and lead to better socioeconomic outcomes across many indices. Data show that attaining legal status—especially lawful permanent resident or naturalized citizen status—is correlated with lower rates of poverty, higher health insurance coverage, greater educational attainment, more stable housing, and increased earnings.

First, take education. Naturalized citizens have higher levels of education and better language skills than noncitizens.[11] Nationwide, they are more than twice as likely to have earned a bachelor's degree as noncitizen immigrants.[12] In New York City, rates of college

---

[8] 8 C.F.R. § 208.7(a)(1)(i).

[9] U.S. Citizenship and Immigration Services, *USCIS Welcomes Refugees and Asylees*, 4-5 (Nov. 2019), https://perma.cc/KL7J-U4AJ.

[10] *Id.* at 7.

[11] Madeleine Sumption & Sarah Flamm, *The Economic Value of Citizenship for Immigrants in the United States*, MIGRATION POLICY INSTITUTE, 1 (Sept. 2012), https://perma.cc/29BF-LUST.

[12] Manuel Pastor & Justin Scoggins, *Citizen Gain: The Economic Benefits of Naturalization for Immigrants and the Economy*, CENTER FOR THE STUDY OF IMMIGRANT INTEGRATION, UNIVERSITY OF SOUTHERN CALIFORNIA, 7 (Dec. 2012), https://perma.cc/PB5N-EEZ9.

5

[PROPOSED] LOCAL GOVERNMENT AMICI BRIEF
IN SUPP. OF PRELIM. INJ.

No. 3:20-cv-09253-JD

attendance are likewise much higher for immigrants who have naturalized.[13] And New Yorkers with green cards are more likely to complete high school than undocumented immigrants.[14]

The same is true for health insurance. Noncitizens—both undocumented immigrants and those with some form of legal status—are significantly more likely to be uninsured than citizens.[15] And within that noncitizen population, the difference between having legal status and being undocumented is substantial: nearly half of all undocumented immigrants are uninsured, compared to under a quarter of immigrants with legal status.[16] In New York City, for example, only 55% of undocumented immigrants have health insurance."[17] Other cities see similar disparities in health insurance coverage.[18]

Aside from a lack of health insurance, undocumented immigrants are also less likely to use health services due to fear of deportation.[19] That is particularly concerning in the middle of a global pandemic. The federal government has itself recognized elsewhere that undocumented immigrants are less likely to seek out the "necessary medical treatment or preventive services" to protect themselves and slow the spread of COVID-19.[20] Despite this, the federal government made no attempt during the abbreviated rulemaking process here to grapple with the long-term

---

[13] New York City Mayor's Office of Immigrant Affairs, *State of Our Immigrant City*, 31 (2019), 21 https://perma.cc/5BVX-T7X6 (hereinafter "MOIA Annual Report").

[14] *Id.*

[15] Kaiser Family Foundation, *Health Coverage of Immigrants* (Mar. 18, 2020), https://perma.cc/S2FE-ZY56.

[16] *Id.*

[17] MOIA Annual Report at 22.

[18] *See generally* Cities Index, New American Economy (2020), https://perma.cc/H4VV-ZM9J.

[19] Tom K. Wong et al., *The Impact of Interior Immigration Enforcement on the Day-to-Day Behaviors of Undocumented Immigrants*, U.S. IMMIGRATION POLICY CENTER, UC SAN DIEGO, 7-8 (Apr. 3, 2019), https://perma.cc/HD4Z-QZHF; Claudia Boyd-Barrett, *Fear Pushes More Immigrants to Avoid Seeking Medical Care*, CALIFORNIA HEALTH REPORT (Feb. 5, 2018), https://perma.cc/ZXG5-KN52.

[20] U.S. Citizenship and Immigration Services, *Public Charge*, (Sept. 2020), https://perma.cc/UGF2-Y96J.

[PROPOSED] LOCAL GOVERNMENT AMICI BRIEF
IN SUPP. OF PRELIM. INJ.

No. 3:20-cv-09253-JD

public health impacts that are sure to follow from swelling the ranks of the undocumented by permanently narrowing the scope of asylum. The unavoidable—and here unexamined—fact is that fostering stable immigration status leads to better health outcomes across the board.

Similar trends exist with respect to housing and home ownership. In crowded cities like New York, undocumented immigrants are, compared to naturalized citizens, far more likely to experience overcrowding and qualify as rent-burdened—spending more than 30% of household income on rent.[21] The picture is much the same in other cities, like Los Angeles, where undocumented immigrant families "are more likely to report difficulties in paying for their housing than families headed by naturalized citizens and other legal immigrants."[22] But when immigrants are able to naturalize, the picture changes. Naturalized citizens see a more than 6% rise in their homeownership rate as compared with similarly situated noncitizens who are eligible to naturalize.[23] In cities, the jump can be even more dramatic: in Boston, those who naturalize are 33% more likely to own homes than comparable noncitizens, while in Seattle, rates for naturalized citizens are almost 20% higher than for noncitizens.[24]

Obtaining stable immigration status also leads to greater income and employment prospects. The Census Bureau's American Community Survey, for example, has found that citizens have average incomes that are 40% higher than those of noncitizen immigrants.[25] A recent study showed that naturalized citizens earn almost 10% more annually than if they remained noncitizens.[26] Incomes increase within just two years of obtaining citizenship, with

---

[21] MOIA Annual Report at 24-25.

[22] Eileen D. McConnell, *Who Has Housing Affordability Problems? Disparities in Housing Cost burden by Race, Nativity and Legal Status in Los Angeles*, 5(3) RACE SOC PROBL. 173 (Sept. 2013), https://perma.cc/89FC-DLAH.

[23] Maria E. Enchautegui & Linda Giannarelli, *The Economic Impact of Naturalization on Immigrants and Cities*, THE URBAN INSTITUTE, 2 (Dec. 2015), https://perma.cc/UCH2-H8HZ.

[24] *Id.* at 20.

[25] Robert Lynch & Patrick Oakford, *The Economic Effects of Granting Legal Status and Citizenship to Undocumented Immigrants*, CENTER FOR AMERICAN PROGRESS (Mar. 20, 2013), https://perma.cc/PAT2-H44G.

[26] Enchautegui & Giannarelli, *supra* note 23, at 15.

7

accelerated earnings growth accruing in later years.[27] A number of other studies have reached similar conclusions.[28] In short, "[p]roviding a road map to citizenship to undocumented immigrants gives them legal protections that raise their wages. It also promotes investment in the education and training of immigrants that eventually pays off in the form of higher wages and output; grants access to a broader range of higher-paying jobs; encourages labor mobility which increases the returns on the labor skills of immigrants by improving the efficiency of the labor market such that the skillsets of immigrants more closely match the jobs that they perform; and makes it more possible for immigrants to start businesses and create jobs."[29]

Enhanced employment prospects and earnings naturally lead to less poverty. Naturalized citizens are half as likely to live below the poverty line as noncitizens.[30] In New York City, immigrants have higher rates of poverty than U.S.-born New Yorkers, "despite working more hours and participating in the labor force at the same or greater rates than U.S.-born New Yorkers."[31] But those New Yorkers who have obtained lawful permanent resident status have substantially lower poverty rates than undocumented immigrants.[32] Naturalized citizens are also generally better equipped to weather economic downturns than are noncitizens. Between 2006 and 2010, for instance, noncitizen incomes fell by nearly four times the drop for naturalized citizens.[33] The greater resiliency provided by stable immigration status is especially significant now, as local economies recover from the unprecedented and sudden

---

[27] Sumption & Flamm, *supra* note 11, at 12.

[28] Pastor & Scoggins, *supra* note 12 at 9; Lynch & Oakford, *supra* note 25.

[29] Lynch & Oakford, *supra* note 25.

[30] Sumption & Flamm, *supra* note 11, at 11.

[31] MOIA Annual Report at 30.

[32] *Id.*

[33] Sumption & Flamm, *supra* note 11, at 11.

8

[PROPOSED] LOCAL GOVERNMENT AMICI BRIEF
IN SUPP. OF PRELIM. INJ.

No. 3:20-cv-09253-JD

recession brought on by the COVID-19 pandemic. With the unemployment rates in several major cities still over 10%, increased economic resiliency would be a lifeline for many.[34]

Aside from its financial impact, the challenged rule will also lead to worse social outcomes. Undocumented immigrants are subject to numerous traumas and stressors that can negatively impact mental health. Limited resources, stress from adjusting to a new environment, fear of deportation, and social stigma all combine to increase the risk of mental health disorders in the undocumented immigrant community.[35] The fear of deportation in particular "limits their use of health care and social services and prevents social integration."[36] These risks are especially pronounced for asylum seekers who are fleeing persecution. For example, many female asylum seekers—especially those coming from Central America— "experience trauma, abuse and violence before they cross the U.S. border seeking asylum."[37]

The consequences cascade over to civic life. Traumas and stressors that asylum seekers and other undocumented immigrants experience also lead to decreased participation in civic life and a reticence to use the legal system—even when they are victims.[38] But when immigrants are not curtailed in their ability to obtain stable immigration status, they have the opportunity to create stronger ties with their community through increased civic participation, more family unity, and a deeper sense of belonging. As incomes and homeownership increase,

---

[34] *See, e.g.*, New York State Department of Labor, *NYS Economy Added 36,300 Private Sector Jobs in November 2020, Marking 7th Straight Month of Gains* (Dec. 17, 2020), https://perma.cc/KHJ4-J9SA (noting 12% unemployment rate in New York City).

[35] *Stress & Trauma Toolkit for Treating Undocumented Immigrants in a Changing Political and Social Environment*, AMERICAN PSYCHIATRIC ASSOCIATION, https://perma.cc/E29Y-YEVS.

[36] *Id.*

[37] Laurie C. Heffron, *Central American Women Fleeing Violence Experience More Trauma After Seeking Asylum*, THE CONVERSATION (Apr. 25, 2019) https://perma.cc/7VLE-68XH.

[38] AMERICAN PSYCHIATRIC ASSOCIATION, supra note 35.

[PROPOSED] LOCAL GOVERNMENT AMICI BRIEF
IN SUPP. OF PRELIM. INJ.

No. 3:20-cv-09253-JD

immigrants will participate more in civic organizations and volunteer activities.[39] The amici cities and counties would all benefit from those strengthened community ties.

Even before the introduction of this rule, asylum was difficult to secure.[40] By making it that much harder to obtain asylum, the challenged rule will rob many asylum seekers of a fair chance to put their traumas behind them and fully integrate into their local communities. Instead, they will be subject to less stable living conditions and a greater risk of deportation, which will only serve to magnify the negative economic and social outcomes outlined above.

## III. Worse socioeconomic outcomes for immigrants will cause long-term harm to the amici cities and counties.

The negative socioeconomic outcomes that immigrants will face as a result of this new rule will impose serious financial burdens on America's cities and counties. Amici all benefit from the businesses that immigrants open and the taxes that they pay. Immigrants are proven job creators. They are twice as likely as native-born citizens to start businesses[41]—both small and large—and almost 8 million Americans are employed at those businesses.[42] Immigrants' "participation in the economy creates a demand for goods and services, thereby boosting job growth,"[43] and studies have consistently shown that "legal status and a road map to citizenship … bring about significant economic gains in terms of growth, earnings, tax revenues, and

---

[39] Oren M. Levin-Waldman, *Income Inequality and Disparities in Civic Participation in the New York City Metro Area*, 15 REG'L LABOR REV. 2, 28-29 (2012), https://perma.cc/9LVP-ZTP2; Brian J. McCabe, *Are Homeowners Better Citizens? Homeownership and Community Participation in the United States*, 91 SOCIAL FORCES 929, 941 (2013), https://perma.cc/X22S-BUFD.

[40] HUMAN RIGHTS FIRST, *Grant Rates Plummet as Trump Administration Dismantles U.S. Asylum System, Blocks and Deports Refugees*, 1 (June 2020), https://perma.cc/V2UG-4KVE.

[41] Peter Vandor & Nikolaus Franke, *Why are Immigrants More Entrepreneurial?*, HARVARD BUSINESS REVIEW (Oct. 27, 2016), https://perma.cc/N6LF-7JR8.

[42] NEW AMERICAN ECONOMY RESEARCH FUND, *New Data Shows Immigrant-Owned Businesses Employed 8 Million Americans; Immigrants Wield $1.1 Trillion in Spending Power*, (Mar. 12, 2019), https://perma.cc/9GPK-GXPJ.

[43] Dan Kosten, *Immigrants as Economic Contributors: Immigrant Tax Contributions and Spending Power*, NATIONAL IMMIGRATION FORUM (Sept. 6, 2018), https://perma.cc/LJ43-TX7N.

jobs."[44] The reason is clear: "legal status and citizenship enable undocumented immigrants to produce and earn significantly more than they do when they are on the economic sidelines. The resulting productivity and wage gains ripple through the economy because immigrants are not just workers—they are also consumers and taxpayers."[45]

Municipalities have a particular interest in the economic mobility and personal growth of their foreign-born residents, not only because cities are home to a disproportionate number of immigrants, but also because the aggregate economic benefits of stable legal status and naturalization translate into significant increased revenue streams through income taxes and decreased dependency on public benefits. For example, thousands of New York immigrants are restricted from qualifying for state or federally supported health insurance programs—such as Medicaid—due to their immigration status.[46] As a result, New York City spends a disproportionate amount of money delivering health care to uninsured immigrants—through the City's public hospital system and programs like NYC Care. Increased access to legal status and naturalization leads to better public health outcomes, more widespread insurance coverage, and a corresponding reduction in the financial burden on localities. But the Administration's new rule will have the opposite effect by making it even harder for already vulnerable asylum seekers to take the first step towards naturalization.

The public benefits burden that this rule forces cities and counties to shoulder is made even more onerous by the pandemic-induced recession. State and local governments across the country face unprecedented fiscal crises and are making deep cuts to public services, from

---

[44] Lynch & Oakford, *supra* note 25; *see also* Madeline Buiano & Susan Ferriss, *Data Defies Trump's Claims that Refugees and Asylees Burden Taxpayers*, THE CENTER FOR PUBLIC INTEGRITY (May 8, 2019), https://perma.cc/96GR-H8JG ("Researchers found that between 2005 and 2014, refugees and asylees here from 1980 on contributed $63 billion more to government revenues than they used in public services."); Pastor & Scoggins, *supra* note 16 at 19-20.

[45] Lynch & Oakford, *supra* note 25.

[46] NYC Health & Hospitals Corporation, *Commission on Health Care for Our Neighborhoods Issue Brief: Sustaining the Safety Net*, 8 (Mar. 2017), https://perma.cc/J7E5-NNKX.

[PROPOSED] LOCAL GOVERNMENT AMICI BRIEF
IN SUPP. OF PRELIM. INJ.

No. 3:20-cv-09253-JD

education to healthcare.[47] Chicago is facing a $1.2 billion budget gap—the largest in the city's history.[48] And Los Angeles's budget shortfall could reach $600 million by the end of the fiscal year.[49] New York City has been hit particularly hard. The pandemic has devastated the City's economy and tax revenues, requiring a 10% budget cut that approaches $10 billion—more than five times the cut that followed the 2008 financial crisis.[50] The challenged rule only exacerbates this unprecedented crisis by depriving cities and counties of the opportunity to increase the economic mobility and earning power of their immigrant population.

Aside from public benefits spending, the challenged rule also undermines investments that local governments have made in legal services organizations. For example, Seattle funds and supports the "Expanded Legal Defense Network," which provides removal defense to low-income residents of Seattle and King County, Washington.[51] The city contracts with community nonprofit partners to fund and support legal services for low-income immigrants and refugees who are in detention, or are facing removal, or are at risk of harm due to their immigration status.[52] Through that program, Seattle has provided removal defense, asylum representation, and related legal services to thousands of people.[53] Similarly, New York City has increased and enhanced access to legal assistance for immigrants—especially for

---

[47] Mary Williams Walsh, *With Washington Deadlocked on Aid, States Face Dire Fiscal Crises*, N.Y. TIMES (Sept. 7, 2020), https://perma.cc/83JF-SZQQ.

[48] Grace Del Vecchio et al., *Chicago's Budge Crisis, Explained*, CITY BUREAU (Oct. 16, 2020), https://perma.cc/DR65-6J57.

[49] David Zahniser, *L.A.'s Budge Crisis Worsens as Deficit Projections Climb to $600 Million*, L.A. Times (Oct. 23, 2020), https://www.latimes.com/california/story/2020-10-23/la-budget-crisis-600-million-deficit.

[50] Office of the New York City Comptroller, *Comments on New York City's Fiscal Year 2021 Adopted Budget*, 23 (Aug. 3, 2020), https://perma.cc/ZH6L-NQZL.

[51] Seattle Office of Immigrant and Refugee Affairs, Comment Letter on Proposed Rule entitled "Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review," 1-2 (July 15, 2020), *available at* https://perma.cc/SPA4-FSVW.

[52] *Id.* at 2.

[53] *Id.*

vulnerable asylum seekers—by investing over $50 million in a continuum of free legal service programs.[54]

The amici cities and counties make these investments because they recognize that policies and programs that assist, welcome, and integrate immigrants lead to stronger and more prosperous communities for all of our residents. But the effectiveness of such investments is diminished by the sudden dismantling of the asylum system. The challenged rule would require legal service providers to upend their case management systems and expend extensive time and resources to retrain attorneys on the arbitrary changes to asylum law.[55]

\*   \*   \*

All those facing the risk of persecution and violence—including those persecuted on account of their gender, gender identity, and sexual orientation—deserve a chance to seek protection through the asylum process. Amici are deeply concerned that this new asylum rule casts aside that principle. The result is not just inhumane and immoral—it also imposes substantial long term economic and social harms on thousands of immigrants and the cities and counties they live in. The challenged rule is illegal, harmful, and contrary to the values that amici have long championed. Amici urge this Court to grant plaintiffs' motion for a preliminary injunction, temporary restraining order, and order to show cause.

---

[54] NYC Comment at 6; New York City Office of Civil Justice, *2019 Annual Report*, 13 https://perma.cc/2ZTS-7YVC.

[55] NYC Comment at 6.

13

[PROPOSED] LOCAL GOVERNMENT AMICI BRIEF
IN SUPP. OF PRELIM. INJ.

No. 3:20-cv-09253-JD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONCLUSION**

Plaintiffs' motion for a preliminary injunction, temporary restraining order, and order to show cause should be granted.

Dated: December 31, 2020
      Los Angeles, California
                           Respectfully submitted,


By:    */s/ Michael Dundas*

        Michael Feuer
        *Los Angeles City Attorney*
        Michael Dundas, *Assistant City Attorney*
        Danielle Goldstein, *Deputy City Attorney*
        200 N. Main Street, 8th Floor
        Los Angeles, California 90012
        *Attorneys for the City of Los Angeles*

        James E. Johnson
        *Corporation Counsel*
        *of the City of New York*
        Richard Dearing*
        Devin Slack*
        Philip W. Young*
        New York City Law Department
        100 Church Street
        New York, New York 10007
        *Attorneys for the City of New York*

        * Not admitted to practice in this jurisdiction

        (additional counsel listed below)

14

**List of Additional Counsel for Amici Curiae**

Esteban A. Aguilar, Jr.
City Attorney
One Civic Plaza NW
P.O. Box 2248
Albuquerque, NM 87103
*Attorney for the City of Albuquerque*

Timothy A. Ball
Corporation Counsel
City of Buffalo
65 Niagara Square
Buffalo, New York 14202
*Attorney for the City of Buffalo*

Nancy E. Glowa, Esq.
City Solicitor
City of Cambridge
795 Massachusetts Avenue
Cambridge, Massachusetts 02139
*Attorney for the City of Cambridge*

Christopher J. Caso
City Attorney
Dallas City Attorney's Office
1500 Marilla Street 7DN
Dallas, Texas 75201
*Attorney for the City of Dallas*

Ronald C. Lewis
City Attorney
City of Houston Legal Department
900 Bagby, 4th Floor
Houston, Texas 77002
*Attorney for the City of Houston*

Peter J. Baker
Corporation Counsel
Department of Law
City of Jersey City
City Hall
280 Grove Street, 3rd Floor
Jersey City, New Jersey 07302
*Attorney for the City of Jersey City*

James R. Rowader, Jr.
City Attorney
City of Minneapolis
City Hall, Room 210
350 South Fifth Street
Minneapolis, Minnesota 55415
*Attorney for the City of Minneapolis*

Barbara J. Parker
City Attorney, City of Oakland
One Frank Ogawa Plaza, Sixth Floor
Oakland, California 94612
*Attorney for the City of Oakland*

Diana P. Cortes
Acting Philadelphia City Solicitor
City of Philadelphia
Law Department
1515 Arch Street, 17th Floor
Philadelphia, Pennsylvania 19102
*Attorney for the City of Philadelphia*

Lyndsey M. Olson
City Attorney, City of Saint Paul
400 City Hall and Court House
15 West Kellogg Boulevard
Saint Paul, Minnesota 55102
*Attorney for the City of Saint Paul*

James R. Williams
County Counsel
70 W. Hedding Street,
East Wing, 9th Floor
San Jose, California 95110
*Attorney for the County of Santa Clara*

Peter S. Holmes
Seattle City Attorney
701 Fifth Avenue, Suite 2050
Seattle, Washington 98104-7097
*Attorney for City of Seattle*

15

[PROPOSED] LOCAL GOVERNMENT AMICI BRIEF
IN SUPP. OF PRELIM. INJ.

No. 3:20-cv-09253-JD

1

Michael M. Lorge
Village of Skokie
Corporation Counsel
5127 Oakton Street
Skokie, Illinois 60077
*Attorney for the Village of Skokie*

William C. Fosbre
City Attorney
City of Tacoma
747 Market Street, Room 1120
Tacoma, Washington 98402
*Attorney for the City of Tacoma*

Michael Jenkins
City Attorney
City of West Hollywood
Best Best & Krieger, LLP
1230 Rosecrans Avenue, Ste 110
Manhattan Beach, California 90266
*Attorney for the City of West Hollywood*

16

[PROPOSED] LOCAL GOVERNMENT AMICI BRIEF
IN SUPP. OF PRELIM. INJ.

No. 3:20-cv-09253-JD

## **CERTIFICATE OF SERVICE**

I hereby certify that on the date given below, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the persons registered as CM/ECF recipients for this case.

Date: December 31, 2020                    By: */s/ Michael Dundas*

Michael Dundas
Assistant City Attorney

17