JEFFREY BOSSERT CLARK
*Acting Assistant Attorney General*
AUGUST E. FLENTJE
*Special Counsel*
DAVID M. McCONNELL
*Director*
PAPU SANDHU
*Assistant Director*
CHRISTINA P. GREER
*Senior Litigation Counsel*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8770
Email: Christina.P.Greer@usdoj.gov

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| Pangea Legal Services, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| U.S. Dept. of Homeland Security, *et al.*, | ) |
| | ) |
| Defendants. | ) |

**OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Civil Action No. 3:20-cv-09253-JD

**Hearing Scheduled:** January 7, 2021 at 10:00 a.m.

1

## TABLE OF CONTENTS

2   INTRODUCTION ...................................................................................................1

3   BACKGROUND ....................................................................................................3

4   STANDARD OF REVIEW ....................................................................................4

5   ARGUMENT .........................................................................................................4

6       I.   Plaintiffs Are Not Likely to Succeed on Their Claims. .....................................4

7            A.  Acting Secretary Wolf Had Authority to Issue the Rule. ...........................4

8            B.  The Departments Had Authority to Issue the Rule...................................6

9            C.  The Rule Is Consistent with the INA and Not Arbitrary and Capricious. .................7

10           D.  The Rule Is Procedurally Valid.................................................................14

11      II.  Considerations of Irreparable Harm and the Equities Favor the Government................16

12      III. Any Relief Must Be Sharply Limited. ............................................................17

13  CONCLUSION ......................................................................................................19

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## Cases

*Abdille v. Ashcroft,*
    242 F.3d 477 (9th Cir. 2001) ............................................................ 8, 9

*Agyeman v. INS,*
    296 F.3d 871 (9th Cir. 2002) ............................................................ 12

*Al-Fara v. Gonzales,*
    404 F.3d 733 (3d Cir. 2005) ............................................................. 7

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) ............................................................ 18, 19

*Caribbean Marine Servs. Co. v. Baldrige,*
    844 F.2d 668 (9th Cir. 1988) ............................................................ 16

*Cement Kiln Recycling Coal. v. EPA,*
    255 F.3d 855 (D.C. Cir. 2001) .......................................................... 15

*Chevron, U.S.A., Inc. v. NRDC.,*
    467 U.S. 837 (1984) ..................................................................... 2, 6, 13

*City & Cty. of San Francisco v. Trump,*
    897 F.3d 1225 (9th Cir. 2018) .......................................................... 18, 19

*City of Sausalito v. O'Neill,*
    386 F.3d 1186 (9th Cir. 2004) .......................................................... 14

*E. Bay Sanctuary Covenant v. Trump,*
    932 F.3d 742 (9th Cir. 2018) ........................................................... 6, 18, 19

*E. Bay Sanctuary Covenant v. Trump,*
    950 F.3d 1242 (9th Cir. 2020) .......................................................... 3, 18

*Envtl. Def. Ctr. v. EPA,*
    344 F.3d 832 (9th Cir. 2003) ........................................................... 16

*Garcia de Rincon v. DHS,*
    539 F.3d 1133 (9th Cir. 2009) .......................................................... 18

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) .................................................................. 18

*In re Grand Jury Investigation,*
    916 F.3d 1047 (D.C. Cir. 2019) ........................................................ 5

*Innovation Law Lab v. McAleenan,*
    924 F.3d 503 (9th Cir. 2019) ........................................................... 17

*INS v. Aguirre-Aguirre,*
    526 U.S. 415 (1999) ..................................................................... 7, 9

*INS v. Cardoza-Fonseca,*
    480 U.S. 421 (1987) ................................................................................................ 7, 10

*INS v. Stevic,*
    467 U.S. 407 (1984) ....................................................................................................... 9

*J.E.F.M. v. Lynch,*
    837 F.3d 1026 (9th Cir. 2016) ..................................................................................... 17

*Kahn v. INS,*
    36 F.3d 1412 (9th Cir. 1994) ......................................................................................... 8

*L.A. Haven Hospice, Inc. v. Sebelius,*
    638 F.3d 644 (9th Cir. 2011) ....................................................................................... 18

*Landon v. Plasencia,*
    459 U.S. 21 (1982) ...................................................................................................... 16

*Lopez v. Davis,*
    531 U.S. 230 (2001) ....................................................................................................... 8

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ..................................................................................................... 18

*Morton v. Ruiz,*
    415 U.S. 199 (1974) ....................................................................................................... 6

*Nat'l Ass'n of Mfrs. v. DHS,* — F. Supp. 3d —,
    2020 WL 5847503 (N.D. Cal. Oct. 1, 2020) ............................................................... 18

*Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.,*
    545 U.S. 967 (2005) ....................................................................................................... 8

*NWIRP v. USCIS,*
    No. 19-cv-3283, 2020 WL 5995206 (D.D.C. Oct. 8, 2020) ...................................... 4, 5

*Phillips Petroleum Co. v. EPA,*
    803 F.2d 545 (10th Cir. 1986) ..................................................................................... 14

*Ranchers Cattlemen Action Legal Fund v. USDA,*
    415 F.3d 1078 (9th Cir. 2005) ..................................................................................... 16

*Riverbend Farms, Inc. v. Madigan,*
    958 F.2d 1479 (9th Cir. 1992) ..................................................................................... 14

*Rosenberg v. Yee Chien Woo,*
    402 U.S. 49 (1971) ..................................................................................................... 8, 9

*Ryan v. United States,*
    136 U.S. 68 (1890) ......................................................................................................... 5

*Sampson v. Murray,*
    415 U.S. 61 (1974) ...................................................................................................... 17

*Shinseki v. Sanders,*
    556 U.S. 396 (2009) ..................................................................................................... 14

*Singh v. Barr*,
   982 F.3d 778 (9th Cir. 2020) .................................................................................. 18

*Smith v. Janey*,
   664 F. Supp. 2d 1 (D.D.C. 2009) ............................................................................ 11

*Sung Kil Jang v. Lynch*,
   812 F.3d 1187 (9th Cir. 2015) ............................................................................. 8, 9

*Tilija v. Att'y Gen. U.S.*,
   930 F.3d 165 (3d Cir. 2019) .................................................................................. 11

*U.S. Cellular Corp. v. FCC*,
   254 F.3d 78 (D.C. Cir. 2001) ................................................................................ 16

*US Citrus Science Council v. USDA*,
   312 F. Supp. 3d 884 (E.D. Cal. 2018) ................................................................... 15

*Va. Soc'y for Human Life v. FEC*,
   263 F.3d 379 (4th Cir. 2001) ................................................................................ 18

*Vt. Yankee Nucl. Power Corp. v. NRDC*,
   435 U.S. 519 (1978) .............................................................................................. 14

*Wash. All. of Tech. Workers v. U.S. DHS*,
   892 F.3d 332 (D.C. Cir. 2018) .............................................................................. 15

*White v. Abrams*,
   495 F.2d 724 (9th Cir. 1974) ................................................................................ 11

*Winter v. NRDC*,
   555 U.S. 7 (2008) .................................................................................................... 4

**Administrative Decisions**

*Matter of A-G-G-*,
   25 I. & N. Dec. 486 (BIA 2011) .............................................................................. 8

*Matter of D-A-C-*,
   27 I. & N. Dec. 575 (BIA 2019) ............................................................................ 10

*Matter of Pula*,
   19 I. & N. Dec. 467 (BIA 1987) ........................................................................ 9, 10

*Matter of Thomas*,
   21 I. & N. Dec. 20 (BIA 1995) .............................................................................. 10

**Federal Statutes**

5 U.S.C. § 3345 ................................................................................................................. 5

5 U.S.C. § 3345(b)(1)(B) .................................................................................................. 4

5 U.S.C. § 3346(a)(1) ................................................................................................... 5, 6

5 U.S.C. § 3346(a)(2) ....................................................................................................... 6

5 U.S.C. § 3347(a)(1) ........................................................................................................ 5

5 U.S.C. § 3349(a)(1) ........................................................................................................ 5

5 U.S.C. § 553 .................................................................................................................. 14

5 U.S.C. § 605 .................................................................................................................. 16

5 U.S.C. § 706 .................................................................................................................. 14

5 U.S.C. § 801(a)(3) ........................................................................................................ 15

5 U.S.C. § 804(2) ............................................................................................................. 15

6 U.S.C. § 113(g)(2) ...................................................................................................... 4, 6

8 U.S.C. § 1103(g) ............................................................................................................. 6

8 U.S.C. § 1103(g)(2) ........................................................................................................ 1

8 U.S.C. § 1158(a)(2)(D) ................................................................................................ 10

8 U.S.C. § 1229a(b)(4)(B) ............................................................................................... 17

8 U.S.C. § 1229a(c)(1)(A) ............................................................................................... 17

8 U.S.C. § 1229a(c)(4)(B) ............................................................................................... 17

8 U.S.C. § 1103(a)(1) .......................................................................................... 1, 6, 19

8 U.S.C. § 1103(a)(3) ........................................................................................................ 1

8 U.S.C. § 1103(g)(1) ........................................................................................................ 1

8 U.S.C. § 1158(a)(1) ...................................................................................................... 10

8 U.S.C. § 1158(b)(1)(A) .................................................................................................. 9

8 U.S.C. § 1158(b)(2)(A)(vi) ............................................................................................ 8

8 U.S.C. § 1158(d)(6) ...................................................................................................... 13

8 U.S.C. § 1225(b) ........................................................................................................... 18

8 U.S.C. § 1229a(a)(1) ..................................................................................................... 12

8 U.S.C. § 1229a(b)(4)(A) ............................................................................................... 17

8 U.S.C. § 1252(a)(5) ....................................................................................................... 17

8 U.S.C. § 1252(b)(9) ....................................................................................................... 17

8 U.S.C. § 1252(e)(3) ....................................................................................................... 18

8 U.S.C. § 1252(e)(3)(A) .................................................................................................. 18

8 U.S.C. § 601(6) ............................................................................................................. 16

8 U.S.C. § 706(2) ............................................................................................................. 18

8 U.S.C. § 805 .................................................................................................................. 15

**Federal Regulations**

8 C.F.R. § 1208.4(a)(4)(ii) ................................................................................ 10

8 C.F.R. § 1240.10(d) ...................................................................................... 12

8 C.F.R. § 1240.11(c)(3) .................................................................................. 12

8 C.F.R. § 212.5(d) ............................................................................................ 9

Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear
    Review,
    85 Fed. Reg. 36,264 (June 15, 2020) ................................................... 2, 10

Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear
    Review,
    85 Fed. Reg. 80,274 (Dec. 11, 2020) ................................................. passim

# INTRODUCTION

Plaintiffs' motion seeks to halt on a nationwide basis an important and well-supported rulemaking effort, issued jointly by the Department of Justice (DOJ) and the Department of Homeland Security (DHS) that implements critical reforms for seeking asylum and related protection in this country and provides much-needed guidance on how to interpret undefined and ambiguous terms in the Immigration and Nationality Act (INA). Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 80,274 (Dec. 11, 2020) (Rule). Although the current rulemaking effort commenced with the publication of a proposed rule in June 2020, the Rule is in actuality the latest chapter in efforts to revise the asylum regulations that began more than 20 years ago. As explained below, the Rule is within the Departments' broad authority to implement the immigration laws, is consistent with the INA, and complies with the rulemaking requirements of the Administrative Procedure Act (APA). The Court accordingly should reject Plaintiffs' sweeping request to enjoin the Rule.

Congress indisputably granted the Attorney General and Secretary of Homeland Security significant authority to implement the nation's immigration laws. The INA charges the Secretary "with the administration and enforcement of th[e INA] and all other laws relating to the immigration and naturalization of aliens" and grants the power to take all actions "necessary for carrying out" the provisions of the INA. 8 U.S.C. § 1103(a)(1). The Homeland Security Act (HSA) provides the Attorney General with "such authorities and functions under [the INA] and all other laws relating to the immigration and naturalization of aliens as were exercised by the Executive Office for Immigration Review" (EOIR) before the HSA. 8 U.S.C. § 1103(g)(1). The INA further states that the Attorney General and the Secretary "shall establish such regulations" as they determine to be "necessary" for carrying out their authorities under the INA. 8 U.S.C. § 1103(a)(3), (g)(2). And the INA provides "[t]hat determination … by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1).

The Departments have carried out their foregoing responsibilities by issuing these regulations to streamline the system for seeking asylum and related protection to "better screen out non-meritorious claims and focus limited resources on claims much more likely to be

determined to be meritorious," Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review, 85 Fed. Reg. 36,264, 36,271 (June 15, 2020) (NPRM), as well as to provide guidance and clarity on the requirements for asylum, withholding of removal, and protection under the regulations implementing the Convention Against Torture and other Cruel, Inhuman or Degrading Punishment (CAT), *id.* at 36,278, 36,281, 36,282, 36,283, 36,286. These goals are reasonable and the reforms sorely needed. As of the second quarter of 2020, the immigration court system had 1,122,697 pending cases. 85 Fed. Reg. at 80,307 n.35. And 120,495 asylum applications were filed during that same time period with the immigration court system alone. *Id.* at 80,307 n.36. But under the present system, fewer than 20 percent of asylum applications filed before an immigration judge (IJ) are granted. 85 Fed. Reg. at 80,309. This Rule seeks to streamline adjudications to better manage the immigration system in part so that meritorious claims do not get caught up in the backlog—which keeps individuals and families in limbo for years. Plaintiffs, on the other hand, ask the Court to stop the Rule from applying to anyone, despite the Rule's legitimate objectives and its rational proposals to meet those objectives, and notwithstanding that Plaintiffs are organizations that are not even regulated by it. This Court should deny that extraordinary request.

*First*, Acting Secretary Chad Wolf had authority to issue the Rule. *Contra* Mot. 5-6. *Second*, the Departments had the authority to issue the Rule, *contra* Mot. 6-9, because in addition to the express rulemaking authority delegated by Congress under 1103(a) and (g) quoted above, Congress left many gaps in the INA and also did not define many key terms, and under *Chevron, U.S.A., Inc. v. NRDC.*, 467 U.S. 837, 842-844 (1984), the Departments—and in particular the Attorney General—have the authority to fill the gaps and interpret the undefined, ambiguous terms. *Third*, Plaintiffs cannot show that the Rule is unlawful and arbitrary and capricious, Mot. 9-15, because the Departments explained the basis for the Rule and provided in-depth explanations for their interpretations, all of which withstand arbitrary-and-capriciousness review. *Fourth*, and finally, Plaintiffs cannot show that the balance of harms warrants drastic and immediate injunctive relief based on the alleged risk that these organizations may need to adapt to a new Rule. Mot. 18-20. The Executive has a paramount sovereign interest in maintaining the integrity of the United

States borders, in enforcing the immigration laws, and in ensuring that meritorious claims for asylum and protection are adjudicated expeditiously. Against those interests, Plaintiffs have not brought before this Court a single individual who claims harm. The United States and the public, by contrast, would be harmed by enjoining a Rule that aims to shore up our asylum system. Last, Plaintiffs fail to confront the reality that they have provided no basis to enjoin the Rule universally. Plaintiffs' lead arguments—on the INA and on arbitrary and capriciousness—fault only parts of the Rule; limited faults with the Rule would provide no basis to enjoin the entire Rule as to everyone. And, in any event, nationwide relief is not appropriate because the relief should be tailored to remedy the Plaintiffs' injury. Should the Court grant relief, however, it must be limited to those portions of the Rule found unlawful, as applied to Plaintiffs or their bona fide clients.[1]

## BACKGROUND

The relevant background of the law for asylum, withholding of removal, CAT protection, and expedited removal, the Acting Secretary of Homeland Security, and the Rule are set forth in Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction filed in the related case, *Immigration Equality v. DHS*, No. 4:20-cv-09258-JD (N.D. Cal. filed Dec. 21, 2020). To avoid duplication, that background is not set forth in this pleading.

On December 21, 2020, four organizations that provide services to immigrants and refugees filed this suit seeking immediate injunctive relief. Plaintiffs allege that the rule unlawfully "prevents most applicants from establishing claims for asylum, withholding of removal, and protection under the [CAT]." Compl. ¶ 1. Plaintiffs' own alleged injuries are different, however, since none of them is an alien: Plaintiffs allege that they must "divert resources" to "address the Rule" *id.* ¶ 346, "update its client database and intake process," *id.*, "analyze the new Rule" to "revise their training materials, and create new curricula," *Id.* ¶ 347, and that the Rule could mean fewer cases and less "funding." *Id.* ¶ 351-52.

Plaintiffs moved for a temporary restraining order (TRO) and preliminary injunction

---

[1] Defendants acknowledge that the Ninth Circuit in *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1267 (9th Cir. 2020) (*East Bay III*), concluded that organizations may assert standing based on diversion-of-resource harms. Defendants disagree with that decision and preserve our arguments with respect to organizational standing that *East Bay III* rejected.

preventing the rule from taking effect. *See* Mot. They argue that such relief is necessary because they are irreparably harmed by their need to divert resources to provide training on the Rule, and by their potential loss of income that might come from preparing asylum applications. Mot. 18-20.

### STANDARD OF REVIEW

For injunctive relief, Plaintiffs must show that (1) they are "likely to succeed on the merits"; (2) they will "suffer irreparable harm" absent relief; (3) "the balance of equities tips in [their] favor"; and (4) relief "is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

### ARGUMENT

**I.   Plaintiffs Are Not Likely to Succeed on Their Claims.**

**A.   Acting Secretary Wolf Had Authority to Issue the Rule.**

Acting Secretary Wolf served lawfully under the Homeland Security Act ("HSA") when this rule was promulgated. Secretary Nielsen's April 2019 order, Decl. of Juliana Blackwell ¶ 2, Ex. 1, Designation of an Order of Succession for the Secretary (April 9, 2019), established the order of succession. By its terms, the order "designate[s] the order of succession for the Secretary of Homeland Security," and expressly does so pursuant to 6 U.S.C. § 113(g)(2), the provision that authorizes the Secretary to designate an order of succession for her office.  Plaintiffs do not develop their contrary argument beyond saying this designation is inconsistent with some court decisions cited in a footnote. Mot. 5. The argument is therefore waived.

In any event, the various courts that have embraced this argument are mistaken.[2] Nielsen's order was unequivocal, stating *five times* that it was designating the "order of succession" and *three times* citing § 113(g), the statute governing order of succession. *See id.* at 1-2. As we explained in detail in our brief filed in *Immigration Equality*, the designation of McAleenan, and in turn of Wolf, was done expressly and consistent with law.[3]

---

[2] We note that one district court that studied this issue at length declined to rule on the basis of an ineffective designation by Secretary Nielsen.  *See NWIRP v. USCIS*, No. 19-cv-3283, 2020 WL 5995206, at *11 (D.D.C. Oct. 8, 2020) (Moss, J.).

[3] Plaintiffs also suggest that Wolf was barred from serving as Acting Secretary during the pendency of his nomination under the FVRA's nomination bar, 5 U.S.C. § 3345(b)(1)(B). *See* Mot. 6. But the FVRA's nomination bar does not prohibit Wolf's acting service under the HSA, because it only applies to a "person serving as an acting officer as described under section 3345."

Plaintiffs spend the bulk of their argument challenging Gaynor's succession order, which was issued in an abundance of caution given uncertainty caused by lower court rulings. But these arguments fail (and are beside the point since Gaynor never became Acting Secretary given the valid succession orders issued by Nielsen and McAleenan). First, Plaintiffs contend that DHS cannot have "two different people ... simultaneously exercise the Secretary's power." Mot. 5. But Defendants have never argued this. Rather, Defendants have always argued that either Wolf has served lawfully pursuant to the Nielson designation, or Gaynor became Acting Secretary by operation of law under the FVRA. That argument does not suggest that Wolf and Gaynor were ever "simultaneously" serving as Acting Secretary. It only demonstrates that, under either outcome, the challenged rule was validly issued.

Second, Plaintiffs argue that DHS "has not noticed a vacancy" as required by 5 U.S.C. § 3349(a)(1). Mot. 15. But the relevant vacancy under § 3349(a)(1) is the one created by Ms. Nielsen's resignation, and DHS notified Congress of that vacancy. And regardless, the FVRA does not condition acting service upon such a notification. *See* 5 U.S.C. § 3349(a)(1).

Third, relying on *NWIRP*, Plaintiffs argue that Gaynor, even if Acting Secretary, had no authority to designate a succession order under § 113(g)(2). However, *NWIRP* and Plaintiffs are wrong on this point because "an acting officer is vested with the same authority that could be exercised by the officer for whom he acts." *See In re Grand Jury Investigation*, 916 F.3d 1047, 1055 (D.C. Cir. 2019); *accord Ryan v. United States*, 136 U.S. 68, 81 (1890) ("It is equally clear that, in the absence of the secretary, the authority with which he was invested could be exercised by the officer who, under the law, became for the time acting secretary of war."). The argument that § 113(g)(2) intended to limit its power to only Senate-confirmed Secretaries because the statute distinguishes between "Secretary" and "Acting Secretary" is incorrect. Congress enacted § 113(g)(2) in view of a century of precedent that acting officials can exercise all the authority of a vacant office. *NWIRP*'s concern that an Acting Secretary could pass power to low-level officers

---

5 U.S.C. § 3346(a)(1). An official who serves under an office-specific vacancy statute—such as the HSA—does not serve under 5 U.S.C. § 3345. *See* 5 U.S.C. § 3347(a)(1) (explaining the FVRA is not the exclusive means for acting service when a vacancy arises in an office with an office-specific vacancy statute).

1   is also misplaced—Section 113(a)–(e) lists the specific "other officers" who may be designated as

2   Acting Secretary § 113(g)(2), all of whom are appointed by the President.

3        Finally, Plaintiffs contend that Gaynor was ineligible to become Acting Secretary because

4   the office had been vacant for more than 210 days.  This is incorrect.  Under the theory that the

5   Nielsen designation was invalid, Gaynor became Acting Secretary by operation of law when

6   Wolf's nomination was submitted to the Senate, and this is true even though the FVRA's initial

7   210-day time limit had lapsed.  *See* 5 U.S.C. § 3346(a)(2).  Neither § 3346(a)(2)'s text nor its

8   legislative history supports this argument. In fact, the legislative history Plaintiffs rely on simply

9   explains that § 3346(a)(1)'s initial 210-day time limit runs from the date of the vacancy and does

10  not restart with each new acting officer. *See* S. Rep. No. 105-250, at 14.

11  **B. The Departments Had Authority to Issue the Rule.**

12       Plaintiffs claim the Departments exceeded their authority to administer the INA by

13  "rewrit[ing] the immigration law[]." Mot. 6-7 (quoting *E. Bay Sanctuary Covenant v. Trump*, 932

14  F.3d 742, 774 (9th Cir. 2018) (*East Bay II*)). In addition to being a talking point rather than a legal

15  argument, Plaintiffs' assertion is based on a faulty premise—the Rule interprets the law, as the

16  Departments are charged to do expressly by Congress, including the authority to fill gaps.

17       Congress has tasked the Attorney General and the Secretary with administering the INA

18  and other laws relating to the immigration and naturalization of aliens. 8 U.S.C. § 1103(a)(1), (g).

19  Furthermore, the INA provides that "determination and ruling by the Attorney General with

20  respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1). Congress also implicitly

21  delegated many functions to the Attorney General and Secretary. It is well established that "[t]he

22  power of an administrative agency to administer a congressionally created ... program necessarily

23  requires the formulation of policy and the making of rules to fill any gap left, implicitly or

24  explicitly, by Congress." *Chevron*, 467 U.S. at 843 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231

25  (1974)). The Rule at issue here fills such gaps left by Congress.

26       Plaintiffs' claim that the Rule contravenes international law, Mot. 7, ignores that the

27  Refugee Convention and Protocol are not self-executing and the Supreme Court cases holding that

28  it is domestic law that governs. 85 Fed. Reg. at 80,376 at n.84 (citing *Al-Fara v. Gonzales*, 404

F.3d 733, 743 (3d Cir. 2005)); *see INS v. Aguirre-Aguirre*, 526 U.S. 415, 426-27 (1999); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 (1987). Plaintiffs' claims that the "sheer breadth of the Rule exposes it as an unlawful attempt at wholesale revision of the asylum laws," Mot. 7, and that the Executive is "not free to force such tectonic shifts in asylum law without clear direction from Congress," Mot. 8, ignore the fact that Congress provided such authority expressly in the INA, as explained above. Plaintiffs do not address that authority.

Plaintiffs' claim that the Rule is arbitrary and capricious because it did not weigh the costs and benefits, Mot. 8, is unavailing. First, Plaintiffs' assertions are unfocused and conclusory and thus not the sort of arguments that establish a likelihood of success. For example, Plaintiffs state generally that the Departments did not adequately consider the risk of *refoulement*, but they do not explain what aspects of the rule are problematic. And while they point to the burden of proof in withholding proceedings in support of this claim, they fail to recognize that it is well established that the withholding statute—and its higher standard—rather than discretionary asylum implements our *nonrefoulment* obligations.

Finally, Plaintiffs claim that the Departments "utterly fail[]" to explain their departure from prior policy. Mot. 9. This blanket assertion itself fails because Plaintiffs do not identify any policy change the Rule does not adequately explain in its more than 100 single-spaced, triple-columned pages of explanation.

### C. The Rule Is Consistent with the INA and Not Arbitrary and Capricious.

Plaintiffs claim that the Rule is "contrary to law and arbitrary and capricious," citing four "core provisions" as examples. Mot. 9. Plaintiffs are wrong. The four provisions cited are consistent with the INA and are neither arbitrary nor capricious. Plaintiffs' conclusory arguments and broad, unsupported assertions do not establish the contrary.

Firm Resettlement. Plaintiffs argue incorrectly that the Rule "dramatically expands the firm resettlement bar far beyond the statutory language[.]" Mot. 19. To the contrary, the Rule's provisions interpreting the INA's undefined term "firmly resettled" are eminently reasonable. The new definition provides that an alien becomes "firmly resettled" in a third country if the alien: (1) received (or could have received) permanent legal immigration status or renewable non-permanent

status in the third country; (2) voluntarily resided in the third country for a year or more without experiencing persecution; or (3) resided in a third country as a citizen. 85 Fed. Reg. at 80,388, 80,397. This is consistent with the INA.

Congress did not define the term "firmly resettled" and, instead, left the definition as a gap for the agency to fill through rulemaking. *See* 8 U.S.C. § 1158(b)(2)(A)(vi); *see, e.g.*, *Matter of A-G-G-*, 25 I. & N. Dec. 486, 495-500 (BIA 2011). Therefore, the Departments are entitled to alter the definition of the term through rulemaking, so long as the change is explained. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005); 85 Fed. Reg. at 80,365.

As the Departments reasoned, clarifying the definition of "firmly resettled" was necessary for multiple reasons, but, most importantly, because the current regulation resulted in inconsistent law and a circuit split. *See Matter of A-G-G-*, 25 I. & N. Dec. at 495-503; 85 Fed. Reg. at 80,362-366 (detailed justification for Rule); *see also* 85 Fed. Reg. at 80,363 (prior framework "contains internal tension, is in tension with other regulations regarding the parties' burdens, [and] introduces ambiguous [burden of proof] concepts). Congress intends for the INA to be applied uniformly and rulemaking is a fair and efficient method of ensuring the uniform application of the INA. *See Kahn v. INS*, 36 F.3d 1412, 1414 (9th Cir. 1994); 85 Fed. Reg. at 80,363 (citing *Lopez v. Davis*, 531 U.S. 230, 244 (2001)).

The Rule builds on a very well-established meaning for "firmly resettled" that dates back to the 1940s. *See Abdille v. Ashcroft*, 242 F.3d 477, 483 n.4 (9th Cir. 2001) (explaining the history of the term); *Matter of A-G-G-*, 25 I. & N. Dec. at 489-94 (same). As the Supreme Court and the Ninth Circuit have held, firm resettlement has not historically been conditioned on the status given to individuals in third countries and, instead, the inquiry had been focused on whether the individuals "found shelter in another nation and had begun to build new lives." *Rosenberg v. Yee Chien Woo*, 402 U.S. 49, 56 (1971); *see Sung Kil Jang v. Lynch*, 812 F.3d 1187, 1190 (9th Cir. 2015) (the purpose of asylum "is not to provide applicants with a broader choice of safe homelands, but rather, to protect refugees with nowhere else to turn"). Because the Supreme Court's 1971 *Yee Chien Woo* decision was issued long prior to Congress's enactment of the firm resettlement bar on asylum in 1996, Plaintiffs' argument that the Rule violates the plain language of the statute lacks

merit. *See Abdille*, 242 F.3d at 483 n.4; Mot. 10.

Further, the Departments provided data to support their reasoning that firm resettlement may be more available in other countries today than in the past. *See* 85 Fed. Reg. at 80,282 n.10, 80,364. Plaintiffs contest the Departments' reliance on that data because those countries might not necessarily be granting asylum at high rates, Mot. 10, but even the original meaning of firm resettlement did not necessarily hinge on a grant of asylum or permanent status (indeed, in many countries, asylum is not permanent—in the United States it is not permanent but provides a pathway to permanent residence). *See Yee Chien Woo*, 402 U.S. at 56-57; *see also Sung Kil Jang*, 812 F.3d at 1190. And, regardless, because issues of firm resettlement implicate sensitive foreign policy issues involving shared global responsibility for refugee protection, foreign law, and foreign countries' practices in permitting refugees to reside within their borders, this Court should accord the Departments extra deference on their foreign policy-based rationale. *See Aguirre-Aguirre*, 526 U.S. at 424-25.

Discretionary Factors. Plaintiffs are equally misguided arguing that the Rule's discretion provision "means that the vast majority of applicants will be barred" from asylum; in particular, they identify four factors they believe, incorrectly, to be contrary to the INA. Mot. 10-12. The Rule simply sets forth a variety of discretionary factors for consideration before granting asylum, 85 Fed. Reg. at 80,387-88, 80,396-97, such as the alien's use of fraudulent documents to enter the United States when not in immediate flight from persecution, failing to apply for protection in a third country through which the alien traveled, and the denial of two or more prior asylum applications. These discretionary factors are not unlawful or contrary to the INA. Asylum is a discretionary form of relief. 8 U.S.C. § 1158(b)(1)(A); *INS v. Stevic*, 467 U.S. 407, 423 n.18 (1984) (meeting the refugee definition does not guarantee asylum). It is entirely appropriate for the Attorney General by regulation to identify factors to consider in the exercise of this discretion, just as the Board has done through adjudication. *See Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987). Although it is common to identify factors to consider in exercising discretion under the INA, *see e.g.*, 8 C.F.R. § 212.5(d), before this Rule the Departments had not issued regulations setting forth

factors for adjudicators when exercising discretion for asylum, *see* 85 Fed. Reg. at 36,283.[4] Limited guidance was provided in *Pula*, where the Board set forth a lengthy list of possible relevant factors. *Id.* at 473-75. The Rule's approach—requiring consideration of three factors as significantly adverse and nine others as adverse—builds upon the considerations provided in *Pula*. 85 Fed. Reg. at 80,341. Under the Rule, any of these factors can be overcome depending on other facts and circumstances presented. *Id.* at 80,388, 80,397. In turn, the rule expressly superseded *Pula*'s contrary statement that in practice discouraged the application of any discretionary factors. *See id.* at 36,285, 80,342 (superseding *Pula*'s statement that "the danger of persecution should generally outweigh all but the most egregious of adverse factors").

As to the four specific provisions Plaintiffs challenge, none shows that the Rule is contrary to law or arbitrary and capricious. First, the factors relating to travel through other countries without applying for protection in those countries reflect a "lack of urgency" on the part of the applicant that the Departments find important in light of the growing number of asylum applications—213,798 in FY2019—which slow down the process for those who urgently need protection. 85 Fed. Reg. at 80,351. Contrary to Plaintiffs' claim, discretionary factors need not relate to "the validity of [a noncitizen's] claim for asylum." Mot. 11; *See Cardoza-Fonseca*, 480 U.S. at 443; *Matter of D-A-C-*, 27 I. & N. Dec. 575, 578 (BIA 2019) ("The ultimate consideration when balancing factors in the exercise of discretion is to determine whether a grant of relief, or in this case protection, appears to be in the best interest of the United States."). Second, whether an alien has a criminal conviction has long been a discretionary consideration. *See Matter of Thomas*, 21 I. & N. Dec. 20, 23-24 (BIA 1995) (collecting cases). Third, consideration of the filing of a reopening motion more than a year after a change in circumstances is consistent with the statute, which requires that an asylum application be filed within one year of entry unless circumstances materially changed, 8 U.S.C. § 1158(a)(1), (a)(2)(D), and the alien must still file "within a reasonable period," 8 C.F.R. § 1208.4(a)(4)(ii); given that the INA already provides a one-year deadline for newly arrived applicants, considering delay as a discretionary factor is consistent with

---

[4] DHS had regulations setting forth several reasons for discretionary referral of asylum applications to EOIR or for denial, 8 C.F.R. § 208.13(b)(1)(i), but the Departments had never issued joint regulations on the subject.

the INA. *Contra* Mot. 11. Fourth, and finally, considering whether someone has remained in the United States unlawfully for a year prior to filing an application for asylum as one of many factors when considering whether discretion is warranted is consistent with the statute—as already stated, the INA includes its own one-year filing deadline. *See* 85 Fed. Reg. at 80,355. *Contra* Mot. 11.

<u>Pretermission</u>. Plaintiffs are similarly incorrect in asserting that the pretermission provision is "contrary to law and arbitrary and capricious." Mot. 12. The Rule directs IJs to deny applications that do not establish "a prima facie claim for relief or protection under applicable law." 85 Fed. Reg. at 80,397. It permits this decision to be made without a hearing and may be made either in response to a motion by DHS or on the IJ's own authority. *Id.* In either case, the applicant is given an opportunity to be heard on the issue and respond prior to dismissal. *Id.* Further, the IJ must consider any responsive filings made by the applicant before making a decision to pretermit. These provisions are neither contrary to the INA, nor an abuse of agency discretion. *Id.*

The ability to pretermit legally insufficient applications for asylum and related protection provides IJs with a more efficient means to adjudicate those claims, just like federal courts routinely dismiss claims that lack a legal basis. Indeed, this process is well established in the law. A prima facie case or claim "is one which, if unrebutted, tends to establish the disputed fact." *Smith v. Janey*, 664 F. Supp. 2d 1, 13 (D.D.C. 2009). A prima facie claim represents the amount of evidence "necessary to require [the opposing party] to proceed with his case." *White v. Abrams*, 495 F.2d 724, 729 (9th Cir. 1974). To establish a prima facie claim in the immigration context, the alien "must produce objective evidence that, when considered together with the evidence of record, shows a reasonable likelihood that he is entitled to asylum relief." *Tilija v. Att'y Gen. U.S.*, 930 F.3d 165, 171 (3d Cir. 2019) (quotation omitted).

The Rule only permits dismissal if the asylum request has no legal basis, akin to dismissal as a matter of law or summary judgment. "[A]n [IJ] may only pretermit an application that is legally deficient." 85 Fed. Reg. at 80,306. Therefore, the Rule will not, as Plaintiffs assert, prevent aliens from presenting facts that can establish asylum at a hearing. Instead, it provides EOIR with a critical tool to help address a massive asylum backlog by eliminating unnecessary hearings where the asylum request is legally deficient. 85 Fed. Reg. at 80,307-08.

Contrary to Plaintiffs' motion, the Rule does not violate the INA. Mot. 12. The INA requires that an IJ "conduct proceedings for deciding the inadmissibility or deportability of an alien." 8 U.S.C. § 1229a(a)(1). The term does not define the nature of "proceedings," nor does it require an evidentiary hearing when the claim is legally deficient. Under existing rules, evidentiary hearings are held to resolve "factual issues in dispute" regarding the alien's removability and/or eligibility for relief or protection. 8 C.F.R. §§ 1240.10(d) & 1240.11(c)(3).  A decision to pretermit and deny an application would eliminate the need to hold an evidentiary hearing on that application. In other words, if the facts asserted in the application are insufficient to establish eligibility, even when accepted as true, there is simply no need to hold an evidentiary hearing to test the veracity of those assertions. On the other hand, the new Rule does not alter existing rules or practice with respect to other issues in a removal hearing—the decision to pretermit a legally deficient asylum application has no impact on the need to hold an evidentiary hearing when removability is contested or when some other form of relief is at issue.

Plaintiffs' concerns that the Rule will unfairly impact pro se litigants by providing only an inadequate "ten-day response period" in which to "to defend their prima facie eligibility ... with no description of the deficiencies in their applications," Mot. 13, are also misplaced and cannot fairly be judged in a vacuum of this facial challenge rather than in practice in individual cases. First, if the ten-day response period is inadequate, the alien is free to seek an extension. Second, procedures require that the pro se litigant would receive adequate notice of the proposed basis for pretermission before a response was required. *See* 85 Fed. Reg. at 80,397. *See Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002) (IJ should explain "what [an alien] must prove to establish his basis for relief").

Finally, Plaintiffs' attacks on the Departments' comparison of the pretermission provision to a motion for summary judgment are unavailing. As we have explained, the procedure is similar to resolving a case without an evidentiary hearing, which is common federal courts (even in cases involving pro se litigants) and essential to effective docket management. The Departments do not need to show that the procedure works just like the federal rules in every respect as Plaintiffs propose. Instead, it was enough for the Departments to explain the value of a procedure that

allowed asylum applications to be resolved, when they are "legally deficient," without an evidentiary hearing.

Frivolousness. Finally, Plaintiffs utterly fail to demonstrate that the Rule's new definition of "frivolousness" is contrary to the INA. Mot. 14-15. The Rule simply revises the Departments' definition of the undefined statutory term "frivolous" at 8 U.S.C. § 1158(d)(6), which permanently bars an alien from any benefits under the INA if he "has knowingly made a frivolous application for asylum." 85 Fed. Reg. at 80,389, 80,398-99. Under the Rule's definition, an application is frivolous if it "[c]ontains a fabricated material element," "[i]s premised upon false or fabricated evidence," "[i]s filed without regard to the merits of the claim," or "[i]s clearly foreclosed by applicable law." 85 Fed. Reg. at 80,389, 80,398. The Rule also provides the procedures for making such a finding. None of this is contrary to the statute.

Plaintiffs urge this Court to find the provision unlawful merely because more frivolousness findings might be made under the new regulations, *see* Mot. 14-15, but that is insufficient to demonstrate that the Rule is contrary to law. As Plaintiffs acknowledge, Mot. 14, Congress left the term "frivolous" undefined, meaning the agency is lawfully permitted to interpret the term through rulemaking, including by changing the framework for making frivolous determinations. 8 U.S.C. § 1158(d)(6) (enacted in 1996); *see Chevron*, 467 U.S. at 843-44; *see also* Violent Crime Control and Law Enforcement Act of 1994, 103 Pub. L. 322, 108 Stat. 1796, at 18 U.S.C. § 75 (urging "comprehensive revision of our asylum law and procedures" to remedy "abuse … by fraudulent applicants[,]" which has "perverted" the system). And as explained above, the INA does not require an evidentiary hearing prior to such a finding, contrary to Plaintiffs' arguments. Mot. 15.

Plaintiffs claim the Departments provided "no reasoned basis" for amending the framework, Mot. 15, but that is also incorrect. As the Departments explained, the new framework will more efficiently deny asylum applications that are "clearly unfounded, abusive, or [that] involve fraud" and discourage the filing of such applications, leading to quicker adjudication of meritorious asylum claims. 85 Fed. Reg. at 80,279. Plaintiffs' concern, Mot. 15, that attorneys and pro se applicants will be confused about whether a claim is "clearly foreclosed by applicable law[,]" 85 Fed. Reg. at 80,389, 80,398-99, overlooks that a frivolous finding requires the

1   *applicant's* knowledge that the claim is foreclosed. *See id.* And although Plaintiffs assert that those

2   with frivolous findings might be returned to persecution, Mot. 15, that is unlikely when the asylum

3   request is frivolous, and does not preclude withholding of removal or CAT protection, per the

4   United States' domestic implementation of international *nonrefoulement* obligations. 85 Fed. Reg.

5   at 80,389, 80,398-99.

6   **D. The Rule Is Procedurally Valid.**

7   <u>Length of Comment Period</u>. Plaintiffs argue that the Rule was adopted without sufficient

8   opportunity for public comment. Mot. 16-17. But the APA has no minimum-length requirement

9   for notice and comment. Title 5 U.S.C. § 553 sets forth the procedures for informal rulemaking:

10   the agency must provide notice of the proposed rulemaking and "give interested persons an

11   opportunity to participate ... through submission of written data, views, or arguments." The APA

12   "mandates no minimum comment period." *Riverbend Farms, Inc. v. Madigan*, 958 F.2d 1479,

13   1484 (9th Cir. 1992). Some "opportunity to participate is all that the APA requires," *Phillips*

14   *Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986); *see Riverbend Farms*, 958 F.2d at 1484

15   (noting with approval the "usual[]" practice to allow "thirty days or more" for comment).[5] Thus,

16   the time for comment is left to an agency's reasonable discretion. *See, e.g.*, *Vt. Yankee Nucl. Power*

17   *Corp. v. NRDC*, 435 U.S. 519, 543 (1978). And it is clear that the 30-day period provided here

18   gave the public sufficient opportunity to comment, given that the Departments received more than

19   87,000 comments. *See* 85 Fed. Reg. at 80,284; 5 U.S.C. § 553; *Riverbend Farms*, 958 F.2d at 1484.

20   Even if a longer comment period were required, there was no prejudice to Plaintiffs. *See* 5

21   U.S.C. § 706. "[T]he burden of showing that an error is harmful normally falls upon the party

22   attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)). A failure

23   to afford adequate opportunity for comment is harmless "where the agency's mistake clearly had

24   no bearing on the procedure used or the substance of decision reached." *City of Sausalito v.*

25   *O'Neill*, 386 F.3d 1186, 1220 (9th Cir. 2004). Here, three of the four Plaintiffs, and three of the

26
27
28
[5] Plaintiffs' reliance on Executive Order Nos. 12866 and 13563 is misplaced. Mot. 16. Those orders are "intended only to improve the internal management of the Federal Government and do[] not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States." EO 12866, § 10; see EO 13563, § 7(d).

four organizations representing Plaintiffs, submitted comments during the 30-day period, so no prejudice can be shown. [6] Plaintiffs nevertheless complain that the Departments "created [problems] for commenters by engaging in staggered rulemaking" because another rule was proposed and finalized after the comment period closed on this Rule. Mot. 16 & n.35. Plaintiffs appear to claim that they were unable to comment on that other rule during the comment period for this Rule. *Id.* But any complaint about Plaintiffs' alleged inability to comment about the impact of that rule on this Rule could have been made during the comment period for that rule because the NPRM for this Rule had already been published and the Plaintiffs knew about it.

Major Rule. The Rule's effective date also does not violate the Congressional Review Act (CRA) as Plaintiffs assert. Mot. 17. Section 801(a)(3) requires a "major rule"—that is a rule that would have "an annual effect on the economy of $100,000,000 or more"—to take effect no fewer than 60 days after publication. 5 U.S.C. § 804(2). Plaintiffs' claim is not viable because under 5 U.S.C. § 805, "[n]o determination, finding, action, or omission under this chapter shall be subject to judicial review." *See e.g.*, *Wash. All. of Tech. Workers v. U.S. DHS*, 892 F.3d 332, 346 (D.C. Cir. 2018) (dismissing claim alleging that agency improperly published a rule prior to the passage of the CRA's "mandatory 60-day delay" for major rules).

Regulatory Flexibility Act (RFA). Plaintiffs also contend erroneously that the Rule violates the RFA, because it did not analyze the Rule's impact on "small entities." Mot. 17-18. Plaintiffs lack a cause of action to enforce the RFA, 5 U.S.C. § 604, because they are not "small entities" that are "directly regulated by" the Rule and, thus, they "do not have an injury contemplated within the zone of interest of the RFA." *US Citrus Science Council v. USDA*, 312 F. Supp. 3d 884, 912 (E.D. Cal. 2018); *see Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) (RFA concerns only a rule's effect on small entities that are directly regulated by the rule and does

---

[6] *See* https://www.regulations.gov/document?D=EOIR-2020-0003-6130 (Pangea Legal Services); https://www.regulations.gov/document?D=EOIR-2020-0003-80591 (Dolores Street Community Services); https://www.regulations.gov/document?D=EOIR-2020-0003-4754 (Catholic Legal Immigration Network); https://www.regulations.gov/document?D=EOIR-2020-0003-6004 (Center for Gender & Refugee Studies); https://www.regulations.gov/document?D=EOIR-2020-0003-74314 and https://www.regulations.gov/document?D=EOIR-2020-0003-74567 (Harvard Immigration and Refugee Clinical Program); https://www.regulations.gov/document?D=EOIR-2020-0003-80522 (ACLU Foundations of California).

not require an agency to consider downstream economic effects). The Rule explains that it would not regulate "small entities" as that term is defined in 5 U.S.C. § 601(6) because "[t]he rule applies to asylum applicants, who are individuals, not entities." 85 Fed. Reg. at 80,378. Plaintiffs thus lack any RFA claim, but any claim would fail on the merits. "The RFA imposes no substantive requirements on an agency; rather its requirements are 'purely procedural' in nature." *Ranchers Cattlemen Action Legal Fund v. USDA*, 415 F.3d 1078, 1101 (9th Cir. 2005) (quoting *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001)). "To satisfy the RFA, an agency must only demonstrate a 'reasonable, good-faith effort' to fulfill its requirements." *Id.* Plaintiffs identify no basis to dispute that Defendants made such a "reasonable, good-faith effort" with this Rule: Defendants "certif[ied] that the proposed rule will not have a 'significant economic impact on a substantial number of small entities' and provid[ed] a factual basis for that certification." *Envtl. Def. Ctr. v. EPA*, 344 F.3d 832, 878 (9th Cir. 2003) (quoting 5 U.S.C. § 605); *see* 85 Fed. Reg. at 80,383.

## II.   Considerations of Irreparable Harm and the Equities Favor the Government.

A TRO would irreparably harm the United States and the public. Efficient administration of the immigration laws at the border is always in the public interest, *see Landon v. Plasencia*, 459 U.S. 21, 34 (1982), as is consistency in adjudications of benefits and protection claims. The Executive Branch issued the Rule after notice and comment to implement critical procedural reforms to the system for seeking asylum and related protections in this country with the goal of providing those benefits and protections to those with meritorious applications more quickly, 85 Fed. Reg. at 80,279, 80,286, 80,293, 80,295, 80,307, 80,309, 80,314, 80,317, 80,325, 80,329, 80,331, 80,337, 80,349, 80,361, 80,370-72, and to provide much needed guidance defining notoriously ambiguous and inconsistently applied statutory terms and providing definitions based on the INA's plain language, *see, e.g.*, *id.* at 80,280-81, 80,283, 80,284. An injunction preventing these reforms from going into effect would irreparably harm the government and public. Against this, Plaintiffs fail to show any "immediate threatened injury." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). They do not identify a single alien who would be affected by the Rule. Mot. 18-20. Plaintiffs are organizations, and the only harms they allege to

themselves are speculations about funding and the need of familiarizing themselves with new law. *See* Mot. 18-20; Compl. ¶¶ 346-53. But those harms do not support standing, let alone irreparable injury that outweighs the substantial public interest in the Rule. *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended ... are not enough."). Even if credited, those inconveniences do not outweigh the harm imposed by undermining the "efficient administration of the immigration laws." *Innovation Law Lab v. McAleenan*, 924 F.3d 503, 510 (9th Cir. 2019) (internal quotation omitted).

**III. Any Relief Must Be Sharply Limited.**

Even if this Court were to grant relief, universal relief would be inappropriate, and any relief must be tailored to the specific claims made and the organizational Plaintiffs here. Additionally, the Court should not rely on the FVRA as a basis to enjoin the Rule.

First, any TRO must be narrowly tailored to portions of the Rule, if any, actually ruled unlawful. Plaintiffs fault only parts of the Rule, and so even if the Court were to hold those parts unlawful, that is no basis to enjoin the parts of the Rule that remain unchallenged. The Rule revises numerous provisions, altering the procedures for reviewing claims of fear at the border, clarifying procedures for IJs, defining ambiguous statutory terms, and providing guidance on issues relating to multiple elements of asylum, withholding of removal, and CAT protection. And Plaintiffs fail to identify a single individual who will imminently be subject to the Rule. That is important, because the provisions of the Rule require assessment of specific facts in the concrete circumstances in an alien's credible fear, affirmative asylum, or removal proceedings. Plaintiffs nevertheless demand that this Court enjoin the Rule as to every alien that may have the Rule applied to them. Relief to such aliens should come, if at all, in an individual alien's removal proceedings, 8 U.S.C. §§ 1229a(b)(4)(A)-(B), (c)(1)(A), (c)(4)(B), and in later petitions for review in the federal courts of appeals, 8 U.S.C. § 1252(a)(5), (b)(9); *see J.E.F.M. v. Lynch*, 837 F.3d 1026, 1032-38 (9th Cir. 2016) ("*any* issue—whether legal or factual—arising from *any* removal-related activity can be reviewed only through the [petition-for-review] process").

The Court also should not enjoin any aspects of the Rule revising the credible fear process. The credible fear screening process is part of the expedited removal procedure set forth at 8 U.S.C.

§ 1225(b). The INA's comprehensive judicial review scheme channels challenges to the implementation of that statute, providing that judicial review of regulations implementing section 1225(b) "is available in an action instituted in the United States District Court for the District of Columbia." 8 U.S.C. § 1252(e)(3)(A); *see Singh v. Barr*, 982 F.3d 778, 782 (9th Cir. 2020); *Garcia de Rincon v. DHS*, 539 F.3d 1133, 1141 n.5 (9th Cir. 2009). Accordingly, the Court cannot reach those issues or set aside those parts of the Rule. *Cf. East Bay III*, 950 F.3d at 1269-70 (holding that section 1252(e)(3) did not bar suit where the rule challenged implemented the asylum statute and not the expedited removal statute or credible fear process directly).

Second, under Article III, "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). And the rule in equity is that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Here, any relief must be tailored to remedying Plaintiffs' alleged resource-allocation harms. *See L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011); *accord, e.g.*, *Nat'l Ass'n of Mfrs. v. DHS*, — F. Supp. 3d —, 2020 WL 5847503, at *15 (N.D. Cal. Oct. 1, 2020) (holding that in organizational-standing case, preliminary relief properly limited to the organizations or their members). Indeed, the Ninth Circuit has repeatedly narrowed nationwide injunctions involving organizations even when the challenges to statutes were facial because "all injunctions—even ones involving national policies—must be narrowly tailored to remedy the specific harm shown." *East Bay II*, 934 F.3d at 1029; *see California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018); *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018). Notably, Plaintiffs do not argue that nationwide relief is necessary to remedy their harms. *See* Mot.

Third, the APA does not require injunctive relief. The APA provides only that a court may "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). Nothing in § 706(2)'s text specifies whether challenged agency action should be set aside on its face or as applied to the plaintiffs. In the absence of a clear statement in the APA that it displaces traditional equity rules, the Court should adopt the narrower view, particularly given the preliminary posture of this case. *See Va. Soc'y for Human Life v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001) ("Nothing in the language

of the APA ... requires us to exercise such far-reaching power."). Indeed, the Ninth Circuit has repeatedly rejected Plaintiffs' view that universal relief follows automatically in an APA case, including immigration cases. *See Azar*, 911 F.3d at 584 (narrowing nationwide preliminary injunction in APA case to apply "only to the plaintiff[s]" as that would "provide complete relief to them"); *East Bay II*, 934 F.3d at 1029 (similar); *City & Cty. of San Francisco*, 897 F.3d at 1244 (similar). Here, a TRO running to the organizations and their bona fide clients, and only as to parts of the Rule the Court finds unlawful, would provide "complete relief." *Azar*, 911 F.3d at 584.

Finally, the rule should not be preliminarily enjoined based on the DHS appointment issue. As Plaintiffs and several courts have stated, the DHS order of succession issue is complex, and it is not equitable to preliminarily enjoin a major rulemaking and disrupt the status quo based upon what, at most, is a purported drafting error made in a succession document in April 2019. That reasoning would effectively hamstring a critical federal national security agency for a period going back over a year (and in spite of good faith efforts to resolve it by the official who would be in charge under Plaintiffs' erroneous theory), which Congress could not have intended in the various vacancy and succession provisions. Instead, recognizing the critical and time sensitive functions being performed by DHS, Congress gave that agency more flexibility to operate during vacancies in excepting it from FVRA requirements, not less. The balance of equities tips sharply against undermining a substantial federal regulatory effort and a cabinet department's operations on this basis, especially when balanced against the miniscule harm alleged by the plaintiff. Further, even if this Court credits the appointment argument, that does not undermine or impact the rule issued by the Attorney General. Instead, because the "determination ... by the Attorney General with respect to all questions of law shall be controlling" under the INA, the Attorney General's rules that set forth the substantive asylum provisions control irrespective of the validity of the DHS rule. 8 U.S.C. § 1103(a)(1).

## CONCLUSION

The Court should deny the motion. Should the Court issue an injunction, the Court should stay it to permit the government to seek emergency relief from the Ninth Circuit.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel

DAVID M. McCONNELL
Director

PAPU SANDHU
Assistant Director

By: /s/ *Christina P. Greer*
CHRISTINA P. GREER
Senior Litigation Counsel
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 598-8770
Email: Christina.P.Greer@usdoj.gov

Dated: December 31, 2020                 *Attorneys for Defendants*