UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PANGEA LEGAL SERVICES, et al., <br>     Plaintiffs, <br> v. <br> U.S. DEPARTMENT OF HOMELAND SECURITY, et al., <br>     Defendants. | Case No. 20-cv-09253-JD <br><br> **ORDER RE PRELIMINARY INJUNCTION** <br><br> Re: Dkt. No. 27 |
| IMMIGRATION EQUALITY, et al., <br>     Plaintiffs, <br> v. <br> U.S. DEPARTMENT OF HOMELAND SECURITY, et al., <br>     Defendants. | Case No. 20-cv-09258-JD <br><br> Re: Dkt. No. 13 |

In these two related actions, plaintiff immigration and asylum services organizations sue to block the implementation of a final rule that was issued last month by the Department of Homeland Security (DHS) and the Department of Justice (DOJ). The rule, titled *Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 80274, 8 C.F.R. parts 208, 235, 1003, 1208, 1235 (Dec. 11, 2020) (Rule), would make sweeping changes to the United States' asylum system and is scheduled to go into effect on January 11, 2021. Plaintiffs have moved for a preliminary injunction to suspend the operation of the rule pending further proceedings. *Pangea* Dkt. No. 27, *Immigration Equality* Dkt. No. 13.[1] An injunction is granted.

---

[1] The Court will specify the case name for the ECF docket cites as needed for clarity.

## BACKGROUND

The United States asylum system has a long and complicated history, and an enormous body of statutory and case law. A few main components bear highlighting here by way of background. Section 208 of the Immigration and Nationality Act (INA), 8 U.S.C. § 1158, makes asylum available to any alien who is determined to be a "refugee" by the Secretary of Homeland Security or the Attorney General, regardless of the alien's immigration status. *See* 8 U.S.C. § 1158(a)(1), (b)(1)(A). A "refugee" generally includes anyone who cannot return to their home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," 8 U.S.C. § 1101(a)(42), and once granted asylum, an alien may avoid removal, seek employment, and travel from and return to the United States. *See* 8 U.S.C. § 1158(c)(1). Section 241(b)(3) of the INA, 8 U.S.C. § 1231(b)(3), provides for withholding of an alien's removal from the United States to a country where "the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." The United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), *opened for signature* Dec. 10, 1984, 1465 U.N.T.S. 85, to which the United States is a signatory, provides that no treaty party "shall expel, return ('refouler') or extradite a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." 1464 U.N.T.S. at 114. The Secretary of Homeland Security and the Attorney General have general regulatory authority over asylum-related practices. *See, e.g.*, 8 U.S.C. §§ 1103(a)(1), (a)(3), (g), 1158(d)(1), 1231(b)(3)(A).

On June 15, 2020, the DHS and the DOJ (through its Executive Office of Immigration Review (EOIR)) published a notice of proposed rulemaking for the Rule. *See Procedures for Asylum and Withholding of Removal; Credible Fear and Reasonable Fear Review*, 85 Fed. Reg. 36264-01 (June 15, 2020) (NPRM). The NPRM was 43 pages long in the Federal Register's format of three columns per page. The stated goals of the NPRM were to adopt "streamlined proceedings" for adjudicating applications for asylum, withholding of removal, and CAT protection, and "to specify what standard of review applies in such streamlined proceedings."

NPRM at 36264. To those ends, the NPRM proposed a broad revision of current asylum practices in favor of "expedited" proceedings, which would entail a massive reworking of DHS's and DOJ's existing asylum regulations. Despite the breadth and scope of this undertaking, the NPRM provided just 30 days for public comments. *See id.* ("comments on the notice of proposed rulemaking must be submitted on or before July 15, 2020"). The government did not say in the rulemaking process why such a truncated comment period was warranted, and counsel for the government at the injunction hearing could not provide one. Even so, over 87,000 comments were submitted, and they overwhelmingly opposed the proposed rule, often with detailed reasoning and analysis. *See* Rule at 80284. These included 311 comments from "non-government organizations, legal advocacy groups, non-profit organizations, religious organizations, unions, congressional committees, and groups of members of Congress." *Id.*

The tidal wave of responses barely made an impact on the government. The final Rule published on December 11, 2020, was "substantially the same as the NPRM." Rule at 80274, 80276. The Rule significantly expands the circumstances under which an alien may be barred from asylum because he or she spent significant time in a third country before arriving in the United States, and effectively establishes a presumption against asylum claims that are rooted in gender-based persecution, among other changes. *Id.* at 80281-82. It also broadens the definition of a "frivolous" application to include applications "foreclosed by applicable law," as well as the circumstances under which an alien may be found to have "knowingly" filed a frivolous application, which then makes the alien permanently ineligible for asylum. *Id.* at 80279 (citing 8 U.S.C. § 1158(d)(6)). Additionally, the Rule creates a new "pretermission" procedure under which an immigration law judge (ILJ) may reject an asylum application without a hearing if the ILJ determines that the applicant has failed to make a "prima facie case" for relief under existing regulations or other law, either *sua sponte* or in response to a motion by the DHS. *Id.* at 80280.

The Rule was signed by Attorney General William P. Barr and Chad R. Mizelle, the "Senior Official Performing the Duties of the General Counsel" for DHS. *Id.* at 80401. The Rule states that Chad F. Wolf, as the Acting Secretary of Homeland Security, "reviewed and approved"

3

both the proposed rule and the final Rule, and "delegated" his signature authority to Mizelle. *Id.* at 80381, 80385. The Rule is scheduled to be implemented on January 11, 2020. *Id.* at 80274.

On December 21, 2020, ten days after the final Rule was published, plaintiffs sued to set it aside. *Pangea* Dkt. No. 1; *Immigration Equality* Dkt. No. 1. As alleged in the complaints, plaintiffs in the *Pangea* action are organizations that provide legal and other services to asylum seekers and immigrant communities. The *Immigration Equality* plaintiffs are organizations that provide services to lesbian, gay, bisexual, transgender, queer, and HIV-positive refugees. Both complaints allege that the Rule should be invalidated because Wolf was not a lawful Acting Secretary of Homeland Security with authority to sign off on the rulemaking, and that the Rule's many changes to the asylum system are arbitrary, capricious, unlawful, and procedurally improper under the Administrative Procedure Act (APA), 5 U.S.C. § 701 *et seq.*

On December 22 and 23, 2020, both plaintiff groups filed applications for a temporary restraining order and preliminary injunction enjoining the Rule from going into effect on January 11, 2021. *Pangea* Dkt. No. 27; *Immigration Equality* Dkt. No. 13. In light of the circumstances, the Court ordered an accelerated briefing and hearing schedule, and the government opposed both motions on December 31, 2020. *Pangea* Dkt. Nos. 29, 48; *Immigration Equality* Dkt. Nos. 16, 20 37.[2] Plaintiffs filed replies on January 5, 2021, *Pangea* Dkt. No. 64; *Immigration Equality* Dkt. No. 52, and oral argument on the applications was heard by videoconference on January 7, 2021, *Pangea* Dkt. No. 65; *Immigration Equality* Dkt. No. 54.

## DISCUSSION

### I.   LEGAL STANDARDS

Plaintiffs' applications seek a temporary restraining order and a preliminary injunction. Where, as here, notice has been given to the adverse party, the legal standard is the same for both types of relief. *See Fang v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 16-cv-06071-JD, 2016 WL 9275454, at *1 (N.D. Cal. Nov. 10, 2016), *aff'd*, 694 F. App'x 561 (9th Cir. 2017)

---

[2] Several former immigration law judges and law professors, advocacy organizations, the City of Los Angeles, the State of California, and a group of several states as well as the District of Columbia, have asked to file amicus briefs. *See Pangea* Dkt. Nos. 33, 39, 41, 47, 50; *Immigration Equality* Dkt. Nos. 23, 30, 35, 36, 39. These unopposed requests are granted.

4

(citation omitted). Not only did the government receive notice, it filed two separate oppositions to the plaintiffs' motions and it fully participated in oral argument at the motion hearing held on January 7, 2021. The Court consequently focuses on plaintiffs' requests for a preliminary injunction. *See* Fed. R. Civ. P. 65(a)(1) (court may issue a preliminary injunction "on notice to the adverse party").

As the Supreme Court has emphasized, injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (quoting *Winter*, 555 U.S. at 20). Alternatively, a preliminary injunction may issue where "serious questions going to the merits were raised and the balance of hardships tips sharply in plaintiff's favor," if the plaintiff "also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* at 1135. This reflects our circuit's "sliding scale" approach, in which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another." *Id.* at 1131; *see also Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014). In all cases, at an "irreducible minimum," the party seeking an injunction "must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105-06 (9th Cir. 2012) (internal quotation and citation omitted); *see also Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) ("The first factor under *Winter* is the most important -- likely success on the merits.").

## II. INJUNCTION FACTORS ANALYSIS

### A. Likelihood of Success on the Merits

The *Pangea* plaintiffs and the *Immigration Equality* plaintiffs lead with the argument that the Rule should be set aside because Wolf, who approved the Rule as Acting Secretary of Homeland Security, did not have valid authority to act in that capacity. *Pangea* Dkt. No. 27 at 5-6; *Immigration Equality* Dkt. No. 13-1 at 8-17. The question arises because Kirstjen Nielsen was

the last Secretary of Homeland Security to have been nominated by the President and confirmed by the Senate, and she resigned effective April 10, 2019.  *See* U.S. Const., art. II, § 2, cl. 2 (requiring cabinet secretaries to be nominated by the President and confirmed by the Senate); 6 U.S.C. § 112(a)(1) (applying Appointments Clause requirement to Secretary of Homeland Security position); *Pangea* Dkt. No. 1 ¶ 310 (Secretary Nielsen's resignation was effective on April 10, 2019).  A new Secretary has not been confirmed since then.  Instead, following Secretary Nielsen's departure, an assortment of individuals have served in the ostensible capacity of Acting Secretary by designation.  Kevin McAleenan, who had been the Customs and Border Protection (CBP) Commissioner, was initially called the Acting Secretary of Homeland Security, after an announcement by President Trump on Twitter.  *See Pangea* Dkt. No. 1 ¶ 310; *Immigration Equality* Dkt. No. 1 ¶ 293.  Wolf, the ostensible current Acting Secretary, claimed the position in November 2019 under a succession plan implemented by McAleenan, which designated the "Under Secretary for Strategy, Policy, and Plans" (at the time, Wolf) as next in line for Acting Secretary after McAleenan resigned.  *See Pangea* Dkt. No. 1 ¶ 311; *Immigration Equality* Dkt. No. 1 ¶¶ 297-98.

Wolf has not spent his time idly at DHS.  During his relatively brief tenure, he has attempted to suspend the Deferred Action for Childhood Arrivals (DACA) program, and impose administrative fees for immigration services and eliminate fee waivers, among other actions.  These efforts resulted in several lawsuits in federal courts across the United States, each of which challenged Wolf's rulemaking authority on the same grounds presented by plaintiffs here.  In all of these cases, the district courts have concluded that Wolf was not a duly authorized Acting Secretary, and that his actions were a legal nullity.  *See Batalla Vidal v. Wolf*, No. 16-CV-4756 (NGG) (VMS), 2020 WL 6695076, at *9 (E.D.N.Y. Nov. 14, 2020); *Nw. Immigrant Rights Project v. United States Citizenship & Immigration Servs.*, No. CV 19-3283 (RDM), 2020 WL 5995206, at *24 (D.D.C. Oct. 8, 2020); *Immigrant Legal Res. Ctr. v. Wolf*, No. 20-CV-05883-

6

JSW, 2020 WL 5798269, at *7 (N.D. Cal. Sept. 29, 2020); *Casa de Maryland, Inc. v. Chad F. Wolf*, Case No. 8:20-cv-02118-PX, 2020 WL 5500165, at *23 (D. Md. Sept. 11, 2020).[3]

        This Court is now the fifth federal court to be asked to plow the same ground about Wolf's authority *vel non* to change the immigration regulations. If the government had proffered new facts or law with respect to that question, or a hitherto unconsidered argument, this might have been a worthwhile exercise. It did not. The government has recycled exactly the same legal and factual claims made in the prior cases, as if they had not been soundly rejected in well-reasoned opinions by several courts. The government initially appealed two of these decisions, both of which it later voluntarily dismissed, and appears to have only one appeal pending. In the main, the government contents itself simply with saying the prior courts were wrong, with scant explanation. *See, e.g., Pangea* Dkt. No. 48 at ECF p. 11 ("the various courts that have embraced this argument are mistaken"); *Immigration Equality* Dkt. No. 37 at 14 (same).

        This is a troubling litigation strategy. In effect, the government keeps crashing the same car into a gate, hoping that someday it might break through. To be sure, one court decision alone does not necessarily close the door to any further cases or arguments along similar lines. Our common law system contemplates that more than one judicial examination of facts and issues is often merited. But our system has no room for relitigating the same facts and law in successive district court cases *ad infinitum*. That is what the government is doing here. The Court took pains at oral argument to discuss this with counsel for the government, and specifically asked how their arguments here are in any way different from the ones made and rejected in the preceding cases.[4] Counsel responded mainly with a disparaging comment to the effect that the other district courts had shirked from working their way through the record. That is untrue. Each of the prior decisions conducted a painstaking analysis of the facts with respect to the Acting Secretary

---

[3] The Government Accountability Office (GAO) has also found that Wolf's appointment was invalid under the Homeland Security Act. *See Matter of Dep't of Homeland Security*, Gov't Accountability Office (Aug. 14, 2020), https://www.gao.gov/assets/710/708830.pdf, at 2.

[4] Attorney August Flentje at DOJ handled this portion of the government's argument at the hearing.

1    position at DHS, with full attention to the unprecedented efforts to validate Wolf's claim to the
2    job, irrespective of governing law and procedures.

3        A good argument might be made that, at this point in time, the government's arguments
4    lack a good-faith basis in law or fact. But the Court need not reach that conclusion to reject those
5    arguments yet again. The Court's independent review of the record indicates that *Batalla Vidal*,
6    2020 WL 6695076, which is the latest decision before this order, correctly identified and analyzed
7    the salient points vitiating Wolf's claim of rulemaking authority, and the Court agrees with it in
8    full.

9        The parties' familiarity with the prior decisions and record here is assumed. In pertinent
10   summary, the government relies on two statutes to demonstrate that Wolf had lawful authority as
11   Acting Secretary: the Homeland Security Act (HSA), 6 U.S.C. § 101 *et seq.*, and the Federal
12   Vacancies Reform Act (FVRA), 5 U.S.C. § 3345 *et seq.* To a certain extent, that spots the
13   government more credit than the record indicates is due. DHS has relied mainly on the HSA to
14   justify Wolf's authority, and resorted to the FVRA as a back-up theory after the HSA argument
15   was turned aside by the court decisions and the Government Accountability Office. As
16   determined in the prior decisions, Secretary Nielsen's April 2019 order was unambiguous. *See*
17   *Immigration Equality* Dkt. No. 37-2, Exh. 1 (Revision 08.5 to DHS Delegation 00106 (Nielsen
18   Order)). That order changed only Annex A, which was the order of succession to be used to
19   determine who would perform the duties of Secretary in the event of a disaster or emergency that
20   left the Secretary unable to act. It did not address what should happen in the event of resignations
21   or other vacancies, which continued to be governed by Executive Order (EO) 13753, 81 Fed. Reg.
22   90667 (Dec. 9, 2016), the operation of which should have resulted in Christopher Krebs, the
23   Director of Cyber Security and Infrastructure Security, assuming head DHS authority after
24   Secretary Nielsen's departure. The government makes no argument that there was a delegation of
25   that authority from Krebs to Wolf, nor could it since Krebs was never said to hold the Acting
26   Secretary position.

27       What this means is that the chain of succession the government invokes -- from Nielsen to
28   McAleenan to Wolf -- does not hold together. The plain language of the Nielsen Order did not

1  designate the CBP Commissioner, McAleenan, as the next person to take on the duties of DHS
2  Secretary. To the contrary, it left intact a previously established succession order that should have
3  put Krebs in charge. But it was McAleenan, and not Krebs, who purported to act as DHS Acting
4  Secretary, and then in that capacity issued his own order purporting to change the order of
5  succession so that the role would next pass on to Wolf, as the Under Secretary for Strategy,
6  Policy, and Plans. Because the passing of the torch from Nielsen to McAleenan was ineffective,
7  the attempt by McAleenan to pass it in turn to Wolf had no legal effect whatsoever. The entire
8  succession argument under the HSA consequently falls apart.

9  The government's "alternative" hypothesis under the FVRA is equally unviable.
Repeating a back-up theory it tendered in the prior cases, the government says that the McAleenan situation can be ignored because FEMA administrator Peter Gaynor was properly in office as DHS Acting Secretary under the FVRA and EO13753. Gaynor was thereby authorized to change the order of succession in Wolf's favor, which he purported to do. This is said to have allowed Wolf to "cure" any dispute about his authority to promulgate the notice of rulemaking in June 2020 by retroactively ratifying it. *See Pangea* Dkt. No. 48 at ECF pp. 12-13; *Immigration Equality* Dkt. No. 37 at 22-23; Rule at 80381-82.

But counsel for the government abandoned this theory at the hearing. In response to a direct question by the Court, counsel stated that Gaynor "never" was the Acting Secretary of Homeland Security. Hr. Tr. at 16:13-24.[5] The FVRA says that an Acting Secretary is someone whose role is to "perform the functions and duties" of the vacant office. *See*, *e.g.*, 5 U.S.C. §§ 3345(a), 3348(b). Because Gaynor was never the Acting Secretary, he did not have authority under the FVRA or EO 13753 to change the order of succession at DHS. It follows that Gaynor could not have designated Wolf to be Acting Secretary, and that Wolf's effort to ratify his June 2020 actions as Acting Secretary is of no moment legally.

---

[5] A "rough" transcript of the hearing has been made available to the Court, with a final transcript to follow.

Consequently, plaintiffs have demonstrated a likelihood of success in establishing that the proposed rulemaking was done without authority of law. APA, 5 U.S.C. § 706(2). This is enough to warrant preliminary relief at this stage of the case.

The fact that Attorney General Barr also signed off on the rulemaking on behalf of the DOJ does not change this conclusion. The government does not seriously contend so, and the Rule itself states that "officials in both DHS and DOJ make determinations involving the same provisions of the INA, including those related to asylum," and so coordinated rulemaking is necessary to "ensure consistent application of the immigration laws." Rule at 80286 (noting that "the DHS and DOJ regulations are inextricably intertwined"). The DHS and DOJ regulations are substantively identical in key respects. *See, e.g.*, 8 C.F.R. §§ 208.1(e), 1208.1(e) (defining "persecution"); 8 C.F.R. §§ 208.15, 1208.15 (standards for deciding whether an alien is ineligible for asylum due to being "firmly resettled" in another country). In many instances, DOJ regulations simply direct Immigration Law Judges to review determinations by DHS officials, and cross-reference the DHS standards alongside their DOJ counterparts. *See, e.g.*, 8 C.F.R. § 1003.42(d)(2) (providing for de novo review of asylum officer's determination under 8 C.F.R. part 208 that alien lacks a reasonable fear of persecution or torture). Given this joint departmental regulatory scheme, invalidating the DHS regulations because of Wolf's lack of authority while leaving the DOJ regulations in place would "impair the function" of relevant immigration statutes as a whole, and is not warranted where the DOJ regulations likely would "not have been passed but for" the inclusion of the DHS regulations. *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988). In addition, as the government itself acknowledges, the "Secretary of Homeland Security shall be charged with the administration and enforcement" of the INA, and "all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). While the Attorney General has a role in issuing binding legal opinions in immigration matters, the substantive rulemaking authority resides in DHS.

Because plaintiffs have shown a likelihood that the DHS lacked authority through Wolf for the proposed rulemaking, the Court need not reach the other grounds plaintiffs propose for an

injunction. The arguments on whether the specific proposed revisions to the asylum system are unlawful under the APA will be taken up at a further proceeding as discussed below.

### B. Irreparable Harm

Plaintiffs have also demonstrated a likelihood of irreparable harm in the absence of injunctive relief. Organizations can establish irreparable injury by showing "ongoing harms to their organizational missions," *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013), including the organizational mission of "representing and seeking asylum seekers," *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 854 (9th Cir. 2020) ("*E. Bay Sanctuary Covenant II*"). Plaintiffs provide legal services and other assistance to those seeking asylum and similar protections from persecution or violence in their home countries. They have provided ample evidence that if enacted, the Rule would harm this mission. For example, plaintiffs have identified at-risk clients who might be prevented from attaining asylum status because, under the new provisions in the Rule, they spent too long in a third country before arriving in the United States, or were unable to timely file an application due to extraordinary circumstances. *See, e.g.*, *Immigration Equality* Dkt. No. 13-17 ¶¶ 23, 27. The potential double threat of pretermission and the expanded frivolousness bar -- which prevents future applications -- has also forced plaintiffs to devote significantly more time to developing their clients' cases in the early stages, limiting the number of asylum seekers they can effectively represent. *See, e.g.*, *Pangea* Dkt. No. 27-2 ¶¶ 46-49. While the Court defers a determination on the merits of these features to a subsequent hearing, there is little doubt that their implementation is likely to harm plaintiffs' missions on an ongoing basis.

Additionally, the Ninth Circuit has held that organizations can show irreparable injury by establishing that "they will suffer a significant change in their programs and a concomitant loss of funding absent a preliminary injunction." *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1280 (9th Cir. 2020) ("*E. Bay Sanctuary Covenant I*"). Economic injuries are deemed irreparable in APA cases because plaintiffs are unable to recover money damages. *Id.*; *E. Bay Sanctuary Covenant II*, 964 F.3d at 854. Plaintiffs have made this showing by demonstrating, among other evidence, that their staff have had to devote significant extra work time to retraining and to

11

explaining the Rule's changes to their clients. *See, e.g.*, *Immigration Equality* Dkt. No. 13-20 ¶¶15-17. They also submitted evidence that their "revenue and funding stream" is linked to the number of asylum applications they file, and quite reasonably contend that portions of the Rule making it more difficult to obtain asylum are likely to diminish the number of filings. *See, e.g.*, *id.* ¶¶ 25-26.

## C. Balance of Hardships and the Public Interest

The balance of hardships and the public interest are considered together in this case. *See E. Bay Sanctuary Covenant II*, 964 F.3d at 854 ("When the government is a party, the third and fourth preliminary injunction factors merge.") (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)). There is a strong public interest in ensuring that the laws duly enacted by elected representatives are not undermined by agency actions. *See id.* at 855 (citing *Maryland v. King*, 567 U.S. 1301, 1301 (2012)). There is also a strong public interest in ensuring compliance with the APA, promoting Congressional intent, and protecting asylum-seekers from wrongful removal or death. *See E. Bay Sanctuary Covenant I*, 950 F.3d at 1280-81. All these interests are implicated here. In addition, maintaining the status quo of the asylum regulations as they currently stand pending further proceedings on the merits will serve the important public interest of promoting "a stable immigration system." *Doe #1 v. Trump*, 957 F.3d 1050, 1068 (9th Cir. 2020). Consequently, the balance of hardships and public interest inquiries for injunctive relief weigh in plaintiffs' favor.

## III. REMEDY

Plaintiffs ask that defendants be enjoined from enforcing the Rule on a national basis. Nationwide injunctions must be justified by a specific showing of nationwide impact. *City & Cty. of San Francisco v. Barr*, 965 F.3d 753, 764-65 (9th Cir. 2020). Generally, to avoid being overbroad, an injunction must be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs before the court." *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011). The Ninth Circuit has recognized a "presumption (often unstated) in APA cases that the offending agency action should be set aside in its entirety rather than only in limited geographic areas" or with respect to particular parties. *Innovation Law Lab v.*

12

1    *Wolf*, 951 F.3d 1073, 1094 (9th Cir. 2020) (explaining that an APA violation results not only in

2    granting relief to the particular plaintiffs in an action, but in setting an agency action aside).  A

3    nationwide injunction is particularly appropriate in "cases implicating immigration policy"

4    because of the special need for "uniform relief."  *Id.* at 1094-95.

5          That presumption applies with full force here.  Enjoining enforcement of the Rule in only

6    part of the country or against only particular parties would result in a fragmented and disjointed

7    patchwork of immigration policy.  There is no good reason to conclude that the grounds for an

8    injunction here are meaningfully limited by geography or other factors.  A nationwide injunction

9    is warranted.

## CONCLUSION

11   A preliminary injunction is granted as follows.

12   (1)  Defendants the United States Department of Homeland Security (DHS); Pete Gaynor,

13   in his official capacity, if any, as Acting Secretary of DHS; Chad F. Wolf, in his official capacity,

14   if any, as Acting Secretary of DHS; the United States Department of Justice (DOJ); William P.

15   Barr, in his official capacity as United States Attorney General; Executive Office for Immigration

16   Review (EOIR); James McHenry, in his official capacity as Director of the EOIR; U.S.

17   Citizenship and Immigration Services (USCIS); Kenneth T. Cuccinelli in his official capacity as

18   an Agent of DHS; United States Immigration and Customs Enforcement (ICE); Tony H. Pham, in

19   his official capacity as Senior Official Performing the Duties of the Director of U.S. ICE; United

20   States Customs and Border Protection (CBP); Mark. A. Morgan, in his official capacity as Senior

21   Official Performing the Duties of the Commissioner of U.S. CBP; and defendants' officers,

22   agents, employees, attorneys, and any person acting in concert with them, or at their behest, and

23   who has knowledge of this injunction, are preliminarily enjoined from implementing, enforcing, or

24   applying the rule titled *Procedures for Asylum and Withholding of Removal; Credible Fear and*

25   *Reasonable Fear Review*, 85 Fed. Reg. 80274 (Dec. 11, 2020), or any related policies or

26   procedures, including the Policy Memorandum entitled, *Guidance Regarding New Regulations*

27   *Governing Procedures For Asylum and Withholding of Removal and Credible Fear Reviews*,

28   issued by the Department of Justice on December 11, 2020.

(2) This injunction will remain in place pending further order of the Court.

(3) Plaintiffs are excused from posting a bond under Federal Rule of Civil Procedure 65(c).

As discussed at the hearing, the parties are directed to file a stipulation proposing a date for further argument on the merits. The parties will also promptly advise the Court of any policy change or other development that is likely to materially impact these proceedings.

**IT IS SO ORDERED.**

Dated: January 8, 2021

JAMES DONATO
United States District Judge